**In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.**

**MDL No. 381.**

United States. District Court,
E.D. New York.

Sept. 25, 1984 as Modified.

742

Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill.; Benton Musslewhite, Law Offices of Benton Musslewhite, Inc., Houston, Tex.; Thomas Henderson, Henderson & Goldberg, Pittsburgh, Pa.; Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molligan, San Francisco, Cal.; Stanley Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio; John M. O'Quinn, O'Quinn, Hagans & Wettman, Houston, Tex.; Neil R. Peterson and Gene. Locks, Greitzer & Locks, Philadelphia, Pa.; Newton B. Schwartz, Houston, Tex.; Irving Like, Reilly, Like and Schneider, Babylon, N.Y.; David J. Dean, Dean, Falanga & Rose, Carle Place, N.Y.; Aaron Twerski, Hempstead, N.Y., of counsel, for plaintiffs.

Leonard Rivkin, Rivkin, Leff, Sherman & Radler, Garden City, N.Y.; Philip Pakula, Townley & Updike, New York City; Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, New York City; William Krohley, Kelley, Drye & Warren, New York City; Thomas Beck, Arthur, Dry & Kalish, New York City; Richard Goldstein, Shea & Gould, New York City, of counsel; David M. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, New York City; Henry G. Miller, Clark, Gagliardi & Miller, White Plains, N.Y.; for defendants.

Arvin Maskin, Dept. of Justice, Washington, D.C., for third-party defendant United States.

WEINSTEIN, Chief Judge.

**744**

## TABLE OF CONTENTS

Preface and Summary ............................................................................ 746
Introduction ........................................................................................ 748
I. Procedural History .......................................................................... 750
 A. Jurisdiction ............................................................................ 754
 B. Conflict of Laws ...................................................................... 755
 C. Class Action ........................................................................... 755
 D. Status of Third Party Complaints ............................................ 757
II. Fairness Hearings .......................................................................... 758
 A. Legal Requirements ................................................................ 758
 B. Reaction of Class Members ...................................................... 764
 1. Hearings ........................................................................... 764
 a. Need for Medical Help for Veterans and Financial Help for Those Too Ill to Work ...................................................... 765
 b. Need for Medical and Financial Aid for Children Born with Birth Defects ............................................................. 765
 c. Need for Information on Possible Genetic Damage to Veterans and Their Children ............................................ 766
 d. Dissatisfaction with the Veterans Administration and the Treatment Received in its Hospitals .............................. 766
 e. Inadequacy of the Settlement Amount to Pay Adequate Damages 767
 f. Failure of Chemical Companies to Admit Fault .................. 768
 g. Failure of Government to Admit Fault, Participate in Settlement and Accept its Responsibility for Caring for Veterans and their Children ...................................................... 768
 h. Possibility of a Coverup of Information with Sealed Files and Return of Documents to Defendants .............................. 769
 i. Need for a Full Open Trial to Vindicate the Plaintiffs and Protect Their Rights to Individual Justice .......................... 770
 j. Inability to Decide Whether to Accept Settlement Without Knowing How it Would be Distributed and How Much would be Spent in Attorneys' Fees ...................................................... 771
 k. Inadequate Payment by Defendants Relative to Their Resources 771
 l. Inadequate Time to File Claims .................................. 771
 m. Need to Settle Now to Get on with Life .......................... 771
 n. Need for Further Research and Reassurances ................... 772
 2. Written Communications ...................................................... 773
III. Factual Problems with Claims ......................................................... 775
 A. Use of Agent Orange in Vietnam ............................................. 775
 B. Claimed Effects of Contact with Agent Orange in Vietnam ........ 777
 1. General Considerations ...................................................... 777
 2. Plaintiffs' Evidence of Causality ...................................... 782
 C. Scientific Studies on Causality ............................................. 787
 D. Knowledge of Government and Defendants ................................ 795
IV. Legal Problems with Claims ........................................................... 799
 A. Statutes of Limitations ......................................................... 800
 1. Introduction ..................................................................... 800
 2. Standard Multijurisdictional Approach ................................ 800
 a. CPLR 202 ................................................................... 800
 b. Application of CPLR 202 to Agent Orange Litigation ........ 802
 c. CPLR 214 ................................................................... 804

3. Single Time-bar Period Based Upon Federal or National Consensus Law ............................................................................................ 804
 a. Federal Substantive Law .................................................... 804
 b. National Consensus Law .................................................... 804
4. Single Time-bar Period for Class Actions ............................... 805
 a. General Theory ................................................................ 805
 b. Federal .............................................................................. 806
 c. New York .......................................................................... 808
5. Single Time-bar Period for American Veterans Based Upon Interpretation of New York Statute ........................................................ 810
 a. Constitutionality .............................................................. 811
 b. Construing Provisions to Apply to Nonresidents ............. 813
6. Wives and Children ................................................................... 815
7. Vietnam Veterans Living Abroad ............................................. 816
8. Conclusion on Statutes of Limitations ..................................... 816
B. Failure to Determine Who Was Harmed and Who Caused Harm ........ 816
 1. Facts ........................................................................................... 817
 2. Law ............................................................................................. 819
 a. The Problem of the Indeterminate Defendant ................. 819
 (1) Introduction ............................................................... 819
 (2) Applicable Law .......................................................... 820
 (a) Enterprise Liability ........................................... 820
 (i) Legal Theory ............................................. 820
 (ii) Application of Enterprise Liability Theory to this Case ..................................................... 821
 (b) Alternative Liability and Its Variations ............. 822
 (i) Legal Theory ............................................. 822
 (ii) Application of Alternative Liability to this Case . 826
 (c) Defendants' Individual Duty to Warn the Government of Dangers ............................................... 828
 (i) Duty to Warn of Danger in Their Own Product 828
 (ii) Duty to Warn of Dangers in Another's Product 830
 (d) Summary ........................................................... 833
 b. The Problem of the Indeterminate Plaintiff ................... 833
 (1) Scope of the Problem ................................................. 834
 (2) Preponderance Rule .................................................... 835
 (a) Application of the Preponderance Rule to Mass Exposure Cases .................................................. 836
 (b) Inadequacy of Individualized Solutions ............. 837
 (3) Possible Solution in a Class Action ........................... 837
 (a) Analogy and Precedent ...................................... 839
 (i) Employment Discrimination Cases ........... 839
 (ii) Consumer Class Actions ........................... 840
 (b) Practical Advantages of Class-wide Solution ...... 841
 3. Conclusion as to Indeterminate Defendants and Plaintiffs .......... 842
C. Nature of Liability and Relations to Defense of Government Knowledge 843
 1. Introduction ............................................................................... 843
 2. Defense Production Act ............................................................. 843
 3. Law to be Applied to Government Contract Defense ................ 845
 4. Modification of Government Contract Defense ......................... 847
D. Punitive Damages .......................................................................... 850

746

V. Government Action To Protect Class ---------------------------------- 851
 A. Agent Orange Registry ------------------------------------------- 852
 B. Medical Care to Veterans Claiming Exposure to Agent Orange -------- 853
 C. Aid to Spouses and Children of Veterans ------------------------- 853
 D. Exposure Data ------------------------------------------------- 854
 E. Veterans' Dioxin and Radiation Exposure Compensation Standards Act 854
VI. Conclusion Concerning Fairness of Settlement ----------------------- 857
VII. Plan for Distribution of Fund ------------------------------------- 858
 A. General Principles ---------------------------------------------- 858
 B. National Center for Vietnam Veterans Assistance ----------------- 859
 C. Veterans' Benefits --------------------------------------------- 859
 D. Genetic and Family Counseling ---------------------------------- 860
 E. Children with Birth Defects ------------------------------------- 860
 F. Legislation --------------------------------------------------- 861
 G. Schedule ------------------------------------------------------ 861
 H. Attorneys' Fees and Disbursements ------------------------------ 861
 I. Cases Against the Government ----------------------------------- 861
VIII. Conclusion ------------------------------------------------------- 862
IX. Order ------------------------------------------------------------ 862

APPENDICES

A. Settlement Agreement -------------------------------------------- 862
B. Order for Hearings on Fairness of Settlement plus Attachments ------- 866
C. Published Opinions in Agent Orange Litigation --------------------- 876
D. Letter of Government Refusing to Participate in Negotiations ------- 879
E. Statutes of Limitations in the Relevant Jurisdictions -------------- 879
F. Excerpts From "Protocol For Epidemiologic Studies of the Health of Vietnam Veterans" [Not printed] ----------------------------------

## PREFACE AND SUMMARY

In 1979 a class action was commenced charging the United States government and a major portion of the chemical industry with deaths and dreadful injuries to tens of thousands of Vietnam veterans who came in contact with herbicides used in the war in Southeast Asia. The suit also claimed that as a result of the veterans' exposure, their children suffer severe birth defects. After five years of numerous motions and extensive discovery a tentative settlement was reached on the eve of trial.

The sole question before this court is whether the case against the chemical companies should now be settled. Eleven days of nationwide hearings were conducted to give the class members themselves an opportunity to be heard on the merits of the settlement. After weighing the uncertainties and legal obstacles that would accompany years of protracted litigation were the case to go to trial, the court has concluded that the settlement should be approved.

This approval is subject to reconsideration after further hearings for the reasons indicated below. See the discussion under II, B, 1, j, Inability to Decide Whether to Accept Settlement Without Knowing How it Would be Distributed and How Much Would be Spent in Attorneys' Fees.

The many legal issues are unique and the factual issues unresolved by the scientific communities addressing them. But it is neither fact nor law that makes this decision such a difficult one—rather, it is the deeply charged emotions that surround and engulf the litigation.

In listening to hundreds of witnesses around the country and reading the poignant letters of many veterans, their wives and parents, a repeated refrain makes it clear that more than money is at stake. The veterans feel that out of love of country they went to its aid and fought bravely in a brutal war. In return, they believe, they were sprayed with chemicals that insidiously are destroying them. They were

vilified by their countrymen on their return because the war became unpopular. Their perception is that they are denied proper treatment by the Veterans Administration to the point where many of them shun the VA's medical and other facilities. Their families suffer as they waste away. And, perhaps even more important, they fear that they have been damaged genetically so that many choose to have no children or live in the despair of having sired children with birth defects who may spread this genetic damage to future generations.

Vietnam veterans and their families desperately want this suit to demonstrate how they have been mistreated by the country they love. They want it to give them the respect they have earned. They want it to protect the public against future harm by the government and chemical companies. They want a jury "once-and-for-all" to demonstrate the connection between Agent Orange and the physical, mental and emotional problems from which many of them clearly do suffer.

The court has been deeply moved by its contact with members of the plaintiffs' class from all over the nation and abroad. Many do deserve better of their country. Had this court the power to rectify past wrongs—actual or perceived—it would do so. But no single litigation can lift all of plaintiffs' burdens. The legislative and executive branches of government—state and federal—and the Veterans Administration, as well as our many private and quasi-public medical and social agencies, are far more capable than this court of shaping the larger remedies and emotional compensation plaintiffs seek.

Within the sharply limited judicial role we must ask whether the settlement of the litigation proposed by the parties' representatives is acceptable. For the reasons indicated below we tentatively hold that it is. It gives the class more than it would likely achieve by attempting to litigate to the death. It provides funds to help at least some men, women and children whose hardships will be reduced in some small degree. It does represent a major step in the essential process of reconciliation among ourselves.

This opinion first summarizes the terms of the settlement and outlines why the settlement as proposed appears reasonable for plaintiffs, defendants and the public. *See* Introduction, *infra*. It then sets forth the procedural history of the case, including a summary of opinions already issued by the court on the issues of subject matter jurisdiction, class certification, choice of law and government liability. *See* I, Procedural History, *infra*. The opinion then discusses the Fairness Hearings held by the court to solicit the views of class members on the settlement. In this section the court discusses the legal bases and requirements for class action settlement and the reactions of the class members to the settlement as expressed at the hearings and in other communications to the court. *See* II, Fairness Hearings, *infra*.

Sections III and IV of the opinion discuss in detail the factual and legal obstacles that would be confronted by both plaintiffs and defendants if the case were to go to trial.

Section III, Factual Problems with Claims, summarizes the evidence that the plaintiffs have adduced in support of their allegations. As the opinion indicates, at best the evidence is inconclusive. This is due in part to the difficulty of proof in any mass toxic tort litigation and in part to the weakness in proof of causal relationship, at least as demonstrated in the epidemiological studies completed to date. Section III concludes with a description of the extensive knowledge the government had in the 1960s concerning the dangers of dioxin.

The legal relevance of this knowledge is developed in section IV. Pursuant to the government contract defense, a defendant could avoid liability by showing sufficient government knowledge of the dangers of Agent Orange. The level of government knowledge was such that were the issue put to a jury, there is a substantial probability that defendants would prevail.

Other legal problems posing major obstacles to plaintiffs' recovery are also dis-

cussed in section IV, including Statute of Limitations and Failure to Determine Who Was Harmed and Who Caused Harm. Although a defensible argument can be made in favor of the application to the entire class of a single statute of limitations, it is at least questionable whether an appellate court would accept such a rationale. Thousands of plaintiffs could, therefore, be barred from recovery, regardless of the merits of the case.

The portions of section IV on Failure to Determine Who Was Harmed and Who Caused Harm deal with two interrelated problems. First, plaintiffs concede that because of the way the different defendants' Agent Orange was mixed before spraying, they are unable to satisfy the traditional tort requirements that they prove not only that they were injured, but also that such injury was caused by an *individual defendant*. Second, it is likely that because of the epidemiological nature of much of the evidence, no *individual plaintiff* would be able to prove that his or her particular adverse health effects are due to Agent Orange exposure. It may be possible—through the use of the class action device—to overcome this obstacle by making a single, class-wide determination of liability and by distributing the damages charged to all defendants as a group among all class members on a pro rata basis. At the present time, however, it is doubtful whether the legal system is ready to employ this device except, perhaps, as part of an overall settlement plan voluntarily entered into by the parties.

The discussion of why the settlement appears to be reasonable concludes with a description of the statutory obligations of the United States to protect and compensate the class. *See* section V, *infra*. Government action—present and potential—is relevant to the discussion since federal aid for the class bears directly on the overall adequacy of the settlement.

It is important to emphasize—as the opinion does in the concluding section—that a tentative finding that the settlement is fair, reasonable and adequate, is but the first step in granting benefits to class members. Future actions include the awarding of attorneys' fees, the resolution of plaintiffs' and third party claims against the government and, most importantly, the preparation of a plan outlining how the settlement fund will be used to assist eligible class members.

## INTRODUCTION

On May 7, 1984, the date on which jury selection was to begin, plaintiffs, on behalf of a class of Vietnam veterans and members of their families, agreed with defendants to settle their claims against the defendant chemical companies. *See* Appendix A, Settlement Agreement. Pursuant to the stipulation of settlement, defendants have agreed to pay to the class $180 million plus interest in a manner directed by the court. Interest began accruing from May 7, 1984, at the rate of some $60,000 per day.

Defendants have not admitted any liability in connection with plaintiffs' claims. Both sides have reserved whatever rights and claims they have against the United States and any person not a party to this class action.

The mechanics of administering the settlement fund will be dealt with in a separate opinion to be issued after further hearings. Some preliminary and tentative conclusions on this subject are set forth in VII, A, Plan for Distribution of Fund, *infra*.

The court held extensive hearings on the fairness of the settlement in New York, Chicago, Houston, Atlanta and San Francisco. *See* Appendix B, Order for Hearings on Fairness of Settlement and Attachments. It heard almost 500 witnesses and considered hundreds of written communications from veterans, members of their families, veterans' organizations and others. It read a large part of the relevant literature, taking judicial notice of its substance. It had the benefit of listening to sound

recordings of sessions held by New Jersey's Commission on Agent Orange at various places in that state. It considered the extensive material in the court's files and the many published opinions on the subject. *See* Appendix C, Published Opinions on "Agent Orange" Litigation. Finally, it studied the extensive briefs submitted by counsel and others.

For the reasons indicated at greater length below, the settlement must be tentatively approved as reasonable under the law. There are many considerations that make this settlement desirable from the plaintiffs' viewpoint. First, the scientific data available to date make it highly unlikely that, except perhaps for those who have or have had chloracne, any plaintiff could legally prove any causal relationship between Agent Orange and any other injury, including birth defects. Second, the law that would need to be established is unique and would almost certainly result in repeated trials and appeals, with the likely ultimate result being no recovery by any plaintiff. Third, the suit was being financed by plaintiffs' lawyers who had already expended millions of dollars in disbursements and time; a full trial, appeals and retrials would have lasted years and would have required the expenditure of many more millions of dollars with serious doubts about the plaintiffs' attorneys' ability to finance the litigation properly. Fourth, benefit to plaintiffs from an ultimate recovery, if any, would not be available for many years. And, fifth, a result adverse to the plaintiffs in the litigation might have an unfavorable impact on evaluation of the Agent Orange claims by Congress and the responsible executive departments which, in the final analysis, must take responsibility for the medical and other care of servicepersons and their families.

From the defendants' point of view the settlement is reasonable: First, defending the case would have cost more tens of millions of dollars in legal fees and expenses plus the time of employees and executives who could be doing more productive work. Second, though slight, there was a possibility of an ultimate finding of liability with claims totalling billions of dollars. Third, an ongoing emotional trial would have created adverse publicity (whether or not unfair), perhaps causing a spillover effect against defendants' other products. Fourth, continued litigation and the possibility of an adverse result has a negative influence on the financial community, causing greater financing expenses as the companies become less attractive to investors. And, fifth, representatives of the defendants, like other Americans, have a sense of compassion and respect for veterans of the Vietnam War and their families who, because of circumstances entirely beyond their control, have been treated with less favor and respect than they should have been. This is a matter of concern to all citizens, including those responsible for defendants' decisions.

From the public's point of view, settlement is desirable for three reasons. First, whether or not the defendants have formally admitted some responsibility for defects in their products and for possible injuries to some plaintiffs, the public can justifiably assume, for perhaps the first time, that there is some merit to the claims of those exposed to Agent Orange that they are suffering because of their war and postwar experiences. In any event, the publicity attendant on the settlement and the Fairness Hearings has alerted the nation to the needs of many Vietnam veterans and their families. Second, the bitterness of a long, hard-fought trial is avoided; plaintiffs and members of the public can devote their energies and talents to using the settlement fund to help the class while obtaining further aid from public and private sources. Finally, trial and appeals of this case would require an expenditure of hundreds of thousands of dollars of court funds and engage the time of judges and court personnel for thousands of hours that now can be spent in the administration of other aspects of the criminal and civil justice systems.

This has been one of the most complex litigations ever brought. Some 600 separate cases have been sent to this district

from all over the country with an estimated fifteen thousand named plaintiffs. Millions of pages of documents and hundreds of depositions of witnesses have been collected. The docket sheet of this court has some 4000 separate entries respecting these related cases. Hundreds of motions have been heard and hundreds of oral directions given by the court, special masters and magistrate in the course of preparing the case for trial. The court, magistrate and special masters have held meetings with counsel from all over the country on an almost daily basis. Hundreds of scientists, government personnel, private executives, lawyers and others have devoted a great deal of time to this litigation. It is unlikely that further expenditure of time and money will be productive. It is time to bring this dispute to a close.

Since practically all the parties are before the court, a binding settlement ending the controversy as to veterans and their families is possible.

There does remain the question of the government's role. It contends that it expends some $70,000,000 a year to treat those veterans who claim Agent Orange exposure, even though causality has not been shown. Nevertheless those testifying at the Fairness Hearings were almost unanimous in expressing dissatisfaction with the medical services supplied by the government to Vietnam veterans claiming Agent Orange related injuries. The government is also spending some $150,-000,000 on research to determine the effects of Agent Orange and of service in Vietnam. Moreover, legislation recently adopted by each house of Congress makes explicit the promise of further aid if a causal connection can be shown. It is, therefore, a matter of some regret to many veterans that the government decided not to participate in any settlement discussions. See Appendix D, Letter of Government, dated April 24, 1984, Refusing to Participate in Negotiations. As a result, further discovery, other pretrial preparations and possible trials and appeals continue to burden the parties and the courts, disturb vet-

erans and their families and roil the conscience of the nation.

## I. PROCEDURAL HISTORY

On February 19, 1979, plaintiffs filed a 162-page complaint in this district on behalf of named and unnamed Vietnam veterans and members of their families who claimed to have been injured as a result of the veterans' exposure to various phenoxy herbicides, including Agent Orange. See Dowd v. Dow Chemical Company, 79 C 467. Plaintiffs alleged, among other things, that defendants negligently manufactured and sold to the government for use in Vietnam herbicides that contained 2,3,7,8 tetrachlorodibenzo-p-dioxin (TCDD or dioxin), thought to be one of the most toxic substances known to man. See, e.g., R. Bovey & A. Young, The Science of 2,4,5-T and Associated Phenoxy Herbicides 134 (1980); United States v. Vertac Chemical Corp., 489 F.Supp. 870, 876 (E.D.Ark.1980); Citizens Against Toxic Sprays, Inc. v. Bergland, 428 F.Supp. 908, 914 (D.Or.1977). Plaintiffs also based their claims on theories of strict liability, breach of warranty, intentional tort and nuisance. According to plaintiffs, the veterans' exposure to TCDD-contaminated herbicides in Vietnam resulted in injuries, such as chloracne, various systemic diseases including soft tissue sarcoma and porphyria cutanea tarda as well as miscarriages to veterans' wives and birth defects in their children. The claims of both sides and the facts are set forth in further detail in the course of this opinion and other opinions by this court and the Court of Appeals referred to infra.

Shortly after the first complaint was filed, eight similar cases were transferred to this district by the Judicial Panel on Multidistrict Litigation (MDL Panel) for consolidation of pretrial proceedings. Almost 600 cases originally filed in state and federal district courts throughout the country have been transferred for inclusion in this multidistrict litigation, MDL No. 381.

Similar actions which have been filed by various civilian plaintiffs have also been

transferred to this district by the MDL Panel. At present there are at least six actions involving claims by civilians. The civilian plaintiffs include: a proposed class of civilians allegedly exposed to phenoxy herbicides in Vietnam, *Thornton v. Dow,* C–81–005–JLQ (D.Wash.); a proposed class of thirty-five thousand civilian residents of the County of Kaui, State of Hawaii, who claim exposure to Agent Orange and other phenoxy herbicides during a testing program conducted in 1967, *Fraticelli v. Dow,* CV No. 82–0021 (D.Hawaii); civilian employees of defense contractors who were allegedly exposed to phenoxy herbicides in Vietnam in 1967, *Kjome v. Dow,* CV 83C–3876 (N.D.Ill.) and *Vaughan v. Dow,* CV No. 83–1440 (D.Ariz.); a medical doctor who served in Vietnam, in the employ of the State Department, *Hogan v. Dow,* CV–R–81–410ECR (D.Nev.); and a civilian employee of a contractor exposed to Agent Orange in 1975, *Lester v. Dow,* CV No. H–80–587 (S.D.Tex.). These actions by civilians are not encompassed in the class and are, therefore, not covered by the settlement. A motion for change in venue in *Fraticelli* was denied by pretrial order number 37 on August 5, 1982; a motion for remand was denied by the MDL Panel on September 29, 1982 and a motion for remand in this court was denied on July 25, 1984. Discovery has not gone forward in these civilian cases although much of the information gathered in the instant case will be relevant to them. *Cf. In re Cenco Inc. Securities Litigation,* 434 F.Supp. 1237, 1239 (J.P.M.D.L.1977) (accommodation to special needs of particular cases in multidistrict litigation).

At the Fairness Hearings a number of class members indicated that they were puzzled by the fact that they had retained counsel to handle their cases near where they lived in other parts of the country, yet the litigation was being conducted in New York. A brief description of the operation of the Judicial Panel on Multidistrict Litigation may be helpful at this point to explain why and how the cases were transferred to the Eastern District of New York. Since 1968, section 1407 of title 28 of the United States Code has provided a means for transferring related cases pending in different districts to a single district for pretrial proceedings. The savings in time and money when many cases are investigated and prepared together for disposition can be enormous.

Pursuant to the statute, the MDL Panel may, after notice to the parties in all actions in which transfer is contemplated, transfer civil actions involving common questions of fact for the convenience of the parties and witnesses and to promote the just and efficient conduct of pretrial motions and discovery. 28 U.S.C. § 1407(a). The Panel may proceed under this section on its own initiative or on motion of any party seeking transfer. 28 U.S.C. § 1407(c). A subsequent action involving questions of fact in common with actions previously transferred under section 1407 is called a tag-along action and is conditionally transferred, with notice to parties, on the basis of the hearings regarding the previously transferred actions. *See* Rules 1 and 9 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 89 F.R.D. 273 (1981). Any party opposing transfer of a tag-along action must file a notice of opposition within 15 days and move to vacate the conditional transfer order to prevent transfer without a further hearing. *Id; see, e.g., In re Penn Central Securities Litigation,* 374 F.Supp. 1400 (J.P.M.D.L.1974).

Section 1407 is designed to promote judicial economy and avoid conflict and duplication in discovery by consolidating related actions for pretrial purposes. 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3861 (1976). To effectuate these purposes, the transferee court has broad powers in matters relating to management of the multidistrict case before it. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 584 (1978). Once a case has been transferred by the Panel, the transferee court assumes complete jurisdiction for pretrial purposes. It has authority to de-

cide all pretrial motions including dispositive motions such as those for summary judgment or approval of a settlement. Weigel, *supra,* 78 F.R.D. at 582. The transferee court is also authorized to handle matters relating to class action certification in order to prevent inconsistent rulings and to promote judicial efficiency. *See In re Piper Aircraft Distribution System Antitrust Litigation,* 405 F.Supp. 1402, 1403–04 (J.P.M.D.L.1975).

Certain types of cases are especially suited to MDL treatment, among them, antitrust cases, *see, e.g., In re Antibiotic Drugs,* 320 F.Supp. 586 (J.P.M.D.L.1970) (transfer of 150 civil antitrust cases); mass tort actions such as aircraft disasters, *see, e.g., In re Air Crash Disaster at Boston, Massachusetts on July 31, 1973,* 399 F.Supp. 1106 (D.Mass.1975); and products liability cases such as *"Agent Orange," A.H. Robins Co., Inc., "Dalkon Shield" IUD Products Liability Litigation,* 406 F.Supp. 540 (J.P.M.D.L.1975) (consolidation for pretrial proceedings of 54 actions involving claims for damages arising out of use of intrauterine contraceptive devices) and *In re Celotex Corp. "Technifoam" Products Liability Litigation,* 68 F.R.D. 502 (J.P.M.D.L.1975) (transfer of 10 actions in which plaintiffs claimed fire losses and structural damages as a result of defects in defendant's insulation material). *See also In re Aviation Products Liability Litigation,* 347 F.Supp. 1401, 1403 (J.P.M.D.L. 1972).

Section 1407 provides that the Panel shall remand each case to the district from which it was transferred at or before conclusion of the pretrial proceedings unless it has already been terminated. 28 U.S.C. § 1407(a). Most actions are terminated in the transferee court, often by settlement or by transfer by the transferee court to itself for trial pursuant to section 1404(a) (convenience of parties and witnesses) or section 1406 (proper venue). Weigel, *supra,* 78 F.R.D. at 583. *See, e.g., In re Antibiotic Actions,* 333 F.Supp. 299 (S.D.N.Y.1971) (transfer of antitrust actions to home district of transferee judge for trial pursuant to section 1404(a)).

Common to the actions either started in this court or sent here by the MDL Panel are allegations that plaintiffs, principally American, Australian and New Zealand servicemen, were injured by exposure to Agent Orange or other phenoxy herbicides used as defoliants in Vietnam from 1961 to 1972. In 1980 a class was certified. The nature of a class action and some of its procedural implications are described in this court's prior opinions. *See In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980), *modified,* 100 F.R.D. 718 (E.D.N.Y.1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). Further reference to the effect of certifying a class action is made in the body of this opinion, particularly in connection with the discussion of statutes of limitations and indeterminate plaintiffs and defendants, *infra.*

Notice was given to the class. All members of the class were afforded the option of withdrawing from the class seeking compensatory damages; this option was not granted to the class seeking punitive damages. *See* 100 F.R.D. 718, 732 (E.D.N.Y. 1983).

In October 1983 the court, after conferring with the parties, ordered the trial to begin on May 7, 1984. To assist the jury in focusing on the problems of causation the plaintiffs were directed to choose ten plaintiffs—veterans, wives and children—who had what they considered to be typical injuries, so that their claims would be litigated as characteristic of those of the class.

The Honorable Shira A. Scheindlin, United States Magistrate, was directed to control the completion of discovery on all issues and assist in preparation of a pretrial order. Special Master Sol Schreiber, Esq., who had been appointed in April 1982, had already supervised much of the discovery on the government contract defense. *See* 94 F.R.D. 173 (E.D.N.Y.1982).

With the approval of the parties, in April 1984, Kenneth R. Feinberg, David I. Shapiro, and Leonard Garment, Esqs., all of

Washington, D.C., were appointed as Special Masters to assist the parties in settling the case. Special Master Kenneth R. Feinberg had already commenced preliminary work on the issues with the knowledge of the parties that such work would be going forward.

Plaintiffs' claims against defendants Hooker, Ansul and Occidental were dismissed on the ground that those companies never designed, manufactured or marketed any phenoxy herbicides for use in Southeast Asia. 534 F.Supp. 1046, 1051–52 (E.D. N.Y.1982). For the same reason, defendant Uniroyal Merchandising Company's motion for summary judgment was granted, 537 F.Supp. 977 (E.D.N.Y.1982), and defendants Syntex Corporation, Syntex Laboratories, Inc., Syntex Agribusiness, Inc., and Hoffman-Taff, Inc. (Delaware) and Northeast Industries were dismissed. *See* 544 F.Supp. 808, 809–10 (E.D.N.Y.1982) and 475 F.Supp. 928, 931 (E.D.N.Y.1979). The dismissal of these defendants as well as Hooker, Ansul and Occidental was conditioned upon each filing with the court a consent to renewal of the action against them by any present or future Agent Orange plaintiffs or class members in the event that the evidence showed that these companies did manufacture and sell Agent Orange to the government for use in Southeast Asia. These defendants also agreed not to raise any statute of limitations defense that included any time that passed between the date of commencement of the first of these actions and any renewal. The summary judgment motions of defendants Riverdale Chemical Company and Hoffman-Taff, Inc. (Missouri) were unopposed and, accordingly, granted. 565 F.Supp. 1263, 1272 (E.D.N.Y.1983).

Summary judgment motions of defendant Hercules, Inc. and defendant Thompson Chemical Corporation were also granted based on plaintiffs' failure to show that these defendants' products contained dioxin. 565 F.Supp. at 1272–74. In November 1983, the court reconsidered this issue and denied the summary judgment motions of Hercules, Inc. and Thompson Chemical Corporation. Also denied were a number of

jurisdictional motions by Thompson Chemical Corporation. Seven companies remain as defendants: Dow Chemical Company, Monsanto Company, Diamond Shamrock Chemicals Company, Hercules, Inc., Uniroyal, Inc., T.H. Agriculture & Nutrition Company and Thompson Chemical Corporation.

Defendants have denied that the products they manufactured and sold to the government for use in Vietnam caused plaintiffs' injuries. Defendants also contend that to the extent their products caused harm injuries occurred because of misuse by the government. Moreover, their position has been that if any liability exists, the government, not the manufacturers, is responsible because it knew as much or more than the defendants about possible dangers and assumed responsibility for any ensuing damages.

It appeared at one point that the government contract defense could be tried separately. *See* 506 F.Supp. 762, 796 (E.D.N.Y. 1980). Later, after further discovery and briefing, it became apparent that a separate trial of the government contract defense was not desirable. 565 F.Supp. 1263, 1265, 1275 (E.D.N.Y.1983). Elsewhere in this opinion, modifying 534 F.Supp. 1046, 1054–58 (E.D.N.Y.1982), are set out the elements of proof which defendants would have had to meet on the government contract defense. *See* IV, Nature of Liability and Relation to Defense of Government Knowledge, *infra*.

Defendants have served third-party complaints upon the United States, seeking indemnification or contribution for monies paid by defendants on plaintiffs' claims. The government moved to dismiss on the grounds that the *Feres-Stencel* doctrine barred defendants' actions. See *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665, *reh'g denied,* 434 U.S. 882, 98 S.Ct. 250, 54 L.Ed.2d 168 (1977). The government's motion was granted. 506 F.Supp. 762 (E.D.N.

Y.1980). Upon reconsideration the government's motion to dismiss defendants' third-party complaints was granted only as to claims made by the veterans and the derivative claims of their family members. 580 F.Supp. 1242 (E.D.N.Y.1984). The government's motion to dismiss was denied insofar as it related to the independent claims of the veterans' wives and children. *Id.* As indicated in the court's 1980 and 1984 decisions on the issue, the law on the point is far from clear; this uncertainty enhances the desirability of the settlement.

The third-party complaints against the government for the independent claims of veterans' wives and children are still pending. They are not subject to the proposed settlement of plaintiffs' claims against defendants. In effect, the manufacturers are saying that anything they pay to plaintiffs either by award or settlement is reimbursable by the government. Plaintiffs' Eighth Amended Complaint, filed after the settlement was reached, for the first time seeks to obtain a remedy directly from the government on behalf of the class.

### A. Jurisdiction

Plaintiffs originally brought this action pursuant to 28 U.S.C. § 1331, asserting that their claims arose under the statutes and common law of the United States. They argued that a private right of action could be implied from any of four statutes allegedly applicable to their claims: the Federal Insecticide, Fungicide & Rodenticide Act (FIFRA), 7 U.S.C. §§ 135–135K; the Federal Environmental Pesticide Control Act (FEPCA), 7 U.S.C. §§ 136–136y; the Toxic Substances Control Act (TOSCA), 15 U.S.C. § 2601, *et seq.* and the Consumer Product Safety Act (CPSA), 15 U.S.C. § 2051, *et seq.* Analyzing each of these statutes, the court rejected plaintiffs' argument, finding that TOSCA and CPSA expressly exclude pesticides and that no private cause of action can be implied from FIFRA as amended by FEPCA. *See* 506 F.Supp. 737, 741–42 (E.D.N.Y.1979).

Plaintiffs also contended that federal question jurisdiction existed because defendants had violated the common law of the United States. This court sustained their contention. 506 F.Supp. 737, 749 (E.D.N.Y.1979). The Court of Appeals reversed over a strong dissent, concluding, for the purpose of denying federal question jurisdiction, that "there is [no] identifiable federal policy at stake in this litigation that warrants the creation of federal common law rules." 635 F.2d 987, 993 (2d Cir. 1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). The Court of Appeals held that if the action was to continue in the federal courts, jurisdiction would have to be based on diversity of citizenship pursuant to 28 U.S.C. § 1332. *Id.*

In a subsequent decision on appealability of the class certification order, the Court of Appeals pointed out that it had not decided whether the government contract defense was controlled by federal law. *In re Diamond Shamrock Chemicals Co.,* 725 F.2d 858, 861 n. 2 (2d Cir.1984). This reservation has implications discussed below in connection with the substantive law applicable to the case and the general rule of conflicts as well as statutes of limitations. The majority decision by the Court of Appeals at 635 F.2d 987 injected great legal complexity and doubt into the litigation making further appeals after trial a near certainty and increasing the desirability of settlement.

In their first amended complaint plaintiffs had asserted diversity of citizenship jurisdiction as well as federal question jurisdiction. The court struck the allegation of diversity because the first complaint failed to include the domiciles of plaintiffs and the corporate residences of the defendants. *See* 475 F.Supp. 928, 936 (E.D.N.Y. 1979). Plaintiffs reasserted diversity as a jurisdictional basis when they filed their fourth amended complaint in 1983. Since the case was certified as a class action complete diversity was required only as between the named plaintiffs and the defendants. *See Snyder v. Harris,* 394 U.S. 332, 340, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969); *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed.

673 (1921). Plaintiffs also alleged that the amount in controversy with respect to each of the individual claims of the representative plaintiffs exceeded $10,000, thus satisfying the requirements of 28 U.S.C. § 1332. *See Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

Subsequent amended complaints designed to avoid various procedural difficulties were filed. The complaint now before the court is styled the Eighth Amended Complaint.

### B. Conflict of Laws

Certification of a class in a diversity jurisdiction case such as this does not necessarily provide uniformity in substantive law because the substantive and conflict of laws rules of many states may apply. Accordingly, this court examined the choice of law rules of New York as well as the choice of law rules of the various states in which the transferor courts sit. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). The difficulty in finding any one state's law controlling was readily apparent. Any state's contacts with this case are dwarfed by the national contacts.

> "[T]he United States Government (as distinct from any state of the United States) carried on [the Vietnam] war ... for national foreign policy and military purposes." The exposure of veterans to Agent Orange manufactured by the defendants "was incident to carrying out those foreign and military policies. If the ... injury suffered by" the veterans "was caused by the negligence of the" defense contractors who manufactured Agent Orange "expressly for the United States and to its specifications, this is a matter of far greater concern to the United States than to any other State of the United States."

580 F.Supp. 690, 712 (E.D.N.Y.1984) (quoting *In re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1974*, 476 F.Supp. 521, 529 (D.D.C.1979)).

The conflict of laws opinion analyzed the five most widely used choice of law methodologies and concluded that under any approach utilized today the result, so far as could be predicted, would be the same. Given the strong state-federal interest in equal treatment of Vietnam veterans, the lack of a federal statute or of any uniform state statute on the issues, as well as the Second Circuit's opinion denying that federal common law controls here of its own force, the states would look to federal or national consensus substantive law as the only workable approach to resolving the issues in this unusual case. The reasoning is developed at length in the opinion at 580 F.Supp. 690 (E.D.N.Y.1984). It is obvious that since no appellate court has passed on this theory, the probability of appeal and possible reversal or modification is substantial, making settlement more appropriate.

### C. Class Action

In 1980, this court decided that the litigation would proceed as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. 506 F.Supp. 762, 787 (E.D.N.Y.1980). The basis for the decision was stated at length in the two opinions on the point, describing why a class action was the best vehicle to achieve a fair result. *Id.*; 100 F.R.D. 718 (E.D.N.Y.1983). As the court noted:

> A single class-wide determination on the issue of causation will focus the attention of Congress, the Executive branch and the Veterans Administration on their responsibility, if any, in this case. By contrast, possibly conflicting determinations made over many years by different juries make it less likely that appropriate authorities and the parties will arrive at a fair allocation of the financial burden, if any.

100 F.R.D. at 721. It was also pointed out that class certification would make settlement more likely. *Id.* at 723.

In addition to its earlier conclusions, this court found that issues of general causation as well as certain defenses were common to the class, that such questions predominated over questions affecting individ-

ual members and that "given the enormous potential size of plaintiffs' case and the judicial economies that would result from a class trial, a class was superior 'for the fair and efficient adjudication of the controversy.'" 100 F.R.D. at 724.

At the same time a separate class was certified on the issue of punitive damages under Rule 23(b)(1)(B), with no power to opt out. Questions as to the effect of certification under Rule 23(b)(1)(B) on plaintiffs' rights to opt out under Rule 23(b)(3) were reserved. It was decided to permit plaintiffs to exercise their right to opt out pursuant to Rule 23(b)(3) but not to opt out pursuant to Rule 23(b)(1)(B). 100 F.R.D. at 728.

The class is defined as "those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to Agent Orange or other phenoxy herbicides, including those composed in whole or in part of 2, 4, 5-trichlorophenoxyacetic acid or containing some amount of 2,3,7, 8-tetrachlorodibenzo-p-dioxin. The class also includes spouses, parents, and children of the veterans born before January 1, 1984 directly or derivatively injured as a result of the exposure." 100 F.R.D. at 729.

Although the class certification order was entered on January 16, 1984, notice to the class was not sent until March 9, 1984 because of a stay issued by the Court of Appeals pending decision on defendants' petition for mandamus. The Second Circuit ultimately denied mandamus and vacated its stay. 725 F.2d 858 (2d Cir.1984).

Pursuant to this court's certification order personal notice was mailed to several hundred thousand persons. The largest group represented names on file at the Veterans Administration Agent Orange Registry which the Veterans Administration made available to plaintiffs' counsel.

A copy of the class order and notice was also sent to the governors of each of the states asking that the notice be referred to the proper state organization dealing with Vietnam veterans. Cooperation was excellent. Many states gave wide circulation to the notice and others provided a list of names and addresses so the notice could be mailed to those veterans by plaintiffs' counsel.

A court-approved announcement on nationwide television networks and on radio stations with a combined coverage of at least 50% of the listener audience in each of the top 100 radio markets was circulated. The text of that notice can be found in 100 F.R.D. at 734.

The class notice was also published in three national general circulation newspapers and magazines and six veterans' magazines. Notice was directed to be sent to the 10 largest circulation newspapers in Australia and the five largest circulation newspapers in New Zealand. The text of the newspaper and magazine notice can be found in 100 F.R.D. at 734–35. Informal notice through the news media was widespread.

Finally, plaintiffs were authorized to arrange a toll-free "800" telephone number. Callers were to be told where to write to obtain more information concerning the litigation. The names and addresses of those calling were to be taken and those requesting a copy of the notice mailed to class members were to be sent one. A large number of people called the "800" number. Their names are in the files of the court.

The notice to class members included a Request for Exclusion Form to be completed by anyone wishing to be excluded from the class. Exclusion forms were to be received by the Clerk of the Court on or before May 1, 1984. As of May 6, 1984, 2440 requests for exclusion had been received. This number should be compared to the 2,400,000 persons who, it is estimated, served in the American, Australian and New Zealand Vietnam forces. The number of persons from that group believed to have had some chance of exposure to Agent Orange has been variously estimated as between 600,000 and 2,400,000.

As of the middle of July 1984 some 600 persons who had previously opted out

asked to be reinstated as members of the class. More such communications are expected as a result of the public hearings even though they were to be filed by July 15. The court will consider such late applications to rejoin the class sympathetically.

Following the settlement, but prior to the Fairness Hearings, counsel for a number of those who had not opted out moved to certify a subclass of those members of the class who object to terms of the settlement and to appoint counsel to represent the subclass. *Cf.* 534 F.Supp. 1046, 1052–53 (E.D.N.Y.1982). The court denied the motion orally on July 25, 1984. Attorneys and objecting members of the class were free to write to the court and to appear at the Fairness Hearings to explain their views. *See* II, A, Fairness Hearings, Legal Requirements, *infra.* No purpose would have been served by appointing counsel for a subclass of disappointed claimants except to increase expenses to the class and delay proceedings. *Cf. Parker v. Anderson,* 667 F.2d 1204, 1208 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982) (10 of 11 named plaintiffs who objected to settlement and insisted on satisfaction of their individual claims named as part of new subclass).

D. Status of the Third-Party Complaints

Defendants' third-party action against the United States for indemnity and contribution on the independent claims of veterans' wives and children is still pending. *See* 580 F.Supp. 1242 (E.D.N.Y.1984). The Court of Appeals denied the government's petition for a writ of mandamus seeking review of this court's February 1984 decision not to strike defendants' third-party claims. 733 F.2d 10 (2d Cir.1984). Subsequently the government filed several motions with the Court of Appeals for rehearings, permission to proceed with an intermediate appeal and for a stay of the trial of the third-party claims which was then scheduled to begin on May 7, 1984. On May 4, 1984, the Court of Appeals stayed the trial of the third-party claims until May 8. On May 8 that court extended its stay. On May 23 the government moved in this court for a stay of all proceedings pending disposition of its appeal to the Court of Appeals. That motion was denied. On June 22 the Court of Appeals indefinitely stayed the trial of the third-party claims and this court then stayed further discovery pending a decision by the Court of Appeals on appealability. The appeal was dismissed for lack of jurisdiction in the Court of Appeals on September 21, 1984. See *In re "Agent Orange" Product Liability Litigation,* 745 F.2d 161 (2d Cir.1984).

The defendants have conducted an enormous amount of discovery of the government in preparing the government contract defense. Since an early stay on discovery was lifted in 1980, 506 F.Supp. 762, 797 (E.D.N.Y.1980), the United States has attended these depositions and, in many cases, represented the deponents. *See* 99 F.R.D. 338 (E.D.N.Y.1983) (approving Special Master's recommendation to permit government counsel appearing as counsel for former employees to review personal files of former employees for relevance as well as privilege claims).

A principal focus of discovery was on an element of the government contract defense—the extent of the government's knowledge of alleged hazards relating to the use of Agent Orange. More than 200 depositions were taken of former or current government employees, including military personnel, ranging from generals to privates. Rooms filled with military documents and other governmental records pertaining to the Vietnam War were made available for inspection by the parties, and hundreds of thousands of pages of government documents, many of which were formerly considered classified, were produced for the parties. Pursuant to pretrial discovery orders, and on consent of the government, all depositions of former or current government employees and the vast bulk of documents produced by the government are not subject to any protective order and are open to public scrutiny.

Many other depositions were taken of selected plaintiffs and of scores of expert witnesses from each side. In addition, a

large file of defendants' records was amassed.

Originally no separate trial of the third-party claims against the government was envisioned. These claims were to be heard by the same jury deciding the claims of plaintiffs against defendants. Since no jury is permitted in Federal Tort Claims Act cases against the government, the jury would be sitting in an advisory capacity to the judge. Any discovery which the government had not completed as of May 7, 1984 was to have been conducted during the trial of the main action pursuant to a schedule worked out by the Magistrate and the parties.

After settlement of the controversy between plaintiffs and defendants, the parties were informed that trial of the defendants' indemnification claims against the government would be scheduled for September 1984. At a pretrial conference on May 29, 1984, on the assumption that the Court of Appeals' stay of trial would be lifted promptly, the Magistrate, at the court's direction, set a new schedule for discovery in the third-party action. Since, however, the government's appeal was not decided until September 21, 1984 it was not possible to complete discovery or to try the third-party claims in September 1984 as scheduled.

On May 4, 1984, defendant Diamond Shamrock moved in this court for reconsideration of so much of the February 16 decision as dismissed third-party claims against the government. Diamond Shamrock's motion was premised upon claims arising under the Tucker Act for breach of contract. Oral argument on that motion was scheduled to be heard after the Court of Appeals decided the government's appeal on third-party claims.

There was substantial doubt about whether the Court of Appeals has jurisdiction to hear an appeal from a district court's order denying dismissal of a complaint. *See In re "Agent Orange",* 733 F.2d 10, 14 (2d Cir.1984). Accordingly, by letter dated May 24, 1984, the government inquired anew whether the district court would certify its ruling refusing to dismiss third-party claims against the government under 28 U.S.C. § 1292(b) to permit an immediate interlocutory appeal. The application was denied on May 25. The court pointed out that a prompt trial or other disposition was in the public interest and was consistent with efficient judicial management of these protracted proceedings.

## II. FAIRNESS HEARINGS

### A. Legal Requirements

■ Rule 23(e) of The Federal Rules of Civil Procedure provides that a class action may not be settled without approval of the court and notice to members of the class. The procedure (1) assures that any person whose rights would be affected by settlement has the opportunity to support or oppose it, *Pearson v. Ecological Science Corp.,* 522 F.2d 171, 176–77 (5th Cir.1975), *cert. denied,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); (2) prevents private arrangements that may constitute "sweetheart deals" contrary to the best interests of the class, Dam, Class Actions: Efficiency, Compensation, Deterrence and Conflict of Interest, 4 J. of Legal Stud. 47, 57 n. 19, 58 (1975); (3) protects the rights of those whose interests may not have been given due regard by the negotiating parties, *Armstrong v. Board of School Directors,* 616 F.2d 305, 313 (7th Cir.1980); *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537, 548 (N.D.Ill.1982); and finally, (4) assures each member of the class that his or her integrity and right to express views and be heard on matters of vital personal interest has not been violated by others who have arrogated to themselves the power to speak and bind without consultation and consent.

■ The court's role in reviewing the proposed settlement is "as a fiduciary ... serv[ing] as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). "Voluntary out of court settlement of disputes is

·'highly favored in the law.' " *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y. 1980), *aff'd,* 647 F.2d 163 (2d Cir.1981). The court will not, therefore, substitute its own judgment for the good faith negotiations of experienced counsel.

■ Because the settlement, if approved, will have res judicata effects on all class members, due process requires that notice of the proposed settlement be given to members of the class. *Grunin v. International House of Pancakes,* 513 F.2d 114, 120 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). *See also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *But see* Manual for Complex Litigation § 1.45 at 51–52 (5th ed. 1981) (suggesting that failure to send notice of proposed settlement may not necessarily prejudice the rights of absent class members in view of Rule 23's requirement that the court approve any settlement). *Cf. Trist v. First Federal Savings & Loan,* 89 F.R.D. 1 (E.D. Pa.1980) (in an antitrust class action, the court approved settlement for damages and other relief and refused to exclude from the class persons to whom notice of the proposed settlement was not sent).

While an objector cannot opt out of a settlement he or she feels is unfavorable, notice provides an opportunity to class members to make their objections known to the court and enables both objectors and supporters to bring to the court's attention relevant facts concerning the settlement. *See Mendoza v. United States,* 623 F.2d 1338, 1348 (9th Cir.1980). The number and nature of objections may reflect, to some extent, the adequacy of class representation, which is a factor in determining whether the settlement is fair. *See Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir. 1983); *In re Federal Skywalk Cases,* 97 F.R.D. 380 (W.D.Mo.1983). In this case there were many objections to the settlement and to the failure of class counsel to consult adequately with members of the class, *see* II, B, Reaction of Class Members, *infra,* but a substantial number were based on a lack of a full appreciation of the case's legal and factual problems and the mechanics of mass tort litigation.

■· The manner of giving notice of the proposed settlement is left to the discretion of the trial court by Rule 23(e). The notice must describe the settlement sufficiently to offer an opportunity to class members to present their objections. *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Notice must be "scrupulously neutral," expressing no opinion on the merits or amount of the settlement. *Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), quoting *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.,* 323 F.Supp. 364, 378 (E.D.Pa. 1970). Due process does not require that a copy of the settlement agreement itself be attached to the notice. *Grunin v. International House of Pancakes,* 513 F.2d at 122. A general description of the settlement terms is sufficient. *Weinberger v. Kendrick,* 698 F.2d at 70. The "options open to dissenting class members" in connection with the proceedings regarding the fairness determination must be apparent. *Air Lines Stewards and Stewardesses Ass'n v. American Airlines, Inc.,* 455 F.2d 101, 108 (7th Cir.1972). In this case both the settlement agreement and a description were included to enhance communication with the class.

■ Finally, the notice should be given a reasonable time before the court determines whether or not to approve the settlement in order to permit members of the class to investigate and reflect on the matter before taking a position. What is a reasonable time varies from case to case. In *Grunin v. International House of Pancakes,* 513 F.2d 114 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), notice of the proposed settlement was given only 19 days before the court

held a hearing on fairness. In *Greenfield v. Villager Industries, Inc.*, 483 F.2d 824 (3rd Cir.1973), the court allowed one month between notice and hearing. Here some three months' notice of the settlement hearings was given to the class. Moreover, additional communications to the court are still possible since a final decision has not yet been reached.

The Manual for Complex Litigation recommends that before sending notice a court decide whether the settlement is within the range of possible approval and suggests that the court hold a preliminary hearing for this purpose. Manual for Complex Litigation § 1.46 (5th ed. 1981); *see In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1133 (7th Cir.1979), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979). Such a preliminary hearing is designed to avoid wasting time and money when a proposed settlement does not approach fairness. *See* Manual for Complex Litigation § 1.46 (5th ed. 1981). This court implicitly found that the settlement was within the range of possible approval before notifying the class. A preliminary hearing was not required because the court had closely followed the settlement negotiations. Settlement was proposed only after intensive negotiations between counsel for all defendants and every member of the Plaintiffs' Management Committee. They were assisted by neutral settlement masters appointed by the court. Negotiations took place over a period of several days culminating in the proposed settlement on the morning the parties were scheduled to go to trial. Obviously both sides had developed substantial evidence by that time and were fully aware of the strengths and weaknesses of their cases.

█ In deciding whether to approve the settlement the court must have a sufficient grasp of the facts and the law involved in the case in order to make a sensible evaluation of the litigation's prospects. *See Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983). An appreciation of the probabilities of plaintiffs' recovery after a trial and

the possible range of damages is essential. The cases caution, however, that the court "should not ... turn the settlement hearing 'into a trial or rehearsal of the trial'." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), quoting *Teachers Ins. & Annuity Ass'n of America v. Beame*, 67 F.R.D. 30, 33 (S.D.N.Y.1975). *See also Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983). Thus the trial court has a limited scope of review for determining fairness. The very purpose of settlement is to avoid trial of sharply disputed issues and the costs of protracted litigation. Haudek, The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement, 23 Sw.L.J. 765, 795 (1969); *Newman v. Stein*, 464 F.2d 689, 691–92 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

█ The court may limit its fairness proceeding to whatever is necessary to aid it in reaching a just and informed decision. *Flinn v. FMC Corp.*, 528 F.2d at 1173. An evidentiary hearing is not required. *Malchman v. Davis*, 706 F.2d at 434; *Patterson v. Stovall*, 528 F.2d 108, 112 (7th Cir.1976). Typically, however, courts hold a hearing so that objectors to the settlement may make their views known. *See, e.g., City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462–64 (2d Cir.1974).

It has been argued that approval of a settlement should in theory turn on whether the group consents, instead of on how close or far the proposed settlement is from an "imagined" judgment. *See* Fiss, Against Settlement, 93 Yale L.J. 1073, 1082 (1984), *reprinted in* G. Friedman, J. Himmelstein, H. Lesnick, C. Menkel-Meadow & L. Riskin, Beyond the Adversary Model, Materials on Mediation and Alternative Approaches to Law Practice 196 (1984). But an approach requiring consent cannot be followed in most cases, including the instant one, for practical reasons. A democratic vote by informed members of the class would be virtually impossible in any large class suit. The costs of ensuring that each member of the class in this case fully

understood the issues bearing on settlement and then voted on it would be prohibitive and the enterprise quixotic. Even though hundreds of members of the class were heard from, there was an overwhelmingly large silent majority. In the final analysis there was and can be no "consent" in any meaningful sense. This is an inherent conceptual problem of the class action, but in considering the matter it must be remembered that without the class action controlled by attorneys for the class there could be no recovery in many instances where a viable lawsuit is clearly in the public interest.

In the usual settlement in a non-class proceeding the parties on both sides voluntarily enter into a compromise of their differences. A party may or may not feel a certain reluctance in giving up its claims or agreeing to pay some amount of money, but each party has determined for itself that settlement is preferable to going forward with the suit. That condition cannot be replicated in a class situation. Class actions are premised on the impracticability of joining all parties in the suit. Individual members are represented in settlement as in all other phases of the litigation by counsel to the representative parties. *See, e.g., In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 721 (E.D.N.Y. 1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). Few members of the class know "their" counsel or have any special reason to have confidence in them. Those class members must, in the ultimate analysis, depend upon the court's impartiality and judgment.

It is apparent, therefore, that while some members of the class object strongly to any settlement to which they did not consent on the ground that they are being deprived of a due process right to an adjudication of individual claims by a jury, this objection cannot prevent a final settlement. The court is sympathetic to these views but individual rights must yield in this instance or the substantial benefits of class actions to other members of the class and to the public will be lost.

Rule 23 does not set out any standard for approval of class action settlements. The cases state in general terms that the settlement should be fair, reasonable and adequate. *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), *aff'g* 314 F.Supp. 710 (S.D.N.Y.1970); *Walsh v. Great Atlantic & Pacific Tea Co., Inc.,* 726 F.2d 956, 965 (3d Cir.1983). Fairness, reasonableness and adequacy must be judged in light of the "totality of the circumstances." *Grunin v. International House of Pancakes,* 513 F.2d at 124.

Several factors have emerged to guide the courts in determining whether a settlement is fair, reasonable and adequate. *See, e.g.,* McGough & Lerach, Termination of Class Actions: The Judicial Role, 33 U.Pitt.L.Rev. 445 (1972). In *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974), the Second Circuit set out the following often-cited factors that a trial court should consider: "(1) The complexity, expense and likely duration of the litigation," *id.* at 463—here complexity and expense are enormous and the litigation would extend over years. "(2) [T]he reaction of the class of the settlement," *id.* —this class was divided; of those who addressed the court, a majority opposed the settlement. "(3) [T]he stage of the proceedings and the amount of discovery completed," *id.*—the case was about to be tried and almost all discovery was completed. "(4) [T]he risks of establishing liability," *id.* —liability is almost impossible to establish. "(5) [T]he risks of establishing damages," *id.*—damages could easily be shown. "(6) [T]he risks of maintaining the class action through the trial," *id.*—this could be accomplished although it would be difficult in view of the great expense to the class attorneys. "(7) [T]he ability of the defendants to withstand a greater judgment," *id.* —there is no doubt about the defendants' great resources. "(8) [T]he range of reasonableness of the settlement fund in light of the best possible recovery," *id.*—the

maximum recovery was great but no recovery was more likely. Finally, "(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," *id.*—the settlement is well within the range of reasonableness in view of all the relevant factors.

The most important consideration is the strength of plaintiffs' case on the merits weighed against the amount offered in settlement. 7A C. Wright & A. Miller, Federal Practice and Procedure § 1797 (1972); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974); *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). The weaknesses of plaintiffs' case, the availability of defenses to the suit, and the risks of establishing liability and damages at trial must be factored into this balance. *See City of Detroit v. Grinnell Corp.,* 495 F.2d at 457; *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537, 548–49 (N.D.Ill. 1982). The costs of continued litigation, *see City of Detroit v. Grinnell Corp.,* 495 F.2d at 457, and the effect of an adverse judgment after rejection of the settlement are also relevant. *See Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980); *In re Scientific Control Corp.,* 80 F.R.D. 237, 242 (S.D.N.Y.1978).

The dollar amount of the settlement by itself is not decisive in the fairness determination. The fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case. *See, e.g., Flinn v. FMC Corp.,* 528 F.2d 1169, 1172–73 (4th Cir.1975); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974). As the *Grinnell* court noted, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.*

at 455 n. 2. As the Fairness Hearings demonstrated, the settlement amount would not begin to cover the total costs of medical treatment for the class which easily could amount to billions of dollars. Ultimately the government will have to make the political and social decision to pay these costs for veterans and their families, as it has already begun to do. This is not unfair since the United States of America ordered the production and use of the Agent Orange.

A second major set of factors for the court's consideration focuses on the process of negotiations which culminate in the proposed settlement. These include the absence of collusion in reaching the settlement and whether the interests of all class members were adequately considered. *Parker v. Anderson,* 667 F.2d 1204 (5th Cir.), *cert. denied,* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983); *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7th Cir. 1979); *In re Federal Skywalk Cases,* 97 F.R.D. 380, 386 (W.D.Mo.1983). *Cf. Ace Heating & Plumbing Co. v. Crane Co.,* 453 F.2d 30, 33 (3d Cir.1971) (negotiating process does not require as strict scrutiny when settlement for class has been negotiated by court-approved class counsel as when it has been negotiated by counsel not so approved). Here negotiations and settlement discussions were observed by Special Masters accountable to the court insuring against any selling out of the class for the benefit of insiders.

A third set of factors utilized in the fairness determination concerns the reaction to the settlement, including the amount of opposition to and support for the settlement, and the opinions of the class members and their counsel. *City of Detroit v. Grinnell Corp.,* 495 F.2d at 463. At least one court has cited the impact of the settlement on the community as a factor to be considered. *See In re Federal Skywalk Cases,* 97 F.R.D. 380 (W.D.Mo. 1983). The court has given these factors extended consideration. A large portion of

the Fairness Hearings was devoted to the impact of the settlement on members of the class and the community. After giving these matters full weight, the court finds they support settlement. The strong opposition of a considerable number of sincere and well-motivated members of the class cannot, under these circumstances, be decisive.

Notice of the proposed settlement was mailed to all class members to whom notice of the pendency of the class action was sent, as well as to all persons whose names and addresses were provided to the Management Committee through the "800" telephone number. *See* Appendix B. Notice was also published in many newspapers and magazines. The notice generally described the litigation and the terms of the settlement and included a copy of the settlement agreement itself. *See* Appendix B. It invited written communications and announced that this court would be holding hearings in five cities across the country to consider the fairness of the settlement and indicated the dates on which these hearings would be held. The notice also announced the date on which this court would hold a hearing to consider attorneys' fee applications. In addition the mailed notice contained a claim form to be filled out by any class member (or representative) who believes he or she suffers or suffered from adverse health effects related to exposure to Agent Orange. The published notice advised class members where to write for this claim form. Over 400,000 copies of this notice have been distributed, although some class members have received more than one notice since the names were taken from overlapping lists supplied by various sources.

The Fairness Hearings revealed that the settlement was widely discussed by veterans groups and public commissions as well as other state officials. There were widespread reports on, and discussions of, the settlement in newspapers, and on radio and television. Undoubtedly there were some who were not aware of the case or its proposed termination, but this group is probably small. Notice must be deemed adequate.

The notice of proposed settlement did not contain the final plan for distribution of the settlement fund. Rather, it outlined the basic elements of the plan that the Plaintiffs' Management Committee has indicated it will propose to the court. As outlined the plan must allocate a portion of the settlement fund for payment of claims for manifested illnesses and another portion for future payments to class members who have not as yet suffered adverse health effects. The fund will also provide assistance to children of veterans exposed to Agent Orange including those not yet born who wish to join the class.

A complete distribution and administration plan will be presented. An appealable order will be entered shortly after fees are fixed to allow appeals challenging the settlement and fees orders. This delay is in partial accord with the views expressed by some at the Fairness Hearings that a final order is not appropriate until members of the class know the amount of attorneys' fees and the elements of the distribution plan have begun to be considered.

 Although a formal order of the court approving or disapproving the settlement will be held in abeyance, this cautionary step is not required. Approval of the settlement amount does not depend on approval of the distribution plan. *See In re Chicken Antitrust Litigation*, 560 F.Supp. 957, 959 (N.D.Ga.1980) ("the approval *vel non* of the interclass sharing proposal is a separate issue [from that of the fairness, reasonableness and adequacy of the settlement], one which the court will consider at a later date"), *aff'd*, 669 F.2d 228 (5th Cir. 1982). *See also West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); 3 Newberg, Newberg on Class Actions § 5640 at 551 (1977).

Conditional approval of the settlement now will permit work to begin on the devel-

opment of a distribution plan unaccompanied by the doubts and uncertainties that would exist if the settlement between the plaintiffs and defendant chemical companies were not tentatively ratified by this court. The formulation of a distribution plan in a case as complex as this is extraordinarily complicated. Consultations with a variety of medical, scientific, economic, actuarial, insurance and other experts are currently proceeding so that a fair and comprehensive distribution scheme may be developed. Some options concerning such a distribution plan have been suggested at the Fairness Hearings. *See* VII, Plan for Distribution of Fund, *infra.* Representatives of the class, including veterans, will play a major role in providing advice and guidance concerning the best methods of achieving the maximum benefits for eligible class members and afterborn children.

At the Fairness Hearings considerable time was devoted to preliminary discussions of the possible distribution plans. Those discussions and research by the court demonstrate that an effective distribution plan is possible. From a practical standpoint no sound purpose would be served by delaying initial approval of the settlement. Significant expenditures of time, money and talent necessary to develop a comprehensive and fair distribution scheme would be called into question if the plan were to be a part of a proposed settlement which did not at least have the conditional approval of this court.

### B. Reaction of Class Members

More than a thousand class members have expressed their views on the settlement both orally, in hearings held by the court and in writing, through letters, cards and telegrams. A few quotations from the hearings and other communications are set out in this section.

The quotations do not begin to reflect the moving sights and sounds of the hearings—broken-hearted young widows who have seen their strapping young husbands die of cancer, wives who must live with husbands wracked with pain and in deep depression, mothers whose children suffer from multiple birth defects and require almost saint-like daily care, the strong men who have tears welling up in their eyes as they tell of fear that their families will be left without support because of their imminent death, the man whose mind is so clouded he must be prompted by his wife standing by with his defective child in her arms to go on with his speech, the veterans trying to control the rage that wells up within them, the crippled and diseased with running sores and green fungus growths, and the women who volunteered for field or Red Cross duty and now feel themselves rejected and sick with what they believe are Agent Orange related diseases.

Just a few years ago these veterans were healthy and handsome youths in their teens and early twenties who bravely went to war because their leaders asked them to. And it is clear from what they said and did in court that they are sincere when many of them say they would volunteer their broken bodies and worn spirits once again if their country called. Some are understandably bitter that their government and its people have shunned them instead of embracing them as heroes. Only the cold written transcript is permitted as a record of these remnants of the war pleading for justice for themselves and for their families. They remind us, as we enjoy the fruits of our power and wealth, to remember those men and women who struggle each day with disastrous medical problems they attribute to service in Vietnam.

### 1. Hearings

The court held Fairness Hearings in Brooklyn, New York (August 8–10, 1984), Chicago, Illinois (August 13–14), Houston, Texas (August 16–17), Atlanta, Georgia (August 20–21) and San Francisco, California (August 23–24). Most of those who spoke were American veterans, their wives and parents. A number of Red Cross volunteers and other civilians who worked in Vietnam and were exposed to Agent Orange testified in support of the veterans

although they themselves are not members of the class and do not receive veterans' benefits.

Representatives from Australia and New Zealand appeared at a three hour session in San Francisco on the evening of August 24. In July the court received a memorandum that discussed some of the special problems, notably with the claim forms, faced by the Australian and New Zealand veterans. The forms were modified to take account of their special needs.

The court also heard testimony from representatives of a variety of veterans' organizations, some born of the Agent Orange controversy itself, such as the Agent Orange Children's Fund and Agent Orange Victims International, as well as less specialized veterans' organizations such as local and national chapters of Vietnam Veterans of America (VVA), the Veterans of Foreign Wars (VFW), Vietnam Veterans Against the War, and Black Veterans for Social Justice. Also represented were some state Agent Orange commissions and state veterans organizations as well as a wide variety of local self-help groups that do impressive work to aid Vietnam veterans.

Despite the many unique and individual stories, certain concerns were voiced repeatedly. Some of these themes are set forth below followed by a few representative quotations from the testimony at the hearings.

a. Need for Medical Help for Veterans and Financial Help for Those Too Ill to Work

Many class members who spoke at the hearings emphasized their need to receive medical treatment for themselves and their families. A monetary award as compensation for their illnesses did not appear to be as important to them as ensuring that some sort of diagnostic and treatment program be instituted to deal with the problems they believe are a result of exposure to Agent Orange in Vietnam.

Veterans recognize the difficulties inherent in allocating one sum out of which

people suffering from a variety of problems could be compensated and they advocate treatment and health care. As one veteran from New York put it:

The answer is to provide a means whereby adequate medical care is made available to Vietnam veterans.... The money in this settlement could be used as a part of a fund that would be set up for this reason.

Many who stressed the immediate need for medical and financial help supported the settlement because they believe that it offers some measure of relief to the veteran now, not as one of them put it, "in some misty future that ... may never come." A veteran from South Dakota who has been active in lobbying for legislation on behalf of Vietnam veterans stated:

Many people have suffered and need some form of support immediately. If the settlement is not accepted and we are forced to reenter the judicial course it could possibly take five to ten years longer at a minimum.

A woman, whose husband saw combat in Vietnam, testified to the emotional toll that the litigation has taken on her and her family.:

I fully support the financial settlement proposed in the class action suit.

There is no sum of money that can replace a loved one's life but this settlement would insure some equitable settlement for those who have and are suffering.

I have gone through an awful lot of emotional suffering. And this settlement would allow me to go on with my life without further disruption because of this case ... I do not need the stress of many years of litigation.

b. Need for Medical and Financial Aid for Children Born with Birth Defects

Most of the class members who spoke had a genuine and deep-felt concern for the future of their children and those of other veterans, whether or not they had yet manifested problems. A number described

their children who suffer from a variety of deficiencies ranging from multiple birth defects necessitating frequent hospitalizations and surgery to less medically severe handicaps and a host of learning disabilities. Over and over again the veterans expressed a desire that any resolution of this litigation provide for the children of veterans who suffer, or may in the future suffer, disabilities and birth defects. The words of one veteran who spoke at the Brooklyn hearing were repeated by many:

> I need some assurances that ... my wife and five kids ... are going to be taken care of if they come down with some medical problems. I don't have that with the VA. ·

Another veteran, from Chicago, stated:

> Money is not the issue. It never will be the issue.... The issue is human beings and life. The issue is my children and their children's children.

And a mother testified in Houston:

> I don't know about the settlement, your honor, the amount of money. What amount of money does it take to tell my son and explain to him why he cannot function, walk, run, talk, play with his friends, go to school, in a world that his dad helped to make safe? I can't explain it to him. I don't think anybody else can. But if all of us talking like this helps one child or one doctor to be able to pinpoint these problems and benefit one life, then I'm all for helping.

c. Need for Information on Possible Genetic Damage to Veterans and Their Children

Many of the speakers believe that their exposure to Agent Orange in Vietnam has damaged their genes. The testimony of a veteran from Connecticut illustrates this view:

> My main risk is not my personal health ... but the reproductive situation of my daughters, should it later be found that some exposure to Agent Orange or Dioxin could negatively affect them.

Another veteran, from Vermont, echoed this concern and asked for genetic counseling services to be a part of the settlement:

> As to my twin daughters, who were conceived and born after I left Vietnam, I believe that the contamination I received has, without a doubt, passed from me to them... This is just my family and the effects of dioxin on them. I ask this court to consider not only my family but every family so affected and set aside at least one half of the total final settlement for the children and their children's children: this should include genetic exams, genetic counseling, psychological counseling along with a monetary settlement.

d. Dissatisfaction with the Veterans Administration and the Treatment Received in its Hospitals

The majority of those who spoke expressed extreme dissatisfaction with the Veterans Administration. The court makes no findings on this issue. The Department of Justice, unlike counsel for plaintiffs and defendants, chose not to attend any of the Fairness Hearings or to present evidence contradicting complaints of VA inadequacy. Nevertheless, it seems highly unlikely that service to veterans is as uniformly bad as was suggested at the Fairness Hearings. For example, by letter dated August 30, 1984 to Special Master Kenneth Feinberg, the Department of Justice indicates that biennial "patient satisfaction questionnaires" and various evaluation and certification procedures ensure adequate quality of care.

A veteran from Montana expressed a common complaint: "The VA ... is not the place to go." Another veteran put it more bluntly: "The treatment in the VA hospital is atrocious."

Many feel that the VA is not sensitive to the needs of Vietnam veterans. A veteran who served in the Army from 1962 to 1969 testified:

> The treatment in VA hospitals is horrendous to the Vietnam veteran. For the

most part they don't care and turn a deaf ear to our problems and conditions.

A Vietnam veteran with twenty-four years of service used a quotation repeated over and over again at the hearings:

In the words of John Fitzgerald Kennedy, "Ask not what your country can do for you, but what you can do for your country." Now the question becomes, what is the country doing for the Vietnam veterans? The Federal Government has closed its eyes to the cry of the Vietnam veteran, not only for medical compensation, but it's closed the doors for medical care.

A veteran who, like many others, had a vasectomy after his wife had a number of miscarriages because he feared he had damaged genes (his wife had healthy full term children by him before he was exposed to Agent Orange), complained:

I was subjected to ridicule and was laughed at about my health concerns by V.A. personnel.... I would hope that somebody, some institution, somebody in this country can direct that the V.A. start out-reaching, identifying and informing those who served this country. My God, our tax dollars went to support it and it's sitting on its collective duff, and I for one have had enough of the V.A.

Many veterans did not always know what benefits were available from the VA or who was entitled to them. Several believed—mistakenly, the court is informed—that they were not entitled to any benefits unless they received an honorable discharge. One veteran who lost a leg in Vietnam combat, cited his personal experience:

I went to the VA myself and asked [about help for Agent Orange]. And they told me I had to go to a private doctor. They have no help because since I received less than honorable discharge, the VA will not handle it and you have to have an honorable discharge.

Another speaker, a veteran from Illinois, testified that those in active service in the military will not seek treatment at military hospitals for illnesses they believe are related to exposure to Agent Orange because they fear their military careers will be jeopardized:

Many of the individuals who have requested medical attention who are on active duty or with reserve contingent from active duty are now being told they may not continue to act or function in the same capacity as they have before ... [These are people who claim] Agent Orange exposure, post-traumatic distress disorder.... They will ask him to leave [the military service].

e. Insufficiency of Settlement Amount to Pay Adequate Damages

A woman who served in the Army Nurse Corps in Vietnam likens the process of allocating the settlement amount among class members to triage—the procedure in battle zones of determining who among the casualties should receive medical attention first. She explained in Chicago:

[W]ho would be given the first chance to live and who would go behind the screen and wait, perhaps til it was too late ... I look upon the settlement as people playing a sort of triage with us. How will it be decided how much each of us is worth? Who will decide it? Is one of us worth more than another? Does a spina bifida baby receive the same amount as ... the soft tissue sarcoma?

We need research. We need evidence. We need facts. We don't need your insignificant amount of money.

The wife of a veteran with a child who had severe birth defects and who was a named plaintiff told the court, while her deformed daughter sat in a wheelchair beside her:

Close to this trial date the Management Committee called to tell me that one of the best economists in the country would call me to ascertain the cost of Kerry living into projected old age.

After four hours of conversation with me and in conjunction with discussion of the Management Committee, the econo-

mist submitted ... a detailed analysis that it will take $6.6 million to care for Kerry.

Michael and I were able to legitimately show we had laid out on Kerry, during these 13 years of her life, a dollar amount of $475,000.

So now I realize we are in need of a miracle of the loaves and fishes if we only have $180 million....

Kerry, with 22 congenital birth defects, who forever lives in a wheelchair, who is denied the right to design her own destiny, who will never know the beauty of making love or marrying some great guy, who will never know the satisfaction of going to M.I.T. or Harvard, but must settle for a special education setting gets $14,000 and you talk about justice?

f. Failure of Chemical Companies to Admit Fault

Some opposed the settlement because it contains no admission of guilt, no assignment of blame. As a former Marine stated:

I don't think it's reasonable that there is no cause or liability assigned at all. I'd like to have this come out in court and have a cause established for the conditions that the veterans, myself included, are alleging and the liability assumed for whoever is at fault.

A woman, the wife of a veteran from Wisconsin, shares this feeling:

For the defendant to deny liability for those physical injuries and the emotion[al] suffering that my family and thousands of others have gone through for years particularly in light of the scientific research is extremely insulting and morally contemptible....

When this litigation began in 1979 and to this day my family has had a primary goal in this historic litigation whereby the chemical companies and the United States government admit what they have done, accept their responsibility to the citizens of this country and never be allowed to repeat this scenario anywhere

in the world. That basic goal has now been dropped by the legal wayside.

Another woman, whose husband returned from Vietnam in 1968 and died nine years later, testified:

On May 7th no one stood accused, no one accepted responsibility for the deaths of these men, no one showed remorse for our losses and the burdens of our families, no one even said they were sorry.

A regional coordinator of a veterans organization from Georgia put it this way:

The toxic effects of Agent Orange were known and utilized by the military, the chemical companies, and now we are supposed to agree to a stipulation that nobody did anything wrong. Somebody did something wrong. Somebody engaged in chemical warfare. Somebody violated international law and even more important somebody violated our health, our bodies, and the future of our children.

Now they want to say and want us to endorse "We are not responsible." 30 years of knowledge regarding the ill effects of Agent Orange calls them liars. They are responsible. You know it, I know it, and the world knows it, and we will never acquiesce in a condition which states otherwise.

g. Failure of Government to Admit Fault, Participate in Settlement and Accept its Responsibility for Caring for Vietnam Veterans and Their Families

Most of those who spoke felt that Vietnam veterans have been ignored by the government. Many did not understand why the government did not participate in the settlement. A majority of those who spoke believed that the government should take responsibility for the problems the veterans believe resulted from their exposure to Agent Orange. One woman, whose husband served in Vietnam and whose son has multiple birth defects, movingly expressed this belief.

Everytime [my son] turns blue you can bet I think of our government and Agent Orange....

Our government knew since 1957 what their chemicals would do to the human body. Our government has sentenced our vets and their children to a slow death.

Some who support the settlement feel that it will prompt the government to take action on behalf of the Vietnam veterans. A veteran from Michigan summarizes this view:

I also feel that this settlement in itself, if it is allowed, will force the Government into recognizing our problem. [I]t's the government who should take care of me and take care of my wife. I am a veteran. I went over there. I served my country. If I die then it is the Government's responsibility. It is not the chemical companies' responsibility.... I truly believe that ... this settlement, if allowed, will actually bring pressure to bear on the Government to say: Hey look, the chemical companies made a bad product, they admitted it. They are giving $180 million. Now it's our turn. We have cheated the veterans. We have denied them all their rights. And now it is our responsibility to take care of the veterans.

In his statement to the court, a lawyer for the plaintiffs urged the United States Government "to put its arms around these veterans and tell them for once that they care." A former male nurse who served in Vietnam and is now a member of the faculty of the School of Medicine, University of Southern California, declared: "The deadly legacy of Agent Orange will only conclude when the United States is held accountable."

Another veteran, who spent thirteen months in a hospital after combat in Vietnam, told us:

I think that we should have some sort of resolution made from this courtroom where we can sue the United States government, let them be accountable. And let them say that they did wrong.

They owe us something. I don't care whether it's a nickel or a dime, I want them to say, "I was wrong." I want justice from my country who I stood for, who I fought for, who I loved and who I gave everything I could in my life.

### h. Possibility of a Coverup of Information with Sealed Files and Return of Documents to Defendants

The testimony of a Marine Corps veteran active in regional veterans' organizations illustrates the repeated concern about coverup:

It is, therefore, necessary that through the process of discovery all information be made public, a guarantee that all parties—not to exclude the government—be held equally responsible and that all parties aid in the process of corrective rehabilitation to veterans, their children and all after-borns.

To do less than that would somehow take on again the awful stench of another governmental cover-up.

As we walked through the rice paddies and the jungle and the marshlands to locate, to close and engage the enemy, we were aware of the risks to our life and limb, but at no time did we feel that our own country would care so little about our welfare that they would spray down from the skies ... poison.

We were exposed to a lethal agent. That in itself is criminal. But the government and its contractors have gone to great lengths in an attempt to cover up their actions.

Ever so slowly the cloak of deception is being removed and the truth is emerging. The total light of day must be placed on this deceit.

The California State Council of Vietnam Veterans of America requested that:

The court unseal all discovery documents produced by the parties, allowing the public free access ... The question ... becomes whether these documents should be returned to the chemical companies or placed in the public domain?

These discovery documents must be placed in the public domain because they

contain important information.... [They] address such issues as the evidence that exists that Agent Orange covered certain illnesses, when and to what extent the chemical companies knew the harmful effects ... and what the government independently knew about these adverse health effects.

These issues are important to Vietnam veterans in making decisions regarding living children needing medical care, etc.

 This concern, while understandable, is not an appropriate reason for rejecting the settlement. The court has the power to order documents released even though they were sealed as part of a settlement. *See In re Franklin National Bank Securities Litigation*, 92 F.R.D. 468 (E.D. N.Y.1981). That power is particularly important in a multidistrict litigation since the purpose of the MDL process is to assemble data through discovery that can be used in any related litigation without the need for duplicative efforts. *See In re Upjohn Co. Antibiotic Cleocin Products Liability Litigation*, 664 F.2d 114 (6th Cir.1981) (transferee court vacated protective order of transferor court). Any party or interested persons may move for such relief. *See In re Franklin National Bank Securities Litigation*, 92 F.R.D. 468 (E.D.N.Y.1981) (public interest group's motion to intervene to unseal documents). Until all litigation related to *"Agent Orange,"* MDL 381, is completed, no documents will be destroyed. The parties are expected to file all depositions and other papers obtained in discovery in a depository at the courthouse in accordance with directions to be provided by a Magistrate who will determine sealing and disposition subject to appeal to the court. *See In re "Agent Orange" Product Liability Litigation*, 98 F.R.D. 539, 545–548 (E.D.N.Y.1983), 99 F.R.D. 645 (E.D.N.Y.1983) (unsealing of documents previously sealed).

i. Need for a Full Open Trial to Vindicate the Plaintiffs and Protect Their Rights to Individual Justice

Many veterans who opposed the settlement did so because they wanted their "day in court." An Army veteran who served in Vietnam from 1968 to 1970 expressed the view of those who wanted a trial to hold the defendants accountable:

I have come here to plead with you not to accept this offer, to give us our day in court. I have heard some say this settlement is fair and I ask them, would any amount of money help correct the problems with our children? Would all the money in the world be worth having a child born without a hand, without a foot, severely brain-damaged, deformed grossly or dead? What price do you put on my suffering? We started this lawsuit to bring those responsible to trial and find them guilty. We can't stop now.

Others wanted their day in court to answer questions about Agent Orange. More than one speaker alluded to the trial as a tool to aid the public, the scientific community and the medical community in understanding the role of Agent Orange in veterans' problems. A veteran from Wisconsin opposed the settlement for this reason:

[t]he feeling is that win or lose at the actual trial we would gain more information and knowledge through the discovery process of the trial....

We feel that the trial procedure would help to determine the facts that will be needed to pursue a claim with the Veterans Administration and the federal government.

For these people, a trial—win or lose—is preferable to a settlement in which the questions still remain. As one former Marine puts it:

We wanted to have our day in court so that the evidence can be brought out and we could present our allegations and that the chemical companies can present their defenses against it concerning the scientific and medical data and we think this would be vastly useful to the scientific and medical community and would probably put them quite a few years ahead with all their studies that are going on. We really wanted to have that brought

out in open public court, printed in the media, let the American public know and also the scientists and doctors.

j. Inability to Decide Whether to Accept Settlement Without Knowing How it Would Be Distributed or How Much Would be Spent in Attorneys' Fees

One veteran from California asked the following questions, reflecting the same position as many other veterans:

Number one, how can the court request class members to decide if the settlement is fair and reasonable when the proposed settlement does not provide those affected with adequate information on which to make an intelligent decision?

Number two, how can the court award damages when there is inaccurate information on how many veterans and their family members have been adversely affected by exposure to Agent Orange; or how many veterans have already died; or identify those exposed veterans who are at risk of developing long term health problems?

Number three, how can the court award damages without addressing eligibility requirements?

Many others indicated that they could not decide if the settlement would be adequate without knowing how much would be spent in attorneys' fees. As a result of these views the order approving the settlement will be made conditional, subject to reconsideration after plans for disposition of funds have been considered preliminarily and the amounts of attorneys' fees have been fixed.

k. Inadequate Payment by Defendants Relative to Their Resources

Repeatedly witnesses referred to the assets of the defendants as over ten billion dollars and their earnings as in the hundreds of millions of dollars a year. The amount of the settlement was, as some indicated, "petty cash" for the defendants. Many pointed out that insurance companies would foot all or most of the cost. Some pointed to the fact that defendants' stock rose on the exchange after the settlement was announced. They thought it unfair not to have defendants pay more in view of their resources.

l. Inadequate Time to File Claims

There were many people who indicated that they and those they knew had just heard of the settlement and many of them needed more time to file claims. One witness asked the court:

How will veterans in the State of Washington find out about the settlement?

Second, veterans are concerned that they are unable to make an informed choice about whether the settlement is fair, reasonable or adequate. We want to know what they're agreeing to in the settlement.

They want to know their rights, their risks, and their options. Vietnam veterans question the fairness of the settlement when most veterans have not been informed and the claims deadline is just around the corner.

As a result of these suggestions, the court has extended the time to file claims to January 2, 1985.

m. Need to Settle Now to Get on With Life

A veteran from Pennsylvania voiced his desire to bring the litigation to a close:

I too would like to see the chemical companies admit that they knew what the herbicides would do, but I do not, nor do the veterans and their families, have the time to continue to fight this out in a court of law.

Many veterans spoke about how the Agent Orange controversy continues the Vietnam war for them. They feel that the government refuses to recognize that there is a problem, they feel slighted by the VA, they feel that no one appreciates the fact that they, like all veterans, fought for their country in time of need. For them, Agent Orange is part of the remaining unfinished

business of the Vietnam War. As one veteran put it:

> Agent Orange and the MIA–POW [missing in action-prisoner of war] issue[s] ... are the only real tragedies left to end that war. It will never end as long as Agent Orange is festering.

Many see the settlement as a part of the process of finally putting the Vietnam War behind us and as a step toward a better future. Some believe that although no liability has been established, the fact of the settlement gives some legitimacy to their claims, or as one of them noted, "the act of paying 180 million would have a voice of its own." Another veteran, comparing the Vietnam episode to a societal mental illness "because we have been so destructive of our veterans," illustrates this point:

> [W]hen there is an illness, the first step is to recognize it and to make an admission that it exists, and then to move from there. The $180 million settlement is a step in the much larger battle which is beyond the legal battle which would be the political battle in the political arena. Move with that toward having the recognition from the government that our veterans deserve and have a compensation from the government that our veterans deserve ... I am hopeful this settlement will be the first step towards that political solution which I think would be the best that we would hope for.

An Oregon doorgunner in the herbicide spraying operation put it this way:

> The Challenge ... is ... a $180 million settlement fund is going to cause power to be created.... I believe firmly that we should stay positive. What has come in the past is the past.... We need to ... create a system able to respond with quality assistance to all needy veterans now.

Another veteran with a deformed daughter who described a comrade's suicide ended his testimony by saying:

> I think that's the most important of all, of the feelings of what these people have really been through and I am sure that with the attorneys and everybody working hand in hand, if that's the intentions of everybody, I am sure we can come to a quick decision and we can get on with our lives and what lives we have got, let's pick up the pieces and go on and let's start living a little bit.
>
> I am tired. I am 42 years old.

### n. Need for Further Research and Reassurance

The unanswered questions about Agent Orange and its effects on health exacerbate the veterans' problems. A veteran from Connecticut points out the terrible cost of our ignorance:

> A lot of veterans are out there thinking they are victims and they are not victims. A lot of veterans have created illnesses because of the controversy of Agent Orange. They think they are contaminated. They don't know. None of us know whether any of these illnesses are a result of Agent Orange poisoning at this time.

And a veteran who works in one of the veterans' organizations summarizes his group's reaction to the settlement.

> [W]e came to the conclusion that had we gotten to trial we would have gotten a lot of dirt out about corporate defendants .... [and] various government agencies. But there would have been a chance that all of this would have jeopardized what we were seeking. We were seeking positive help for the Vietnam veterans. This is how we started out when we initiated this litigation. We started out simply to get help for the veterans.... [W]e see the settlement as a positive step in the right direction in obtaining help for the veterans. We really don't want to go through five more years or more of litigation. We want an end—an end to the legal controversy. Our fight now should be in the medical community and the scientific community in getting more help. And we feel this settlement can be a catalyst for that.

## 2. Written Communications

The court has received hundreds of letters from class members about the settlement. A few express a deep hostility toward the defendant chemical companies and the United States bordering on the irrational. Most, however, are thoughtful and helpful. The letters express essentially the same considerations referred to at the hearings. These include doubts about the existence or provability of a causal connection between exposure to Agent Orange and a host of ailments; an understanding that even if general causation were provable, there are serious legal obstacles to each individual class member's recovery; a recognition that even if the plaintiffs were ultimately to prevail after trial and on appeal, the many years it would take to achieve that result might make any victory a Pyrrhic one; and satisfaction that "something is finally being done" for Vietnam veterans after years of perceived mistreatment and neglect.

Those who oppose the settlement do so for a variety of reasons. Some are genuinely convinced that they, their comrades and families suffer as a direct result of the use of Agent Orange in Vietnam and that the evidence and law will sustain their views. Others, while not opposed to the concept of a settlement, are dissatisfied with the amount and the nonparticipation of the government, viewed by some as the chief culprit. Many are outraged by the failure of defendants to admit culpability. Some wish a full airing of all the evidence in a public trial and oppose return or destruction of any evidence assembled through discovery.

Typical of the letters favoring settlement is one from a physician in Michigan who feels that while Vietnam veterans were unjustly treated, he has

seen no reputable research indicating that any of the so called "Agent Orange" casualties are anything but anecdotal. I have seen studies that show that those who were most heavily exposed suffered no ill effects.

Others do believe that there is a causal connection, but believe, in the words of a New York veteran, that "to go to trial would be a disaster and turn out to be a can of worms with losers on both sides."

A veteran from California asked that the settlement be approved because

[a]fter reading and hearing much material about this proposed settlement, I am somewhat concerned. I believe that under the circumstances revolving around such a legal suit that what was effected by the chemical companies is justifiable. Naturally only one who lives in a dream would expect to receive everything asked for. Compromise is the basis of any settlement and the benefit of compromise is [to] AVOID COURT DELAY.

As he and many class members recognize, "the 180 million dollars looks damn good" because it "avoid[s] all the red tape" and eliminates the "possible chance of losing in the end."

No more valuable time can be wasted in dealing with this matter because the victims directly involved are hurting. Compensation is one of the major priorities.

A Rhode Island veteran writes:

We have waited long enough. Let us be done with the delays and begin now to create programs and provide services to assist present and future generations affected by the dioxins used in Southeast Asia. At last, perhaps, we shall see a light at the end of the tunnel.

Also typical of the communications favoring the settlement is a letter from an Arkansas veteran who writes that he

feel[s] that the chemical companies did the Veterans a great justice by settling out of court. If the veterans would have held on and went to court, they could have spent another 10 to 20 years in court.

Many of the class members express a special desire that the settlement fund be used to assist the children who were allegedly affected. As a veteran from Pennsylvania writes:

I have seen with my own eyes the children [of exposed veterans] with birth de-

fects ... and I want to express to you my belief that the Federal Class Action Law Suit should be settled now, with acceptance of the Trust Fund money ....

I am blessed with a healthy son and for that I thank my Higher Power. For those of my military friends who do [have children with birth defects], I know we should do what is necessary now to start the healing process. Again, I implore you to accept the Chemical Companies Trust Fund Offer.

Along the same line, a veteran from California, after detailing his wife's and children's problems which he attributes to Agent Orange, writes:

The newly acquired monies from the lawsuit would mean nothing to me, but continued research into the dioxin-related illnesses could help thousands of others, and a fund started to aid that research would be a fitting tribute to the many who suffered for their participation in the Vietnam War. Put the money into a trust for that purpose!!

Many letters are strongly negative. In the words of one letter which was circulated by a group of veterans from Iowa:

The amount of money agreed upon by the management committee and the chemical companies does not even begin to compensate the hundreds of thousands of families for their medical expenses, not to mention physical suffering and emotional agony. More importantly, the issues of causation and liability have gone unresolved, perhaps forever.

In a similar vein, a Wisconsin veteran urged the court to reject the settlement because he believes the settlement

is an attempt to prevent the public from finding out the true facts as to who is responsible for the use of Agent Orange. A lot of loyal U.S. servicemen are to be affected by this decision and I think that they should have their day in court.

Letters urging rejection of the settlement assume that there is a causal connection that can be proven between exposure to Agent Orange and the various illnesses and conditions Vietnam veterans suffer from. As a New Jersey veteran put it,

[y]ou would be hard pressed to convince me that Agent Orange is not responsible for my daughters [birth defects] and my [medical] problems.

The need to "bring out the facts" is emphasized by virtually all the letters urging rejection of the settlement. As another veteran from Wisconsin put it,

the issue goes far beyond mere monetary compensation. The ultimate issue is establishing liability for damages and/or injuries arising from exposure. This settlement did not affix blame; indeed, it emphasizes that the payment is in no way an admission of guilt or liability....

I view this settlement as an attempt to sweep the whole issue under the rug; to cover up the plight of thousands of veterans and their families.

Many letters express frustration and anger with the way Vietnam veterans have been treated by the government and society. Typical are the comments of a New Jersey veteran:

I volunteered for the army as soon as I was 18 years old because at that time it seemed like the right and patriotic thing to do. If I had been able to see into the future and seen how shabbily my own government and fellow Americans (nonvets) would treat all Vietnam vets, I probably would have become a draft resister and moved to Canada.

Similarly, another New Jersey veteran writes,

When my country needed me, I went. When I needed my country, they were not there. Who will go next time?

Others believe that the government is at least as responsible, if not more so, than the chemical companies for any damage that was done; they object to the nonparticipation of the government in the settlement. In the words of a Virginia woman,

In my opinion the government reps were aware of what we were being exposed to in RVN [Republic of Vietnam] as well as the companies. I am appalled that the

government is not a defendant and that it along with the chemical companies are not admitting irresponsibility.

Another Wisconsin veteran writes:

> I want [the court] to know that I, and many of my fellow Veterans of all eras stand in protest of this proposed sell-out to big business—I feel that liability *and* responsibility go hand in hand here. This must be proven. We owe it to the thousands of Nam Vets and their families to prove this issue once and for all. We will not be used and thrown away— No more Vietnams.

As does the writer of the last quoted letter, some view the settlement as another example of a victory by "big business" represented by the chemical companies, over the "little guy," represented by the veterans. In the words of a West Virginia veteran,

> [t]hese [chemical] companies are in reality getting away with murder and torture, while we, the veterans, are getting stepped on and pushed under the rug, as usual.

In sum, there is a sharp split of opinion among class members as to whether the court should accept the settlement. Yet only a small fraction of one percent of the class has been heard from at the Fairness Hearings and in correspondence with the court. The silent majority remains inscrutable.

## III. FACTUAL PROBLEMS WITH CLAIMS

There are serious factual problems with plaintiffs' case, the chief one being doubt that present scientific knowledge would support a finding of causality. In addition, problems respecting the discretionary power of the government to make decisions even when it creates dangers to individuals, and the defense the manufacturers may have because of the government's knowledge of the dangers from Agent Orange reduce substantially the prospects of recovery after trial. This legal issue is discussed in section IV, *infra*, in connection with the applicable substantive law.

## A. Use of Agent Orange in Vietnam

In late 1961, President Kennedy approved a joint recommendation of the Departments of State and Defense to initiate, on a limited scale, defoliant operations in Vietnam. The decision made at these high levels provides a basis for the argument that the government in its discretion knowingly assumed the risks. If so, there is possibly no right to sue the government under the Federal Tort Claims Act and, since at least some of the manufacturers claim that they were compelled to supply the government under various war power acts, governmental immunity might accrue to them to some degree. *See* IV, C, Nature of Liability and Relation to Defense of Government Knowledge, *infra*.

Project Ranch Hand, as the Air Force defoliation program became known, began its spray missions in January 1962. *See generally*, W. Buckingham, *Operation Ranch Hand, The Air Force and Herbicides in Southeast Asia 1961–1971* at 29–31 (1982); G. Lewy, *America in Vietnam*, 257–66 (1978). Initially the aerial spraying took place near Saigon; its purpose was to clear the thick jungle canopy from around roads, power lines and other lines of communications in order to lessen the potential of ambush. There was also some hand spraying from the ground around gun emplacements and the like to reduce surprise attacks and maintain open lines of fire. By late 1962 approval was granted for offensive use of herbicides to destroy planted fields and crops suspected of being used by the Viet Cong. The use of herbicides for crop destruction peaked in 1965 when 45% of the total spraying was designed to destroy crops.

Various herbicides were used for defoliation and crop destruction spraying in Vietnam including Agent Blue (cacodylic acid), Agent White (a mixture of 80% tri-isopropanol amine salt of 2,4-dichlorophenoxyacetic acid (2,4–D) and picloram), Agent Purple (a formulation of 50% n-butyl ester of 2,4–D, 30% n-butyl ester of 2,4,5-trichlorophenoxyacetic acid (2,4,5–T) and 20% isobutyl ester of 2,4–D), Agent Green (100% n-butyl ester

of 2,4,5–T) and Agent Pink (60% n-butyl ester of 2,4,5–T and 40% isobutyl ester of 2,4,5–T).

After 1964, Agent Orange, a 50–50 mixture of the n-butyl esters of 2,4–D and 2,4,5–T, was one of the most widely used herbicides, along with Agent White and Agent Blue. *See* A.L. Young, J.A. Calcagni, C.E. Thalken & J.W. Tremblay, *The Toxicology, Environmental Fate, and Human Risk of Herbicide Orange and its Associated Dioxin*, USAF OEHL Technical Report (Oct. 1978); R. Bovey & A. Young, *The Science of 2,4,5–T and Associated Phenoxy Herbicides* (1980). Phenoxy herbicides such as Agents Orange, White, Pink and Green are growth regulators that kill certain plants by inducing malfunctions in the growth process. Agents Pink and Green were rarely used after Agent Orange was introduced in early 1965. Agent Orange proved to be an effective defoliant when used in heavy concentrations and was used on a wide variety of woody and broadleaf herbaceous plants, causing discoloration and dropping of leaves. Agent White was especially useful in killing conifers. Agent Blue was used primarily for crop destruction.

Evaluation of the early Ranch Hand missions recommended increasing the amount of herbicide sprayed per acre. The first mission in 1962 lasted three days and used 7920 gallons of herbicide to cover 6920 acres. *See* W. Buckingham, *Operation Ranch Hand, supra*, at 36. In September 1962, in a four-week period, Ranch Hand sprayed more than 9000 acres with 27,648 gallons of Agent Purple, clearing vegetation along rivers and canals on the Cau Mai Peninsula in the Mekong Delta. *Id.* at 62. This application rate of three gallons of herbicide per acre became the standard for spraying in Vietnam. Domestically, herbicides such as 2,4–D and 2,4,5–T were applied at a rate of one gallon per acre.

Occasionally, because of malfunctions and the need of aircraft to escape enemy fire, much higher concentrations were dropped suddenly on small areas. Miscalculations, drifts and respraying undoubtedly caused heavier concentrations in some instances than the planned three gallons per acre.

As the war in Vietnam escalated in the mid-1960s, so too the use of herbicides expanded. In 1967, the peak year for herbicide spraying in South Vietnam, 1,687,758 acres were sprayed—85% for defoliation purposes and 15% for crop destruction. W. Buckingham, *Operation Ranch Hand, supra*, at 129. Eighteen to twenty-seven sorties were flown per day. *Id.* at 131.

Beginning about 1967 herbicide spraying in Vietnam became the subject of increasing controversy in this country and abroad. A report prepared by the Bionetics Research Laboratory for the National Institutes of Health in 1969 indicated that 2,4,5–T, a major component of Agent Orange and other herbicides used in Vietnam, could cause malformed offspring and stillbirths in mice when administered in high dosage to the mothers. The Bionetics study has been criticized on the ground that the test conditions greatly increased the amount and intensity of exposure. *See, e.g.*, W. Buckingham, *Operation Ranch Hand, supra*, at 163–64.

On April 15, 1970, the Secretaries of Health, Education and Welfare, Agriculture and the Interior issued a joint statement suspending domestic use of herbicides containing 2,4,5–T except for limited non-crop uses. W. Buckingham, *Operation Ranch Hand, supra*, at 166; *see also Dow Chemical Co. v. Ruckelshaus*, 477 F.2d 1317, 1318–19 (8th Cir.1973); *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908, 914 (D.Or.1977); *United States v. Vertac Chemical Corp.*, 489 F.Supp. 870, 881 (E.D.Ark.1980). That same day, the Department of Defense suspended military use of 2,4,5–T, including Agent Orange, "pending a more thorough evaluation of the situation." W. Buckingham, *Operation Ranch Hand, supra*, at 166. Thereafter, herbicide spraying for defoliation continued for a short while, using Agent White. Crop destruction, utilizing Agents White and Blue, continued through-

out 1970. In January 1971, the last Ranch Hand mission took place.

Overall, between 17 and 19 million gallons of Agents Orange, White and Blue were procured by the United States and disseminated in Vietnam between January 1965 and February 1971. A.L. Young, J.A. Calcagni, C.E. Thalken & J.W. Tremblay, *The Toxicology, Environmental Fate, and Human Risk of Herbicide Orange and its Associated Dioxin, supra,* I–10. A study by the National Academy of Sciences concluded that herbicides had been sprayed on 10.3% of inland forests, 36.1% of mangroves and 3% of cultivated areas. *Id.* at I–11. Between eight and ten percent of the total land area in South Vietnam was sprayed. *Id.*

It is estimated that the seven defendant chemical companies manufactured approximately 99% of all Agent Orange used by the military between 1965 and 1970. After cessation of herbicide spraying in February 1971, approximately 2,220,000 gallons of Agent Orange remained unused—1,370,000 gallons in Vietnam which was shipped to Johnston Island in the Pacific Ocean for storage, and 850,000 gallons stored at Gulfport, Mississippi. W. Buckingham, *Operation Ranch Hand, supra,* at 183. The average dioxin contamination of these more than 2 million gallons of left-over Agent Orange was estimated at approximately 2 parts per million (ppm). *Id.* Of 200 samples of the Agent Orange that had been shipped to Johnston Island for storage, four contained more than .15 ppm of dioxin, with one sample as high as 47 ppm. Of the samples tested at Gulfport, none contained more than 15 ppm. A.L. Young, J.A. Calcagni, C.E. Thalken & J.W. Tremblay, *The Toxicology, Environmental Fate, and Human Risk of Herbicide Orange, supra,* at I–21. *See also* Veterans Administration, *Review of Literature on Herbicides Including Phenoxy Herbicides and Associated Dioxins,* Vol. I, 2–21 (1981).

The teratogenic effects—that is the effect on a fetus of exposure of the mother during pregnancy—associated with high level doses of 2,4,5–T in the Bionetics re-

port were subsequently determined to result from a toxic contaminent in 2,4,5–T, identified as 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD). TCDD enters the 2,4,5–T product during the manufacture of trichlorophenol (TCP), a necessary precursor chemical for 2,4,5–T; some of the TCDD generated in the manufacture of TCP carries forward into 2,4,5–T and thus into the phenoxy herbicides containing 2,4,5–T.

B. Claimed Effects of Contact with Agent Orange in Vietnam

1. General Considerations

The basic problem with the plaintiffs' factual case was succinctly and accurately stated in a memorandum by counsel to a large number of plaintiffs, dated December 28, 1983, edited January 25, 1984, and attached to an affirmation filed July 26, 1984. It stated:

[The] class action ... is now careening toward a trial in May without the basic information necessary to establish a causal relation between exposure to dioxin contaminated phenoxy herbicides in Vietnam and the illness, disability, and death of the plaintiff veterans. There is not sufficient command of the biological, chemical, medical, epidemiological, and genetic evidence to establish a causal relation between the disease, disability, and death of the plaintiff veterans much less the catastrophic polygenetic birth defects afflicting their children.

Plaintiffs' factual case may be briefly summarized. Agent Orange contained small quantities of dioxin. Dioxin is a potent poison which can cause serious harm to humans. Many plaintiffs suffer from diseases that can be caused by dioxin. Dioxin caused the diseases. The logical and practical difficulty with their argument is that the diseases referred to may result from causes other than dioxin poisoning.

As to the poisonous nature of dioxin and its ability to cause harm to mammals, including homo sapiens, there is no doubt. The form of dioxin implicated in Agent Orange is a dangerous, stable, long lasting chemical. *See, e.g.,* R.E. Tucker, A.L.

Young & A.P. Gray, *Human and Environmental Risks of Chlorinated Dioxins and Related Compounds*, sections on Environmental Chemistry, and Environmental Toxicology, 143–341 (1983); M.P. Esposito, T.O. Tiernan & F.E. Dryden, U.S. Environmental Protection Agency, *Dioxins* 230–256 (1980); A. Hay, *The Chemical Scythe* 32 (1982).

Dioxin is one of the most powerful poisons known, as is indicated by the following table.

| Substance | Molecular weight | Minimum lethal dose (moles/kg) |
|---|---|---|
| Botulinum toxin A | $9.0 \times 10^5$ | $3.3 \times 10^{-17}$ |
| Tetanus toxin | $1.0 \times 10^5$ | $1.0 \times 10^{-15}$ |
| Diphtheria toxin | $7.2 \times 10^4$ | $4.2 \times 10^{-12}$ |
| 2,3,7,8-TCDD | 322 | $3.1 \times 10^{-9}$ |
| Saxitoxin | 372 | $2.4 \times 10^{-8}$ |
| Tetrodotoxin | 319 | $2.5 \times 10^{-8}$ |
| Bufotoxin | 757 | $5.2 \times 10^{-7}$ |
| Curare | 696 | $7.2 \times 10^{-7}$ |
| Strychnine | 344 | $1.5 \times 10^{-6}$ |
| Muscarin | 210 | $5.2 \times 10^{-6}$ |
| Diisopropylfluorophosphate | 184 | $1.6 \times 10^{-5}$ |
| Sodium cyanide | 49 | $2.0 \times 10^{-4}$ |

M.P. Esposito, T.O. Tiernan & F.E. Dryden, U.S. Environmental Protection Agency, *Dioxins* 188 (1980). *See generally* R.E. Tucker, A.L. Young & A.P. Gray, *Human and Environmental Risks of Chlorinated Dioxins and Related Compounds* (1983); Veterans Administration, *Review of Literature on Herbicides Including Phenoxy Herbicides and Associated Dioxins* Vols. I, II, III (1981, 1983); Centers for Disease Control, Protocol for Epidemiologic Studies of the Health of Vietnam Veterans (Nov. 1983).

There is also little doubt that many servicepersons were exposed to some amounts of herbicides containing at least trace amounts of dioxin while they were in Vietnam. The following map and tables from volume I of the *Review of Literature on Herbicides, Including Phenoxy Herbicides and Associated Dioxins* suggest the extent of the spraying. These charts do not help much in determining extent of exposure since, for example, a great deal of the herbicide was in the high canopy of jungle trees and samples of Agent Orange showing relatively high dioxin content may have been taken from unused batches. *Id.* at 2–20 to 2–22. Although no one can tell exactly how much dioxin was involved, a reasonable estimate for the years 1965 to 1971, the time of heaviest troop involvement in Vietnam, is 240 pounds. As the *Review of Literature* puts it:

> Overall, the spraying of more than 11.3 million gallons of Orange/Orange II from August 1965 through February 1971 is estimated to have released close to 240 pounds of TCDD, assuming that the average concentration of TCDD ... was 2 ppm ($2.1 \times 10^{-5}$ pounds per gallon).

*Id.* at 2–22. Another estimate for the years 1962 to 1971 is 368 pounds, although some of this total may have come from herbicides other than Agent Orange. *See* B.B. Dan, Vietnam and Birth Defects, 252 J.A.M.A. 936 (1984). The differences are not significant for present purposes given the large amount of Agent Orange sprayed and the wide area over which it was spread.

Herbicide Defoliation Missions—Fixed Wing
1965-1970. Data from HERB 01 file

SOUTH VIETNAM

STATUTE MILES

KILOMETERS

[From Veterans Administration, <u>Review of Literature on Herbicides,</u>
<u>including Phenoxy Herbicides and Associated Dioxins,</u> Vol. I, Fig.
2-6, at 2-13.]

## APPLICATION OF HERBICIDES IN THE VIETNAM WAR BY YEAR

Millions of Gallons

| Year | 1962–July 1965 | Aug–Dec 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | Total |
|------|------|------|------|------|------|------|------|------|------|
| Orange | NA[a] | .37 | 1.64 | 3.17 | 2.23 | 3.25 | .57 | .00 | 11.22 |
| White | NA[a] | 0 | .53 | 1.33 | 2.13 | 1.02 | .22 | .01 | 5.24 |
| Blue | NA[a] | 0 | .02 | .38 | .28 | .26 | .18 | .00 | 1.12 |
| Total | 1.27 | .37 | 2.19 | 4.88 | 4.63 | 4.53 | .97 | .01 | 18.95 |

[a] Not Available.

[From Veterans Administration, Review of the Literature on Herbicides, Including Phenoxy Herbicides and Associated Dioxins, Vol. I Table 2–1, at 2–16.]

### ANNUAL NUMBER OF ACRES SPRAYED IN VIETNAM[a]

| Year | Acres[a] |
|------|------|
| 1962 | 5,724 |
| 1963 | 24,920 |
| 1964 | 93,869 |
| 1965 | 221,552 |
| 1966 | 608,106 |
| 1967 | 1,570,114 |
| 1968 | 1,365,479 |
| 1969 | 1,365,754 |
| 1970 | 294,925 |
| 1971 | |

[a] Acres sprayed more than once are counted as additional acres sprayed.

[From Veterans Administration, Review of Literature on Herbicides, Including Phenoxy Herbicides and Associated Dioxins, Vol. I Table 2–2, at 2–17.]

As the various industrial accidents in which people were exposed to heavy doses of dioxin in a single event or smaller doses over a longer period show, dioxin may be highly toxic to humans. This conclusion is confirmed by experience with contamination around homes and farms. Animal studies also suggest the serious harm that this poison can cause. These studies and data are considered more fully in III, C, Scientific Studies on Effect of Contact with Agent Orange, *infra*.

It is important in considering the facts to keep clearly in mind in this section and the sections that follow the different problems of proof posed in determining if dioxin *can cause* certain diseases and whether it *did cause* a particular disease or defect in a particular person. This is an issue to which we now turn and return to again and again in the course of this opinion.

In this connection we note that a number of letters and statements at the Fairness Hearings suggest that there may be a failure among some class members to distinguish between the *avoidance* of risks by regulation and legislation designed to prevent injuries on the one hand, and the *compensation* for injuries, particularly through tort law, on the other. For example, a number of class members pointed out that while the government refuses to compensate veterans and defendants continue to deny liability in this case, the United States has spent large sums cleaning up toxic wastes and compensating "victims" of the chemical dumps, most notably in

Times Beach, Missouri. *See, e.g.,* A. Hay, *The Chemical Scythe* 229–43 (1982) (description of the Love Canal incident); *cf.* A.L. Young, J.A. Calcagni, C.E. Thalken & J.W. Tremblay, *The Toxicology Environmental Fate, and Human Risk of Herbicide Orange and its Associated Dioxin,* USAF OEHL Technical Report, V–17 to V–19 (Oct. 1978) (description of the Eastern Missouri Horse Arena episode in which heavily contaminated oils were spread on farm property).

The distinction between avoidance of risk through regulation and compensation for injuries after the fact is a fundamental one. In the former, risk assessments may lead to control of a toxic substance even though the probability of harm to any individual is small and the studies necessary to assess the risk are incomplete; society as a whole is willing to pay the price as a matter of policy. In the latter, a far higher probability (greater than 50%) is required since the law believes it unfair to require an individual to pay for another's tragedy unless it is shown that it is more likely than not that he caused it. *See, e.g., Ayers v. Jackson Tp.,* 189 N.J.Super. 561, 461 A.2d 184, 187 (N.J.Super.Ct.Law Div.1983) (increased risk of exposure to contaminated water not enough for tort liability because of "speculative" nature of proof); *Pierce v. Johns-Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020, 1026 (C.A.Md.1983) (applying 50% probability rule to asbestos exposure). *See generally* ALI–ABA, Symposium on Environmental Law sponsored by the Environmental Law Institute and the Smithsonian Institute, February 23–25, 1984, Washington, D.C.; Grad, Hazardous Waste Victim Compensation: The Report of the § 301(e) Superfund Study Group, 13 Envtl. L.Rep. 10234 (1983); Office of Science and Technology Policy, Chemical Carcinogens: Review of the Science and Its Associated Principles, 49 Fed.Reg. 21594, 21596 (1984); D.G. Barnes, Regulatory Actions in Dioxins and Related Compounds, *in* R.E. Tucker, A.L. Young & A.P. Gray, *Human and Environmental Risks of Chlorinated Dioxins and Related Compounds* 23–31 (1983).

In both the regulatory and tort models, the *techniques* for assessment of the probabilities of risk can be similar—courts need not deny themselves the same sophisticated methods used by regulatory agencies. National Research Council, Steering Committee on Identification of Toxic and Potentially Toxic Chemicals for Consideration by the National Toxicology Program, *Toxicology Testing* 349 (1984).

The statistical and other scientific bases for finding possible dangers from the use of Agent Orange might be more than enough for a court to uphold governmental action limiting its use, particularly in view of the need to defer to an administrative agency. *See, e.g., Batterton v. Marshall,* 648 F.2d 694, 699–710 (D.C.Cir.1980) (statistical methodology for a rule); *FMC Corp. v. Train,* 539 F.2d 973 (4th Cir.1976); *National Association of Metal Finishers v. Environmental Protection Agency,* 719 F.2d 624 (3d Cir.1983) (toxic pollutants and causation), *cert. granted,* —— U.S. ——, 104 S.Ct. 2167, 80 L.Ed.2d 551 (1984); *Lead Industries Association v. Environmental Protection Agency,* 647 F.2d 1130 (D.C. Cir.) (standard deviation method not arbitrary), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). Even given such deference, some courts might have difficulty in finding a causal relationship between Agent Orange use in Vietnam and dangers to servicepersons. *See, e.g., Ethyl Corporation v. Environmental Protection Agency,* 541 F.2d 1 (D.C.Cir.) *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), where the court was sharply divided on the issue of cause and the probative force of epidemiological studies. *See generally* National Research Council, Committee on the Institutional Means for Assessment of Risks to Public Health, *Risk Assessment in the Federal Government: Managing the Process* (1983); Office of Science and Technology Policy, Chemical Carcinogens: Review of the Science and its Associated Principles, 49 Fed.Reg. 21594 (1984); ALI–ABA Conference on Environmental Law, *supra,* at 48–49; Proceedings of the Seventh Sympo-

sium on Statistics and the Environment, 37 American Statistician 359 ff. (1983). Regardless of what regulatory action would be justified by current evidence, as noted in III, B, 2, Plaintiffs' Evidence of Causality and III, C, Scientific Studies on Causality, *infra*, such evidence would not be sufficient to find an individual defendant liable to an individual plaintiff.

## 2. Plaintiffs' Evidence of Causality

The critical problem for the plaintiffs is to establish that the relatively small quantities of dioxin to which servicepersons were exposed in Vietnam caused their present disabilities. Here adequate proof is lacking.

Since no motion for summary judgment based on inability to demonstrate causation was made, the exact evidence plaintiffs were relying upon to satisfy their burden of proof on the issue was never fully set forth. Some indication of their theory is contained in their draft memorandum on "Distribution and Administration of Settlement Fund" dated June 1, 1984. See also the references in plaintiffs' Fairness Brief to expected scientific testimony on particular plaintiffs, *infra*. A central problem under plaintiffs' theory would be establishing a causal relationship between exposure and discrete diseases. As yet little if any scientific support for plaintiffs' views has been developed.

Even if we assume that chloracne in veterans was caused by exposure to Agent Orange, plaintiffs concede that the government contract defense, *see* IV, C, Nature of Liability and Relation to Defense of Government Knowledge, *infra*, represents a substantial impediment to recovery for this disease. It was well known in the 1960's that workers' exposure to dioxin in herbicides caused chloracne, so that the government's knowledge of this fact was probably as great as that of the manufacturers.

The kind of study necessary to support some of the hypotheses of plaintiffs' experts is now being undertaken by the Centers for Disease Control. *See* Centers for Disease Control, Protocol for Epidemiologic Studies of the Health of Vietnam Veterans (Nov. 1983) ("CDC Protocol") (101 page detailed description of study). Assuming that the study was started in December, 1983 as planned, it would take 69 months to complete the report—i.e., if all goes well it will be available in mid-1989. *Id.* at 40. A partial copy of the CDC Protocol is printed as Appendix F to indicate the difficulty of obtaining satisfactory proof. [omitted.] Courts cannot, unfortunately, wait indefinitely until all scientists have completed their long term studies. They must decide on information now available.

In the intensive study of the Ranch Hand personnel who conducted most of the spraying and had most contact with Agent Orange, no statistically significant dermatological differences were found between these men and a control group. Air Force Health Study, *An Epidemiologic Investigation of Health Effects in Air Force Personnel Following Exposure to Herbicides,* XV-9 (Feb. 24, 1984) (Ranch Hand II Study —1984 Report).

The evidence with respect to birth defects is even more tenuous. Male mediated birth defects might theoretically result from exposure of the father to Agent Orange, but no supporting data associating dioxin exposure of males with birth defects of children has been made available.

No test, plaintiffs' experts apparently concede, is decisive in proving exposure to Agent Orange, partly because, as one expert put it, "all of us have probably been exposed to dioxin at some time." Their suggestion that combinations of symptoms "hold the most promise for determining possible exposure to dioxin," is certainly worth study, but could not now be the basis for recovery in a lawsuit, where relatively high degrees of probative force are required.

In short, the evidence provided by the plaintiffs to date on general causality, while supportive of the desirability of further studies, lacks sufficient probative

force—except in the case of chloracne—to permit a finding of general causality. It might require the direction of a verdict for defendants at the end of plaintiffs' case. It simply is not sufficient to point to an individual and show that he was exposed to Agent Orange and had a cancer. The incidence of cancers of the type suffered by plaintiffs in the population as a whole make it at least as likely, based upon present knowledge, that the cancer resulted from causes other than Agent Orange. The problems with plaintiffs' factual case are even greater with respect to birth defects and miscarriages.

The scientific data relied upon by defendants, a subject to which we turn in the next section, throws even greater doubt on plaintiffs' case. This litigation presents quite a different picture from one where long term repeated exposure to a highly toxic substance leads a number of acknowledged experts to state flatly that the exposure caused the disease. *See, e.g., Ferebee, Jr. v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.1984) (repeated intensive exposure to paraquat; experts' positive testimony as to specific causation). We are not dealing here with exposure of workers in a factory or laboratory to dioxin in concentrated amounts where the probative force of the evidence on causality may be substantial.

As all experts, both plaintiffs' and defendants', recognize, "[t]he dose-response relationship at low levels of exposure for admittedly toxic chemicals is one of the most sharply contested questions currently being debated in the medical community." *Id.* at 1536. *See also, e.g.,* National Research Council, Steering Committee on Identification of Toxic and Potentially Toxic Chemicals for Consideration by the National Toxicology Program, *Toxicity Testing* (1984); R.E. Tucker, A.L. Young, & A.P. Gray, *Human and Environmental Risks of Chlorinated Dioxins and Related Compounds* (1984); Office of Science and Technology Policy, Chemical Carcinogens: Review of the Science and Its Associated Principles, 49 Fed.Reg. 21594 (1984); Proceedings of the Seventh Symposium on Statistics and the Environment, 37 American Statistician 359 (1983); National Research Council, Committee on the Institutional Means for Assessment of Risks to Public Health, *Risk Assessment in the Federal Government: Managing the Process* (1983); Leape, Quantitative Risk Assessment in Regulation of Environmental Carcinogens, 4 Harv.Envt'l L.Rev. 86, 100–03 (1980).

The problem of obtaining useful data on the effects of Agent Orange is particularly difficult for a number of reasons. First, the relatively young males who served in Vietnam were a highly selected, healthy group so that the expected mortality was relatively slight in their early ages and a comparison with base civilian populations is difficult. Second, there may be many confounding factors that explain diseases such as stress of combat and local natural and man-made carcinogens. Third, the cancers involved may take a long time to reveal themselves since they become important in a epidemiologic sense only in older age groups. Some of the problem is revealed in the table below, taken from the Air Force Health Study of some 1000 Air Force personnel, showing very few cancers among the control group or the Ranch Hand group.

TOTAL MORTALITY AND MORBIDITY STUDY
MORPHOLOGY OF SYSTEMIC NEOPLASM

| ICD-O CODES | NOMENCLATURE | MORTALITY | | MORBIDITY | |
|---|---|---|---|---|---|
| | | RANCH HAND | COMPARISON | RANCH HAND | COMPARISON O S R |
| M800 | Neoplasm not otherwise specified (NOS) | | | | |
| | Bronchus and Lung | 0 | 1 | 0 | 0 0 0 |
| | Intestinal Tract | 0 | 1 | 0 | 0 0 0 |
| M801–804 | Epithelial neoplasms | | | | |
| | Appendix | 0 | 0 | 0 | 1 0 0 |
| | Bladder | 0 | 0 | 0 | 1 0 0 |
| | Bronchus and Lung | 1 | 1 | 1 | 0 0 0 |
| | Kidney | 1 | 0 | 0 | 0 0 0 |
| | Lip | 0 | 0 | 1 | 0 0 0 |
| | Nasopharynx | 0 | 1 | 0 | 0 0 0 |
| | Tongue | 0 | 0 | 1 | 0 0 0 |
| | Unspecified site | 1 | 1 | 0 | 0 0 0 |
| | Vocal Cord | 0 | 0 | 0 | 1 0 0 |
| M805–808 | Papillary and Squamous Cell | | | | |
| | Lip | 0 | 0 | 2 | 2 0 0 |
| | Lung | 0 | 0 | 1 | 0 0 0 |
| M812–813 | Transitional Cell Papillomas and Carcinomas | | | | |
| | Bladder | 0 | 0 | 2 | 0 1 0 |
| M814–838 | Andenomas and Adenocarcinomas | | | | |
| | Bronchus and Lung | 0 | 1 | 0 | 0 0 0 |
| | Colon | 0 | 0 | 0 | 2 0 1 |
| | Kidney | 0 | 1 | 1 | 0 0 0 |
| | Prostate | 0 | 0 | 1 | 1 0 0 |
| | Pancreas | 0 | 0 | 0 | 1 0 0 |
| M850–854 | Ductal, lobular, and medullary neoplasms | | | | |
| | Thyroid | 0 | 0 | 0 | 1 0 0 |
| M872–879 | Nevi and Melanomas | | | | |
| | Mediastinal | 1 | 0 | 0 | 0 0 0 |
| M905 | Mesothelioma | | | | |
| | Bronchus and Lung | 0 | 1 | 0 | 0 0 0 |
| M906–909 | Germ cell neoplasms | | | | |
| | Testicle | 0 | 0 | 2 | 0 0 0 |
| M938–948 | Gliomas | | | | |
| | Frontal Lobe | 0 | 1 | 1 | 0 0 0 |

[From Ranch Hand II Study—1984 Report, Table X–6]

Even in cohorts as large as 6000, such as that being used in the Centers for Disease Control Study of Veterans, the incidence in the general population of diseases of particular concern in this case is so low that changes due to exposure to any one chemical such as Agent Orange are difficult to detect. This is shown by the table below.

Estimated Prevalence of Vietnam Service and Expected Number of Cases of Cancer for the Selected Cancers Case-Control Study in Males Aged 30–54 in 1986 in the SEER Areas

| Age | Number of Males[1] | Prevalence of Vietnam Service[2] | Estimated Yearly Number of Cases[3] | | | |
|---|---|---|---|---|---|---|
| | | | Soft Tissue[4] Sarcoma | Lymphoma[5] | Nasal and[6] Nasopharyngeal | Primary Liver[7] |
| 30–34 | 980 | 4.9 | 20 | 53 | 4 | 3 |
| 35–39 | 907 | 11.7 | 14 | 45 | 5 | 3 |
| 40–44 | 740 | 12.5 | 17 | 52 | 6 | 5 |
| 45–49 | 590 | 3.7 | 22 | 75 | 10 | 12 |
| 50–54 | 552 | 1.5 | 33 | 106 | 17 | 20 |
| Total | 3,769 | 7.4 | 106 | 331 | 42 | 43 |

[1] Estimated number of males (thousands) in SEER areas, 1976 data projected to 1986, National Cancer Institute Monograph 57, 1981.

[2] Percent of males who are Vietnam veterans; estimated from VA data on numbers of Vietnam era veterans and assumption that 32.2% of Vietnam era veterans served in Vietnam.

[3] Incidence of cancers derived from National Cancer Institute Monograph 57, 1981.

[4] Includes the following (morphology-based) tumor types: fibrosarcoma, malignant fibrous histiocytoma, liposarcoma, leiomyosarcoma, rhabdomyosarcoma, Kaposi's sarcoma (estimate based on pre-AIDS incidence), blood vessel sarcoma, nerve sheath sarcoma, synovial sarcoma, malignant mesenchymoma, malignant paragarglioma. Incidence estimates also based on categories "sarcoma NOS" and "other sarcoma."

[5] Includes Hodgkin's Disease and non-Hodgkin's lymphoma.

[6] Includes the following topographic tumor types: nasopharynx, nasal cavity, accessory sinuses.

[7] Includes liver and intrahepatic bile ducts.

[From CDC Protocol, Table 4]

A government administrative agency may regulate or prohibit the use of toxic substances through rulemaking, despite a very low probability of any causal relationship. A court, in contrast, must observe the tort law requirement that a plaintiff establish a probability of more than fifty percent that the defendant's action injured him. *See* IV, B, Failure to Determine Who Was Harmed and Who Caused Harm, *infra*. This means that at least a two-fold increase in incidence of the disease attributable to Agent Orange exposure is required to permit recovery if epidemiological studies alone are relied upon.

The numbers are such that even when we put aside such confounding factors as use of drugs administered for malaria or self administered through smoking or drinking, special stresses and natural carcinogens peculiar to service in Vietnam, *see*, *e.g.*, S. Karnow, Vietnam, A History 25–26 (1983), increased relative risks are hard to prove. This point is illustrated by the table set out below and other tables of the CDC Protocol for Epidemiologic Studies of the Health of Veterans at 43, 48–49; *see also* Appendix F. Extrapolations to all Vietnam veterans (approximately 2,400,000) from the table below, which is designed for 6,000, can be obtained by multiplying the table's figure by 400. These figures, it should be pointed out, are for a sample civilian population and therefore do not take account of special health and other factors that may affect Vietnam veterans. Putting aside such problems, the total expected deaths of veterans after the war would be in the order of 85,000. More than 52,000 deaths would be violent—accident, homicide and suicide—about the number of deaths of United States servicemen in Vietnam from 1961 to 1972. *The New Columbia Encyclopedia*, Vietnam War, 2891 (1975).

Cumulative Expected Numbers of Deaths by Cause[1] in a Hypothetical Cohort of 6,000
Men Aged 22 in 1968 and Followed Through 1984 (17 Years)

| Cause of death[2] | Expected Number of Deaths |
|---|---|
| All causes | 213.0 |
| Accidents (E800–E949) | 79.1 |
| Motor vehicle (E810–E823) | 48.3 |
| Other (E800–E807, E825–E949) | 30.8 |
| Suicide (E950–E959) | 25.5 |
| Homicide (E960–E978) | 27.3 |
| Diseases of Heart (390–398, 402, 410–429) | 18.6 |
| Malignant Neoplasms (140–204) | 17.3 |
| Cirrhosis of liver (571) | 6.6 |
| Cerebrovascular diseases (430–438) | 3.6 |
| Influenza and Pneumonia (470–474, 480–486) | 2.9 |
| Diabetes Mellitus (250) | 2.1 |
| Nephritis and nephrosis (580–584) | 0.7 |
| Bronchitis, emphysema and Asthma (490–493) | 0.5 |
| Septicemia (038) | 0.5 |
| All other causes (residual) | 28.2 |

[1] Expected numbers based on 1978 U.S. age-specific rates for males. The age-specific rates were quinquennial (5 years), and the cumulative rates used to derive the expected numbers were computed by weighting the quinquennial rates by the number of years of cohort experience in each quinquennium (constant cohort size). Source of rates: Vital statistics of the U.S.: 1978, Vol. II, Mortality Part A, NCHS, 1982.

[2] Numbers in parentheses are the relevant codes from the Eighth Revision International Classification of Diseases, Adapted.

[From CDC Protocol, Table 1]

Yet, despite the lack of general scientific evidence, it cannot be said without hearing the evidence that the plaintiffs could not possibly recover. In Plaintiffs' Fairness Brief, dated August 7, 1984, at 38–43, they summarize their evidence on representative plaintiffs based upon their proposed expert opinion testimony. The flavor of their claims is illustrated by the following paragraph (citations to depositions and some omissions not indicated):

As to those Representative Plaintiffs whose cases were to be tried beginning May 7, 1984, Plaintiffs' experts, Dr. Alastair Hay, Dr. Ellen Silbergeld, Dr. Marvin Legator, Dr. Lennart Hardell, Dr. Ronald Codario, Dr. Peter Orris and Dr. Alan Levin, testified [in depositions] that in their scientific opinions, based on reasonable medical and/or scientific certainty and/or probability certain specific conditions of the 5 Representative Plaintiff veterans resulted from their exposure to Agent Orange in Vietnam. Further, Dr. Silbergeld, Dr. Legator, and Dr. Levin testified that the birth defects suffered by Chad and Michael Jordan and Kerry Ryan were the result of their fathers' exposure to Agent Orange, with its contaminant dioxin, in Vietnam. More specifically, Dr. Hardell, Dr. Legator, Dr. Silbergeld, Dr. Levin, Dr. Codario and

Dr. Orris testified that George Ewalt's basal cell carcinoma, David Lambiotte's lymphocytic lymphoma and basal cell carcinoma and Danny Ford's rhabdomyosarcoma (a soft-tissue sarcoma) were proximately caused by these veterans' exposure to Agent Orange in Vietnam.

This positive evaluation of the depositions is that of plaintiffs' counsel, not that of the court. How effective the testimony would be at trial is not clear. The birth defect testimony would be subject to analysis in light of the study published by the Centers for Disease Control *after* the depositions relied upon by plaintiffs. *See* III, C, Scientific Studies on Causality, *infra*. Briefs and other materials from defendants throw substantial doubt on the probative force of this evidence and indicate that highly persuasive contrary evidence on specific causality would have been offered had the case gone to trial. See the extensive brief submitted by defendants in support of the settlement, dated August 24, 1984, devoting 260 pages to the proposition that plaintiffs cannot prove causation, with extensive documentation.

It is possible that the court would have admitted all the experts' evidence offered by both sides, leaving it to the jury to decide credibility. *See* Federal Rules of Evidence, Rules 702, 703. Experience with hundreds of Eastern District of New York juries over an eighteen year period gives the court no confidence in predicting how the jury would evaluate this evidence. Based on the evidence so far provided, however, even if the case were permitted to go to a jury and even were there a verdict for plaintiffs, it appears doubtful whether the verdict would have withstood a post-trial motion for judgment notwithstanding the verdict in the trial and appellate courts. This legal evaluation shared by almost all attorneys from both sides in the case provides a strong inducement for plaintiffs to settle.

C. Scientific Studies on Causality

The effect of exposure to dioxin has been and is being studied at least as intensively as that of any other toxic substance. To date none of the studies furnish sufficient support for plaintiffs' casuality claims to warrant a recovery by individuals.

A number of state studies of Agent Orange effects on veterans do not provide substantial support to plaintiffs because of their small size, self-selective nature and other defects. *See, e.g.,* G.R. Newell, Development and Preliminary Results of Pilot Clinical Studies (March 26, 1984) (Texas Study); New York State Temporary Commission on Dioxin Exposure, What You Should Know About Dioxin (January 1983) (New York Report). *See also* 3 Agent Orange Rev. 1 (July 1984) (describing other ongoing state studies). At the hearings in New York, representatives of New Jersey's Agent Orange Commission indicated that New Jersey was about to undertake a scientific study, but its results will probably not be available for a year or more. At the Chicago hearings a proposed Wisconsin study was described, but it will not be available until at least December 1985. A reference to the Australian study of birth defects is made in the Study of the Centers for Disease Control described in the next section; it is essentially negative.

The Texas study of 85 men with the assumed highest exposure to Agent Orange provided no statistically significant correlation with observed cell aberrations. Texas Study, *supra,* at 12–13. There also was no demonstrated effect on sperm characteristics. *Id.* at 14–15. Immunologic studies also proved essentially negative. *Id.* at 16–18. The New York State sponsored studies, one a proportional mortality rate study and another, an epidemiological study of soft tissue sarcoma, both based primarily on death certificates are expected to be published late in 1984. New York Report at 13. The value of the New York Studies has been recognized as extremely limited. *See* New York State Department of Health, *Dioxin Exposure* 28–29 (April 1982).

The most intensive Agent Orange study of effects on veterans published to date is that of the Air Force. Air Force Health Study, *An Epidemiologic Investigation of*

*Health Effects in Air Force Personnel Following Exposure to Herbicides* (February 24, 1984) (Ranch Hand II Study—1984 Report). This study utilized 1024 matched pairs of men for analysis. *Id.* at v. Essentially all those who had participated in the fixed wing spraying and who could be located were studied. The conclusion was negative. In summary,

> This baseline report concludes that there is insufficient evidence to support a cause and effect relationship between herbicide exposure and adverse health in the Ranch Hand group at this time.

*Id.* at iii.

Undoubtedly this conclusion is subject to reevaluation insofar as it is sought to extrapolate from it to the entire class of plaintiffs. It is, for example, obvious that Air Force personnel who generally have clean clothes and showers available at the end of their missions are in a far different situation from a marine or soldier in the jungle who may be drinking contaminated water and living under primitive conditions in sprayed areas.

There were a number of anomalies noted in the Ranch Hand Study. For example, significantly more nonmelanotic skin cancers were observed in the ranch handers, but whether that was due to differences in exposure to sunlight—the prime etiology of these cancers—was not determined. *Id.* at ii. Ranch Hand offspring "showed significantly more minor birth defects (birth marks, etc.).... [N]eonatal deaths and physical handicaps were also significantly excessive in the Ranch Hand Group," but there was an inconsistent relationship to the herbicide exposure index. *Id.* Subjective deficits such as fatigue, anger, fear and anxiety were higher in the Ranch Hand personnel. *Id.* Significantly, however, "no cases of chloracne were diagnosed clinically or by biopsy." *Id.* at iii, XV–9.

It is fair to say that some of the Ranch Hand Study findings were "puzzling." *Id.* at iii. The small sample and other factors, particularly the length of time it takes for most cancers to develop, support the conclusion that more work is needed before any firm conclusion can be reached respecting morbidity. *Id.* at v. The authors support a 20 year mortality follow-up study. *Id.* at v., XVIII–I.

The Ranch Hand Study authors state that "[i]n full context, the baseline study results should be viewed as reassuring to the Ranch Handers and their families at this time." *Id.* at iii; *see also id.* at XIV–4 to XIX–9. Their study, however, offers no solace to either defendants or plaintiffs in the instant litigation. It simply seems inconclusive.

The other major study of the effect of Agent Orange published to date is that on birth defects of the Centers for Disease Control. It furnished no material support for plaintiffs' claims. Because it was first publicly released only a short time ago in The Journal of the American Medical Association, it is too early for critical analysis by medical and statistical experts and others. *See* J.D. Erickson, J. Mulinare, P.C. McClain, T.G. Fitch, L.M. James, A.B. McClearn & M.J. Adams, Jr., Vietnam Veterans' Risks for Fathering Babies With Birth Defects, 252 J.A.M.A. 903 (Aug. 17, 1984) (CDC Birth Defect Study). Because it has been condensed and somewhat simplified, the JAMA version rather than the original CDC Birth Defect Study is referred to in the discussion and quotations that follow.

The study covers male-mediated defects only. There are a number of female veterans who are members of the class. A female class member who was stationed in Vietnam and claimed exposure to Agent Orange testified at the Chicago hearing. Her pregnancy was apparently in the third trimester when she left Vietnam. The father, her former husband, was a Vietnam veteran who apparently also was exposed before she conceived. The child, a thirteen year old male, apparently suffered from no birth defects, but has recently required some psychiatric help. So far as this witness knew, hers is the only case of this type. For all practical purposes, therefore, the CDC Birth Defect Study is relevant to the entire class of children. Mutagenesis

rather than teratogenesis is our primary concern.

The CDC Birth Defect Study is well summarized and its significance in excluding support for claimed Agent Orange genetic effects is reasonably assessed in an editorial published in JAMA by Bruce B. Dan, M.D., for the American Medical Association. He writes:

Despite the lack of evidence of increased incidence of congenital malformations in children of parents exposed to large doses of TCDD, there has still been concern that birth defects observed in children of men serving in Vietnam might be related to exposure to Agent Orange or to some other chemical during their experience in Southeast Asia. Because serious birth defects occur in approximately 2% to 3% of all live births, the number of such defects that would be expected to have occurred, to date, in children of Vietnam veterans ranges from 50,000 to 150,000. It is not surprising that a veteran who noted a disturbing skin condition apparently associated with his tenure in Vietnam might question whether a birth defect in his child could also be related to that experience.

How might a chemical exposure be related to congenital malformations? Most birth defects result from the abnormalities of development soon after conception, through either teratogenesis or mutagenesis. For teratogenesis to occur, the exposure to a putative chemical agent would have to occur in utero. While it is possible that an absorbed and retained chemical from previous exposure might be transmitted to an embryo through semen, it is unlikely. It is possible, however, that a chemical mutagen could produce future birth defects by disturbing the father's germ cells.

It is also possible that exposure to a specific infectious agent encountered while in Vietnam could contribute to an increased rate of birth defects. And while it might not be a *direct* effect of military service, it is conceivable that stress experienced in Vietnam could translate into an unhealthy family milieu

with the possibility of inadequate prenatal care, poor nutrition, or abuse of alcohol or other drugs that would adversely affect the pregnancy. Therefore, it is not only important to investigate whether exposure to specific chemical agents could increase the incidence of birth defects, but also whether service in Vietnam alone would have done so....

As with all retrospective views of "experiments of nature," the study has some inherent strengths and weaknesses....

The data set is derived from a large subset of the Metropolitan Atlanta Congenital Defects Program, a registry of birth defects observed during the first year of life. Attributes of parents of babies with defined defects were compared with those of randomly selected babies born without known defects. The case group and control group were matched to race, year, and hospital of birth. Parents of each group were questioned by interviewers who were blinded as to case or control status in order to eliminate possible bias.

Possible confounding by known contributors to birth defects, e.g., maternal age, education, or alcohol consumption, were considered in the lengthy analysis. The investigators were able to evaluate possible birth defect syndromes by considering combinations of two and three defects taken together. They also looked at the effect of malaria or malaria chemoprophylaxis on birth defects.

Because it is impossible to measure accurately the actual herbicide exposure a veteran may have received, the authors have constructed two indices of possible exposure—a veteran's own estimate of possible exposure and an objective scoring system based on the serviceman's location, occupation, and dates of service in Vietnam. While neither one of these two scales relates the possible contribution of ingestion, inhalation, or skin contact of herbicides, they are probably the best estimates of exposure that can be obtained. Although imprecision in exposure might exist, the estimates do not

seem to be distorted by any bias. The consequence of this imprecision in the exposure to TCDD is the reduction in sensitivity in detecting specific birth defects.

The authors are appropriately cautious in the interpretation of their results, but considering the overall strength of the study, the past evidence from human exposure, and the confirming experience of Australian servicemen, it would seem that a fairly strong statement can be made that it is unlikely that serious congenital anomalies in children of men serving in Vietnam were results of that experience. That may be of little consolation to those who have suffered the unfortunate circumstances associated with birth defects. But perhaps it will encourage us to expend more effort in preventing birth defects in any child.

252 J.A.M.A. at 936–37 (footnotes omitted).

Only birth defects diagnosed in the first year of life are covered. CDC Birth Defect Study, *supra*, at 904. At the Fairness Hearings it was apparent that those anomalies revealed shortly after birth were of most concern to the veterans who testified. Some did refer to certain learning and emotional problems that manifest themselves later in childhood, but it would be difficult if not impossible to associate such manifestations with primary effects of herbicide spraying in Vietnam. Those problems may be secondary effects of the emotional and physical problems of the fathers that caused stresses within families.

Overall, there was no significant difference between birth defects of children of Vietnam and non-Vietnam veterans. The Study notes:

[T]here is no evidence in favor of the position that veterans (excluding Vietnam veterans) have had a different risk for fathering babies with the aggregate of the birth defects studied here.... [T]here is no support in these data for the proposition that Vietnam veterans (in general) have been at different risk than other men for fathering babies with the types of birth defects that we studied.

*Id.* at 907. As to specific defects such as spina bifida, cleft lip or "other Neoplasms", there were some indications of a slightly higher incidence of birth defects with exposed fathers but a slightly lower estimated risk for defects classified as "complex cardiovascular defects." The variations would not seem to be significant in a tort case such as the one before us. This conclusion, however, would be the subject of complex statistical analysis at any trial. *Cf. id.* at 911–12. The basic data is indicated by the following table:

| | | | | | Tests of Hypotheses for Birth Defects Risks * | |
|---|---|---|---|---|---|---|

| | | Hypotheses† | | | | |
|---|---|---|---|---|---|---|
| Defect Group | No. of Cases ‡ | Veteran, Odds Ratio | Vietnam Veteran, Odds Ratio | Self-report Agent Orange Exposure, Odds Ratio | Agent Orange Exposure Opportunity Indices, Regression Coefficients | |
| | | | | | 1 | 2 |
| All case babies | 4,815 | 0.94 | 0.97 | ... | 0.03 | 0.04 |
| Multiple defects | 1,107 | 0.93 | 0.99 | 1.07 | 0.03 | 0.06 |
| Total nervous system defects | 663 | 0.96 | 0.91 | 0.78 | 0.06 | 0.07 |
| Total eye defects | 113 | 0.71 | 0.91 | 0.42 | −0.00 | −0.02 |
| Total cardiovascular defects | 1,012 | 0.91 | 0.92 | 0.97 | 0.01 | 0.02 |
| Complex cardiovascular defects | 443 | 0.97 | 0.69 | 0.55 | −0.07 | −0.11 |
| Total respiratory tract defects | 35 | 1.00 | 0.87 | 1.08 | −0.23 | 0.06 |
| Total gastrointestinal tract defects | 1,008 | 1.07 | 0.98 | 1.09 | 0.02 | 0.06 |
| Total sex organ defects | 267 | 0.81 | 0.92 | 1.16 | 0.09 | 0.02 |
| Total urinary tract defects | 214 | 1.05 | 0.93 | 0.21 | −0.06 | −0.06 |
| Total musculoskeletal defects | 1,014 | 0.90 | 0.98 | 1.06 | 0.01 | 0.00 |
| Total endocrine defects | 44 | 1.10 | 0.66 | ... | −0.13 | 0.01 |
| Autosomal chromosome defects | 257 | 1.29 | 0.81 | 0.75 | −0.13 | −0.17 |
| Dominant mutations | 19 | 0.62 | ... | ... | ... | ... |
| Anencaphalus and spina bifida | 343 | 1.13 | 0.99 | 1.03 | 0.08 | 0.11 |
| Anencephalus | 142 | 0.99 | 0.89 | 0.80 | −0.07 | −0.10 |
| Spina bifida | 201 | 1.25 | 1.05 | 1.19 | 0.16 | 0.20 |
| Hydrocephalus | 68 | 0.68 | 0.85 | 0.25 | 0.04 | 0.04 |
| Encephalocele | 39 | 0.59 | 1.21 | ... | 0.19 | 0.15 |
| Microcephalus | 85 | 1.37 | 1.14 | 2.15 | 0.15 | 0.15 |
| Neurofibromatosis | 5 | 0.56 | ... | ... | ... | ... |
| Anophthalmia | 3 | 0.16 | 2.55 | ... | ... | ... |
| Microphthalmos | 44 | 1.08 | 0.76 | ... | −0.47 | −0.12 |
| Buphthalmos | 8 | 1.86 | 1.60 | ... | ... | ... |
| Congenital cateract | 42 | 0.79 | 1.20 | ... | 0.11 | −0.21 |
| Coloboma | 16 | 0.75 | 1.35 | 3.45 | 0.24 | 0.42 |
| Aniridia | 3 | 0.45 | ... | ... | ... | ... |
| Anomalies of ear causing impaired hearing | 31 | 1.40 | 1.54 | ... | −0.70 | −0.81 |
| Conus arteriosus defects | 155 | 0.79 | 0.81 | 1.08 | −0.10 | −0.01 |
| Common truncus | 24 | 0.59 | 0.67 | ... | 0.10 | 0.22 |
| Transposition great vessels | 91 | 0.88 | 0.75 | 1.49 | −0.38 | 0.07 |
| Tetralogy of Fallot | 55 | 0.89 | 0.79 | 0.61 | 0.02 | −1.02 |
| Ventricular septal defect | 404 | 0.87 | 1.00 | 1.01 | 0.05 | 0.03 |
| Selected ventricular septal defects | 322 | 0.95 | 0.97 | 0.98 | 0.02 | −0.07 |
| Atrial septal defect | 176 | 0.82 | 0.84 | 0.24 | 0.05 | 0.04 |
| Ostium atrioventriculare commune | 35 | 0.87 | 0.88 | 0.89 | −0.02 | −0.01 |
| Anomalies of heart valves | 158 | 1.07 | 0.71 | 1.01 | 0.11 | 0.07 |
| Fibroelastosis cordis | 7 | 0.98 | ... | ... | ... | ... |
| Patent ductus arteriosus | 376 | 0.89 | 0.81 | 0.74 | −0.11 | −0.13 |
| Selected patent ductus arteriosus | 333 | 0.84 | 0.82 | 0.69 | −0.14 | −0.14 |
| Coarctation of aorta | 75 | 1.01 | 1.26 | 1.89 | 0.08 | 0.05 |
| Other anomalies of aorta | 63 | 1.28 | 0.59 | ... | −0.09 | −0.06 |
| Stenosis atresia of pulmonary artery | 83 | 0.66 | 0.53 | ... | −0.07 | −0.04 |
| Anomalies of great veins | 39 | 0.90 | 0.82 | ... | −0.08 | 0.11 |
| Choanal atresia | 24 | 1.04 | 0.77 | 1.41 | −0.25 | 0.14 |
| Congenital cystic lung | 4 | 1.47 | ... | ... | ... | ... |
| Agenesis of lung | 7 | 0.62 | 1.66 | ... | −0.09 | −0.03 |
| Cleft palate | 117 | 0.73 | 0.56 | 0.76 | −0.47 | −0.08 |
| Cleft lip without cleft palate | 131 | 1.40 | 1.10 | 1.07 | 0.06 | 0.16 |
| Pyloric stenosis | 317 | 1.15 | 0.90 | 0.60 | 0.00 | 0.00 |
| Tracheoesophageal fistula, esophageal atresia, and stenosis | 52 | 1.11 | 1.16 | 0.89 | 0.14 | 0.22 |
| Atresia and stenosis of small intestine | 74 | 0.77 | 0.81 | 0.71 | −0.60 | −0.27 |
| Atresia and stenosis of rectum and anal canal | 89 | 1.36 | 0.89 | 1.09 | −0.03 | −0.05 |
| Hirschsprung's disease | 39 | 0.77 | 1.12 | 2.43 | 0.09 | −0.05 |
| Anomalies of intestinal fixation | 41 | 1.49 | 0.99 | 3.11 | 0.17 | 0.22 |

| Tests of Hypotheses for Birth Defects Risks * (Cont) | | | | | |
|---|---|---|---|---|---|
| | | Hypotheses† | | | |
| Defect Group | No. of Cases‡ | Veteran, Odds Ratio | Vietnam Veteran, Odds Ratio | Self-report Agent Orange Exposure, Odds Ratio | Agent Orange Exposure Opportunity Indices, Regression Coefficients | |
| | | | | | 1 | 2 |
| Anomalies of gallbladder, bile ducts, and liver | 20 | 0.51 | 2.05 | 1.91 | 0.16 | −0.28 |
| Anomalies of pancreas | 8 | 0.49 | ... | ... | ... | ... |
| Indeterminate sex | 5 | 2.26 | ... | ... | ... | ... |
| Hypospadias | 583 | 0.83 | 0.76 | 0.99 | 0.03 | −0.04 |
| Epispadias | 17 | 0.60 | 1.30 | ... | ... | ... |
| Anomalies of ovary, fallopian tubes, and uterus | 16 | 0.83 | 0.93 | 2.13 | 0.03 | −0.00 |
| Anomalies of vagina and external female genitalia | 40 | 0.82 | 1.10 | 0.94 | 0.13 | −0.02 |
| Pseudohermaphroditism | 28 | 0.93 | 0.79 | ... | −0.07 | 0.09 |
| Renal agenesis | 60 | 1.11 | 0.74 | ... | −0.27 | −1.00 |
| Cystic kidney disease | 50 | 0.75 | 0.23 | ... | −0.83 | −0.52 |
| Urinary tract obstructive defects | 86 | 0.88 | 1.22 | 0.50 | 0.06 | −0.05 |
| Exstrophy of urinary bladder | 9 | 2.58 | 1.42 | ... | −0.23 | 0.25 |
| Atresia stenosis of urethra and bladder neck | 49 | 1.42 | 0.95 | ... | −0.06 | 0.00 |
| Clubfoot | 849 | 0.90 | 1.02 | 1.19 | −0.00 | 0.01 |
| Selected clubfoot | 547 | 0.88 | 0.99 | 1.25 | −0.02 | 0.01 |
| Reduction deformity | 157 | 1.02 | 1.03 | 1.13 | 0.11 | 0.05 |
| Generalized flexion contracture of limb joints | 21 | 1.11 | 2.93 | 1.53 | 0.16 | 0.32 |
| Chondrodystrophy | 14 | 0.47 | ... | ... | ... | ... |
| Osteogenesis imperfecta | 7 | 0.89 | ... | ... | ... | ... |
| Hereditary edema of the legs | 3 | ... | ... | ... | ... | ... |
| Specified anomalies of hair | 13 | 0.64 | 2.01 | 8.69 | 0.45 | ... |
| Specified anomalies of nails | 15 | 2.14 | 4.22 | ... | 0.33 | 0.46 |
| Anomalies of spleen | 41 | 1.22 | 0.56 | ... | 0.04 | −0.12 |
| Anomalies of adrenal gland | 6 | 0.75 | ... | ... | ... | ... |
| Anomalies of thyroid gland | 25 | 0.80 | 0.74 | ... | 0.02 | 0.14 |
| Anomalies of other endocrine glands | 14 | 1.89 | 0.66 | ... | ... | −0.27 |
| Situs inversus | 13 | 0.61 | 2.52 | ... | 0.54 | 0.50 |
| Conjoined twins | 4 | 0.41 | ... | ... | ... | ... |
| Other forms of monster | 5 | 0.95 | ... | ... | ... | ... |
| Down's Syndrome | 212 | 1.30 | 0.95 | 0.73 | −0.08 | −0.12 |
| Other syndromes caused by autosomal abnormality | 45 | 1.27 | 0.22 | 0.86 | −0.81 | −0.94 |
| Tuberous sclerosis | 1 | ... | ... | ... | ... | ... |
| Other specified syndromes | 20 | 0.52 | 2.01 | 0.69 | 0.09 | 0.16 |
| Potter's syndrome | 43 | 0.68 | 0.63 | ... | −0.20 | ... |
| Multiple congenital anomalies, unspecified | 3 | 3.76 | ... | ... | ... | ... |
| Diaphragmatic hernia | 74 | 1.41 | 0.69 | 0.47 | −0.18 | −0.84 |
| Omphalocele and gastroschisis | 108 | 0.84 | 1.41 | 1.51 | 0.15 | 0.15 |
| Other neoplasms | 87 | 0.83 | 1.80 | 1.50 | 0.14 | 0.26 |
| Cytomegalovirus | 10 | 1.67 | 1.25 | ... | ... | ... |
| Herpes simplex | 10 | 1.54 | 4.02 | ... | 0.15 | 0.31 |
| Syphilis | 7 | 0.57 | ... | ... | ... | ... |

* Significant odds ratios or regression coefficients ($P<.05$) are underlined. Ellipses indicate that test was not done because there were no exposed cases and/or exposed controls. "All case babies" test was not done because it was considered inappropriate (see text).

† Veteran hypothesis, estimated relative risk (odds ratio) for veteran fathers (excludes Vietnam veterans); if significant, and odds ratio was less that 0.83 or greater that 1.2, data for remaining hypotheses limited to families with veteran fathers. Vietnam veteran hypothesis, estimated relative risk (odds ratio) for Vietnam veteran fathers. Self-report Agent Orange exposure, estimated relative risk (odds ratio) for self-reported exposure to Agent Orange. Agent Orange exposure-opportunity indices, logistic regression coefficient for association between birth defects risk and index scores. Index 1 derived from information in military records. Index 2 based on information obtained from fathers' interviews.

‡ Number of case-group families contributing to analysis of Vietnam veteran hypothesis.

[From CDC Birth Defect Study, Table 4 at 908–909]

As with most statistical studies of this kind, it cannot be proven conclusively that a particular child's birth defect was or was not "caused" (in a tort law sense) by the father's exposure to Agent Orange. Nonetheless, the data to date does not support any claim of birth defect sufficient to allow a jury finding in favor of a member of the class. Since plaintiffs would have the burden of proof at a trial, the "weakness" of any statistical data would tend to favor defendants' position. In medical-statistical terms the position is stated as follows:

The most important conclusion to be drawn from this study is that the data collected contain no evidence to support the position that Vietnam veterans have had a greater risk than other men for fathering babies with all types of serious structural birth defects combined....

This study cannot prove that some factor associated with service in Vietnam was or was not associated with the occurrence of rare types of defects, of defects in the babies of selected persons, or of defects in the babies of small groups of veterans. However, the conclusion that Vietnam veterans in general have not fathered babies with all types of birth defects combined, at higher rates than other men is based on relatively strong evidence. This study has not identified the causes of the birth defects that have occurred in the babies of Vietnam veterans, nor in the babies of men who did not serve in Vietnam. The causes of the vast majority of birth defects remain unknown....

In addition this study does not provide support to the notion that those men who may have been exposed to Agent Orange in Vietnam have had an increased risk of fathering babies with most types of defects. The conclusion regarding the lack of increased risks associated with Agent Orange is based on considerably weaker evidence than the conclusion about Vietnam veterans in general....

The data on some of the exposures of interest had to be collected from parents, not from some external source. In most case-control studies, there is fear that members of the case and control groups will not give exposure histories with equal accuracy, thereby introducing bias into the case-control comparison. For the main exposure in this study, paternal military service in Vietnam, we believe that there is little reason for concern about the accuracy of information reported by either parents in the case or control group....

The validity of the Agent Orange EOI [Exposure Opportunity Index] is uncertain and will probably remain so.

*Id.* at 910.

An extensive birth defect study of Australian veterans, who are members of the class, is also discussed in the CDC Birth Defect Study. It showed "no increased risk of all types of structural birth defects." *Id.* at 911; see J.W. Donovan, R. MacLennan & M. Adena, Vietnam Service and the Risk of Congenital Anomalies, 140 Med.J.Aust. 394 (1984) (no evidence that Army service in Vietnam increases risk of fathering children with anomalies). *See also* A.H. Smith, D.O. Fisher, N. Pearce & C.J. Chapman, Congenital Defects and Miscarriages Among New Zealand 2,4,5–T Sprayers, 37 Archives of Envtl. Health 197 (July/August 1982) (no reproductive effects).

Summarizing their results, the authors of the CDC Birth Defect Study acknowledge that it cannot be deemed conclusive even though it is "strong evidence" of lack of Agent Orange causation.

Although the present study was large, the estimates of Agent Orange exposure that had to be used were probably rather inaccurate. Therefore, the conclusions regarding possible Agent Orange-associated risks for Vietnam veterans that can be drawn from this study are weak. Even so, this study provides strong evidence that Vietnam veterans in general are not at increased risk. This suggests that if there is any increased risk related to exposure to Agent Orange, either the risk must be small, must be limited to select groups of Vietnam veterans, or the

increased risk must be limited to specific types of defects.

CDC Birth Defect Study, *supra,* at 912.

This conclusion of lack of reliability of inferences with regard to a connection between Agent Orange exposure and birth defects is supported by the testimony of Michael Gough and Helen Gelband, Office of Technology Assessment of the United States Congress, before the Subcommittee on Hospitals and Health Care of the House Committee on Veteran's Affairs in their review of the Centers for Disease Control Study "Vietnam Veterans' Risks for Fathering Babies with Birth Defects," October 3, 1984, concluding:

> The validity or lack of validity of the Agent Orange Exposure Opportunity Indices does not in any way affect the conclusions about associations of birth defects with *Vietnam service.* If the indices are invalid, however, the *Agent Orange* analyses provide no reliable information either to rule out associations with Agent Orange or to confirm them.

Manuscript at p. 10. (Emphasis is in original).

Other literature on herbicides and their effects, particularly the various published studies concerning Agent Orange issues, also do not support plaintiffs' position. *See, e.g.,* Centers for Disease Control, Protocol for Epidemiologic Studies of the Health of Vietnam Veterans, 63–77 (November 1983) (CDC Protocol). The conclusion of the CDC Protocol accurately indicates that none of the studies to date are reliable for our purposes.

> In summary, many health studies have been conducted on veteran populations, but because of the lack of control groups, the selection of control groups from among veterans who were not classified as to their combat experience, and the selection of study subjects from specific military occupational specialties, the studies are not useful for evaluating the overall effect of war service. CDC's review of this literature revealed little which could be used to generate specific

hypotheses about health effects on military service in the Vietnam war.

*Id.* at 77.

A number of independent reviews of literature were prepared at the request of the VA. One by Clement Associates, Inc. is entitled *Review of Literature on Herbicides, Including Phenoxy Herbicides and Associated Dioxins* Vol. III (1984) (Clement Report). The Clement report analyzes 450 documents made available since mid-1981, *id.* at II–1, suggesting intense interest in the subject. But as the report indicates, many of these studies have inherent limitations and "many potentially informative studies are either still in progress or have not been published." *Id.* The Clement conclusion is that "All of the human studies available to date have been inadequate in design and/or sensitivity," for purposes of this case. *Id.* at II–10.

An additional two volume analysis of literature was prepared independently by J.R.B. Associates, Inc. for the VA. *See Review of Literature on Herbicides and Associated Dioxins* Vols. I & II (1981) (JRB Report). The JRB Report extensively summarizes "gaps in information." *Id.* Vol. 1, at 1–6 to 1–15. It recommends more study to answer questions worrying Vietnam veterans. *Id.* at 1–14.

Various symposia and many other studies leave the reader with the conclusion that *there may be* some causal connection between Agent Orange exposure and present diseases. *See, e.g.,* R.E. Tucker, A.L. Young & A.P. Gray, *Human and Environmental Risks of Chlorinated Dioxins and Related Compounds* (1983), reporting on an international symposium held at Arlington, Virginia in October of 1981 (the Arlington Studies). The distinguished panel in "Human Observations" of the Arlington Studies concluded that probably the best indication of toxic exposure we have is chloracne. It stated:

> The skin lesion, chloracne, is an important indicator of exposure to TCDD ... and is probably the most sensitive indicator of exposure.

*Id.* at 795. As already noted in section III, B, *supra,* there are very few diagnosed cases of chloracne known to the Veterans Administration.

Significantly, the Arlington Studies panel concludes that, "there is no evidence that TCDD is a teratogen in humans." Arlington Studies, *supra,* at 795. Moreover, "chromosome aberrations have not been observed in people exposed to TCDD." *Id.* at 796. This suggestion that the claim of birth defects is unfounded is supported by the study conducted by R.R. Cook and K.M. Bodner. *Id.* at 593.

No evidence has been found in the literature suggesting that either in humans or animals, exposure of the male results in birth defects. *See* Clement Report, *supra,* IV–41ff. Even the studies of the industrial explosion at Seveso, Italy in 1976, which apparently released several pounds of dioxin over a small area, show no pattern of abnormalities in the children. A. Hay, *The Chemical Scythe* 216–17 (1982). Since mothers as well as fathers were exposed in Seveso and since the scientific data is questionable, *id.* at 216–18, this incident does not support any finding of male mediated fetus abnormalities. *Id.* at 36–40, 168–69; *see* Clement Study, *supra,* at IV–174 to IV–186. The birth defect study released recently by the Centers for Disease Control in Atlanta reinforces this conclusion. Whether a satisfactory study in humans is ever possible that will definitively resolve the Agent Orange problem as it affects birth defects is doubtful. *Id.* at IV–186.

In sum, then, the result of an enormous scientific effort to be helpful on causation has, from the plaintiffs' point of view, left the case at best open. This is not sufficient to support a recovery in tort law even though it may suffice to permit regulation of products that might contain dioxin or support a public policy decision to use public funds to compensate exposed Vietnam veterans or their children with medical problems.

Many of those who testified at the Fairness Hearings were of the opinion that further studies and a full trial would reveal more evidence supporting their causality claims. Defendants' predictions are to the contrary. It is, of course, possible that in a few years a sudden increase in diseases associated with Agent Orange will be revealed. (It took almost forty years for solid tissue cancers to develop in victims of atomic bombing in Japan.) But based on present data it appears unlikely that such proof will develop in time to affect this litigation. Current scientific controversy about the relative effects of natural carcinogens, man-made carcinogens such as toxic chemicals, diet, smoking and good health care make any legal predictions foolhardy. *See, e.g.,* B.N. Ames, Dietary Carcinogens and Anticarcinogens, 221 Science 1256 (1983) (natural foods and other non man-made materials can present far greater risks of cancer than toxic chemicals in non-occupational situations); *but see* letters supporting and opposing the Ames view in 224 Science 659ff (1984) (note particularly the dissent and emphasis on carcinogenic effects of pesticides by S.E. Epstein and J.B. Schwartz). In conclusion, all that can be said is that persuasive evidence of causality has not been produced.

### D. Knowledge of Government and Defendants

As indicated in IV, C, Nature of Liability and Relation to Defense of Government Knowledge, *infra,* if the defendants can show that the government knew as much as they (the defendants) should have known about the dangers of Agent Orange, they have a complete defense. This court previously decided there is substantial evidence to support that defense. *In re "Agent Orange" Product Liability Litigation,* 565 F.Supp. 1263, 1266–74 (E.D.N.Y. 1983). The court canvassed the evidence then available and concluded:

> Even when all doubts are resolved in favor of the plaintiffs ..., the record demonstrates that the government and the military had a considerable amount of knowledge about 2,4,5–T, about dioxin, and about the health hazards associated with both.

*Id.* at 1266.

Since the summary was written in June 1983 substantial additional evidence sup-

porting the defendants' position has been assembled through extensive discovery. This evidence strongly suggests that many in the government were aware of possible dangers in the herbicide spraying program.

Knowledge was spread horizontally throughout various government agencies. Plaintiffs argue that much of this knowledge never reached the highest levels of those agencies concerned with the manufacture or use of Agent Orange. The legal question is when, where, and to what level does "knowledge" of a fact need to rise before it can be imputed to the "government" for purposes of the government contract defense.

Plaintiffs argue that because of the complex nature of the United States government, knowledge on the part of employees within various agencies, particularly at the lower echelons, cannot be imputed to the White House or the Secretary of Defense. Their position appears to be an overstatement of the knowledge requirement. Neither the Secretary of Defense nor the President are "the government." Widespread knowledge among lower echelons can be attributed to the Executive.

■■■■ Under principles of agency law, knowledge in the possession of an agent— here a government employee—who has a duty to transmit or receive the information is knowledge in the possession of the principal—here the United States or an appropriate agency. As the Restatement (Second) of Agency § 272 puts it:

> [T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information.

*See also* Restatement of Agency § 275 ("principal is affected by ... knowledge which an agent has a duty to disclose to the principal or to another agent of the principal to the same extent as if the principal had the information"); *id.* § 277 (principal not affected by knowledge that agent should have but did not acquire). Under the agency law standard, the fact that information did not get to a person with final decision-making authority would not be material.

■■■■ The case law on imputation of knowledge within the government is consistent with the Restatement standard. Thus, the knowledge of employees of one agency may be imputed to those of another if there is some relationship between the agencies—either some reason for the agency without knowledge to seek the information or a reason for the knowledgeable agency to transmit the information. *See, e.g., J.A. Jones Construction Co. v. United States,* 390 F.2d 886, 182 Ct.Cl. 615 (1968) (in contract action for premium wages, the necessity of which was caused by action of one agency, knowledge imputed to contracting agency because knowledgeable agency was acting as its agent and sharing information). *See also United States v. Currency Totalling $48,318.08,* 609 F.2d 210, 215 (5th Cir.1980) (knowledge of customs agent not attributed to government since claimant could not prove agent had duty to reveal knowledge). Some relationship is required: "a truly independent federal agency should not be charged with knowledge of what another is doing simply because both are components of the same federal government." *J.A. Jones Construction Co.,* 390 F.2d at 891.

■■■ As will be seen in the next few pages where the government's knowledge is outlined, it is clear that the relationship between those in possession of the relevant knowledge and those in a position to decide the fate and direction of the herbicide program was much more than that of "simply [different] components of the federal government." *Id.* Certainly where the failure to transmit the knowledge can create serious dangers, it is appropriate to charge the United States with the knowledge of any responsible employees who could reasonably be expected to alert the government. *See, e.g., Pina v. Henderson,* 586 F.Supp. 1452, 1456–57 (E.D.N.Y.1984) (citing cases on charging the government with information for *Brady* purposes regardless of whether the prosecutor had the

information if another government agent had information). *Cf.* Federal Tort Claims Act cases applying state law; *Emelwon, Inc. v. United States,* 391 F.2d 9 (5th Cir.) (liability for spraying by independent contractor where employee of government knew of dangerous condition), *cert. denied,* 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968); *Barron v. United States,* 473 F.Supp. 1077 (D.Hawaii 1979), *aff'd,* 654 F.2d 644 (9th Cir.1981) (knowledge of some government employees that contractor had failed to comply with contract); *Schwartz v. United States,* 230 F.Supp. 536, 539–40 (E.D.Pa.1964) (doctor in malpractice action).

Were the issue submitted to a jury, as it almost certainly would have been, it would be necessary to refine further the definition of what constitutes knowledge on the part of the government. For now it is sufficient to say that the evidence briefly sampled below based upon plaintiffs' fairness brief indicates that defendants would have been able to make out a prima facie case whatever the precise test. (Quotations from depositions come from plaintiffs' brief.)

One of the governmental entities with knowledge of potential hazards of Agent Orange use was the President's Science Advisory Committee ("PSAC"). PSAC was an organization within the White House during the 1960's that provided advice to the President on a "wide variety of national and military problems." During the 1960's PSAC was composed of 18 scientists appointed by the President for four-year terms. "One of the major roles of the PSAC was ... advice to the military." PSAC was assisted by the Office of Science and Technology and chaired by the President's Science Advisor.

Representatives of the Army Chemical Corps briefed PSAC on the "Possible Health Hazards of Phenoxyacetates As Related To Defoliation Operations In Vietnam" on May 9, 1963. Moreover, PSAC was intimately involved with the preparation and distribution in 1963 of a report on "Use of Pesticides" raising serious safety problems; this report was referred to the Joint Chiefs of Staff for review by the Secretary of Defense. The significance of the Army's knowledge is reflected in the fact that as early as 1952, personnel at Edgewood Arsenal learned from Monsanto Chemical Company of toxic byproducts of 2, 4, 5–T production in connection with Edgewood's search for chemicals with possible military applications. In June of 1952, the Army Chemical Center at Edgewood Arsenal acquired information on the 1949 accident at Monsanto's TCP plant in Nitro, West Virginia, from the chief of the Pharmocology Division of the Food and Drug Administration. This information was the subject of a discussion at the Thirty-Sixth meeting of the Advisory Committee on New CW (chemical warfare) held on August 8, 1952 at the Chemical Corps Medical Laboratory. Edgewood scientists were aware of dioxin compounds even before a representative of the Army's Chemical Corps Research and Development Command was sent to Europe in 1959 where he obtained "startling" information regarding the toxicity of dioxin. *See In re "Agent Orange" Product Liability Litigation,* 565 F.Supp. 1263, 1266 (E.D.N.Y.1983).

One member of PSAC testified that sometime in 1965 he became aware that herbicides or defoliants were being used in Vietnam; that one of the constituents of the herbicide Agent Orange was 2, 4, 5–T; that between March and July of 1965 he became aware that a contaminant called "dioxin" was in the 2, 4, 5–T; that he was aware that dioxin was toxic; that all of these matters were discussed within a subgroup of PSAC concerned with Biological and Chemical Warfare (the "BWCW" panel); that some specific human health effects were discussed but that he could not remember which specific ones; and that the question of human health hazards associated with the presence of dioxin in 2, 4, 5–T was discussed within the full committee of PSAC sometime between April and June of 1965.

Other witnesses confirmed the view that PSAC was alerted to the possible health

hazards of Agent Orange before the most intensive spraying was started. One member of PSAC testified that he did not transmit his information to President Johnson because he personally did not believe at the time that there was a threat of serious health effects.

Other government officials also had knowledge of potential health problems from exposure to the herbicides. In 1964 a scientist in the Public Health Service in Cincinnati, Ohio, was instructed to determine whether there was a contaminant in the 2, 4, 5–T that could cause "chloracne and liver damage." He wrote to several of the defendants, including Hercules and Dow, requesting samples of their 2, 4, 5–T for purposes of undertaking a study to determine if 2, 4, 5–T could be linked to chloracne and liver damage. He found what he suspected to be chloracne and liver damage after examining rabbit tissue, but he could not definitely assess whether it was caused by the applied chemicals. On the basis of his studies and the published literature, he submitted an application in January 1965 for research which was to begin February 1, 1965, for continued study of 2, 4, 5–T. In the proposal he stated:

> The herbicide 2, 4, 5–T is produced and widely used in large quantities and several cases of illness have resulted from contact with the compound. If the toxic compound is not 2, 4, 5–T but some other contaminant, then the manufacturing process might be altered in some way to eliminate the hazardous compound.

By 1967, the government began to be concerned with the availability of sufficient quantities of Agent Orange, particularly 2, 4, 5–T, to keep up with the military spraying demands in Vietnam. It began considering construction of a 2, 4, 5–T plant at Weldon Spring. Deposition testimony confirms that the Weldon Spring project was both initiated and reviewed at the highest levels of the Defense Department. The Assistant Secretary of Defense, Installation & Logistics ("I & L"), from May to December 1966, who was Deputy Assistant

Secretary (Materiel) in the Office of the Assistant Secretary of Defense, I & L, from December 1966 to June 1970, briefed the Secretary of Defense daily on material requirements, including herbicide needs. Such high level review of herbicide requirements is not surprising since herbicides were recognized as an important component of the government's munitions arsenal for Southeast Asia and their significance to the war effort was confirmed at a meeting with General Westmoreland and his staff. The decision to proceed with an in-house facility was made by the Secretary of Defense, acting upon the recommendation of I & L.

Early in 1968 an Army chemical engineer assigned to Edgewood Arsenal's Weapons Development & Engineering Lab, circulated a memorandum dated February 20, 1968 to the "EA staff at WSCP" (Weldon Spring Chemical Plant) specifically addressed to the subject of dioxin in order "to supply [the recipients] with as much information about the stated subject as possible." The memo diagrams the structure of 2,3,7,8–TCDD, explains how and where dioxin is formed in the 2,4,5–T process and discusses its potential toxicity.

The government's awareness of the potential health hazard posed by dioxin is also evidenced by the numerous references to that compound in the Safety Manual for the Weldon Spring plant recently produced by the government. Dioxin is cited six times in the introduction to the manual. Moreover, section 8 of the manual, entitled "DIOXIN," is devoted entirely to safety considerations arising from dioxin exposure. That section opens with the following comment:

> Dioxin (2,3,7,8–Tetrachlorodibenzo–P–Dioxin) is a very dangerous chemical and should be avoided at all times. This material is the main cause of chloracne, liver, and kidney damage. Dioxin has been found to kill rabbits by feeding them amounts as low as 0.00005 grams per kilogram of body weight. Chloracne has been produced on a rabbit's ear by repeated application at a concentration of

less than one PPM. Although operating temperatures are controlled to prevent this formation, Dioxin may be present in the process steps for the production of the sodium salt of 2,4,5–Tri-chlorophenol in the autoclave, methanol still, and anisole still area. Trace amounts may be evident downstream as far down as the esterification segment of the process. The section goes on to prescribe protective clothing and equipment and first aid procedures in connection with dioxin exposure.

Among the other departments whose responsible officials had knowledge of safety problems in the production and use of herbicides were the United States Public Health Service at least as early as 1967; the Centers for Disease Control through its studies in the early 1960's of Silvex, composed of 2,4,5–T, revealing adverse health effects; the Department of Agriculture whose records relating to registrations and warnings under the Federal Insecticide, Rodenticide and Fungicide Act refer to animal studies and potential human health problems from contact with herbicides in the 1960's; the Department of Commerce which had been informed by Dow of chloracne and systemic disorders involved in its production of 2,4,5–T in the mid-1960's; and the National Academy of Science which in 1968 issued a statement raising many unanswered questions about the adverse effects of herbicides in Vietnam.

Typical of the warnings the Department of Agriculture approved for use on herbicides containing 2,4,5–T in the 1960's was that on "Bushwhack", manufactured and sold domestically by Hercules. Users were instructed not to contaminate any body of water; not to graze dairy animals in treated areas within seven days after application; not to contaminate feed or foodstuffs; that the product may cause "skin irritation;" that human beings should "avoid inhaling spray mist;" "that it should not be taken internally;" that all human beings should avoid contact of the product "with the eyes, skin, or clothing" and that in case of such contact should "get prompt medical attention."

In light of this and much other evidence, it is apparent that the government contract defense in this case is powerful. If, as appears not unlikely, the information necessary for an informed decision on Agent Orange was readily available to the government while it was ordering and using this herbicide, plaintiffs could not succeed in their suit. This factor provides a strong reason for settlement.

## IV. LEGAL PROBLEMS WITH CLAIMS

There are enormous legal problems that plaintiffs would have to overcome before they could succeed in obtaining relief from the courts. Some of these problems were covered in the extensive opinion certifying plaintiffs as a class. *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983), *certification for interlocutory appeal denied,* 100 F.R.D. 735 (E.D.N.Y.1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). Other issues were discussed in connection with the most recent opinion on government liability in view of the *Feres* restrictions on governmental liability. 580 F.Supp. 1242 (E.D.N.Y.1984), *mandamus denied,* 733 F.2d 10 (2d Cir.), appeal dismissed, 745 F.2d 161 (2d Cir.1984). Still others were covered in connection with the analysis of the general conflict of laws problems. 580 F.Supp. 690 (E.D.N.Y.1984). The reader is respectfully referred to these published opinions for elaboration. We have not discussed the possible government contract defense as it relates to the standard of liability. See the full discussion in Note, Liability of a Manufacturer for Products Defectively Designed by the Government, 23 B.C.L.Rev. 1023 (1982).

Set forth below is a discussion of some of the serious legal hurdles that plaintiffs would have to surmount in connection with the statutes of limitations, A, *infra,* the inability to prove that a particular plaintiff was injured by a particular defendant, B, *infra,* and the substantive standard of lia-

bility and its relationship to the defense of government knowledge, C, *infra*.

These discussions of the law are necessarily arcane, complex and difficult for the nonlawyer to follow. The case is so unprecedented, however, that it is necessary to explore fundamental concepts to provide useful analogies. In such circumstances, it seems wise to err on the side of caution by fully exploring the issues.

### A. Statutes of Limitations

#### 1. Introduction

The primary statutes of limitations issue is whether a single bar period should apply to all members of the class or whether each of the groups—servicepersons, wives and children—need to be treated separately and, in turn, subdivided among the various jurisdictions where they reside and where critical events occurred. More than one hundred and fifty subclasses, covering each of the states and foreign countries, might be involved. Each jurisdiction has separate statutory limitations periods, points in time from which the statute is measured (such as time of exposure to the toxic substance or time of manifestation of the disease) and tolling provisions and case-law glosses applicable to the servicepeople, spouses and minor children. Complex subsidiary problems of "when" and "where" the serviceperson's injury took place, "when" and "where" manifestations "were" or "should have been" noted by the individual claimant, and what actions by defendants may have operated to toll the statute because of alleged "coverup" of information or other reasons would all need to be considered.

The unfairness of allowing some claims while denying others for reasons having nothing to do with the merits is obvious when all the claims arose out of a war in which the servicepersons were comrades in arms. A number of theories permit escape from this difficulty but each is subject to serious objection and requires finding "new" law applicable to this unique case with the possibility of appeal and reversal.

In the discussion that follows we consider first the standard approach to statutes of limitations, which would require application of the law of each of many jurisdictions. We then turn to a number of possible approaches applying a single limitations period to all class members. They include the single time-bar period based upon federal or national consensus law, a single time-bar period based upon the fact that this is a class action, and a single time-bar period for American Veterans based upon an interpretation of a New York State statute.

#### 2. Standard Multijurisdictional Approach

Were this a simple two-party tort case, the federal court would look to the statutes of limitations of the state in which it sits—here, New York (where the original MDL case was brought). If New York under its statutes would then look to the law of another state—as it would were a non-New York resident suing—then so too would the federal court. *See, e.g., Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); N.Y. C.P.L.R. § 202 (nonresident plaintiff suing in New York subject to shorter of New York statute or that of jurisdiction where cause of action arose); *Sack v. Low*, 478 F.2d 360 (2d Cir. 1973) (interpreting New York statute as looking to place where injury suffered). *Cf. Arneil v. Ramsey*, 550 F.2d 774 (2d Cir.1977); *Stafford v. International Harvester Co.*, 668 F.2d 142 (2d Cir.1981). Using this traditional approach looking to the law of other states, many veterans' claims would be barred by the statute of the state in which they reside. *See* Appendix E, *infra*.

##### a. CPLR 202

In this case—assuming that the Special Agent Orange statute does not cover non-New York residents, *see* discussion *infra*—*Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), require the court to look to the New York borrowing statute, CPLR 202, in or-

der to determine the applicable statute of limitations.

CPLR 202 is frankly designed as a statutory exception favoring "residents" of New York. *United States Fidelity & Guaranty Co. v. E.W. Smith Co.*, 46 N.Y.2d 498, 504, 414 N.Y.S.2d 672, 675, 387 N.E.2d 604, 607 (1979). Under the statute the claim must accrue (1) in favor of the nonresident, and (2) "without the state." *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978); O.G. Chase, Civil Litigation in New York 317 (1983); D.D. Siegel, New York Practice § 57 (1978). This form of parochialism is reflected in the statutes of most states. O.G. Chase, Civil Litigation in New York 317 (1983). CPLR 202 explicitly tells nonresident plaintiffs that their own state's shorter period applies to them. It reads:

An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

■ Section 202 requires application of the shorter statutory period of either New York or the place where the nonresident's cause of action accrued. Where CPLR 202 causes another state's statute to be borrowed, that state's statute and the interpretations given its tolling and other provisions will be applied as a total package. *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 74 A.D.2d 290, 427 N.Y.S.2d 10 (1st Dept.), *appeal dismissed*, 50 N.Y.2d 1021, 431 N.Y.S.2d 812, 410 N.E.2d 745, *appeal dismissed*, 51 N.Y.2d 970, 435 N.Y. S.2d 720, 416 N.E.2d 1055 (1980); *Martin v. Julius Dierck Equipment Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978).

The underlying reason for CPLR 202 is to give New York resident-defendants protection from suits in New York that would have been barred by shorter statutory periods in other jurisdictions where nonresident plaintiffs could have brought suit. *Sack v. Low*, 478 F.2d 360, 367 (2d Cir.1973). Since statutes of limitations are usually characterized as procedural by the states (i.e., for non-*Erie* purposes), so that the law of the forum is applied regardless of its contacts with the transaction, a plaintiff is normally afforded considerable latitude in choice of law. If he can serve a defendant in a jurisdiction with a favorable limitations statute, he can obtain the benefits of that statute without satisfying any requirements as to the forum state's contacts with the transaction. CPLR 202 prevents such forum shopping—at least by nonresident plaintiffs—by applying the bar of the statute of limitations of the state in which the cause of action accrued. In this respect the section is similar in purpose to certain conflict of laws rules that, on matters of "substance," apply the law of the foreign state having appropriate contacts with the transactions rather than the law of the forum in order to achieve uniformity, avoid forum shopping, and lessen court congestion. *Daigle v. Leavitt*, 54 Misc.2d 651, 283 N.Y.S.2d 328 (Sup.Ct.1967); Report of N.Y. Law Revision Commission 146 (1943); 1 H.L. Korn, et al., New York Civil Practice, para. 202.01 (1983); Comment, Choice of Law and the New York Borrowing Statute: A Conflict of Rationales, 35 Alb.L.Rev. 754, 766–767 (1971); Comment, Statute of Limitations and the Conflict of Laws, 28 Yale L.J. 492 (1919).

■ Where a cause of action accrues in favor of a New York resident, a New York court will apply its own statutory limitation regardless of where the cause of action arose. *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *Arneil v. Ramsey*, 414 F.Supp. 334 (S.D.N. Y.1976), *aff'd*, 550 F.2d 774 (2d Cir.1977).

The pivotal CPLR 202 factor in the instant case is determining where the cause of action arose for the purposes of the statute. The New York Court of Appeals has furnished little guidance. With reference to tort actions generally, the Court of Appeals in *Babcock v. Jackson*, 12 N.Y.2d

473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (New York residents injured in an automobile accident in Ontario, Canada), declined to follow the traditional conflicts rule that the law of the place where the tort occurred controls and adopted the "grouping of contacts" doctrine. This doctrine gives "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue[s] raised in the litigation." *Id.* at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283. *See generally* Korn, The Choice-of-Law Revolution: A Critique, 83 Colum.L.Rev. 772 (1983), discussed in this court's conflicts opinion, *In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 690 (E.D.N.Y.1984). Both litigants in *Babcock* were residents of New York so the borrowing statute was not implicated.

The New York Appellate Division has only tangentially addressed the issue of where a cause of action arises for borrowing statute purposes. In *Myers v. Dunlop Tire & Rubber Corp.*, 40 A.D.2d 599, 335 N.Y.S.2d 961 (1st Dept.1972), where a tire manufactured in New York exploded in Kentucky injuring plaintiff attempting to mount it on a car, the court ruled that with respect to a negligence claim, for the purposes of applying CPLR 202, the cause of action arises at the place where the injury occurred. On a second issue the court found that a breach of warranty claim arises where the product is manufactured.

*Martin v. Julius Dierck Equipment Co.*, 52 A.D.2d 463, 384 N.Y.S.2d 479 (2d Dept. 1976), *aff'd*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 374 N.E.2d 97 (1978), took a somewhat more sophisticated view of the problem on the issue of whether a warranty cause of action accrues separately from strict liability and negligence causes of action. A forklift truck defectively manufactured in New York was shipped to Virginia where the injury occurred. The court departed from the traditional rule by applying the "grouping of contacts" approach to determine where the cause of action accrued. It reasoned that it must first

ascertain the underlying nature of plaintiff's action, and then decide which area or locality has the primary interest in the matters in dispute.... [T]he test requires [the court] to determine what the essence of the action is and which jurisdiction has the most significant contacts with the issues before the court.

52 A.D.2d at 466, 384 N.Y.S.2d at 482. Under this analysis, the cause of action for breach of warranty and negligence purposes was held to have accrued in Virginia whose statute of limitations was applied pursuant to CPLR 202. The Court of Appeals in *Martin* took a simpler approach, applying Virginia law because that is where the plaintiff was hurt. 43 N.Y.2d at 591, 403 N.Y.S.2d at 189, 374 N.E.2d at 101.

In the absence of state case law directly on point, the Second Circuit, estimating what New York's highest court would rule, has embraced the traditional doctrine that the place of injury determines where a cause of action accrues. *Sack v. Low*, 478 F.2d 360 (2d Cir.1973).

Professor Siegel has concluded from these cases that section CPLR 202 will be construed to bar the nonresident's claim if on almost any theory the place of occurrence can be placed outside the state, provided the defendant is amenable to suit there. He writes:

In this writer's view the action should be barred if it is shown to be barred by the law of any foreign jurisdiction which has contacts with the case as significant as New York's. The obvious purpose of CPLR 202 is to bar from imposing on the New York courts any case which has an equal or greater claim on the attention of a foreign forum. If there are several such forums which would be just as appropriate for suit as New York, and any one of them bars the claim, the intent underlying CPLR 202 should bar it in New York, too.

D.D. Siegel, New York Practice 58 (1978).

b. Application of CPLR 202 to Agent Orange Litigation

As already demonstrated, it is the view of the *federal* court of appeals that for

borrowing statute purposes, the cause of action accrues under New York law at the place where the injury occurred. Under New York law a cause of action based on injuries due to exposure to a deleterious substance accrues when the substance is last inhaled, ingested or injected. *Thornton v. Roosevelt Hospital*, 47 N.Y.2d 780, 417 N.Y.S.2d 920, 391 N.E.2d 1002 (1979) (injection); *Matter of Steinhardt v. Johns-Manville Corp.*, 54 N.Y.2d 1008, 466 N.Y. S.2d 244, 430 N.E.2d 1297 (1981), *appeal dismissed*, 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982) (inhalation); *Fleishman v. Eli Lilly & Co.*, 62 N.Y.2d 888, 478 N.Y.S.2d 853, 467 N.E.2d 517 (1984) (DES).

If the determination of "when" controls the determination of "where" the injury occurred, the place of injury for "Agent Orange" serviceperson plaintiffs would be Vietnam. *Stafford v. International Harvester Co.*, 668 F.2d 142 (2d Cir.1981), stands for the proposition that Vietnam's statute of limitations cannot be used since it is not likely that any of the defendant corporations is or would have been amenable to process in Vietnam. *Cf. Neal v. Butler Aviation International, Inc.*, 422 F.Supp. 850 (E.D.N.Y.1976) (Vietnamese statute not applicable to United States corporate defendant). *See also In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 690, 707–708 (E.D.N.Y.1984), for a discussion of policy reasons for not looking to Vietnam law.

So far as nonresidents are concerned, there is no basis for claiming that the cause of action arose in New York. Some support might be marshalled for the proposition that the injury took place in the state of residence where manifestations did occur. *Martin v. Julius Dierck Equipment Corp.*, 384 N.Y.S.2d at 482; *Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880, 883–85 (S.D.N.Y.1977); *Sack v. Low*, 487 F.2d at 368. *But cf. Stafford v. International Harvester Co.*, 668 F.2d at 152 (dictum). But this result is not required by any analytical imperative. Once Vietnam is rejected as the place of occurrence for statute of limitations purposes, choice of an arbitrary "place of oc-

currence" is required. The litigation cannot, like The Man Without a Country, travel endlessly from sea to sea without ever finding a home port.

It might be argued that since the place of injury could not control, CPLR 202 should have no application. The argument is attractive and is not out of keeping with the language of the provision itself. This approach would result in a single statute, New York's, being applied to all plaintiffs in the class. This statute could be either the Special Agent Orange statute or New York's personal injury statute, *see infra. Cf.* Note, Mechanical and Constitutional Problems in the Certification of Mandatory Multistate Mass Tort Class Actions Under Rule 23, 49 Brooklyn L.Rev. 517 (1983) (full discussion of federalism concerns).

The table set out in Appendix E, *infra*, suggests the enormous problems involved in applying the statutes of each plaintiff's residence under New York's CPLR 202 if place of residence of servicepersons or place of occurrence for wives and children is used in this class action. At least as to servicepersons, such a result would make it almost impossible to administer the litigation sensibly. Transaction costs would become so high as to be uneconomic both for the parties and the courts. Speaking in the context of selecting a proper statute of limitations for civil rights litigation purposes, the Supreme Court has recently reminded us that "assuring the full availability of a judicial forum necessitates attention to the practicalities of litigation." *Burnett v. Grattan*, —— U.S. ——, ——, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984). What is a proper statute for one litigation may be quite inappropriate for another. *Id.*

Although New York has enacted a special Agent Orange statute of limitations, its existence does not necessarily provide warrant for ignoring CPLR 202. While the introductory clause of the statute, CPLR 214–b, states: "Notwithstanding any provision of law to the contrary," the reference appears to have been intended to avoid application of CPLR 214, the three-year

statute for personal injury cases, to New York veterans. It does not suggest that CPLR 202 is inapplicable. In his Practice Commentaries on CPLR 214–b, Judge McLaughlin concludes that even were the Special Agent Orange Statute construed to cover nonresidents, "a nonresident plaintiff ... would also have to deal with the additional hurdle of CPLR § 202, the borrowing statute." *McKinney's Cons.Laws of N.Y.*, Book 7B § 214–b, at 198 (Supp.1983). As to individual suits, this conclusion may well be correct; as to class members it may not be because of the special class action issues discussed in 4, *infra.*

### c. CPLR 214

If New York's Special Agent Orange Statute is not applicable to nonresident class members, *see* discussion *infra*, then CPLR 214, the New York personal injury three-year limitation, will bar the causes of action of all nonresident servicepersons without any need to refer to any other state's statutory period. Since the last serviceperson returned from Southeast Asia more than a decade ago, the three-year period necessarily elapsed before the certification of the class action tolled the statute for all class members. New York has a very restrictive rule on time. It is measured from exposure, not discovery of the injury. *See, e.g., Fleishman v. Eli Lilly & Co.,* 62 N.Y.2d 888, 478 N.Y.S.2d 853, 467 N.E.2d 517 (1984); *Steinhardt v. Johns-Manville Corp.,* 54 N.Y.2d 1008, 446 N.Y. S.2d 244, 430 N.E.2d 1297 (1981); O.G. Chase, Civil Litigation in New York 252–53 (1983); Birnbaum, Statutes of Limitations in Products Liability, N.Y.L.J., Feb. 29, 1984, p. 1, col. 1. Because CPLR 202 calls for application of the shorter period, the only other relevant statutory period would be one shorter than three years, with the same net result: the action would be barred.

### 3. Single Time-bar Period Based upon Federal or National Consensus Law

#### a. Federal Substantive Law

If federal substantive law controlled a reasonable argument could be constructed that absence of an applicable federal statute of limitations gives the courts power to develop a single common law time-bar based upon theories of laches or using analogous state and federal statutes and cases. *See, e.g., Delcostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). This route has been blocked by the Court of Appeals. *In re "Agent Orange" Product Liability Litigation,* 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), held that for jurisdictional purposes no federal question is presented by this litigation. The case must be considered as having been grounded on diversity jurisdiction under 28 U.S.C. § 1332, with all the resulting complex *Erie* issues. It is for this reason that a decision on the application of statutes of limitation was reserved in the general conflicts opinion. *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690, 713 (E.D.N.Y.1984).

In a footnote the Court of Appeals declared that it "did not decide whether potential defenses implicating federal interests such as the government contract defense would be governed by federal or state law." *In re Diamond Shamrock Chemical Co.,* 725 F.2d 858, 861 n. 2 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 745 (1984). A statute of limitations is sometimes treated as a defense. *See* N.Y. CPLR 3211(a)(5). But the court's footnote was written without consideration of the statute of limitations problem, leaving the issue open.

#### b. National Consensus Law

Although this court's opinion on conflicts generally determined that a national consensus law applies substantively, *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690 (E.D.N.Y.1984), the opinion does not necessarily provide warrant to deal with statutes of limitations by looking to a single law. The general conflicts opinion assumed that each state would in effect agree that its own state substantive law required a single national common law. Since, however, time limita-

tions rules are not created by common law but by statute, there is far less freedom for the court to shape the law to meet new problems. National consensus law thus offers little aid to plaintiffs on statutes of limitations problems.

### 4. Single Time-bar Period for Class Actions

The effect of class action certification on the applicable law was discussed briefly in the court's general conflicts opinion where we assumed, for the purposes of that opinion that class certification had no bearing on applicable law. *See In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690, 695 (E.D.N.Y.1984) (discussing the effect of *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). It was not decisive in that context because case law permitted the application of a single substantive rule on other grounds. The situation is different, however, when the issue is which time-bar rule to apply since, as noted *infra,* such rules are overwhelmingly statutory with only modest room for caselaw development.

#### a. General Theory

The class action provides a useful conceptual vehicle for a unified treatment of time limits. In effect the class action is a judicial construct designed to treat all members of the class as if they stood in the shoes of the named representative plaintiffs. Arguably, although there is no precedent on the point, members of the class could be constructively treated as if they were New York residents for the purposes of the suit and New York's statute of limitations.

Lest this concept be deemed far-fetched, it is well to recall that it is just this kind of fictional device that enabled the English courts to expand their jurisdiction while avoiding difficult conflicts decisions. As Professor Friedrich Juenger points out:

> As late as 1774, it was still necessary for the plaintiff to allege that he had been falsely imprisoned on the island of Minorca "at London ... in the parish of St. Mary le Bow, in the ward of Cheap."

When defendant dared object to this geographical folly, Lord Mansfield observed that he "was embarassed a great while to find out whether counsel for the plaintiff really meant to make a question of it," pointing out that "the law had ... invented a fiction ... for the furtherance of justice; and ... a fiction of law shall never be controverted." However contrived this solution may appear, it helped the common law courts escape the difficulties of devising choice of law rules and of applying foreign law. As a result, unlike on the Continent, in England, jurisdiction necessarily implied the choice of forum law.

Juenger, A Page of History, 35 Mercer L.Rev. 419, 436–37 (1984).

Much of the class action concept and practice reflects a pragmatic legal state of mind equivalent to that of the sensible English common law judges utilizing the parish of St. Mary le Bow fiction. For example, the opt-out alternative for members of the main class in the instant action, *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984), is largely based on the same psychological premise as is the book-of-the-month club operation—people will usually not take the trouble to act. Requiring opting-out rather than joinder therefore obviously skews the law in favor of class actions and represents a major change in effective substantive rights between plaintiffs and defendants.

We have assumed in the general conflicts decision that casting the litigation in the form of a class action does not affect the rule of conflicts while recognizing that certifying the dispute as a class action has had a profound effect on many aspects of the substantive-procedural balance. *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690, 695–96 (E.D.N.Y. 1984). *See also* J.T. McLaughlin & P. Elliott, Class Actions, in II ALI–ABA Civil Practice & Litigation in Federal and State Courts, 973, 1002 (1984) ("class action prac-

tice in recent years has shown that the courts have tacitly, and sometimes expressly, abandoned substantive legal principles in order to allow class actions to proceed"). Specifically in the area of tolling of statutes of limitations, the class action provides protection for plaintiffs who do not know each other and whose relationship is the tenuous one of arguably having had similar rights violated by the same defendants. In many cases they were neither aware of each others' existence or even of the fact that they had a claim. To press the concept a little further so as to provide not only identical substantive law protection, but also identical statute of limitations protections of the forum state is compatible with theory. As J.A. Jolowicz, Professor of Comparative Law, Trinity College, Cambridge reminds us:

> The class action in the American mode has become, whether we like it or not, much more than a means of securing redress for large numbers of small claimants; it provides a way of depriving the defendant of what are seen and described as his "ill-gotten gains" and of deterring people from similar conduct in the future.

Jolowicz, Three Dilemmas of Civil Litigation, 18 Is.L. Rev. 161, 172 (1983). See also the effect of certification in avoiding diversity jurisdiction problems, referred to in the Introduction, *supra.*

However attractive this shaping of the law of statutes of limitations might be, courts would be reluctant to adopt it absent some clear directive from Congress. There are two reasons for this. First, time-bar rules are overwhelmingly statutory, and, second, the matter has been held to be substantive for most *Erie* purposes and generally not subject to the rule-making authority upon which Rule 23 was erected.

Time-bar periods are primarily creatures of the legislative rather than the judicial process. *N.Y. State Labor Relations Bd. v. Wyckoff Heights Hosp.,* 59 Misc.2d 284, 298 N.Y.S.2d 576 (Sup.Ct.1969) (court refused to introduce a period of limitations without statutory authority). *See generally* 1 H.L. Korn, et al., New York Civil Practice, para. 201.01 (1983). Upon passage of the specified period recovery is denied to well-founded as well as unjustified claims without regard to whether the delay in bringing suit could have been avoided. Statutes of limitations represent a legislative judgment that occasional hardship and injustice is outweighed by the promise of repose, the outlawing of stale claims and the difficulty of obtaining reliable evidence with the passage of time. *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945); *Schmidt v. Merchants Despatch Transp. Co.,* 270 N.Y. 287, 302, 200 N.E. 824, 828 (1936).

Legislatures never contemplated a case such as the "Agent Orange" litigation when they adopted general statutes of limitations provisions. But this does not excuse ignoring the language of the statutes.

### b. Federal

Statutes of limitations do not fit comfortably in either of the chameleon-like categories of "procedure" and "substance." *See, e.g., Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965) ("The line between 'substance' and 'procedure' shifts as the legal context changes"); *Guaranty Trust Co. v. York,* 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945) (Frankfurter, J.) ("each [of the terms 'substance' and 'procedure']" implies different variables depending upon the particular problem); C.A. Wright, Law of Federal Courts 378 (4th ed. 1983). Often described as "remedial," statutes of limitations might well have been placed in the procedural category for some of the purposes that now concern us. But they were not, and in *Guaranty Trust Co. v. York,* the Court held that a state statute of limitations must be characterized as "substantive" and applied in a diversity case to ensure that "the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." 326 U.S. at 109, 65 S.Ct. at 1470. *See* C.A. Wright, *supra,* at 379; Blume &

George, Limitations and the Federal Courts, 49 Mich.L.Rev. 937 (1951).

Some perplexing results of the Supreme Court's view are revealed in a case such as "Agent Orange." The outcome determinative test of *York* has little meaning when such a suit could probably never have been pressed in New York courts because of that state's restrictive view of class actions, a matter discussed below. *Cf. Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949) (dismissed on state statute of limitations grounds although complaint timely filed under Fed.R.Civ.P. 3); *Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980) (same). This is one of the entrancing aspects of the class action area—we deal with a series of constructs and "as ifs" having little relation to the world in or outside federal and state courthouses.

It is one of the many paradoxes of the field that viewed from the state perspective, "the statute of limitations is generally deemed 'procedural.'" D.D. Siegel, New York Practice 34 (1978). *See also, e.g., Fieldman v. Roper Corp.*, 586 F.Supp. 936 (D.C.Miss.1984) (statutes of limitation as well as tolling provisions are procedural for conflicts purposes). Passing of the applicable period does not eliminate the cause of action but suspends the court's power to grant a remedy. *Hulbert v. Clark*, 125 N.Y. 295, 28 N.E. 638 (1891). It is waivable. N.Y. CPLR 3018(b), 3211(a)(5), 3211(e). *But cf. Romano v. Romano*, 19 N.Y.2d 444, 280 N.Y.S.2d 570, 227 N.E.2d 389 (1967) (time for right of annulment not a statute of limitation and not waivable). The court's discretion to ignore the statute, however, is specifically denied. N.Y. CPLR 201.

Even the federal rule that statutes of limitations are substantive for *Erie* purposes becomes somewhat murky about its edges since federal procedural rules are relied upon to add to state tolling provisions. For example, under Rule 15(c) a new party may be added and an amendment relate back to the beginning of the action, ensnaring a defendant who might have been entitled to a dismissal in the state courts. *See, e.g.,* C.A. Wright, *supra,* at 384–85 & n. 4. Even more important, from our point of view, is that commencement of the federal class action tolls the statute for all members of the class. *Cf. Chardon v. Soto*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983); *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); C.A. Wright, *supra* at 486 & nn. 96–97; Note, The Tolling of State Statutes of Limitations in Federal Courts, 71 Colum.L.Rev. 865 (1971). There is no persuasive conceptual reason why the Court should not go beyond tolling and some ancillary matters of interpretation to permit Rule 23 to encroach somewhat on the substance and abstract theory of *Erie* in the area of class actions. Its tolling rule, as Professor Wright explains, was needed for purely pragmatic reasons.

> This result is reached even if the court, for reasons of judicial housekeeping, ultimately holds that it will not allow the suit to proceed as a class action, since otherwise members of the class would have to file a protective individual suit pending that determination.

C.A. Wright, *supra,* at 486. Once embarked on a course toward sensible results, it is difficult to stop the voyage arbitrarily at a point where people in the same position and class of national servicepersons who fought a single war and were allegedly injured by a single product while serving the nation are treated so differently—one group obtaining a remedy and another getting nothing.

This is a gray area falling between that which is clearly substantive or procedural.

> To hold that a Federal Rule of Civil Procedure must cease to function whenever it alters the mode of enforcing state-created rights would be to disembowel either the Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act.

*Hanna v. Plumer*, 380 U.S. 460, 473–74, 85 S.Ct. 1136, 1145, 14 L.Ed.2d 8 (1965).

What we are now considering is but a step beyond the tolling provision which operates for the benefit of all class members.

In *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the Supreme Court determined that a statute of limitation substantially affects the outcome of litigation. For the purposes of rulemaking authority, statutes of limitation must, therefore, be considered substantive in individual cases. But it does not follow that for that reason an attempt to imply from Rule 23 a statutory limitation applicable to class actions in special cases such as "Agent Orange" would exceed the grant of congressional authority. Substantive rights established by state statutes of limitations would not necessarily be abridged by applying a federal rule prescribing a limitation period for diversity cases in unique cases such as the one before us. *But cf.* 19 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4509 (1982); Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693, 726–27 (1974) ("Congress could constitutionally enact" a statute prescribing a limitation period for diversity cases, but the Court could not do it under the Rules Enabling Act).

On balance, however, it would be too great a departure from history and precedent to use the federal class action as a method of overriding *Erie* with its constitutional overtones. *Erie* requires deferring to state law.

### c. New York

The New York class action provision, N.Y. CPLR 901 *et seq.*, was largely modeled on the federal rule. *See, e.g.*, Homburger, State Class Actions and the Federal Rule, 71 Colum.L.Rev. 609 (1971); D.D. Siegel, New York Practice 176 & n. 27 (1978). The language of the statute is as broad in concept as that of Rule 23. The two class action devices differ primarily in the areas of opt-out provisions, notice requirements and counsel fees.

New York's rule is, in some degree, a response to the need for expanded state-level class action procedures caused by the Supreme Court's restrictive decisions in *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) (no aggregation of claims) and *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (rejecting the use of pendent or ancillary jurisdiction to surmount the requirement that each individual's claim exceed $10,000), which severely restricted the use of federal class actions in diversity cases. D.D. Siegel, New York Practice § 142 (1983).

The basic provisions of CPLR 901 permit a class action to be certified if all of the following conditions are met:

1. the class is so numerous that joinder of all members ... is impracticable;

2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

4. the representative parties will fairly and adequately protect the interests of the class; and

5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Despite the New York legislative response to the need for broadened scope and more liberal procedures in class action, "the approach to Article 9 of the CPLR continues to be a cautious if not hostile one by most courts." D.D. Siegel, New York Practice § 141 (Supp.1982). As Judge McLaughlin notes in his Practice Commentaries, *McKinney's Cons. Laws of N.Y.*, Book 7B, CPLR 901, (Supp.1978): "it has become clear that the New York courts have not embraced the class action with the same warmth it has received in the federal courts." *See generally* Dickerson, Class Actions Under Article 9 of the CPLR, N.Y. L.J., March 18, 1984, p. 1.

Illustrative of this restrictive attitude is *Rosenfeld v. A.H. Robins Co.*, 63 A.D.2d 11, 407 N.Y.S.2d 196 (2d Dept.1978), a class action on behalf of all New York women who had suffered pelvic injury from use of

an intra-uterine birth control device. The court in *Rosenfeld* denied both total and partial class action certification on the grounds that common questions of law and fact did not predominate. The court acknowledged that consideration should be given to "isolating the issue of liability for class action treatment, while allowing the individual determinations on damages to be tried separately thereafter." 63 A.D.2d at 15, 407 N.Y.S.2d at 198–99. *Compare* 7A C.A. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1783 (1983) (federal class action treatment in mass tort cases) *with* D.D. Siegel, New York Practice § 142 (1978) (use of CPLR 901 in mass tort cases). It concluded that CPLR 901 was inapplicable in product liability cases where the key issue of whether the individual class member's injury was caused by the product's defect must be resolved on an individual basis. 63 A.D.2d at 20, 407 N.Y.S.2d at 201. Moreover, what is particularly important for our purposes is that the court noted that defendant had raised as an affirmative defense "the Statute of Limitations ... which can[not] be determined on a class-wide basis." *Id.* at 16, 407 N.Y.S.2d at 199.

The New York Court of Appeals refused to hear an appeal from the *Rosenfeld* denial of class status on the ground that the disposition of a motion for class certification is not a final decision. 46 N.Y.2d 731, 413 N.Y.S.2d 374, 385 N.E.2d 1301 (1978). This is the position taken by the Supreme Court in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 470–77, 98 S.Ct. 2454, 2458–62, 57 L.Ed.2d 351 (1978). The effect of the New York ruling illustrates the narrow approach to class action application. Justice Lazer, in his instructive opinion in *Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83, 434 N.Y.S.2d 698 (2d Dept.1980), notes that "class action status has been denied in 75% of the reported cases construing article 9 since its enactment in 1975 ... indicat[ing] a continuing tendency toward narrow construction of the statute." *Id.* at 92, 434 N.Y.S.2d at 704.

Viability of multistate-plaintiff class action litigation in New York is especially tenuous. While certification of multistate class actions poses no constitutional problems in federal court, *see Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940) (in personam jurisdiction not required to bind nonparties in class suit), the question of whether a New York court can or should exercise jurisdiction over nonresident class members remains unsettled. *See Reis v. Club Med, Inc.*, 81 A.D.2d 793, 439 N.Y.S.2d 127, 128 (1st Dept.1981) ("few" New Yorkers); *Bloom v. Cunard Line, Ltd.*, 76 A.D.2d 237, 430 N.Y.S.2d 607, 609 (1st Dept.1980) ("great bulk" non-residents); *Gottlieb v. March Shipping Passenger Services*, 67 A.D.2d 879, 413 N.Y.S.2d 679, 680 (1st Dept.1979) ("perplexing and unsettled problem" of whether nonresidents can be bound by New York class action); O.G. Chase, Civil Litigation in New York, 358 (1983). See generally as to the capacity of state class actions to replace federal class actions, Lerach, Class Actions, in IV ALI–ABA, Civil Practice and Litigation in Federal and State Courts 1855, 1899–1906 (1984).

There is disagreement among the states on the issue of whether in personam jurisdiction is necessary in a state class action in order for the judgment to be binding on nonresident class members. The Illinois Supreme Court in *Miner v. Gillette Co.*, 87 Ill.2d 7, 56 Ill.Dec. 886, 428 N.E.2d 478 (1981), *cert. dismissed*, 459 U.S. 86, 103 S.Ct. 484, 74 L.Ed.2d 249 (1982), held that class actions were an exception to the general rule requiring in personam jurisdiction. *Accord, Shutts v. Phillips Petroleum Co.*, 222 Kan. 527, 567 P.2d 1292 (1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1246, 55 L.Ed.2d 811 (1978) (procedural due process is the element necessary to exercise jurisdiction over nonresident plaintiff class members).

New Jersey and Pennsylvania courts have reached the opposite conclusion. *Feldman v. Bates Mfg. Co., Inc.*, 143 N.J. Super. 84, 362 A.2d 1177 (1976), decided that a state court cannot exercise binding jurisdiction over nonresident class members without minimum contacts with the

state. In *Klemow v. Time Inc.*, 466 Pa. 189, 352 A.2d 12, *cert. denied*, 429 U.S. 828, 97 S.Ct. 86, 50 L.Ed.2d 91 (1976), the court declared that class actions must be limited to state residents and those who submit to the court's jurisdiction such as opt-in class members. 352 A.2d at 16 n. 15.

The New York Court of Appeals has not yet addressed this issue. Lower courts suggest a conservative attitude. *See, e.g., Simon v. Cunard Line Ltd.*, 75 A.D.2d 283, 428 N.Y.S.2d 952, 956 (1st Dept.1980) (denied certification in a breach of contract class action by multi-state passengers); *Katz v. NVF Co.*, 119 Misc.2d 48, 55, 462 N.Y.S.2d 975, 980 (Sup. Ct. 1983) ("Flexibility is ... necessary in applying traditional principles of jurisdiction to non-resident plaintiffs."), *rev'd on other grounds*, 100 A.D. 470, 473 N.Y.S.2d 786 (1984); *Brandon v. Chefetz*, 121 Misc.2d 54, 467 N.Y. S.2d 312 (Sup. Ct. 1983) (personal jurisdiction issue had never been settled by the appellate courts, although 51.5 percent of the shareholders owning 78 percent of the stock were state residents). In *Chimenti v. American Express Co.*, 97 A.D.2d 351, 467 N.Y.S.2d 357 (1st Dept. 1983), although the jurisdictional issue was not directly addressed, the court declared that "any class, if ultimately certified, might also be better limited to residents of New York State." 467 N.Y.S.2d at 359. *See also* Homburger, State Class Actions and the Federal Rule, 71 Colum.L.Rev. 609, 657–58 (1971); Dickerson, A Review of Class Actions under C.P.L.R. Article 9, N.Y.L.J., March 14, 1984, p. 1, col. 2.

Given the New York courts' ambivalent and somewhat restrictive view of class actions, it is doubtful that, were they handling the *Agent Orange* litigation, they would apply a single statute of limitations. It is not even clear that they would accept such a case. New York's attitude toward class actions places this court in the strange position of sitting as if it were a state court under *Erie*, but, through the use of Federal Rule 23, reaching a result using state law in a manner that the state court almost certainly would eschew. In short, the class action route to a single

statute, if not leading to a dead end, does require traversing an almost impenetrable legal jungle.

5. Single Time-bar Period for American Veterans Based Upon Interpretation of New York Statute

The New York Civil Practice Law and Rules deals with statutes of limitations in comprehensive Article 2. As the reader is already aware, the CPLR contains a series of discreet time limitations applicable to different kinds of claims (*e.g.*, CPLR 214 three years for personal injury), methods of computing (*e.g.*, CPLR 203(f) time computed from actual or imputed discovery) and a special conflict of laws provision applicable to causes of action accruing without the state (CPLR 202). New York has also adopted a special section dealing with Agent Orange claims (CPLR 214–b) and an uncodified preservation of rights and remedies provision for Agent Orange cases (L.1981, c. 266, § 4, amended L.1982, c. 153, § 2, L.1983, c. 358, § 1).

The special section for Agent Orange claims tolls the statutes of limitations. CPLR 214–b, "Action to recover damages for personal injury caused by contact with or exposure to phenoxy herbicides" states:

Notwithstanding any provision of law to the contrary, an action to recover damages for personal injury caused by contact with or exposure to phenoxy herbicides while serving as a member of the armed forces of the United States in Indo-China from January first, nineteen hundred sixty-two through May seventh, nineteen hundred seventy-five, may be commenced within two years from the date of the discovery of such injury, or within two years from the date when through the exercise of reasonable diligence the cause of such injury should have been discovered, whichever is later.

L.1981, c. 266, § 3, amended L.1982, c. 153, § 1.

Even more important, a special Preservation of Rights and Remedies revival section was adopted making it possible to commence an Agent Orange action prior to

June 16, 1985, regardless of the date that the injury was or should have been discovered. The provision reads:

> Every cause of action for an injury or death caused by contact with or exposure to phenoxy herbicides while serving as a member of the armed forces of the United States in Indo-China from January first, nineteen hundred sixty-two through May seventh, nineteen hundred seventy-five, which is or would be barred prior to June sixteenth, nineteen hundred eighty-five, because the applicable period of limitation has expired is hereby revived or extended as the case may be, and an action thereon may be commenced and prosecuted provided such action is commenced not later than June sixteenth, nineteen hundred eighty-five.

L.1981, c. 266 § 4, amended L.1982, c. 153, § 2, L.1983 c. 358, § 1.

The preamble to the 1981 amendments containing supporting legislative findings embodied in section 1 of the Laws of 1981, Chapter 266, stresses the legislature's primary intention to protect New York's residents. It reads:

> During the Vietnam era, *over six hundred thousand New York state residents served our nation in Indo-China. A large number of these people were exposed* to phenoxy herbicides. The legislature finds that there is credible scientific evidence that exposure to these toxic substances has caused serious physical disabilities. The legislature also finds that *the citizens of this state who were exposed* to these substances have been denied access to the courts.
>
> This legislature finds that at the time of the enactment of subdivision five of section two hundred fourteen of the civil practice law and rules, the legislature had been principally motivated by the desire to discourage "belated litigation". Belated litigation did not serve the interests of justice since protracted delays in litigating issues resulted in the failing memory of witnesses and the disappearance of evidence that was relevant and germane to such issues. It was never the intent of the legislature in imposing limitations, *to foreclose the citizens of this state* from prosecuting legitimate claims, provided such claims are diligently and expeditiously pursued. An exception to the general period of limitation rule is required when the pathological effect of an injury occurs without perceptible trauma, and the victim is blamelessly ignorant of the cause of the injury.
>
> The legislature further finds that, in the interest of justice, the claims of veterans of the Vietnam era should not be prohibited by the holding that a cause of action accrues, and the statute of limitations commences to run from the "date of injury". The obstruction to the prosecution of legitimate claims by individuals who served in Indo-China should be remedied by a discovery statute of limitations.
>
> The legislature further finds that the compelling circumstances present indicate a strong moral obligation by the state *to revive time barred causes of action that have accrued in favor of citizens of this state* who served in the armed forces during the Vietnam era, and had been exposed to and had come in contact with toxic chemical substances, and suffered severe physical disabilities which were undetected or undiscovered until years later.

(Emphasis added.)

CPLR 214–b, the special revival section and the preamble are, from time to time, referred to jointly below as "the Special Agent Orange Statute." The effect of these provisions is to remove any bar to Agent Orange cases brought by servicepersons. Wives and children were not covered.

Two key questions are raised. First, is the Special Agent Orange Statute constitutional and, second, does it apply to nonresidents.

### a. Constitutionality

■ State statutes reviving time-barred actions are not prohibited by the due process clause of the Fourteenth Amendment. The Supreme Court has characterized statutes of limitations as representing

a public policy about the privilege to litigate ... [T]he history of pleas of limitations shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945). The Court, reaffirming its analysis first voiced in *Campbell v. Holt*, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885), concluded "as a matter of constitutional law, ... statutes of limitation go to matters of remedy not to destruction of fundamental rights," and are, therefore, rules in which flexibility rather than stability is of prime importance. 325 U.S. at 314, 65 S.Ct. at 1142. The *Chase* Court held that

> the Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation.... [I]t cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment.

*Id.* at 315–16, 65 S.Ct. at 1143.

New York courts also recognize the state legislature's wide power to extend or revive a cause of action. *Gallewski v. H. Hentz & Co.*, 301 N.Y. 164, 174, 93 N.E.2d 620, 624 (1950) held:

> [A] revival statute is not necessarily and per se void as a taking of "property" without due process of law.... [T]he Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated.

*McCann v. Walsh Construction Co.*, 282 A.D. 444, 123 N.Y.S.2d 509 (3d Dept.1953), *aff'd*, 306 N.Y. 904, 119 N.E.2d 596 (1954), is particularly instructive since its facts are reminiscent of those in Agent Orange. Plaintiff suffered from caisson disease, caused by working in compressed air, which was not discovered until after the period required for filing workmen's compensation claims had expired. New York acted constitutionally in extending the claim period of the Act. The court wrote:

> This is a classic instance of the granting of legislative relief in a situation where the arbitrary application of the statute of limitations would work injustice. As the legislature recognized, in the case of a disease of an insidious character, the effects of which might be latent or long delayed, the right to compensation might be barred by the operation of the Statute of Limitations even before the claimant was aware of the fact that he had the disease. In these circumstances, the legislature did no more than to comply with the simple demands of justice in relieving innocent claimants of the effect of the statutory time limitations which would otherwise bar their right to compensation.

123 N.Y.S.2d at 514. *See also Robinson v. Robins Dry Dock & Repair Co.*, 238 N.Y. 271, 144 N.E. 579 (1924); *Denkensohn v. Ridgway Apartments, Inc.*, 13 Misc.2d 389, 180 N.Y.S.2d 144 (2d Dept.1958).

The New York Legislature acted within both federal and state constitutional limitations in lifting the statutory bar to recovery for servicepersons injured by contact with Agent Orange. Legislative findings place the statute well within the scope of the *Gallewski* and *McCann* rationale permitting legislative relief in the form of revival of time-barred claims.

The traditional purposes underlying statutory limitations are not affected by the revival of Agent Orange time-barred claims. Staleness of claims is not a relevant issue in this litigation. Defendants have not lost evidence on their key defenses through the passage of time. On the contrary, time has worked in favor of both plaintiffs and defendants. The availability of pertinent information, factual analyses and scientific studies has increased during the interim period facilitating the preparation of the case for all litigants. Nor are defendants suddenly faced with the reinstigation of an action for which they are

unprepared. Defendants have been aware, since not all claims were time-barred, that they would be litigating these issues at some point against some plaintiffs. The equities protected by the enforcement of statutory limitations are not endangered where defendants are aware of the pending litigation and able to prepare for it. As the court in *Allen v. United States*, 588 F.Supp. 247 (D.Utah 1984) (suit by Utah citizens exposed to fall-out from open air nuclear tests at Nevada test site), recently pointed out:

> In such cases, the underlying policy of the statute of limitations, discouraging litigation of "stale" claims, does not arise. The claim is not stale. It merely took time to accrue. Genuine concern about lost evidence, fading memories and the passage of time are subordinated to a greater concern that legal wrongs be remedied at the first practical opportunity.

*Id.* at 341.

Through the enactment of CPLR 214–b, and the revival section, the Legislature has expressed a public policy giving preference to plaintiffs' privilege to litigate over defendants' need for protection against time-barred claims.

### b. Construing Provisions to Apply to Nonresidents

Some support for a conclusion that New York courts would apply the Special Agent Orange Statute to actions by nonresidents can be found in traditional principles of statutory construction. The language of the statute, on its face, supports the contention that it is applicable to *all* members of the armed forces of the United States who served in Indo-China during the relevant time period. Although the preamble to chapter 266 of the laws of 1981 refers to the 600,000 New York State residents who served in Indo-China, the statute itself makes no such distinction. Where the Legislature could have enacted a law expressly limited to New York State residents, the failure to do so does lend credence to an inference that exclusion of nonresidents was not intended. The Supreme Court reg-

ularly embraces such a sensible plain meaning concept. *See, e.g., United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) ("in the absence of 'a clearly expressed legislative intent to the contrary, ... language must ordinarily be regarded as conclusive,'" quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

New York courts usually follow the same path as the Supreme Court in interpreting statutes. It is a fundamental principle of New York statutory construction that "'an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded.'" *Patrolmen's Benevolent Association of New York v. City of New York*, 41 N.Y.2d 205, 208–09, 391 N.Y.S.2d 544, 546, 359 N.E.2d 1338, 1341 (1976). *See also Rozler v. Franger*, 61 A.D.2d 46, 401 N.Y.S.2d 623 (4th Dept.), *aff'd*, 46 N.Y.2d 760, 413 N.Y.S.2d 654, 386 N.E.2d 262 (1978) (court must, if possible, give effect to natural and obvious meaning of statute).

The legislative history of the Special Agent Orange Statute can be viewed as lending some support to such an inference. The *New York State Assembly Memorandum in Support of Legislation* (10875–A) (1982) states the "Purpose or General Idea of Bill":

> To extend to June 16, 1983, the revival of time barred causes of action for an injury or death caused by contact with or exposure to phenoxy herbicides *for those persons serving as members of the armed forces of the United States in Indo China*...

(Emphasis added.) Documentation submitted to the Legislature in support of or against the proposed Bill indicates some legislative awareness of the scope of the statute's possible applicability. Thus the *Memorandum in Support of Assembly 7231–A* (June 5, 1981) from the Division of Veterans Affairs, State of New York, specifically mentions, "[t]he Bill in the form presented is not confined or limited to 'citizens of New York State.'" A letter from

the State of New York Insurance Department to the Counsel to the Governor (June 12, 1981) discusses the problems that might result from New York becoming "the center of all litigation involving herbicides" because the benefit of CPLR 214–b was not limited to New York State residents.

To summarize, the "Agent Orange" statute, on its face, does not dictate the exclusion of nonresident plaintiffs. The legislative history, although not determinative, indicates that the Legislature was aware that nonresidents were not explicitly excluded from the statute's benefits. Moreover, as the last enacted provision is narrower in scope than the more general sections of the CPLR, it can be argued that the Special Agent Orange Statute should apply to this unique suit. It is possible, therefore, to infer that the intention of the Legislature was to include nonresidents. The district court, in predicting the decision of the highest court of the state, would be rationally able to conclude that the special Agent Orange Statute was applicable to resident and non-resident American service-person plaintiffs alike.

An argument can also be made against the application of the Special Agent Orange Statute to the claims of nonresident servicepersons. Although the statute on its face is not limited to New York State residents, the preamble makes explicit reference to "over six hundred thousand New York state residents who served our nation in Indo-China." 1981 N.Y.Laws, ch. 266 § 1. While prefatory remarks cannot be considered dispositive of the intent and scope of the legislation, there is substantial support in the legislative history of the original 1981 law and the 1982 and 1983 amendments for the contention that the "Agent Orange" statute was meant to be limited to New York residents.

Assemblyman Conners, sponsor of the "Agent Orange" bill, stated in his letter to the Counsel to the Governor (June 4, 1981): "This legislation is an important recognition of the right of a Vietnam Veteran *who is a New York resident* to have his or her day in court to redress injuries sustained as a result of contact with the deadly chemical Agent Orange." (Emphasis added.) The "Justification" section of the *New York State Assembly Memorandum in Support of Legislation* includes the following statement supporting the 1981 provision: "This legislation will allow *New York Vietnam veterans* to have their day in court." (Emphasis added.) The *New York State Assembly Memorandum in Support of A–10875*, the 1982 amendment, restates the legislature's intent "to revive time barred causes of action that have accrued *in favor of citizens of this state*." (Emphasis added.) Additional letters and committee reports on the proposed legislation and amendments in the legislative file supplied to the court by the Counsel to the Governor of the State also support a general understanding that the benefits created by the "Agent Orange" bill were intended for New York residents.

The Legislature might have been aware that failure to limit the Special Agent Orange Statute to New York State residents could have the effect of making New York "the center of all litigation involving herbicides." See June 12, 1981 letter from the State of New York Insurance Department. It was not acting in a vacuum. At the time the "Agent Orange" statute was enacted in New York, the United States District Court for the Eastern District of New York was already the site of consolidation of the multidistrict "Agent Orange" suits, and the class action resulting in this settlement had been provisionally certified. *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 762 (E.D.N.Y.1980). The Legislature may have assumed that the brunt of the litigation would be felt in federal court so that it was merely acting to ensure that New York residents would not be barred in that court by the state's restrictive personal injury limitation. The legislative history does not permit a firm conclusion one way or the other. There is, however, no indication at all in the legislative history that the Legislature was made aware of the subtle *Erie* and conflict of laws issues implicit in its action.

Courts are justified in taking a conservative view of special legislation of this kind. Special laws that revive causes of action are "extreme example[s] of legislative power" and are narrowly construed. *Hopkins v. Lincoln Trust Co.*, 233 N.Y. 213, 215, 135 N.E. 267 (1922). The more conservative view is that the legislature intended only to protect the interests of citizens of the state. Confirmation for that restrictive view is found in the reluctance of New York courts to extend their class action protections to nonresidents, a matter already touched upon, as well as in the special treatment of residents as part of the state's statutes of limitations scheme in CPLR 202.

Nevertheless, discrimination in favor of residents of one state against residents of another has been analyzed and struck down by the Supreme Court under a number of different provisions of the Constitution, including the commerce clause, the privileges and immunities clause, the equal protection clause and the due process clause. *See, e.g., Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) (quasi in rem jurisdiction over nonresident); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (same); *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975) (income tax on nonresident); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (residency as prerequisite for emergency treatment); *Edwards v. California*, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (indigent nonresident).

We need not determine whether these and other cases might be used to invalidate a perceived discrimination against citizens of other states and nations. It is enough for this purpose to say that avoidance of the constitutional question lends some support to an interpretation favoring uniform treatment of New York citizens and other United States servicepersons in construing the Special Agent Orange Statute. *See, e.g., Rescue Army v. Municipal Court of City of Los Angeles*, 331 U.S. 549, 568, 67 S.Ct. 1409, 1419, 91 L.Ed. 1666 (1947); *Ash-*

*wander v. Tennessee Valley Authority*, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *McKinney's Cons. Laws of N.Y.*, Book 1, Statutes § 150(c) (1971) ("If possible, a statute is required to be construed in favor of its constitutionality.").

Allowing discrimination against nonresidents in a diversity case would be particularly troubling since in *Erie* the Court recognized that "[d]iversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the State." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 74, 58 S.Ct. 817, 820, 82 L.Ed. 1188 (1938). *See also Walker v. Armco Steel Corp.*, 446 U.S. 740, 744–45, 100 S.Ct. 1978, 1982, 64 L.Ed.2d 659 (1980).

The force of this interpretative guide against discrimination does not extend to outlawing CPLR 202, which applies a shorter statute to nonresidents. This borrowing statute was designed to avoid forum shopping. It has a widespread historical basis in American law that would probably sustain it against an attack on the ground of discrimination. *See, e.g., Canadian Northern Ry. Co. v. Eggen*, 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920) (sustaining borrowing statutes against claims of unconstitutionality); *Stafford v. International Harvester Co.*, 668 F.2d 142, 145 n. 1 (2d Cir. 1981); Restatement (Second) Conflict of Laws § 142 comment f (1971). A more sensitive present-day Supreme Court might, if presented for the first time with this issue, have decided it differently. *Cf., e.g.,* Note, The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits, 96 Harv.L.Rev. 1683 (1983). But on matters of this kind "the doctrine of *stare decisis* weighs heavily against" changes. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749, 100 S.Ct. 1978, 1984, 64 L.Ed.2d 659 (1980).

6. Wives and Children

Wives and children cannot avail themselves of the extended discovery limitation

afforded by the Special Agent Orange Statute. It is applicable only to members of the American armed services. To determine which statutory period a New York court would apply to such actions, it is necessary to refer again to the borrowing statute, CPLR 202, with the exception that causes of action accruing to New York residents, whether or not servicepersons, will be governed by the appropriate New York statutory limitation.

As noted above, for most purposes of CPLR 202, the place of injury determines where the cause of action arises. With respect to the claims of children, this would probably be the place of birth rather than conception. Under *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), a cause of action would probably not be considered to have accrued to a fetus. The children's claims present few problems since virtually all states have tolling provisions that stay the running of the period during infancy. *See* Appendix E.

The place of injury with regard to wives' claims for miscarriages would probably be the place where the miscarriage occurred. While an argument could be made that the place of injury should be the place of conception, a miscarriage would reasonably be viewed as the final injury completing the tort. For CPLR 202 purposes the cause of action would arise where and when the injury was "completed." CPLR 202 would mandate the application of the limitation period of the state where the miscarriage occurred if that period was shorter than New York State's three-year personal injury statute.

### 7. Vietnam Veterans Living Abroad

The claims of individual Vietnam veterans who are not United States servicepersons would presumably have been controlled by the provisions of the statutes of limitations of their respective countries, subject to CPLR 202. A case by case analysis, considering the foreign statutes and their tolling provisions, would be necessary to determine eligibility for recovery. At the Fairness Hearings, counsel for Austra-

lian and New Zealand veterans indicated that their suits would be barred by the law of those countries.

### 8. Conclusion on Statutes of Limitations

It is apparent that the law on statutes of limitations applicable to this case is far from clear. In view of the class action nature of the action and the desirability of having one rule apply to all class members, *see In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 690 (E.D.N.Y. 1984), were the action not settled the Special New York Agent Orange statute of limitations would be applied to all United States servicepersons who are class members. The matter is, however, sufficiently debatable that had the case been tried, the court would have required jury findings of fact permitting application of either single or multiple state statutes.

This ruling, tentatively applying a single statute to the class would not apply to servicepersons who have chosen not to participate in the class. On balance there appears to be more reason to apply their individual state statutes of limitations to such individual actions.

Most infants—whether or not members of the class—would be unaffected by a statute of limitations. In many instances wives claiming damages will be barred whether New York or some other state statute applies without respect to whether they are members of the class or have opted out.

Uncertainties presented by the law of statutes of limitations could not finally be resolved until after trial and appeals. Avoiding the procedural frustrations, expense and delays required to resolve the issues provides another good reason for settlement.

### B. Failure to Determine Who Was Harmed and Who Caused Harm

Defendants contend that even if anyone was injured by Agent Orange, plaintiffs cannot establish that the harm to any one of them was caused by any individual defendant. It is apparent that present knowl-

edge will not, however favorably construed, support an inference that it is more probable than not that (1) except for chloracne (a skin condition usually of transient effect), a particular plaintiff was injured by Agent Orange rather than some other cause; or (2) any particular defendant's Agent Orange was the herbicide a particular serviceperson came in contact with. Were this a case brought by a single plaintiff against one or more defendants, it probably would have to be dismissed. Because it is a class action, were it not settled, we would probably be constrained to deny such a motion for reasons that appear below. Nonetheless, serious questions of law make ultimate recovery on these theories questionable. These questions are relevant in assessing the reasonableness of the settlement.

### 1. Facts

While the facts have been set forth in some detail earlier and in other opinions, it is desirable to recapitulate the relevant evidence for purposes of analyzing the law relating to indeterminate plaintiffs and defendants.

The seven chemical company defendants, Dow Chemical Co., Hercules, Inc., The Monsanto Company, Diamond Shamrock Chemicals Corporation, Thompson Chemical Corporation, T.H. Agriculture & Nutrition, and Uniroyal, Inc., manufactured over 99% of a herbicide called Agent Orange used by the military in Vietnam between 1965 and 1970.

The amount of dioxin in the Agent Orange varied from defendant to defendant. There is evidence that it may have averaged less than one part per million (ppm) for some defendants and over 10 ppm for another defendant. Even the least contaminated Agent Orange may have contained enough dioxin to cause chloracne, a skin disease which may leave large permanent scars. It is claimed — but sufficient evidence to support a finding has thus far not been produced — that exposure to dioxin such as that experienced by servicepersons in Vietnam can cause other diseases such as soft tissue sarcoma, a form of cancer, porphyria cutanea tarda, a liver ailment, miscarriage of wives of servicemen, and genetic damage to children of servicemen.

Construing available information most favorably to plaintiffs, it could be found that defendants had known for some years before Agent Orange production began in 1965 that factory workers exposed to dioxin in concentrations of tens of parts per million could develop chloracne, liver damage and other diseases. By 1965 Dow knew that in cases of continuous exposure, dioxin could be hazardous in amounts as low as 1 ppm, which was at that time the lowest level at which dioxin could be readily detected. Dow also arguably knew that dioxin was present in its Agent Orange below the 1 ppm level of sensitivity. Although Dow was not aware of all the harmful effects that such amounts of dioxin could produce in humans, based on animal tests it did suspect that dioxin could have deleterious effects even below 1 ppm.

Dow shared this information at a meeting it called in March 1965. Representatives of Hooker Chemical, Hercules, and Diamond Shamrock (then known as Diamond Alkali) were present. Monsanto was invited, but did not attend. Dow told those present at the meeting that it had sampled other companies' herbicides and had found them to contain relatively high levels of dioxin. At the meeting, and on a number of subsequent occasions, Dow and other defendants expressed fear that the government, if it learned of the scope of the problem, might intervene in a way disastrous to the entire herbicide industry. By that time herbicides were being used more and more in commercial farming and in other ways profitable to its suppliers. The components of Agent Orange were "shelf items" widely used in commercial applications.

After other defendants acquired information about the hazards of dioxin, they became concerned about regulation and interference with the herbicide industry if the United States was made fully aware of the problem. The defendants also knew of the

existence of the vapor phase chromatography (VPC) method for detecting dioxin in Agent Orange which was accurate to 1 ppm. Not all the defendants were familiar with the methodology, but all defendants knew that it existed. All were aware of the fact that precautions in production and in filtering out dioxin could sharply limit the risk of contamination of the final herbicide.

Each defendant reacted differently to the evidence it had on the dangers of dioxin. Information submitted on summary judgment motion, for example, suggests that Dow and Hercules took steps to reduce dioxin content to below 1 ppm, at that time the threshold for dioxin detection, while Monsanto's and Diamond Shamrock's dioxin levels remained significantly higher.

The government used the Agent Orange to clear vegetation that concealed the military movements of the enemy. It knew of at least some of the health hazards to workers posed by dioxin in large concentrations. There is some evidence that government agencies charged with the purchase and use of Agent Orange were not told by defendants and were not aware that dioxin could be dangerous in concentrations of as low as, or perhaps even below, one part per million. Nor were they, the evidence may show, made aware by the defendants of the sensitive VPC method for detecting dioxin in trace amounts.

Use of herbicides in Vietnam began as early as 1961 at the request of the South Vietnamese government. From 1965, when Agent Orange began to be used there intensively and extensively by United States forces, until 1970 when its use was sharply curtailed, largely out of health concerns, the defendants and the government were in regular communication. The communications concerned the defendants' contracts with the government for Agent Orange production, methods for detecting dioxin, and the government's proposal to build its own Agent Orange production facilities. The government and the plaintiffs argue that the evidence would allow the inference that not until 1970 did the government learn what the defendants knew in 1965 about the dangers of dioxin in low concentrations and of the VPC method for detecting dioxin.

From 1965 through 1968, the government was pressing the manufacturers to produce as much Agent Orange as possible so that, in effect, the defendants were able to sell to the government as much as they were able to produce. Thus, arguably, defendants were not competing with each other for the government's business and had an incentive not to alert the government to possible dioxin contamination in their product and that of their competitors. Even if defendants are correct that they were in effect dragooned into producing Agent Orange in the war effort when they would have preferred to use their limited facilities for the production of more profitable commercial herbicides, it can be argued that alerting the defense establishment to the full dangers of Agent Orange might have led to limits on the sale of commercial herbicides in the civilian market since the production problems and dangers were much the same.

The Agent Orange produced by the defendants was by government order shipped in fifty-five gallon drums. Under the contract, each drum had an orange stripe on it and a "contract identification number" enabling the government to identify the specific manufacturer. Unlike the equivalent commercial product sold to civilians, the contract called for no warning on the drums about precautions and dangers. The defendants had no control over how the government used the product after it was delivered, although they were aware of how in fact it was used. The drums were sent to a number of central transportation points for shipment to Vietnam. In Vietnam, in preparation for spraying, the drums were drained into large tanks and their contents mixed with those of other drums, making identification of the individual manufacturer's Agent Orange impossible. Even if the Agent Orange had not been mixed, connecting an individual defendant's product with a person in contact

with it would be virtually impossible because of lack of records.

As compared to commercial use of herbicides, the government increased the health risks by (1) spraying in much greater concentrations than recommended by the manufacturers for civilian use, (2) failing to inform users to guard against direct contact with the herbicide, (3) failing to take precautions to warn those who might be exposed to the herbicide, (4) failing to warn those in the area where it was used to avoid contact with vegetation and drinking or bathing in contaminated water or eating contaminated food, and (5) failing to provide sanitary precautions such as showers and fresh clothing and medical attention to those who were exposed.

Members of the armed services were exposed to Agent Orange in a number of different ways. Air Force personnel handled the Agent Orange in preparation for large scale spraying from the air. Hand and mechanical equipment was used locally to clear the perimeter of installations. Troops were exposed to the spraying when they walked and lived in areas with affected vegetation. Some drank water or ate food prepared from crops that had been contaminated with Agent Orange. The exigencies of battle sometimes resulted in fast dumping of large quantities of the herbicide on troops. It is not disputed that the amount sprayed per acre vastly exceeded what would have been used in commercial farming or plant clearing activities by civilians.

## 2. Law

Plaintiffs have several difficult legal hurdles to overcome. The first results from the conceded inability of any veteran to identify the manufacturer of the herbicide to which he was exposed. Second, all of the ailments and conditions class members allegedly suffer from, with the possible exception of chloracne, are not unique to Agent Orange or dioxin exposure and occur in the population at large. Thus, even if it is possible to establish by a preponderance of the evidence that some members of the

class were injured because it is shown that those diseases occur in a higher percentage of the class members than would be statistically expected, it may be impossible to prove who those members are. Each problem will be analyzed in turn.

### a. The Problem of the Indeterminate Defendant

#### (1) Introduction

This case illustrates the inapplicability of burden of proof rules designed for simple two-party cases to mass toxic torts where injury was allegedly caused, but the question of which manufacturer created the harm cannot be answered with precision. Under "traditional" product liability law, to establish a *prima facie* case against any given manufacturer of Agent Orange, a plaintiff would have to prove, by a preponderance of the evidence, the following material propositions: (1) he was injured, (2) the injury was caused by Agent Orange, (3) a defendant had violated some legal duty owed to the plaintiff (as by negligent manufacture of Agent Orange), and (4) the particular Agent Orange causing injury to the plaintiff was manufactured by that defendant.

Plaintiffs concede that because of the way the defendants' herbicides were mixed by the government in Vietnam before spraying no plaintiff would be able to establish the fourth material proposition. As will be seen, this inability is not fatal to their case. Instead, a class of plaintiffs would be able to establish a *prima facie* case by showing, in addition to the first three material propositions, that the manufacturer knew or should have known about the dangers of Agent Orange as it was to be used in Vietnam and that the manufacturer failed to warn the government of those dangers.

Once plaintiffs succeeded in establishing a *prima facie* case, each defendant would assume the burden of establishing the government contract defense. Specifically, a defendant would have the burden of proving one of two material propositions to establish the defense: either that (1) the

government knew as much or more of the dangers of Agent Orange as that defendant knew or should have known, or, alternatively, that (2) even if the government had had the knowledge, it would have continued to buy or produce Agent Orange of the same toxicity as that manufactured by defendants and would not have taken steps to reduce Agent Orange hazards to servicepersons. If a defendant failed to establish the government contract defense, it could nonetheless escape liability by showing that its product could not have caused the plaintiffs' injury or, alternatively, that it should only be responsible for a proportion of the damage.

## (2) Applicable Law

The question of how to apportion damage among tortfeasors when by independent or concurrent acts or failures to act they have produced indivisible damage has arisen in several contexts. First, defendants act jointly or in a consciously parallel fashion in the performance of a tortious act. *See* (2), (a), Enterprise Liability, *infra.* Second, although there is no concert of action, the independent acts or omissions of several actors concur to produce indivisible harmful consequences; as a variation on this fact pattern, several defendants acting independently have breached a duty of care to the plaintiff and, although at least one of them actually caused the harm, it is impossible to determine which one. *See* (2), (b), Alternative Liability and Its Variations, *infra.* Third, defendants independently fail to perform the same duty each owed to the plaintiff. *See* (2), (c), Defendants' Individual Duty to Warn the Government of Dangers, *infra.* As will be seen, courts have developed a number of legal models to hold defendants liable either jointly and severally or by apportioning damages.

In recent years, a fourth fact pattern has arisen similar to the second but differing in one respect: While it can be shown that defendants injured some of a large group of plaintiffs, it is impossible to determine which of the plaintiffs were injured. This could happen, for example, if defendants exposed plaintiffs to a toxic substance that caused the incidence of cancer among the plaintiffs to rise significantly above the "background" level of cancers, but it is impossible to determine if the cancer in a particular plaintiff is due to the toxic substance or is part of the "background" cancers. Because of its novel nature, there is not yet a clear judicial response to this fact pattern although, as indicated in the discussion below, current procedural and substantive law can be adapted to meet the challenge. This issue is discussed under IV, B, 2, b, The Problem of the Indeterminate Plaintiff, *infra.*

The applicability of each of these four fact patterns to this case will be examined in turn.

### (a) *Enterprise Liability*
#### (i) *Legal Theory*

Joint or parallel action by defendants in the commission of a tortious act is alleged to be evidenced by defendants' individual adherence to an inadequate industry-wide standard of safety. By focusing on the safety standard instead of on the cause-in-fact, plaintiffs hope to eliminate the necessity for identifying the individual manufacturer. They allege that each defendant knew of the danger of dioxin contamination and had the ability to detect and reduce the magnitude of its incidence. While they concede that a number of the defendants did make some effort to monitor and reduce the amount of dioxin in their product, they contend that the effort was inadequate given the evidence the defendants had suggesting that even a trace amount of dioxin can have serious effects.

Plaintiffs rely heavily on *Hall v. E.I. DuPont DeNemours & Co., Inc.,* 345 F.Supp. 353 (E.D.N.Y.1972). *Hall* applied a variant of the concert of action theory to an entire industry, referring to it as "enterprise liability." In that case plaintiffs were children who had been injured when blasting caps they were playing with exploded. The explosion destroyed the blasting caps, thus making it impossible to identify the manufacturer. Despite the impossibility of

identification, defendants' motion to dismiss was denied. The court held that the plaintiffs' allegations of joint knowledge and action in failing to provide a warning label on the blasting caps were sufficient to state a claim for relief:

> Where courts perceive a clear joint control of risk ... the issue of who "caused" the injury is distinctly secondary to the fact that the group engaged in joint hazardous conduct.... Joint control may be shown ... [by] evidence that defendants, acting independently, adhered to an industry-wide standard or custom with regard to the safety features of blasting caps.

345 F.Supp. at 372–74. The claim of joint control in *Hall* included allegations that defendants had actual knowledge that children were frequently injured by blasting caps and through an industry-wide trade association kept statistics and other information regarding those accidents. The evidence also supported the contention that defendants jointly considered the possibility of putting warning labels on the caps, that they jointly rejected this course of action, and that they jointly lobbied against legislation that would have established such requirements.

> The court in *Hall* concluded that
>
> [i]f plaintiffs can establish by a preponderance of the evidence that the injury-causing caps were the product of some unknown one of the named defendants, that each named defendant breached a duty of care owed to plaintiffs and that these breaches were substantially concurrent in time and of a similar nature, they will be entitled to a shift of the burden of proof on the issue of causation.

*Hall,* 345 F.Supp. at 380.

In recent years, courts have been asked to apply a form of the enterprise liability theory to claims brought by daughters of women who ingested DES, a synthetic hormone, while they were pregnant with their daughters. Plaintiffs allege that as a result of their mothers taking the drug, the daughters developed vaginal cancer or pre- ·

cancerous lesions. Because of the long period of time that elapses between the ingestion of the drug and the manifestation of the symptoms and because DES was manufactured by hundreds of different companies in largely identical form, plaintiffs are usually unable to identify the manufacturer of the particular DES their mothers ingested.

Virtually all courts, while accepting the validity of the enterprise liability theory, have found it inapplicable to the facts of the DES cases. They have concluded, first, the fact that hundreds of drug companies entered and left the DES marketplace over the twenty-four years that DES was on the market weakens the assumption that the defendants jointly controlled the risk of injury. This point was recognized in *Hall* when the court noted that, "What would be fair and reasonable with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers." *Hall v. E.I. DuPont DeNemours & Co., Inc.,* 345 F.Supp. 353, 378 (E.D.N.Y.1972). Second, the assumption of joint control in the DES cases was further weakened because, unlike the situation in *Hall,* the Food and Drug Administration, not members of the industry themselves, formulated the criteria for the testing and marketing of the drug. *See, e.g., Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 935, 163 Cal.Rptr. 132, 143, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980); *Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 342 N.W.2d 37, 47 (1984).

#### (ii) *Application of Enterprise Liability Theory to This Case*

In one respect, the *"Agent Orange"* litigation presents an appealing case for the application of enterprise liability in that, like *Hall,* and unlike the DES and asbestos cases, there are only seven producers.

The *sine qua non* of an enterprise liability claim is the joint or parallel action of the defendants. The plaintiffs claim that the parallel action in this case is a deliberate failure on the part of all of the defendants

to take adequate steps to reduce the dioxin content of the Agent Orange to a safe level. It was this parallel action which they urge be viewed as the source of the injury. Plaintiffs misconstrue the parallel action requirement. There appears to be little doubt that different defendants reacted in different ways when they learned of the dangers of dioxin. Some took steps to lower the dioxin level below the then detectable limit. Others allegedly took no effective action. Plaintiffs' theory confuses the fact that conceivably no defendant took *adequate* action, which is true of most alternative liability cases, with an industry-wide decision to take inadequate action of which they have shown no evidence.

If there was an industry-wide decision, it was taken through parallel action by the defendants in individually deciding not to fully inform the government of the possible dangers posed by low levels of dioxin and in not supplying the government with the more accurate methods they had of dioxin detection. The legal relevance of this fact will be developed in (2), (c), Defendants' Individual Duty to Warn the Government of Dangers, *infra*. It is this alleged failure of any defendant to alert the government to the dangers while profiting from the sale of Agent Orange to the government and by the sale of other herbicides to private persons that constitutes the industry-wide predicate of enterprise liability.

### (b) *Alternative Liability and Its Variations*

#### (i) *Legal Theory*

Plaintiffs also urge variants of the alternative liability theory, developed to apply to a variation of the second of the fact patterns, to wit, two or more defendants have independently breached a duty of care owed to plaintiffs, but it is impossible to determine, as to an individual plaintiff, which one caused the injury.

This model is illustrated by the classic case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). In *Summers*, two hunters negligently shot in the direction of the plaintiff, but it could not be ascertained which hunter's bullet injured the plaintiff. The problem thus posed is troublesome from a legal standpoint. In the other two of the first three fact patterns, each defendant can be said to have contributed in some fashion or measure to an individual plaintiff's harm. By contrast, in *Summers* it is clear that at least one defendant did not contribute in any measure to the harm. This difference results in a clash between two fundamental principles of tort law: (1) that a plaintiff who was injured by a tortiously acting defendant should be compensated for his injuries and (2) that a defendant should not be held responsible for harm he did not cause.

The court in *Summers* responded to the dilemma by developing a theory of "alternative liability" which is summarized in the Restatement of Torts as follows:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one of them has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Restatement (Second) of Torts § 433B, subdivision 3 (1965). Under *Summers*, when all defendants, although acting independently, have breached a duty of care toward the plaintiff but only one of them caused the plaintiff's injury, the burden of proof shifts to each defendant to prove that he or she did not cause the injury. Failure to meet that burden results in joint and several liability with other defendants. The logic is simple and compelling: "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 936, 163 Cal.Rptr. 132, 144, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

The cases in which the *Summers-Sindell* approach has been most widely applied are those in which the independent actions of several actors concur to produce indivisible harm. Such cases arise when, for example, plaintiff's automobile is struck by several other automobiles at almost the same time

or when plaintiff's land is polluted by several defendants, each acting independently. Once plaintiff proves a breach of duty on the part of a defendant, that defendant is jointly and severally liable for the entire harm suffered by plaintiff and plaintiff need not prove what portion of the total damage, if any, was caused by defendant. *See, e.g., Michie v. Great Lakes Steel Division National Steel Corp.,* 495 F.2d 213 (6th Cir.) (three allegedly polluting defendants can be held jointly and severally liable), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974); *Phillips Petroleum Co. v. Hardee,* 189 F.2d 205 (5th Cir.1951) (pollution); *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P.2d 270 (1947) (pollution); *Maddux v. Donaldson,* 362 Mich. 425, 108 N.W.2d 33 (1961) (multiple collisions causing indivisible injuries); *Landers v. East Texas Salt Water Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731 (1952) (pollution).

In the pollution and multiple crash cases, the degree to which the individual defendant's actions contributed to an individual plaintiff's injuries is unknown and generally unascertainable. Yet all defendants have been held liable even though an individual defendant may not have caused any injury. *See, e.g., Hackworth v. Davis,* 87 Idaho 98, 390 P.2d 422 (1964) (car crash); *Zulauf v. New York,* 119 Misc.2d 135, 462 N.Y.S.2d 560 (Ct.Claims 1983) (car crash). *See also, e.g., Anderson v. Somberg,* 67 N.J. 291, 338 A.2d 1 (manufacturer, distributor and user of surgical instrument, the tip of which broke off in the course of surgery and injured plaintiff, all held jointly and severally liable unless a defendant could prove it was not responsible for the injury), *cert. denied,* 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975); *Ybarra v. Spangard,* 25 Cal.2d 486, 154 P.2d 687 (1944) (all those who participated in operation from which plaintiff awoke with severely injured shoulder held jointly and severally liable unless a defendant could prove he was not responsible for the injury).

In the last few years courts have been asked to apply alternative liability or a variation of it to claims involving mass exposure to substances that turn out to be harmful. The claims of women who allege they were injured by their mothers' ingestion of DES and of workers who allege they developed various lung diseases as a result of exposure to asbestos are striking examples of this trend. In both situations, plaintiffs are able to prove with a substantial degree of probability that the DES or asbestos caused the injury, but are unable to identify the specific manufacturer of the product which injured him or her.

The DES and asbestos cases in some respects provide a pattern arguing even more strongly for recovery than does the *Summers* fact pattern. In the mass tort cases, unlike the *Summers* situation, dropping the requirement that a plaintiff identify a particular defendant as the cause in fact of his injuries does not undermine the principle that a defendant should only be held responsible for the damage it caused. As long as a plaintiff can prove general causation, i.e., that he was injured by the type of product or substance manufactured by defendants, and as long as there is a rational method for determining the percentage of the total harm caused to all those damaged by each of the possible defendants, the principle remains intact.

Assuming every injured person will sue, looking at the total number of successful claims, each defendant will, at least theoretically, only be held responsible for that part of the damage that it caused to the community. *See, e.g., Sindell,* 607 P.2d at 937, 163 Cal.Rptr. 145; Comment, DES and a Proposed Theory of Enterprise Liability, 46 Fordham L.Rev. 963, 994 (1978). *Cf.* Ball, The Moment of Truth: Probability Theory and Standards of Proof, 14 Vand.L. Rev. 807 (1961); Kaye, The Paradox of the Gatecrasher and Other Stories, 1979 Ariz. St.L.J. 101. The approach becomes particularly useful when all possible claimants and all possible defendants are joined together in a single suit because then the total damage done to the community can be assessed against all wrongdoers at one time. There will be no inconsistent ver-

dicts and procedural and other transactional costs of a complete vindication of plaintiffs' rights become manageable. When there are many individual suits against a changing array of possible malefactors, the costs and the likelihood of inconsistent verdicts make the approach less attractive.

Partially in recognition of the difficulties of proof under traditional tort theory, three of the four highest state courts that have considered the issue in the context of DES claims have applied some form of alternative liability. The one state supreme court that did not apply alternative liability strongly suggested that under the proper circumstances it would accept the theory.

The first state supreme court to address the question was the Supreme Court of California in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). It initially considered the application of "pure" alternative liability as set forth in *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). The court rejected defendants' contention that *Summers* is only applicable when the defendants have greater access to information about the cause of the injuries than the plaintiff. It noted that this was not true in *Summers* and it concluded "that the fact [that] defendants do not have greater access to information which might establish the identity of the manufacturer of the DES which injured plaintiff does not per se prevent application of the *Summers* rule." *Sindell*, 607 P.2d at 930, 163 Cal. Rptr. at 138. There was, however, a crucial difference between *Summers* and *Sindell* which made *Summers* inapplicable. In *Summers* all those who committed the allegedly tortious act were before the court. By contrast, only five of the approximately 200 drug companies that made DES, and thus allegedly breached their duty of care to plaintiff, were defendants in *Sindell*.

After rejecting the application of the enterprise liability concept, the *Sindell* court adopted a theory of "market share" liability which it called "a modification of the rule of *Summers*." *Sindell*, 607 P.2d at 936. Under this theory, once the "plaintiff joins in the action the manufacturers of a substantial share of the DES which her mother might have taken," and all the other necessary elements other than causation-in-fact are proven, damages will be apportioned among the defendants by holding "[e]ach defendant ... liable for the proportion of the judgment represented by its share of [the] market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." *Id.* at 937, 163 Cal.Rptr. at 145. "Under this approach, each manufacturer's liability would approximate its responsibility for the injuries caused by its own products." *Id.*

The next state supreme court to consider the question was the Supreme Judicial Court of Massachusetts in *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982), upon certification by the federal district court of the District of Massachusetts. The theory that the plaintiffs urged the court to adopt was identical to the market share theory adopted by the California Supreme Court, with two differences. First, instead of only allowing a plaintiff to recover from the defendants that proportion of her damages that corresponded to a defendant's market share of the DES, plaintiffs asserted that "they should be allowed to recover 100% of their losses from the six named defendants ... apportioned among named defendants in proportion to each named defendant's share of the DES distributed by all named defendants." *Payton*, 437 N.E.2d at 188–89. Second, plaintiffs also asked the court to "prohibit exculpatory proof, that is, proof by particular defendants that the DES they marketed could not have been ingested, for whatever reason, by a particular plaintiff's mother." *Id.* 437 N.E.2d at 189.

The court stated that "[a]cceptance of this theory of proof would create the risk of holding the named defendants liable in negligence for more harm than they caused.... [and] [b]y prohibiting exculpatory proof ... the plaintiffs would practically ensure that defendants innocent of

wrongdoing to a particular plaintiff would be held liable to her." *Id.* Because of these objections, the court refused to adopt the theory suggested by plaintiffs. In summarizing its ruling, however, it stated that

> [we] have indicated ... that we might permit recovery from those defendants shown to be negligent to the extent of their participation in the DES market, even though the plaintiffs cannot identify the particular source of DES which their mothers ingested.

*Id.* 437 N.E.2d at 190. Thus the court strongly hinted at its willingness to accept the modification of *Summers* adopted by the California Supreme Court as long as each defendant is only held liable for the amount of damage it caused to the total population injured by the product.

More recently the Supreme Courts of two more states, Wisconsin and Michigan, have applied some form of alternative liability to DES claims. In *Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 342 N.W.2d 37 (1984), the Supreme Court of Wisconsin, after applying essentially the same analysis as *Sindell*, adopted a "risk contribution" theory, which is in essence the "market share" theory with two differences. First, plaintiff need only sue one manufacturer of DES, not those representing a "substantial share" of the DES market, so long as that defendant produced or marketed the type of DES taken by her mother. That defendant may then implead other drug companies which it alleges produced or marketed the type of DES taken by plaintiff's mother as third-party defendants. 342 N.W.2d at 49–51. Second, percentage of liability is based on comparative negligence with market share only one of the factors used to make that finding. *Id.* 342 N.W.2d at 53.

Finally, the Supreme Court of Michigan in *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984), has also adopted the theory of alternative liability. The Michigan court did not water down the *Summers* requirement that all the alleged tortfeasors be joined as defendants, 343 N.W.2d at 173, but its ruling was potentially even harsher on prospective defendants than the rulings of the California and Wisconsin courts because it held that once all tort-feasors were joined, each may be found jointly and severally liable. Like the Supreme Courts of California and Wisconsin, the Michigan court held that defendants' access to evidence of causation is not a relevant factor for alternative liability:

> [T]he requirements of better access to evidence and its counterpart, exclusive control, are more correctly facets of the doctrine of *res ipsa loquitur*. *See Ybarra v. Spangard*, 25 Cal.2d 486, 154 P.2d 687 (1944); *Anderson v. Somberg*, 67 N.J. 291, 305, 338 A.2d 1 (1975). Even as a factor within that doctrine, the defendant's access to evidence as a controlling consideration has been criticized. *See, e.g.*, Prosser, [Torts (2d ed.)] § 39, p. 225.

343 N.W.2d at 174.

The courts of two other states, those of New Jersey and Florida, also have considered the alternative liability question. Two courts in New Jersey have split on the issue: *Namm v. Charles E. Frosst & Co., Inc.*, 178 N.J.Super. 19, 427 A.2d 1121 (App.Div.1981), refused to adopt the theory, relying on the fact that not all the manufacturers of the harmful substance, DES, were before the court and the belief that the precedent it found controlling should be modified by the New Jersey Supreme Court, not the Appellate Division. *Ferrigno v. Eli Lilly & Co.*, 175 N.J.Super. 551, 420 A.2d 1305 (Law.Div.1980), did adopt the alternative liability theory and interpreted the same precedent in a contrary manner.

The Florida Third District Court of Appeals in *Copeland v. Celotex Corp.*, 447 So.2d 908 (Fla.App.1984), held that a plaintiff who developed asbestosis need only show that he was exposed to asbestos products in general and join as defendants a substantial number of asbestos manufacturers who marketed asbestos products during the time of his exposure. Liability

would be apportioned on the basis of national market share.

Federal courts have split in making *Erie*-based predictions as to whether their forum state's courts would adopt an alternative liability or market share theory. *Compare, e.g., McElhaney v. Eli Lilly & Co.,* 564 F.Supp. 265 (D.S. Dak.1983) (predicting that South Dakota would adopt alternative liability in DES case) *and Hardy v. Johns-Manville Sales Corp.,* 509 F.Supp. 1353 (E.D.Tex.1981) (predicting that Texas would adopt alternative liability in asbestos case), *rev'd on other grounds,* 681 F.2d 334 (5th Cir.1982), *with Morton v. Abbott Laboratories,* 538 F.Supp. 593 (M.D.Fla.1982) (predicting, prior to *Copeland v. Celotex Corp.,* 447 So.2d 908 (Fla.App.1984), that while Florida may adopt alternative liability, it would not adopt market share liability) *and Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C.1981) (predicting that South Carolina would not follow *Sindell*).

None of the courts rejected alternative liability when all the defendants were before the court. On the contrary, they emphasized that what they found most objectionable about *Sindell* is the fact that all defendants may be held liable "despite the possibility that no defendant [before the court] caused the injury." *Morton v. Abbott Laboratories,* 538 F.Supp. 593, 599 (M.D.Fla.1982). *See also Tidler v. Eli Lilly & Co.,* 95 F.R.D. 332, 335 (D.D.C.1982) ("There is some indication that the District of Columbia courts might accept the theory of alternative liability ... where *all* possible manufacturers ... are ... joined.").

### (ii) *Application of Alternative Liability to this Case*

Defendants object to use of alternative liability precedents on several grounds. They contend first, that the reasoning of those state supreme courts that have imposed liability in the DES cases has been rejected by a number of federal courts that have, under *Erie,* attempted to foretell what their forum states' courts would do. Second, they argue that even if some form of alternative liability is to be generally accepted, there are critical differences be-

tween the DES cases and this litigation which make any variation of that theory inapplicable. Each of these objections will be detailed and addressed in turn.

As to the first objection, defendants cite *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C.1981); *Mizell v. Eli Lilly & Co.,* 526 F.Supp. 589 (D.S.C.1981), and the other federal district court cases noted above that have refused to follow *Sindell.* They also cite a number of federal court decisions that have, in the context of the asbestos litigation, rejected an alternative-liability type theory. Defendants read too much into those cases. A number of the decisions they cite reject a *Summers*-type approach in large part because the plaintiff was able to identify some of the manufacturers of the products to which he was exposed. *See, e.g., Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581, 583 (5th Cir.1983) (*Sindell* will not be applied "where a large group of defendants whose products [the plaintiff] did recall using remain before the court"), *cert. denied,* —— U.S. ——, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); *In re Related Asbestos Cases,* 543 F.Supp. 1152, 1158 (N.D.Cal.1982) (same). Other courts have refused to apply the doctrine because of other differences between *Sindell* and the case at bar which do not apply here. *See, e.g., Hannon v. Waterman Steamship Corp.,* 567 F.Supp. 90, 92 (E.D.La.1983) (" 'defining the relevant product and geographic markets [for *Sindell* market share liability] would be an extremely complex task due to the numerous uses to which asbestos is put, and to the fact that some of the products to which the plaintiffs were exposed were undoubtedly purchased out of state sometime prior to the plaintiffs' exposure,' " quoting *In re Related Asbestos Cases,* 543 F.Supp. 1152, 1158 (N.D.Cal.1982)). *See also Starling v. Seaboard Coast Line Railroad Co.,* 533 F.Supp. 183, 191 (S.D.Ga.1982) (citations and footnotes omitted):

Courts have noted significant differences between the marketing and use of asbestos products and the manner in which DES pills were marketed so that perhaps

only the exceptional plaintiff in asbestos actions will be deprived of a remedy.... [T]he likelihood that either the asbestos manufacturers or the purchasers have maintained invoice records denoting whose products were used at a specific work site is much greater [than in DES cases]. Moreover, the plaintiff need not determinatively prove which producer's asbestos caused his injury. A *prima facie* case is shown if the plaintiff can prove that he was exposed to the defendant's products on at least one occasion.

Defendants' second contention is that notwithstanding the possible acceptance in principle of some variation of an alternative liability theory, there are crucial differences between other cases that have applied alternative liability and the *"Agent Orange"* litigation. They contend that in order for *Sindell* to apply the causal connection between the defendants' acts and the harm must be undisputed, as they claim it is in the DES cases and as it was in *Hall* and in *Summers*. As a variation on this point, defendants contend that, despite the fact that all the manufacturers are before the court, not all the potential tortfeasors are before the court since there are substances other than Agent Orange to which plaintiffs were exposed that defendants claim could have acted together with Agent Orange to cause the injuries suffered by plaintiffs. *Cf. Starling v. Seaboard Coast Line Railroad Co.*, 533 F.Supp. 183, 191 (S.D.Ga.1982) ("The injuries caused by asbestos exposure are not restricted to asbestos products—other products ... may have caused or contributed to the injury."). For example, defendants point to dapsone, an anti-malarial drug given to American servicepersons in Vietnam, which is a suspected carcinogen, as a far more likely source of cancer than Agent Orange.

There are several procedural and substantive factors unique to this litigation that blunt the force of defendants' contentions and justify the application of a modified burden-shifting theory to this case while holding each defendant liable only for the damage that plaintiffs can prove that it caused. In the instant case not only are virtually all producers of the allegedly harmful substance before the court, but because this is a class action, so are almost all persons allegedly injured who could now be before an American court. Because of these unique facts the *"Agent Orange"* litigation is a far more appealing case for the application of some form of alternative liability than are the DES cases.

As the Supreme Court of Wisconsin pointed out in rejecting "pure" market share liability, there is a severe

> practical difficulty [in] defining and proving market share [of DES] ... Even assuming that some drug companies have records, the fact finder still may not be able to compose an accurate assessment of the total market of which those companies were a part. There are several reasons for this: The DES market apparently was quite fluid, with companies entering and leaving the market over the years; some companies no longer exist and some that still exist may not have relevant records; and apparently there are no accurate nationwide records pertaining to the overall production and marketing of DES. We view defining the market and apportioning market share as a near impossible task if it is to be done fairly and accurately in order to approximate the probability that a defendant caused the plaintiff's injuries.

*Collins v. Eli Lilly & Co.*, 116 Wis.2d 166, 342 N.W.2d 37, 48 (1984).

The situation here is in stark contrast to the one described in the *Collins* case. The market for Agent Orange was not "fluid," companies were not "entering and leaving the market over the years," relevant detailed records exist for all the companies and there are accurate records pertaining to the overall production and marketing of Agent Orange. If general causation were proven it would be possible for a jury to apportion damages so that a defendant would only be held responsible for the injury it could reasonably be said to have caused to all servicepersons. Thus, if an alternative-liability-type theory is justified

in DES, it is even more justified in the *"Agent Orange"* litigation despite the lack of certainty as to causation. Furthermore the likelihood that a *particular* manufacturer contributed to a plaintiff's injury is increased because the herbicides of many manufacturers were mixed together and because many plaintiffs were repeatedly exposed to Agent Orange.

The power of defendants' objections are further attenuated when it is realized that while it makes sense to require that the manufacturers of all potentially causal agents be joined when, as in the DES cases, it is within plaintiff's power to do so, it does not necessarily follow that this requirement should be retained when, as here, it is not within plaintiff's power. For example, defendants contend that one possible carcinogen to which plaintiffs were exposed was aflatoxin, a rice fungus occurring naturally in Vietnam. It is obviously impossible to join as defendants the Vietnamese peasants whose rice contained the aflatoxin. Furthermore, to the extent that the other toxic agents acted not independently, but synergistically with Agent Orange, defendants' argument is without merit; if the manufacturers of the Agent Orange are joint tortfeasors with the other causative agents, they may be entitled to implead the manufacturers of those agents, if possible, but they are not entitled to a judgment in their favor if they cannot. Finally, and most importantly as developed more fully in the next section on Duty to Warn, the evidence may show that defendants should be estopped from asserting the inability to identify a particular defendant's connection to a particular plaintiff to bar a plaintiff's claim.

### (c) *Defendants' Individual Duty to Warn the Government of Dangers*

#### (i) *Duty to Warn of Dangers of Their Own Product*

It was noted above that plaintiffs may be able to show that there was an understanding among the manufacturers to keep the government "in the dark" about the dangers of trace amounts of dioxin because, in the words of one contemporaneous memorandum by a defendant, "they [were] fearful of a Congressional investigation and excessively restrictive legislation on manufacture of pesticides which might result." Internal memorandum of Hercules, Inc., dated July 12, 1965. If a manufacturer did know of possible health hazards associated with Agent Orange and stood idly by while the government, with the knowledge of that manufacturer, combined its product with that of other manufacturers in such a way as to make identification impossible, the manufacturer should not be allowed to take advantage of the consequences of silence to bar a suit against it.

The same reasoning applies even if a manufacturer was only negligent, not deliberate, in its silence. If a manufacturer negligently supplied a harmful product with the knowledge that it would be mixed and sprayed in a mixture so that its product would no longer be separately identifiable, that manufacturer may have been negligent in allowing the destruction of the evidence that would have enabled a plaintiff to identify it. In the words of one court, "we base joint liability here on concurrent failure to do that which would have supplied the knowledge necessary to determine actual liability." *Transamerica Insurance Co. v. Diplomat Parking Corp.*, 282 A.2d 564, 566 (D.C.App.1971). *Cf. Haft v. Lone Palm Hotel*, 3 Cal.3d 756, 478 P.2d 465, 476, 91 Cal.Rptr. 745, 756 (1970) (motel that failed to provide a lifeguard for pool or to post sign warning that none was on duty had burden of proving that decedents would have drowned even if those precautions had been taken; "defendants may … appropriately be designated at 'fault' for the factual deficiencies that are present"). By contrast, in the DES cases, "there [was] nothing inherent in the conduct of defendants or in the manufacture of DES which creates [a] 'complexity of identification,'" and therefore no justification for using an estoppel theory. *Namm v. Charles E. Frosst & Co.*, 178 N.J.Super. 19, 427 A.2d 1121, 1127 (App.Div.1981).

The relevance of the point just made to the application of burden-shifting theory is that it would bring this case within the third fact pattern described: defendants each owe a duty to a plaintiff and each fails to act on that duty. Here, it is urged that each defendant had a duty to warn the United States of the dangers of Agent Orange and each failed to do so. The failure not only made it impossible for a plaintiff to identify the origin of the herbicide that injured him, but arguably was a proximate cause of his injuries.

■ It is an accepted principle of product liability law that when a manufacturer, through his negligent acts, exposes a consumer to possible harm, he breaches his duty of care to that person twice: first, by exposing him to the risk of harm and a second time by failing to tell him of that harm so that the person can either take steps to avoid the risk or make an informed decision to accept it. *Tingey v. E.F. Houghton & Co.*, 30 Cal.2d 97, 179 P.2d 807 (1947); Restatement (Second) of Torts §§ 389–99 (1965).

■ Ordinarily it is the harm caused by a particular manufacturer's product that provides the causal link between the breach of the duty to warn and a plaintiff's injury. The situation is different, however, when a consumer purchases a functionally identical, fungible product intended to be mixed in a way that destroys identification from several manufacturers, all of whom fail to warn the consumer of a danger that is common to the product of all.

In an "ordinary" product liability suit a defendant may have an argument that the manufacturer of the product that actually injured the plaintiff should be primarily liable for the plaintiff's injury, rather than the manufacturer who, although it made a dangerous product and breached its duty to warn, did not make the product that caused the harm. Where, however, as here, it is impossible to determine who made the injury-causing product and where that impossibility was "inherent in the conduct of defendants," *Namm v. Charles E. Frosst & Co.*, 78 N.J.Super. 19, 427 A.2d 1121, 1127 (App.Div.1981), each manufacturer's failure to warn may be viewed as a legal cause of the user's injury although the cause-in-fact of the injury may have been the product of another.

At the very least, the failure to warn justifies shifting to an individual defendant the burden of negating causation-in-fact. *Cf. Transamerica Insurance Co. v. Diplomat Parking Corp.*, 282 A.2d 564 (D.C. App.1971) (where customer's automobile was stolen from garage operated by insured near time at which coverage was changed from one insurer to another, time of loss could not be established precisely enough to fall within either coverage, and neither insurer had availed itself of the right to inspect the premises at the time coverage changes, liability was apportioned between insurers). For the purpose of this analysis, it makes no difference whether the injury was suffered by the purchaser (here the government) or a third party (here a member of the armed forces, spouse or child).

By way of contrast, in the DES cases each consumer purchased her DES from only one or at most, a few of the manufacturers, and therefore was owed no duty by the other manufacturers. *Cf. Carrier v. Riddell, Inc.*, 721 F.2d 867 (1st Cir.1983) (defendant manufacturer owed no duty to warn the plaintiff, who purchased another manufacturer's football helmet, of dangers common to the helmets of both companies despite the fact that the manufacturer was negligent in not warning the high school football team of which the plaintiff was a member).

This argument assumes, of course, that there was a danger from that particular manufacturer's product, i.e., that it contained sufficient dioxin to cause the injury. In the next section, (ii), Duty to Warn of Dangers of Another's Product, we address the problem of a manufacturer whose product did not contain a dangerous amount of dioxin.

Defendants do not contend, and are in no position to contend, that they are not liable

because no individual defendant's failure to warn was a "but for" cause of the injury since if any of them had warned the government, the bell would have tolled for all. Concurrent tortfeasors do not have the luxury of the "but for" argument. *See, e.g., Anderson v. Minneapolis, St. P. & SS. M. R.R. Co.*, 246 Minn. 430, 179 N.W. 45 (1920); *Kingston v. Chicago & N.W. R. Co.*, 191 Wis. 610, 211 N.W. 913 (1927).

### (ii) *Duty to Warn of Dangers in Another's Product*

Plaintiffs ask that we go further and hold that even if it is proven that a defendant's product was "clean" that defendant should be held liable for failing to warn the government about the dangers of the high level of dioxin contained in another defendant's product. Plaintiffs admit that the imposition of such a duty to warn of the negligence of others is highly unusual but they contend that it is justified by the facts of this litigation.

Tort law has always sharply distinguished between feasance and nonfeasance: while a defendant nearly always has a duty not to injure another person, it is rare for the law to impose a duty on a defendant to *prevent* injury to another person. The latter duty has generally been imposed only where there is "some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." W. Prosser, Handbook of the Law of Torts, 339 (1971). As may be surmised from Dean Prosser's description, duties are not discoverable facts of nature; the word "duty" merely certifies the legal conclusion that liability ought to exist.

In deciding whether a defendant has a duty and, if so, what the scope of that duty is, it is useful to remember that the question is not one susceptible of broad generalizations. Rather it is one that must be decided on a case-by-case basis "after a full factual presentation and analysis of applicable law." *Hall v. E.I. DuPont DeNemours & Co., Inc.*, 345 F.Supp. 353, 366 (E.D.N.Y.1972).

In the product liability field a duty to warn or to furnish a safe product is often imposed on a defendant despite the fact that it did not produce the component or product that injured the plaintiff. This duty is commonly imposed on wholesalers and retailers who are held liable for supplying a defective product despite the fact that they did not cause the defect in question. *See, e.g., Greenberg v. Lorenz*, 9 N.Y.2d 195, 213 N.Y.S.2d 39, 173 N.E.2d 773 (1961); *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1961); Restatement (Second) of Torts § 402A (1965). Among the factors considered relevant in the imposition of such a duty are (1) the distributor's "integral [role in] the overall producing and marketing enterprise [which justifies its] bear[ing] the costs of injuries resulting from defective products," *Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 262, 391 P.2d 168, 171, 37 Cal.Rptr. 896, 899 (1964); "(2) the participants' capabilities of promoting the requisite safety in the risk-creating process; (3) the need to protect the consumer, both in terms of ascertaining responsible parties and providing compensation; and (4) the participants' ability to adjust the costs of liability among themselves in a continuing business relationship." *Hall v. E.I. DuPont DeNemours & Co., Inc.*, 345 F.Supp. 353, 375 (E.D.N.Y.1972) (analyzing *Vandermark*).

To put the criteria in somewhat more general terms, the question is whether the magnitude of the risk, the defendant's role in creating the risk and its ability to avoid or spread the costs of the liability justify the imposition of the duty. The judicial response is that as to the retailer and wholesaler, they do. In some respects that duty is more onerous than the duty plaintiffs urge be imposed on the defendants here in that the distributor is liable despite the fact that usually it is impossible for a distributor to discover the defect before a customer is injured. By contrast here the plaintiffs contend the defendants were at least aware of the fact that their comanufacturers' products contained dioxin. Unlike the average retailer or wholesaler, they each had access to research, testing

and experts' advice normally associated with the production of complex chemicals; many of them also had years of experience producing 2,4–D and 2,4,5–T, the components of Agent Orange.

Defendants seek to distinguish the line of cases noted above by pointing out that in all of the cases in which a defendant was found liable, that defendant was a necessary link in the defective product's reaching the consumer, whether as a producer, distributor, or assembler. *See, e.g., Brizendine v. Visador Co.*, 437 F.2d 822 (9th Cir.1970) (glass manufacturer held liable when it knew or should have known that strength B glass was unsafe for use in doors in high traffic areas and supplied such glass to frame manufacturers with knowledge that glass would be used for doors and that the frame manufacturers did not know of the dangers); *State Steamship Co. v. Stone Manganese Marine, Ltd.*, 371 F.Supp. 500 (D.N.J.1973) (manufacturer of alloy ingots could be held liable if alloy was inadequate for casting into propeller although casting and installation were done by third party). By contrast, if the product was not in some way the defendant's own, the courts have uniformly found no liability. *See, e.g., Carrier v. Riddell, Inc.*, 721 F.2d 867 (1st Cir.1983). Similarly, here, they argue, a defendant should not be held responsible for defects in a product it did not make.

Instead of analogizing to the case of the distributor or the component manufacturer, the defendants find the analogy to the "good samaritan rule" apt. The common law's extreme reluctance to impose on an "innocent" bystander a duty to rescue someone in peril even if the rescue would involve little or no risk to the rescuer is not only well known but it is notorious. *See, e.g., Handiboe v. McCarthy*, 114 Ga.App. 541, 151 S.E.2d 905, 907 (1966) (no duty to rescue 4-year old seen drowning in pool); *Sidwell v. McVay*, 282 P.2d 756 (Okla.1955) (no duty to warn neighboring child hammering upon explosives); W. Prosser, Handbook of the Law of Torts, 340 (1971); Ames, Law and Morals, 22 Harv.L.Rev. 97, 113 (1908); D'Amato, The "Bad" Samaritan

Paradigm, 70 N.W.L.Rev. 798 (1975); Rudolf, The Duty to Act: A Proposed Rule, 44 Neb.L.J. 499 (1965); Seavey, I Am Not My Guest's Keeper, 13 Vand.L.Rev. 699 (1960). Similarly here they argue a commercial manufacturer does not have a duty to warn of the dangers it should have known existed in a competitor's product.

Plaintiffs respond by pointing out that the defendants in this case are readily distinguishable from the innocent bystanders of the good samaritan cases and from the defendant in *Riddell,* a manufacturer of a mass market product for the individual consumer who failed to warn a consumer of the dangers of the product of another manufacturer. This case concerns a specialized product that had one consumer, the United States, and seven manufacturers who produced virtually all of the product. The potential dangers, in terms of both the hazards to the individual and the number of people potentially affected, were enormous and, in some respects, unprecedented. *Cf. Hall v. E.I. DuPont DeNemours & Co., Inc.*, 345 F.Supp. 353, 366 (E.D.N.Y.1972) ("[w]here the foreseeable risks of a product's use are sufficiently serious—particularly to large numbers of people—courts have not hesitated to require manufacturers to face substantial costs in warnings, testing, inspection and safety design"). The allegedly dangerous substance, dioxin, was not unique to the "dirty" manufacturers, but was, plaintiffs contend they can show, present in each manufacturer's product to some extent. It was a substance about whose dangers, plaintiffs urge, the manufacturers communicated regularly with the government and among themselves. Each defendant knew that its product would be comingled in use and, hence, contaminated by products that had varying amounts of dioxin. For most of the time Agent Orange was being produced in largest quantities, i.e., between late 1965 and December 1968, the defendants were not seriously in competition with each other for the Agent Orange market since the government was buying all that they could produce. The government was so anxious to

get as much of the product as it could that it apparently compelled the defendants to produce the herbicide under the Defense Production Act.

In addition to the legal implications of the great potential hazards to third persons who could not possibly protect themselves, it is worth noting that each defendant arguably benefited by an implied conspiracy of silence. Had any one of them warned that some Agent Orange contained hazardous amounts of dioxin, the Agent Orange program might well have been terminated at once, causing lost profits even to those producing a "clean" product. More important, the danger of a scandal that might have reduced sales of commercial herbicides or caused the government to take strong action to regulate the industry was substantial; a number of the defendants expressed such fears themselves. Each defendant thus gained by its silence. The "good samaritan" rule cannot block assigning a duty to warn to a manufacturer who stands to benefit substantially if the warning is not given.

In sum, there is a good deal of merit to the contentions of both sides. On the one hand, the unique facts of this case call for some modification of the general rule that a manufacturer has no duty to warn of the dangers of another's product. On the other hand, it is harsh to hold a manufacturer liable for its failure to warn of dangers it may not have been sure existed in a comanufacturer's herbicide.

The fairest solution appears to be the application of a rule of law unique to this case as follows: A manufacturer of Agent Orange who was or should have been aware of the dangers posed by its product or the product of another manufacturer whose product was to be combined with its own had a duty to warn the prime purchaser who combined the products, the United States, of the dangers inherent in the combination. If a plaintiff could show that a manufacturer failed in that duty, the burden would shift to that defendant to prove by a preponderance of the evidence that its product could not have caused plaintiff's

injury because its product could not cause the type of injury which the plaintiff suffers.

Given the heavily statistical nature of the proof and the way in which the United States combined the products of the various manufacturers, the burden would be a difficult one to meet. It is far easier to ascertain whether Agent Orange in the generic sense was hazardous than it is to determine if a specific manufacturer's Agent Orange was dangerous. Yet, unlike the *Summers* and most DES fact patterns, such a burden shifting will not automatically result in a defendant's liability; it merely prevents a defendant from hiding behind its negligence and silence to avoid liability. Moreover, each manufacturer should be in a position to show, if that is the case, that its product contained no dioxin in harmful concentrations.

Although, because of the unique facts of this litigation, there are no precedents directly on point, a burden shifting rule is consistent with a recent expansion of a defendant's duty to warn a plaintiff of, and protect him from, the actions of third parties. Courts now hold that duty to warn arises when one should realize through special facts within his knowledge or a special relationship that an act or omission exposes another to an unreasonable risk of harm through the conduct of a third party. Restatement (Second) of Torts § 302B and comments (1965). *See, e.g., Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (duty to provide lighthouse because of known navigational hazards); *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (duty to protect a prison inmate from other inmates). *See also Johnson v. California*, 69 Cal.2d 782, 447 P.2d 352, 73 Cal.Rptr. 240 (1968) (holding state liable for placing a minor with homicidal tendencies in plaintiff-victim's home).

As the cases cited demonstrate, this expansion of duty has taken place in both the commercial and the noncommercial areas. It is still the rule that "[i]f a defendant's relation to the damage stems primarily

from the fact that he could have prevented it or rescued the victim by doing something rather than nothing, he is not held to a duty to take reasonable care, absent special circumstances. *See* Restatement (Second) of Torts, § 314 (1965); Prosser, Handbook of the Law of Torts (1971) 338–350." *Equilease Corp. v. Smith International, Inc.*, 588 F.2d 919, 928 (5th Cir.1979). Courts, however, are increasingly willing to find such "special circumstances" based on the gravity of the danger, the specificity of the knowledge, the nature of the relationship between the defendant, the third party and the plaintiff, or a combination of these factors. *See, e.g., Caldwell v. Bechtel, Inc.*, 631 F.2d 989 (D.C.Cir.1980) (contractual authority vested in consultant engineering firm with respect to jobsite safety regulations created special relationship between firm and heavy equipment operator working at site such that firm owed duty to operator to take reasonable steps to protect him from foreseeable risks to his health posed by dust laden tunnel); *Hopkins v. Chip-in-Saw, Inc.*, 630 F.2d 616 (8th Cir. 1980) (if manufacturer can reasonably foresee that warnings given to a purchaser of its product will not be adequately conveyed to ultimate users of the product, its duty to warn may extend beyond purchaser to those persons foreseeably endangered by product's use); *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976) (therapist has a special relationship with his patient such that when the therapist knows of the patient's intention to harm the victim, therapist has a duty to warn that person).

#### (d) *Summary*

As indicated in this opinion, IV,C, Nature of Liability and Relation to Defense of Government Knowledge, *infra*, the applicable rule of substantive law *in this class action* is as follows: if a plaintiff established that it is more probable than not that (1) he or she was injured, (2) the injury was caused by Agent Orange, (3) a defendant knew or should have known about the dangers of Agent Orange, whether manufactured by it or by a comanufacturer, as it

was to be used in Vietnam and failed to warn the United States of those dangers, and (4) the defendant manufactured and sold to the United States Agent Orange to which plaintiff might have been exposed, *then* that defendant would be jointly liable for the damage suffered by the plaintiff, *unless* the defendant established that it is more probable than not that (5) the Agent Orange it sold to the United States could not have caused the injury (e.g., because it contained no harmful substance). If a defendant could not prove (5), it might nonetheless escape liability if it could show either that (6) the United States knew as much as it knew or should have known about the dangers of Agent Orange or (7) even if the United States had known as much as that defendant knew or should have known, it would have nevertheless produced or continued to buy Agent Orange of the same toxicity as that supplied by defendant and would not have taken steps to reduce its hazards to the plaintiff.

If a plaintiff succeeded in establishing a *prima facie* case and a defendant failed to establish any of material propositions five through seven, that defendant would be jointly and severally liable with all other defendants similarly situated unless it could show why it should only be liable for a portion of the damage (e.g., because of the percentage of Agent Orange supplied or the relative purity of its product) and, thus, should pay only a proportion of plaintiff's damages.

#### b. The Problem of the Indeterminate Plaintiff

The preceding discussion assumed that although a plaintiff would be unable to identify the manufacturer of the Agent Orange to which the veteran was exposed he or she would be able to prove, by a preponderance of the evidence, that the specific injuries from which he or she suffers were caused by Agent Orange. It is likely, however, that even if plaintiffs as a class could prove that they were injured by Agent Orange, no individual class member would be able to prove that his or her injuries were caused by Agent Orange. For example,

plaintiffs as a class may be able to show that statistically, X% of the population not exposed to Agent Orange could have been expected to develop soft-tissue sarcoma, but that among those veterans who were exposed to Agent Orange, X + Y% suffer from soft-tissue sarcoma. If Y is equal to or less than X and there is no meaningful "particularistic" or anecdotal proof as to the vast majority of plaintiffs, virtually no plaintiff would be able to show by a preponderance of the evidence that his or her cancer is attributable to the Agent Orange rather than being part of the 'background' level of cancer in the population as a whole. The probability of specific cause would necessarily be less than 50% based upon the evidence submitted.

## (1) Scope of the Problem

The problem just noted is one that has received a significant amount of scholarly discussion as well as some attention from the United States Congress. *See, e.g.,* Rosenberg, The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, 97 Harv.L.Rev. 849 (1984); Black and Lilienfeld, Epidemiological Proof in Toxic Tort Litigation, 52 Fordham L.Rev. 732, 782–83 (1984); Dore, A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact, 7 Harv.Envtl.L.Rev. 429 (1983); Delgado, Beyond *Sindell:* Relaxation of Cause-in-Fact Rules for Indeterminate Plaintiffs, 70 Cal.L.Rev. 881 (1982); Proposed Radiogenic Cancer Compensation Act of 1983, S.921, 98th Cong., 1st Sess., 129 Cong.Rec. S.3918 (daily ed. March 24, 1983), introduced by Senator Hatch (1983). Because of the rarity of the situation until recently scant attention has been given to the issue by the courts. There has apparently been only one other mass exposure decision that has discussed the indeterminate plaintiff problem explicitly, *viz, Allen v. United States,* 588 F.Supp. 247 (D.Utah 1984), a case where injury was claimed as a result of radiation exposure from testing of atomic explosive devices.

In our complex industrialized society it is unfortunately possible that some products used on a widespread scale will cause significant harm to the public. While it may be possible to prove, through the use of such proof as laboratory tests on animals and epidemiological evidence, that such harm—for example cancer—can be "caused" by a particular substance, it may be impossible to pinpoint which particular person's cancer would have occurred naturally and which would not have occurred but for exposure to the substance.

> Epidemiological statistics, which constitute the best (if not the sole) available evidence in mass exposure cases, can only attribute a proportion of the disease incidence in the population to each potential source.... But ... it is impossible to pinpoint the actual source of the disease afflicting any specific member of the exposed population.

Rosenberg, The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, 97 Harv.L.Rev. 849, 856–57 (1984) (footnotes omitted).

In two of the largest and most widely publicized mass tort litigations, those involving DES and asbestos, the problem outlined above does not pose a serious obstacle since at least some of the damage caused by the harmful substance was, it has been claimed, unique to that substance. Adenosis and clear cell adenocarcinoma of the vagina and uterus, the conditions associated with DES, are, it is said, almost unknown among women whose mothers had not taken DES. Note, DES and a Proposed Theory of Enterprise Liability, 46 Fordham L.Rev. 963, 965 (1978). The situation is similar, in the asbestos litigation, albeit to a lesser extent. Although lung cancer is associated with cigarette smoking and other factors as well as asbestos exposure and mesothelioma may have causes other than asbestos, *see* Stanton & Wrench, Mechanisms of Mesothelioma Induction With Asbestos and Fibrous Glass, 48 J. Nat'l Cancer Inst. 797, 811–15 (1972), asbestosis is alleged to be uniquely associated with asbestos exposure. *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1083

(5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). In most other mass exposure cases, however, the harm caused by the toxic substance is indistinguishable from the naturally occurring disease or condition. *See* Dore, A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact, 7 Harv.Envtl.L.Rev. 429, 437 (1983); Solomons, Workers' Compensation for Occupational Disease Victims: Federal Standards and Threshold Problems, 41 Alb.L.Rev. 195, 199 (1977).

The recent case of *Allen v. United States,* 588 F.Supp. 247 (D.Utah 1984), illustrates the problem well. Plaintiffs claimed that they developed various forms of cancer as a result of their exposure to radiation from nuclear explosions. While some forms of cancer can, it is contended, with some certainty be attributed to factors other than exposure to radiation, many others "cannot be distinguished from cancer of the same organ arising from ... unknown causes". i.e., the 'background' cancers. J. Gofman, *Radiation and Human Health* 59 (1981), quoted in *Allen v. United States,* 588 F.Supp. at 406. The statistical evidence in *Allen* apparently made it clear that there was a strong positive association between exposure to low-level ionizing radiation, presumably the result of atomic explosions, and various forms of cancer suffered by plaintiffs. Thus, the *Allen* case has some of the characteristics of the DES and asbestos cases in addition to persuasive statistical correlations.

(2) Preponderance Rule

Even if there were near certainty as to general causation, if there were significant uncertainty as to individual causation, traditional tort principles would dictate that causation be determined on a case-by-case basis using the preponderance-of-the-evidence rule. *Santosky v. Kramer,* 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982); W. Prosser, Handbook of the Law of Torts, 208–09 (1971); Kaplan, Decision Theory and the Fact Finding Process, 20 Stan.L. Rev. 1065, 1072 (1968). The rule provides an " 'all or nothing' approach, whereby [assuming all other elements of the cause of action are proven], the plaintiff becomes entitled to full compensation for those ... damages that are proved to be 'probable' (a greater than 50 percent chance), but is not entitled to any compensation if the proof does not establish a greater than 50 percent chance." *Jackson v. Johns-Manville Sales Corp.,* 727 F.2d 506, 516 (5th Cir. 1984).

Under the "strong" version of the preponderance rule, statistical correlations alone indicating that the probability of causation exceeds fifty percent are insufficient; some "particularistic" or anecdotal evidence, that is, "proof that can provide direct and actual knowledge of the causal relationship between the defendant's tortious conduct and the plaintiff's injury," is required. Rosenberg, *supra,* 97 Harv.L. Rev. at 857, 870. *See Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C.1981); *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 427 A.2d 1121 (App.Div.1981). As Professor Jaffee has put it,

If all that can be said is that there are 55 chances of negligence out of 100, that is not enough. There must be a *rational,* i.e., evidentiary basis on which the jury can choose the competing probabilities. If there is not, the finding will be based ... on mere speculation and conjecture.

Jaffee, Res Ipsa Loquitur Vindicated, 1 Buffalo L.Rev. 1, 4 (1951). The "weak" version of the preponderance rule would allow a verdict solely on statistical evidence; the "all-or-nothing" approach converts the statistical probability into a legally absolute finding that the causal connection did or did not exist in the case. C. McCormick, Handbook on the Law of Damages, 118 (1935). The justification for not requiring "particularistic" or anecdotal evidence is trenchantly and accurately stated by Professor Rosenberg:

[T]he entire notion that "particularistic" evidence differs in some significant qualitative way from statistical evidence must be questioned. The concept of "particularistic" evidence suggests that there ex-

ists a form of proof that can provide direct and actual knowledge of the causal relationship between the defendant's tortious conduct and the plaintiff's injury. "Particularistic" evidence, however, is in fact no less probabilistic than is the statistical evidence that courts purport to shun .... "Particularistic" evidence offers nothing more than a basis for conclusions about a perceived balance of probabilities.

Rosenberg, *supra*, 97 Harv.L.Rev. at 870 (footnotes omitted). Except where it appears that the absence of anecdotal evidence may be due to spoliation, probabilities based upon quantitative analysis should support a recovery. *See, e.g.,* E.M. Morgan & J.M. Maguire, Cases and Materials on Evidence, 39 (7th ed. 1983).

There would appear to be little harm in retaining the requirement for "particularistic" evidence of causation in sporadic accident cases since such evidence is almost always available in such litigation. In mass exposure cases, however, where the chance that there would be particularistic evidence is in most cases quite small, the consequence of retaining the requirement might be to allow defendants who, it is virtually certain, have injured thousands of people and caused billions of dollars in damages, to escape liability. Because of this fact and the fact that "particularistic evidence ... is ... no less probabilistic than ... statistical evidence," the "weak" version of the preponderance rule appears to be the preferable standard to apply in mass exposure cases—particularly where, as here, all claimants and defendants are joined in one suit.

### (a) *Application of the Preponderance Rule to Mass Exposure Cases*

Conventional application of the "weak" version of the preponderance rule would dictate that, if the toxic substance caused the incidence of the injury to rise more than 100% above the "background" level, each plaintiff exposed to the substance could recover if he or she is suffering from that type of injury. If, however, to put it in somewhat graphic, albeit artificial terms, the incidence rose only 100% or less, no plaintiff could recover—i.e., the probability of specific causation would not be more than 50%.

Where a plaintiff's injuries result from a series of unrelated sporadic accidents, this "all-or-nothing" rule is justifiably rationalized on the ground that it is the fairest and most efficient result. In mass exposure cases, however, this all-or-nothing rule results in either a tortious defendant being relieved of all liability or overcompensation to many plaintiffs and a crushing liability on the defendant. These results are especially troublesome because, unlike the sporadic accident cases, it may be possible to ascertain with a fair degree of assurance that the defendant did cause damage, and, albeit with somewhat less certainty, the total amount of that damage.

The problem is both illustrated and further compounded by the fact that lack of precision in the data and models used may cause the range of the probabilities estimated by the statistical proof to lie on either or both sides of the 100% line. Because the statistical proof will almost never be as complete or as free from confounding factors as desirable, it may be possible to infer, for example, that the toxic substance caused the incidence to rise over the background level somewhere between 80 and 120%. *See, e.g., Allen v. United States,* 588 F.Supp. 247, 438, 439 n. 197 (D.Utah 1984) (noting significant variation in experts' interpretations of statistical evidence relating to the likelihood that plaintiff's cancer was caused by exposure to radiation). Moreover, issues of credibility and varying inferences drawn by the trier based upon varying assessments of probative force may cause reasonable people to assess these percentages in a range from almost zero to well over 120. *See, e.g.,* E.M. Morgan & J.M. Maguire, Cases and Materials on Evidence, ch. 1 (7th ed. 1983).

Under the traditional application of the preponderance rule, whether individual plaintiffs recover will depend on where the probability percentage line is drawn despite

the fact that a reasonable trier would conclude that a large proportion of the plaintiffs were injured by the defendant and a large number were not. Even if the statistical increase attributed to the substance in question is just a few percentage points, if statistical theory supports a finding of correlation there is no reason why the industry as a whole should not pay for the damages it probably caused.

A simple hypothetical will illustrate why too heavy a burden should not be placed on plaintiffs by requiring a high percentage or incidence cf a disease to be attributable to a particular product. Let us assume that there are 10 manufacturers and a population of 10 million persons exposed to their product. Assume that among this population 1,000 cancers of a certain type could be expected, but that 1,100 exist, and that this increase is "statistically significant," permitting a reasonable conclusion that 100 cancers are due to the product of the manufacturers. In the absence of other evidence, it might be argued that as to any one of the 1100 there is only a chance of about 9% ($^{100}/_{1100}$) that the product caused the cancer. Under traditional tort principles no plaintiff could recover.

### (b) *Inadequacy of Individualized Solutions*

Any attempt to resolve the problem on a plaintiff-by-plaintiff basis cannot be fully satisfactory. The solution that would most readily suggest itself is a burden shifting approach, analogous to that used in the indeterminate defendant situation already discussed. *Allen v. United States* provides a good example of how burden-shifting would be applied in an indeterminate plaintiff case. A plaintiff must show that the defendant, in that case the United States, negligently put "an identifiable population group" of which he was a member at "increased risk" and that his injury is consistent with having been caused by the hazard to which he has been negligently subjected, such consistency having been demonstrated by substantial,

appropriate, persuasive and connecting factors....

*Allen*, 588 F.Supp. at 415. At that point, the burden shifts to the defendant which will be held liable unless it can offer "persuasive proof" of noncausation. *Id.*

Generally courts have shifted the burden to the defendant to prove that it was not responsible for plaintiff's injury only in sporadic accident cases where it was certain that one of a very limited number of defendants injured the plaintiff, *see, e.g., Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948); *Ybarra v. Spangard*, 25 Cal.2d 486, 154 P.2d 687 (1944), or in mass exposure cases where general causation was certain and liability was apportioned in accordance with some market-share theory. *See, e.g., Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980); *Copeland v. Celotex Corp.*, 447 So.2d 908 (Fla.App.1984). *But see Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984) (joint and several liability in DES cases).

Shifting the burden of proof in such cases will, at least theoretically, not result in crushing liability for the defendant either because the litigation only involves a sporadic accident, as in *Summers* and *Ybarra*, or because the defendant will only be held liable for the amount of damage it caused based on market share—although as indicated above, there may be practical problems in defining market share. By contrast, shifting the burden of proof in the indeterminate plaintiff situation could result in liability far out of proportion to damage caused. It is not helpful in most situations to say that the defendant will not be liable for "those harms which [he] can reasonably prove were *not* in fact a consequence of his risk-creating, negligent conduct," *Allen*, 588 F.Supp. at 415, since, were such individualized proof available, there would have been no need to shift the burden.

### (3) Possible Solution in Class Action

Since the problem results from a plaintiff-by-plaintiff method of adjudication, one

solution is to try all plaintiffs' claims together in a class action thereby arriving at a single, class-wide determination of the total harm to the community of plaintiffs. Given the necessarily heavy reliance on statistical evidence in mass exposure cases, such a determination seems feasible. The defendant would then be liable to each exposed plaintiff for a pro rata share of that plaintiff's injuries.

This approach can be illustrated using the hypothetical given above. Suppose all 1,100 of those who were exposed to the harmful substance and who developed the cancer in the example join in a class action against all 10 manufacturers. Let us say that damages average $1,000,000 per cancer. A recovery of $100,000,000 (100 × $1,000,000) in favor of the class would be allowed with the percentage of the award to be paid by each manufacturer depending on the toxicity of its product. For example, if a company produced only 20% of the substance in question but, because of the greater toxicity of its product, likely caused 60% of the harm, it would contribute 60% of the total amount. If accurate records are available on the composition of each defendant's product, that analysis should be possible.

Since no plaintiff can show that his or her cancer was caused by any one of the defendants, they should divide the $100,-000,000 by 1,100, giving each a recovery of about $90,000. While any plaintiff might feel that his or her recovery denigrated the degree of harm, the alternative of receiving nothing is far worse. The latter is, of course, the necessary result in any plaintiff's individual suit. Moreover, the deterrent effect of this result on producers would be significant. *See* Delgado, *Beyond Sindell: Relaxation of Cause-in-Fact Rules for Indeterminate Plaintiffs*, 70 Cal.L.Rev. 881, 893 (1982).

If the number of cases were only 1,050, most statisticians would say the difference was not statistically significant and a court using the pro rata approach might find that the defendant is not legally responsible for any of the increased incidence. *But see*

*Allen v. United States*, 588 F.Supp. at 416–17 (noting that although increased incidence might be deemed "insignificant" by a scientist or statistician, it may well be that it "is still far more likely than not" that "the observed increase is related to its hypothetical cause rather than mere chance"). (In the numbers used, the standard deviation could be computed by square root as $\sqrt{1000} = 31.6$. Two standard deviations—a rough test of statistical significance often used in the law—is 63.2; 50 is less than two standard deviations. Yet, assuming the 100 variation of the hypothetical (more than 3 standard deviations), the law should nonetheless attribute to the defendants all 100 additional cancers, not just 100 minus 63 or 37 (the total variation less two standard deviations). As a matter of rough justice, once legal responsibility for the increased incidence is found, it is sounder to attribute all 100 cases to the defendant, even though a substantial number of these cases may be random variations with no reasonable assurance that they are attributable to the defendants' activities. There is, of course, also the possibility that more than 100 cases were "caused by" defendant's activities since the figure properly attributable to background cancer incidence might have been less than 1000. We are in a different world of proof than that of the archetypical smoking gun. We must make the best estimates of probability that we can using the help of experts such as statisticians and our own common sense and experience with the real universe.

Putting a dollar amount on the damages suffered by individual plaintiffs is, from a real-world standpoint, a critical part of the solution. If the judicial and monetary economies of the class action are not to be lost through lengthy and expensive individual trials on damages, some mechanism must be devised to decide damage claims without the need for a full-fledged trial for each plaintiff. As Professor Rosenberg points out, "[p]ossibly the greatest source of litigation expense [in mass exposure tort litigation] is the individual assessment and distribution of damages that must follow trial of common lia-

bility questions." Rosenberg, *supra,* 97 Harv.L.Rev. at 916.

How individualized such a mechanism would have to be depends on (1) the size of the individual claim and (2) what the variations between plaintiffs are in the nature of the claims: the smaller the individual claim and the less the variation, the more generalized the process can be. If the claims are for one type of injury, a compensation schedule to calculate average loss could be developed based on sampling techniques. *See* Manual for Complex Litigation § 2.712 at 116–18 (1982). If a number of different injuries are to be compensated, the process could be made somewhat more sophisticated.

Every effort should be made to reduce questions of fact to a bare minimum. A preferred solution is to pay claims on a fixed and somewhat arbitrary schedule using a ministerial agency as is done with the Medicaid and Medicare programs where disbursements are made by insurance agencies acting for the United States.

No matter what system is used the purpose is to hold a defendant liable for no more than the aggregate loss fairly attributable to its tortious conduct. As long as that goal is met a defendant can have no valid objection that its rights have been violated.

The legal arguments in favor of and against certification of plaintiffs as a class in mass tort actions under Rule 23 of the Federal Rules of Civil Procedure and the relevant cases have already been analyzed in this court's decision certifying plaintiffs' class. *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The present discussion assumes that the class is otherwise suitable for certification and will focus on the relevant analogies and precedent and on the practical advantages of a class action in resolving mass exposure cases with indeterminate plaintiffs.

(a) *Analogy and Precedent*
(i) *The Employment Discrimination Cases*

It was noted above that courts have only recently been faced with fact patterns involving mass exposure and indeterminate plaintiffs. That is not to say that there is no relevant guidance or precedent. In the employment discrimination area courts have long dealt with cases involving a defendant who through his acts exposed an entire class to harm resulting in an injured class with indeterminate plaintiffs. The solutions developed and the reasoning used by some courts in those cases parallel that outlined above for the mass exposure fact patterns. The defendant employer has acted wrongfully through his discriminatory acts. As here, however, it is often impossible to prove whether the plaintiff's condition, in that case the lower salary or lack of promotion or employment, is due to the defendant's wrongful acts or whether it would have occurred even absent the discriminatory acts. For example, if class members outnumber the openings for job promotions it is undeniable that some class members would not have been promoted even if there had been no discrimination. The solution adopted by some courts parallels the pro rata approach suggested above for mass exposure cases: awards are based on the "average" pay and rank of a group of employees, not injured by discrimination, comparable in all other material respects, such as ability and length of employment. *See, e.g., Bowe v. Colgate-Palmolive,* 489 F.2d 896, 902–907 (7th Cir.1973); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 260–63 (5th Cir.1974); *United States v. Wood, Wire & Metal Lathers Int. Union, Local Union 46,* 328 F.Supp. 429, 443–45 (S.D.N.Y.1971); *cf. Eovaldi v. First Nat. Bank of Chicago,* 71 F.R.D. 334, 337 (N.D.Ill.1976), *rev'd on other grounds,* 596 F.2d 188 (7th Cir.1979) (each class member of group of credit card holders injured by defendant's violation of Truth in Lending Act awarded damages based on presumed damages of average class member although some class members were almost certainly not injured by defendant).

In the employment discrimination cases the impossibility of identifying individual class members is recognized. The courts have noted that although "[t]here is no way of determining which jobs the class members would have ... obtained if [the] discriminatory [system] ... had not been in existence [because] [c]lass members outnumber promotion vacancies.... [i]t does not follow that back pay claims based on promotions cannot be awarded." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir.1974). "Doubts about which individuals ... would have been promoted" call for "a class approach." *Id.* at 261 n. 150.

> [T]he total award for the entire class would be determined. At that point, individual claims would be calculated on *pro rata* shares for those workers of similar ability and seniority claiming the same position, possibly eliminating the necessity of deciding which one of many employees would have obtained the position but for the discrimination.

*Id.* at 263 n. 154. Here, too, the "total [injury] to the entire class [can] be determined" and, "[a]t that point, individual claims could be calculated on *pro rata* shares for those" exposed plaintiffs "claiming the same" injury, "eliminating the necessity of deciding which one of many" plaintiffs would not have developed the injury "but for" the exposure. *Cf.* P.J. Spiegelman, Court-Ordered Hiring Quotas After *Stotts:* A Narrative on the Role of Feminine and Masculine Voices in the Legal Process, 31ff. (1984).

The *"Agent Orange"* case is especially well-suited to the application of such an approach. Not only are all producers of the allegedly harmful substance before the court, but so is almost every person allegedly injured who could now be before an American court. While, for example, American civilians and Vietnamese residents may have been injured, the statutes of limitations have probably run on their claims.

## (ii) *Consumer Class Actions*

There is another area in which courts have dealt with fact patterns involving large numbers of injured plaintiffs where it is possible to determine the damage on a class-wide basis, but it is not feasible to determine the amount of damage suffered by each class member and to compensate him for that damage. Such situations arise where defendants have sold a product to, or performed a service for, numerous persons, sometimes ranging into the millions, and have illegally overcharged many or all of those persons. While each class member's damages are often quite small, the defendant has reaped a substantial wrongful gain. Because most plaintiffs will not come forward to claim their damages due to the small amounts involved, courts are faced with the choice of either allowing the defendant to keep the wrongful gain or, as a number of courts have done, to distribute the damages to as many members of the class as is practicable. *See*, for example, *Eisen v. Carlisle & Jacquelin*, 52 F.R.D. 253 (S.D.N.Y.1971), where the defendant brokerage firms were accused of monopolizing odd-lot trading on the New York Stock Exchange and of charging excessively high brokerage commissions. The court in *Eisen* suggested that one possible method of distributing the damages would be to set up "a fund equivalent to the amount of unclaimed damages ... and [to reduce] the odd-lot differential ... in an amount determined reasonable by the court until such time as the fund is depleted." *Eisen*, 52 F.R.D. at 265.

This type of solution is sometimes referred to as a "fluid recovery," i.e., one

> which avoids the requirement of individual identification of class members and individual distribution of damages, in favor of a remedy for the next best class, *e.g.*, macro-statistical description of the class harm remedied by future reduction in prices or rates charged by the defendant.

3B J.W. Moore, Moore's Federal Practice ¶ 23.45[4.–4] (1984).

As in the solution proposed for the indeterminate plaintiff situation, "the damage issue [is tried] only once," with the result that "the amount of damages arrived at is likely to correspond to the total injury inflicted by defendant or the extent of its unjust enrichment." 7A C. Wright & A. Miller, Federal Practice and Procedure § 1784 (1972). Courts must choose between compensating large numbers of demonstrably injured people in an imperfect manner or not compensating them at all.

The fluid recovery theory has received considerable support from courts and commentators. *See, e.g., Eisen v. Carlisle & Jacquelin,* 52 F.R.D. 253 (S.D.N.Y. 1971); *Bebchik v. Public Util. Comm'n,* 115 U.S.App.Dec. 216, 318 F.2d 187, 203–04 (D.C.Cir.) (fund established for benefit of transit riders after proof that they were overcharged by defendant), *cert. denied,* 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); *Daar v. Yellow Cab Co.,* 67 Cal.2d 695, 433 P.2d 732, 63 Cal.Rptr. 724 (1967) (using fluid recovery to benefit taxicab customers overcharged by defendant); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1784 (1972); Dam, Class Actions: Efficiency, Compensation, Deterrence, and Conflict of Interest, 4 J. Legal Stud. 47 (1975); Comment, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U.Chi.L.Rev. 448 (1972). Yet the concept has met a good deal of resistance from the appellate courts. *See, e.g., Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1010–12 (2d Cir.1973) (rejecting the district court's use of a "fluid recovery" scheme); *aff'd on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *In re Hotel Telephone Charges,* 500 F.2d 86 (9th Cir.1974) (rejecting use of "fluid damages"); *see also* Malina, Fluid Class Recovery as a Consumer Remedy in Antitrust Cases, 47 N.Y.U.L.Rev. 477 (1972) (criticizing use of a fluid class recovery). Nevertheless it is regularly used as a settlement mode in consumer class actions. *See, e.g., In re Folding Carton Antitrust Litigation,* 557 F.Supp. 1091 (N.D.Ill.1983); *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

It should be emphasized that we are not concluding that the analysis and solutions in the employment discrimination and consumer class action cases compel a similar result in the mass exposure cases. There are obviously differences between the fact patterns. It also appears undisputed that no court, except perhaps as part of a settlement, has ever applied the pro rata plan in mass exposure cases. Given the present reluctance of many courts to certify mass tort litigations as class actions, it is likely that courts, at least for a number of years, will not be faced with a request to adopt such an approach. *See* the analysis of cases in *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718 (E.D. N.Y.1983), *mandamus denied,* 725 F.2d 858 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The application of such a scheme, although consistent with the accepted goals of tort law, requires a fundamental rethinking of a number of well established legal concepts. Nevertheless, the employment discrimination and consumer class action cases reflect a pragmatic judicial solution to analogous problems, providing a clue to the direction courts may properly take in resolving mass exposure cases.

(b) *Practical Advantages of a Class-wide Solution*

In addition to the strong legal arguments in favor of dealing with the indeterminate plaintiff fact pattern in a class action, there are strong practical considerations as well. The most important of these was already noted in passing—namely, the judicial and economic efficiencies that result from class-wide treatment. This factor has already been alluded to in the opinion certifying plaintiffs as a class. *See In re "Agent Orange," Product Liability Litigation,* 100 F.R.D. 718 (E.D.N.Y.1983).

Although recent studies suggest that defendants in mass tort cases spend more than plaintiffs do for legal services, *see* J. Kahalik, P. Ebener, W. Felstiner & M.

Shanley, *Costs of Asbestos Litigation,* Rand Corp., The Institute for Civil Justice, (July 1983), defendants, often large corporations, are usually better able to bear the cost of litigating individual suits than are plaintiffs' attorneys who are generally financing the litigation out of their own pockets. A class action, by allowing plaintiffs' attorneys to pool their resources and by forcing the defendants to litigate all of plaintiffs' claims at once, should not only reduce the overall cost of the litigation significantly but should tend to equalize the odds between the two sides. *Cf.* Note, The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation, 35 Stan.L.Rev. 575, 586 (1983). A class action would also facilitate settlement by allowing defendants to buy their peace with all of the plaintiffs at once. *See, e.g., "Agent Orange,"* 100 F.R.D. at 721. On the negative side, making it easier to sue may increase the possibility of obtaining unjustified settlements by a form of legal coercion.

By litigating the issue of liability only once courts can avoid the danger of inconsistent verdicts that could easily result in those cases where the increased incidence of the disease hovers around 100%. The danger is especially acute given the number of possible confounding factors and the fact that available data and statistical studies are rarely as reliable and complete as they ideally could be. It is, therefore, altogether possible that different juries would reach different conclusions on similar or identical evidence despite the fact that their interpretations of the evidence might not differ appreciably.

The transaction costs of obtaining a remedy are a proper consideration in determining substantive law. If much of a recovery will go to attorneys and experts rather than to those injured, then traditional tort remedies may be so ineffective as to put in doubt their utility in particular types of cases. Punishment of defendants who cause harm and deterrence of future harmful conduct is a by-product of the traditional tort system, but it should not independently furnish the rationale for private civil litigation. Where, therefore, the transaction costs of obtaining a remedy for a class are much less per dollar recovered than they would be in a case-by-case recovery, the class action may, as a matter of policy, be the only reasonable route to recovery. Added to the costs to defendants and plaintiffs must be the cost to the public and the courts in burdening the system with large numbers of private, individual claims. Thus, while the class action is deemed procedural and distinct from substantive considerations for most purposes, it may become, in a case like *"Agent Orange,"* the only practicable way to secure a remedy.

### 3. Conclusion as to Indeterminate Plaintiffs and Defendants

The vexing problems of toxic torts probably would be best dealt with by legislation. In the absence of legislative and executive action courts must attempt to devise the most effective and equitable means of dealing with them through approaches that are consonant with present law and reasonable predictions about trends in the law. The enterprise and pro rata liability approaches set forth above are such an attempt. An enterprise liability approach allows plaintiffs to avoid the otherwise legally fatal effect of their inability to identify the manufacturer of the herbicide to which individual plaintiffs were exposed.

There is a strong likelihood that even if some causal link could be established between Agent Orange and the diseases and conditions from which plaintiffs claim they are suffering, it would be impossible in most cases to identify the individual class members who were injured by Agent Orange. Given the desirability of resolving the indeterminate plaintiff problem using a form of proportional liability or some other acceptable method, a dismissal of the class action would be unwarranted. The statistical theory, available data, and public policy are far from settled. Particularly during this period of rapidly changing scientific approaches and increased threats to the environment, we should not unduly restrict de-

velopment of legal theory and practice—both substantive and procedural—by dismissing a class action such as the one now before us although the hazards of an ultimate dismissal must be considered in assessing the fairness of the settlement. As has previously been suggested, like inhibitions against dismissal of individual actions do not exist.

We now turn to the related substantive-procedural problems of the government contract defense. The issues raised in the discussion of that defense are closely related to the factual issue of the relative knowledge of the parties.

### C. Nature of Liability and Relation to Defense of Government Knowledge

Both plaintiffs and defendants made a number of motions concerning the standard of liability and the government contract defense, which, as will be seen, has a very direct bearing on the standard of liability. Plaintiffs asked the court to modify the government contract defense to reconsider the first two legs of the defense and to apply some form of strict liability. The defendants urged that under section 707 of the Defense Production Act, 50 U.S.C.App. § 2157, they should not be held liable for damages resulting from their compliance with the government's contracts for production of Agent Orange.

For the reasons given below the court concludes that were the case to go to trial the standard to be applied is essentially one of negligence. The government contract defense would be modified to reflect that standard. As with the other legal issues, however, lack of certainty because of scarcity of legal precedent argues in favor of approving the settlement.

### 1. Introduction

To recover in tort, a plaintiff must show that the defendant owed him a duty and that he was injured when the defendant breached that duty. In product liability cases the duty, broadly speaking, is defined in one of two ways—(1) negligence: a duty to exercise reasonable care in the design, manufacture and marketing (including warnings and instruction to consumers) of a product or (2) strict liability: a duty not to design, manufacture or market a defective product—whether or not the defect resulted from the lack of exercise of due care.

A third category arises when the product was defectively designed by the government and produced by a manufacturer under contract with the government pursuant to that design. This situation gives rise to the government contract defense. *See generally* Note, Liability of a Manufacturer for Products Defectively Designed by the Government, 23 B.C.L.Rev. 1025 (1982); Note, The Government Contract Defense in Strict Liability Suits for Defective Design, 48 U.Chi.L.Rev. 1030 (1981).

As applied in this case, the defense provides that if a manufacturer produced Agent Orange according to government specifications, it is not liable if it can show that the government knew as much about the dangers of the product as the manufacturer knew or should have known. While phrased as a defense, it is conceptually better understood as part of the standard of liability: a manufacturer had a duty to produce the Agent Orange in compliance with the government's specifications, and a duty to warn the United States, as the prime purchaser, of all the dangers associated with its or a comanufacturer's Agent Orange about which it knew or should have known. This portion of the opinion will explore the justifications for the various standards of liability and the rationale for applying a modified form of the government contract defense.

### 2. Defense Production Act

Defendants contend that plaintiffs are barred from asserting any claims against them, regardless of the standard of liability, because they are immunized from suit under section 707 of the Defense Production Act, 50 U.S.C. app. § 2157. That section states, in relevant part, that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compli-

ance with a rule, regulation, or order issued pursuant to this Act." To understand the application of section 707 to the facts of this case some background is in order.

Section 101 of the Defense Production Act, 50 U.S.C. app. § 2071(a), authorizes the President, when necessary,

> to require that performance under contracts or orders ... which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders....

Section 101 has been implemented through regulations issued by the Business and Defense Services Administration of the Department of Commerce. *See* 32A C.F.R. § 10 (1967). These regulations are now contained in 15 C.F.R. pt. 350 (1984). The regulations create a system for contracts deemed vital to the national defense. Contracts are "rated" and contractors receiving a "rated" contract are required to accept and perform that contract "regardless of existing contracts and orders." DPS Reg. 1, *id.* at § 17.

As the *quid pro quo* for performance of the contracts, defense contractors are protected from "liab[ility] for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with ... this Act." 50 U.S.C. app. § 2157. Plaintiffs and defendants agree that all of the contracts between the defendants and the United States for production of Agent Orange were "rated" contracts and thus performance of those contracts is protected by section 707. They disagree, however, as to the scope of that protection. Defendants contend that section 707 should be interpreted literally to bar all suits, in both contract and tort, resulting from performance of the contract. Plaintiffs contend that historical context makes it clear that section 707 bars only suits by third parties, whose contracts with and shipments from the contractor were adversely affected by

the "ratings" given the defense contract. Alternatively they argue that for section 707 to apply, there must be a causal relationship between the "rating" (not merely the performance of the contract) and the injury. While the prime example of such a causal relationship would be the contract case of the third party whose source of product was cut off because the government took the supply, it is possible to hypothesize tort cases where a causal connection could be found, e.g., where the "rating" forced the contractor to begin production before it was fully ready to or at a quicker pace than it would have done otherwise, resulting in injury to an employee. Under either interpretation, section 707 would not bar the Agent Orange claims.

It is indisputable that the statutory ancestors of section 707 only immunized contractors from liability for breach of contract damages; the law was explicit on that point. "No person ... shall be held liable for damages or penalties *for any default under any contract or order* which shall result directly or indirectly from his compliance with ... this section." Act of May 31, 1941, ch. 157, 55 Stat. 236 (emphasis added). The defendants argue that the deletion of the reference to "contract" in section 707 and a number of references in the statutory history about the time the statute was reenacted as the Defense Production Act of 1950 indicate a desire by Congress not to limit the immunity to contractual breaches. For example, they point to language in the Senate committee report that accompanied a minor clarifying amendment made in 1952:

> The first sentence of section 707 of the act contains the so-called exculpatory clause, which protects a person from liability, *under contract or otherwise,* as the result of compliance with the act or regulations issued under the act. This provision was included to encourage and assist people to comply with the act, even though it was recognized that common-law doctrines, such as frustration and impossibility of performance and the like, would cover many of the same cases.

S.Rep. No. 1599, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad. News 1789, 1818 (emphasis added).

The deletion of the reference to contract and the inclusion of this language in the legislative history are inconclusive at best and, in light of other factors, irrelevant. The last sentence in the quoted section of the Senate report is certainly consistent with the interpretation that no change was intended in the scope of section 707.

The only two reported cases we have been able to find applying section 707 involve breach of contract claims and thus shed no light on the question. *See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir.1976); *United States ex rel. Caldwell Foundry & Machine Co. v. Texas Construction Co.*, 224 F.2d 289 (5th Cir.), *cert. denied,* 350 U.S. 895, 76 S.Ct. 154, 100 L.Ed. 787 (1955).

Several factors militate against giving section 707 full literal effect. The first is that section 707 was enacted as the *quid pro quo* to section 101, the section authorizing the President to compel acceptance and give high priority to defense contracts. Logically, then, the protection afforded by section 707 should correspond to the risk imposed, viz., the possible need for the contractor to break its contracts with third parties or the increased risk to employees or users posed by speeded-up production. Except in rare instances there is no logical connection between the compulsion of section 101 and the risk of injuries to those using or exposed to the contractor's product; the risk is something that all government contractors have in common and is already taken into account in the government contract defense.

Second, it is unlikely that Congress would work such a major change in tort law without being explicit about it. This point is emphasized by the fact that when, in analogous areas, Congress did deal with the question of tort liability it was quite explicit about it. A good example is contained in the enactment of the First War Power Act which, among other things, permitted the president in time of national

emergency to make indemnity payments to defense contractors under certain contracts. Act of August 28, 1958, Pub.L. No. 85–804, 72 Stat. 972. The Congressional report indicated that the reason for such power is that "production contracts may involve items, the production of which may include a substantial element of risk, giving rise to the possibility of an enormous amount of claims ... [T]o the extent that commercial insurance is unavailable, the risk of loss in such a case should be borne by the United States" through indemnification. S.Rep. No. 2281, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Ad.News 4043, 4045. The report noted that "[t]he Atomic Energy Commission now possesses similar indemnification authority by virtue of the enactment of the Price-Anderson Act." *Id.* It is telling that neither the Defense Production Act itself nor the legislative history made any reference to tort claims despite the fact that, as evidenced by this suit, the contracts "rated" under the Act "involve items, the production of which may ... giv[e] rise to the possibility of an enormous amount of claims."

If section 707 is to be applied to tort claims at all, it should only be read to bar claims for strict liability, not negligence. The former involve holding a defendant liable despite the fact that it may not have been at fault and the liability thus truly "result[s] ... from compliance with ... this Act." Whether this last interpretation or one not applying section 707 to tort suits altogether is adopted, the Defense Production Act would not bar plaintiffs' claims.

3. Law to be Applied to Contract Defense

Before discussing possible modification of the government contract defense, it is necessary to decide which law applies to that defense. Since jurisdiction in this case is based on diversity, *In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981), this court under the rule of *Klaxon Co. v. Stentor Electric Manufacturing*

*Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), has looked to the courts of the relevant states to determine what law applies and has concluded that a national consensus or federal common law would govern. *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 690 (E.D. N.Y.1984).

■ That diversity is the basis of jurisdiction does not control the law applicable to any defenses that may be raised. *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 2846–47, 77 L.Ed.2d 420 (1983); *Tennessee v. Union & Planters' Bank,* 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511 (1894). Regardless of the law applied to other substantive issues, it may be necessary under the Supremacy Clause to apply federal law to defenses such as the government contract defense. As the Court of Appeals recognized, its holding that federal common law does not provide a basis for jurisdiction in this case "did not decide whether potential defenses implicating federal interests such as the government contract defense would be governed by federal or state law." *In re Diamond Shamrock Chemicals Co.,* 725 F.2d 858, 861 n. 2 (2d Cir.1984), *cert. denied,* ── U.S. ──, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

■ In determining whether federal law applies to a claim or defense, a court must look to (1) whether there "exist[s] . . . a substantial federal interest in the outcome of [the issue], (2) [what] the effect on this federal interest [would be] should state law be applied; and (3) [what] the effect on state interests [would be] should state law be displaced by federal common law." *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 737, 746 (E.D.N.Y. 1979), *rev'd on other grounds but quoted with approval in* 635 F.2d 987, 990 (2d Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981).

■ This court has already discussed the extensive federal interest in the government contract defense. *"Agent Orange",* 580 F.Supp. at 701–05. It pointed out

that the Supreme Court has recognized the "distinctively federal" nature of the "relationship between the Government and its suppliers of ordnance." *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 672, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977). The court also noted that "[t]he existence and scope of a contractor's liability, if any, will undoubtedly affect future dealings between the contractor and the government." *"Agent Orange,"* 580 F.Supp. at 705.

Of particular significance in this case is the rule that "ordinarily federal law controls the construction and applicability of government contracts." *Id.* (citing *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947)). While the rule is arguably not directly applicable (*but see supra* for argument that Defense Production Act, under which the Agent Orange contracts were performed, dictates standard of liability), it is certainly suggestive. Not only was Agent Orange produced pursuant to contracts with the United States, but those contracts were performed under the threat of compulsion by federal law. As will be noted *infra,* that compulsion is one of the important factors in the formulation of the government contract defense.

What was just said is also relevant in applying the second consideration, "the effect on this federal interest should state law be applied." It might be grossly unfair to subject a defense contractor who produced war materiel for the national government under the compulsion of federal law to the laws of dozens of different states in determining what standard governs its liability for damages resulting from the production. There is, therefore, a substantial federal interest in uniformity for its own sake.

As to the third consideration, there will be virtually no negative "effect on state interests should state law be displaced by federal common law." There is, of course, a well developed body of state law dealing with negligence and strict product liability. Nevertheless, "[s]tate tort law has not yet

evolved rules to govern the duties of federal war contractors to federal soldiers." "Agent Orange," 506 F.Supp. at 749. Although there have been a number of cases applying state law to the government contract defense, see, e.g., Brown v. Caterpillar Tractor Co., 696 F.2d 246 (3d Cir.1982); Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir.1969); Casabianca v. Casabianca, 104 Misc.2d 348, 428 N.Y.S.2d 400 (Sup.Ct.1980), all of them were suits by individual soldiers or civilians injured either by nonmilitary products, such as bulldozers (Brown) and dough mixers (Casabianca) or by defects in airplanes and explosives, objects whose misuse is frequently regulated by state tort law. None of them implicated to the same extent any of the federal interests detailed above relating to Agent Orange.

It must be concluded that federal law applies of its own force under the Supremacy Clause to the government contract defense. In the event federal common law were not applied of its own force, the same result would be reached under Erie using the national consensus law approach set forth in the conflict of laws opinion. See "Agent Orange," 580 F.Supp. 690.

4. Modification of the Government Contract Defense

The rationale for the government contract defense and its formulation and application to this case have been discussed extensively in previous decisions. See In re "Agent Orange" Product Liability Litigation, 506 F.Supp. 762, 792–96 (E.D.N.Y. 1980); id., 534 F.Supp. 1046, 1053–58 (E.D. N.Y.1982); id., 565 F.Supp. 1263 (E.D.N.Y. 1983); id., 580 F.Supp. 690, 701–05 (E.D.N. Y.1984).

In 1982, this court concluded that

a defendant will be entitled to judgment dismissing all claims against it ... if the defendant proves:

1. That the government established the specifications for "Agent Orange";

2. That the "Agent Orange" manufactured by the defendant met the government specifications in all material respects; and

3. That the government knew as much or more than the defendant about the hazards to people that accompanied use of "Agent Orange."

Id., 534 F.Supp. at 1055. The opinion made it clear that to show that the government "set" the specifications and that it met those specifications, "all that is necessary .. for [a] defendant to prove [is] that the product it supplied was a particular product specified by the government." Id. at 1056. The fact that a defendant may have played a "role ... in preparation of the specifications, whether it be advice to the government about the product design, or even touting of the product to the government," was not relevant for the first two elements of the defense, although it "may be relevant in establishing the relative degrees of knowledge as between the government and the defendants." Id.

Subsequently the court concluded that "[e]ach defendant has established the first two elements of the defense—that the government established the specifications for Agent Orange and that the Agent Orange manufactured by the defendant met those specifications in all material respects," In re "Agent Orange" Product Liability Litigation, 565 F.Supp. 1263, 1274 (E.D.N.Y.1983)—and therefore granted summary judgment in defendants' favor on those two material propositions. See id.

Plaintiffs contend that, for several reasons, the government contract defense cannot be used to bar their claims. They argue, first, that the defendants' role in formulating Agent Orange and their long time civilian experience with its components made it defendants' own product and make the government contract defense inapplicable. Specifically, they contend that Agent Orange is merely a combination of two herbicides, 2,4–D and 2,4,5–T, that had long been produced by the defendants for the civilian market for use by farmers and homeowners. As a result, they conclude, the rationale of the government contract defense, that "[c]ourts should not require

suppliers of ordnance to question the military's needs or specification for weapons during wartime," *"Agent Orange,"* 534 F.Supp. at 1054, does not apply; the specifications were already drawn up and used by the defendants for many years. As a variation on this point they urge that the court reconsider the first two legs of the government contract defense and redefine the first leg to include a requirement that a defendant not have had any input into the setting of the specifications. They also urge that the court hold that the second leg of the defense is not met if a defendant's Agent Orange contained dioxin; defendants do not seriously contest that almost all their Agent Orange did contain dioxin, although they claim not in amounts large enough to be harmful. Plaintiffs note that dioxin was not part of the specifications and, therefore, they conclude, the defendants supplied a product that did not conform to the specifications.

Plaintiffs' arguments have some force, especially when examined in light of the policies that underlie the government contract defense. One of the purposes of imposing tort liability is the "strong incentive" that the imposition provides "to prevent the occurrence of future harm." *"Agent Orange,"* 506 F.Supp. at 793 (citing W. Prosser, Handbook of the Law of Torts, 23 (1971)). If the defense contractor's "only role in causing the injury was the proper performance of a plan supplied by the government," then there can be no deterrent effect since the contractor is not "in a position to correct the tortious act or omission." *Id.* at 793–94. The situation is different where a contractor does play a "role in causing the injury" by manufacturing and marketing the product for civilian use and the product was not wholly a military creation.

As an outgrowth of the manufacture and production, many of the defendants had considerable experience with the hazards of trace amounts of dioxin in 2,4,5–T and a number of the defendants had done extensive research, about which all of the defendants were aware, into the hazards of dioxin. Thus, although the defendants are correct in their assertion that the government "invented" Agent Orange in the sense that 2,4–D and 2,4,5–T (the components of Agent Orange) had never been previously combined in that form and manner, Agent Orange was very closely related to "shelf products" with which the chemical companies had a good deal of familiarity from the civilian market.

A second reason given for the government contract defense is that without it

a manufacturer capable of producing military goods for government use would face the untenable position of choosing between severe penalties for failing to supply products necessary to conduct a war, and producing what the government requires but at a contract price that makes no provision for the need to insure against potential liability for design flaws in the government's plans.

*"Agent Orange,"* 506 F.Supp. at 794. What was said in discussing the applicability of the deterrence rationale applies here with equal force. It is true that the defendants' contracts "ma[de] no provision for the need to insure against potential liability for design flaws in the government's plans." Because of their long experience with components of Agent Orange, however, defendants were in a position to "insure" against liability for government design flaws by learning from their civilian experience of the dangers of 2,4–D, 2,4,5–T and dioxin. The situation here is thus distinguishable from almost all other recent cases applying a government contract defense in that the product was neither one with a primarily military application, *see, e.g., McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 711, 79 L.Ed.2d 175 (1983) (ejection system for military aircraft); *Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir.1969) (hand grenade), nor a civilian product specifically modified for use by the military with the injury resulting from the modification. *See, e.g., Brown v. Caterpillar Tractor Co.,* 696 F.2d 246 (3d Cir.1982) (defendant alleged that government specifications

called for bulldozer with no protective structure around the passenger seat); *Sanner v. Ford Motor Co.*, 144 N.J.Super. 1, 364 A.2d 43 (1976), *aff'd*, 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied*, 75 N.J. 616, 384 A.2d 846 (1978) (jeep manufactured to military specifications without seat belts or roll bar).

If plaintiffs' allegations are correct, the dangers that accompanied the spraying of Agent Orange were far greater than those posed by the products in the "ordinary" product liability cases in which the government contract defense has been invoked, and unprecedented in tort law in their magnitude. While defendants had no control over how Agent Orange was used by the military, they were undoubtedly aware of the scope of the spraying program and the concentrations in which Agent Orange was being sprayed.

The defendants respond by pointing out that although the components may not have been unique to Agent Orange, it was sprayed in concentrations much greater than that recommended for civilian use and without the precautions recommended for civilian use. This, they claim, made the risks far greater and wholly different from those posed by civilian use and made Agent Orange a military product for purposes of the government contract defense.

While this last fact of concentrated use does call for the application of some form of government contract defense, it does not justify the application of the government contract defense in its present form. It is not disputed that the defendants had years of experience with the herbicide's components. If the government's methods of spraying increased the risk beyond that experienced in civilian use, that factor is relevant in determining what a defendant knew or should have known about the dangers of Agent Orange, but it does not make a defendant's experience irrelevant.

What is needed, then, is a standard of liability crafted for the particular needs of this case that takes into account both the fact that defendants were compelled to produce Agent Orange for the military in time of war and had no control over its use by the military and the fact that the defendants had years of experience with the components of Agent Orange.

The plaintiffs' suggested modifications do not meet the first part of that need. Stripping a defendant of the protection of the government contract defense entirely, which is the practical effect of their proposed changes, (1) would result in a defendant's being liable without regard to how much the government knew about the dangers of Agent Orange when it compelled the defendant to produce the herbicide and (2), depending on the form of strict liability used, could result in a defendant's being liable even if it had no reason to know of the dangers of Agent Orange.

It is possible, however, to properly balance the relevant considerations by keeping the first two legs of the government contract defense intact while modifying the standard of liability as follows: A plaintiff would be required to prove, along with the other elements of his cause of action, that the hazards to him that accompanied use of Agent Orange were, or reasonably should have been known, to the defendant. The burden would then shift to each individual defendant to prove (1) that the government knew as much as or more than that defendant knew or reasonably should have known about the dangers of Agent Orange or (2), even if the government had had as much knowledge as that defendant should have had, it would have ordered production of Agent Orange in any event and would not have taken steps to reduce or eliminate the hazard.

The "knew or reasonably should have known" standard is meant to ensure that, at least in the case of a highly technical product with which a manufacturer has had years of experience and which allegedly caused damage unprecedented in its magnitude, a defendant is not "encourag[ed] to know as little as possible about the dangers of [its] product[ ]." Note, Liability of a Manufacturer for Products Defectively Designed by the Government, 23 B.C.L.Rev. 1025, 1078–79 (1982).

Allowing a defendant to exculpate itself by proving government knowledge serves several purposes. First, a manufacturer is entitled, at least in cases where it was compelled to produce under threat of fine or imprisonment, to expect that if the government is aware of a hazard, it has either taken steps to reduce or eliminate the hazard or has made a conscious decision to use the product despite the dangers. Second, if the government was aware of the hazard, no harm results from the lack of warning and the element of proximate cause is, therefore, missing. W. Prosser, Handbook of the Law of Torts, 682 (1971). These two reasons also explain why a "should have known" standard is not appropriate for the government's knowledge: if the government is not aware of the dangers, a defendant obviously can not rely on its making a conscious decision on how to deal with that hazard and the lack of warning would, very likely, cause harm. There are several other reasons as well: The fact that the government may have been derelict in its duty should not relieve a defendant from the consequences of its negligence. Furthermore, an inquiry into what the military should have known or done could come perilously close to the second-guessing of military decisions prohibited by *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) and *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

In practical terms, then, it appears reasonable to modify the law applicable to the case at hand so that a defendant would not be liable despite the fact that it negligently produced a defective product if it could show either that the government knew of the defect or that it would not have acted any differently even if it had known. The fact that there has never been an appellate ruling approving this approach creates uncertainty in the outcome, making settlement more desirable.

### D. Punitive Damages

■ Together with a Rule 23(b)(3) class for compensatory damages, the court certified a mandatory class under Rule 23(b)(1)(B) for punitive damages. *In re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718, 729 (E.D.N.Y.1983), *mandamus denied*, 725 F.2d 858 (2d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The former permits a member to opt out of the class and sue individually while the latter does not. On the basis of information now available, for reasons given below, the court finds that punitive damages are not warranted. This is an important consideration in deciding the reasonableness of the settlement.

Those who have not opted out are bound by the settlement which does not provide for punitive damages. Those who have opted out of the 23(b)(3) class, though they do not share in the settlement, may have an independent, continuing interest in punitive damages. In effect, it could be argued, plaintiffs who have not opted out agreed to forego punitive damages to enhance the amount they received in compensatory damages. This would, arguably, support a contention that lawyers for the 23(b)(3) class had a conflict of interest.

To avoid any claim of conflict in the future, any party who opted out is free to raise this conflict issue by motion within thirty days of issuance of the opinion. It should be noted that those who opted out and their attorneys were free to raise the issue at the Fairness Hearings and they did not do so. Thus, as matters now stand, no person, including those who have opted out of the 23(b)(3) compensatory damage opt-out class, may receive punitive damages.

It has already been held that a national consensus law would apply to all substantive issues, including punitive damages. *In re "Agent Orange" Product Liability Litigation*, 580 F.Supp. 690 (E.D.N.Y.1984). Although there are semantic differences from state to state in what plaintiff must show to be entitled to punitive damages, the common denominator of all those standards is well expressed by the Restatement (Second) of Torts:

Punitive damages may be awarded for conduct that is outrageous, because of

the defendant's evil motive or his reckless indifference to the rights of others. *Id.* § 908(2) (1977). *See also, e.g.,* Forde, Punitive Damages in Mass Tort Cases: Recovery on Behalf of a Class, 15 Loy.U.Chi. L.J. 397, 402–403 (1984); *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 838–43, 851–52 (2d Cir.1967). The "outrageousness" standard can be met if the defendant was negligent but only upon a showing of "negligence ... so gross as to evince an entire want of care and ... something of a criminal character. Many cases take the view that there must be a conscious failure to use due care." Stein, Damages and Recovery § 187 (1972).

It should be clear from section III, *supra,* dealing with the factual problems with plaintiffs' case, that it would be virtually impossible for an individual plaintiff to show that there were any dangers to him or her from Agent Orange given the current lack of any significant evidence showing a causal connection between exposure to Agent Orange and the diseases and conditions from which plaintiffs say they are suffering. Given evidence of the high level of government knowledge already discussed, there is a substantial possibility that a defendant would be able to establish the government contract defense. Either of these favorable developments from the defendants' point of view would constitute a failure to establish one of the "facts ... [necessary] to maintain a cause of action" and the plaintiff would therefore not be entitled to compensatory damages, let alone punitive damages. Restatement (Second) of Torts § 908, comment c (1977).

More important for present purposes, however, is the lack of any evidence that would tend to establish that the defendants acted with the "evil motive or reckless indifference to the rights of others" which would justify the imposition of punitive damages. Construing the evidence in the light most favorable to the plaintiffs, it at best shows that the defendants should have been aware of the dangers to servicepersons posed by the spraying of Agent Orange in heavy concentrations and that they did not pass on to the government information they did have. Such a failure, under the circumstances of this case, will not support a recovery of punitive damages.

Based on the record now before the court and subject to any motion by a class member who opted out, it appears that no plaintiff, regardless of the standard used, will be able to establish facts sufficient to make out a punitive damages claim. Accordingly, the settlement is reasonable in foregoing punitive damages on behalf of both classes of plaintiffs.

## V. GOVERNMENT ACTION TO PROTECT CLASS

An important factor in determining reasonableness is the possibility that members of the class can look to sources other than the manufacturers of Agent Orange for assistance. It is quite clear that the United States government has promised to afford help to servicepersons once causation is shown. This fact militates strongly in favor of finding the settlement fair.

The government of the United States has, at least in theory, taken extensive steps to diagnose and treat veterans who may have been exposed to Agent Orange. It appears from testimony at the Fairness Hearing that the Australian government is taking a position almost identical with that of the United States government. (Hearings before a Royal Commission reportedly reflect many of the same kinds of complaints about poor medical services afforded veterans as were made by American veterans.) New Zealanders have the protection of a form of socialized medicine that assures medical services to all veterans and their children.

The information that follows is based partly on a letter dated June 19, 1984 from the government to one of the Special Settlement Masters, conferences with the Special Masters and officials of the Veterans Administration, the legislation adopted by Congress and the proposed Veterans' Dioxin and Radiation Exposure Compensation Standards Act. *See, e.g.,* 38 U.S.C. § 354;

130 Cong.Rec. S6144–83 (daily ed. May 22, 1984); H.R.Rep. No. 592, 98th Cong., 2d Sess. (1984) (to accompany H.R.1961, Agent Orange and Atomic Veterans Relief Act); Hearings before the Senate Committee on Veterans' Affairs, 98th Cong., 1st Sess. (June 15 and 22, 1983) ("Veterans' Exposure to Agent Orange").

In the executive branch there is an "Agent Orange Working Group" reporting directly to the White House Cabinet Council on Human Resources. The Group's present chairman is the Chief Medical Officer of the United States.

In evaluating government claims about what it is doing for Vietnam veterans it should be borne in mind that at the Fairness Hearings, see II, B, supra, veterans repeatedly expressed complaints about VA medical services and testing.

### A. Agent Orange Registry

The Agent Orange Registry was established by the Veterans Administration in 1978 to accomplish four objectives: (1) to identify all Vietnam veterans expressing a concern about the possible adverse health effects of their exposure to Agent Orange; (2) to provide a mechanism for Vietnam veterans to voice their concerns to a physician, and to receive a physical examination; (3) to serve as a mechanism for follow-up of these veterans if, at a later date, new information develops as a result of the various research efforts underway or being planned; and (4) to obtain some preliminary information on the current health status of the veterans who have participated in the Registry program. The Registry was designed to, and does, provide some information on the health status questions. It is not, however, by itself a scientifically valid study from which reliable medical conclusions may be drawn. The Registry cannot be considered a reliable or acceptable basis for deriving medical conclusions because of the self-selection of the sample, a lack of precision in the reporting of the exposure history, possibly inadequate examinations in some cases (as reported by a large number of veterans at the Fairness Hearings)

and the possibility of selective recall of symptoms and exposure.

Many of those who spoke at the Fairness Hearings testified that they were discouraged by Veterans Administration personnel from claiming Agent Orange effects. Those who persisted were given, they testified, superficial examinations. A number referred to lost and inaccurate records. It was also said that persons who were still in the armed forces were afraid to claim Agent Orange effects because they feared discharge from the service.

Subject to these limitations, the following information is available. As of April 30, 1984, 130,891 veterans had received an initial examination (i.e., a general physical examination with appropriate laboratory studies) and had their cases entered into the Registry. The Registry is an essentially computerized index of the medical records of the examined veterans. Prior to 1983 the index was based on the body system for which health effects were claimed, but it is now predicated on the medical condition diagnosed.

Prior to May 1983, 33,408 of the 85,903 veterans examined, or 39%, complained of skin diseases, ranging from severe psoriasis to athlete's foot. The Veterans Administration contends that this percentage is consistent with general medical experience. "Nervousness" accounted for 15,409 or 17.5 percent of the other complaints.

Since May, 1983 more than 130 different diagnostic groups have been confirmed among the 16,729 veterans examined. 5,403 of 16,729, or 32% of the veterans examined, either did not claim the existence of a disease or no diagnosis of a disease could be confirmed. The most common diagnostic category is again skin disease, totalling 3,726. The next most common diagnostic group is that of cardiovascular disease with 2,250 cases. This category includes varicose veins as well as serious heart diseases.

Copies of the medical examination reports have been provided to the parties, but the reports and the Registry remain of doubtful utility. See Comptroller General,

Report to the Congress, VA's Agent Orange Examinations Program: Actions Needed to More Effectively Address Veterans' Health Concerns (Oct. 25, 1982).

B. Medical Care to Veterans Claiming Exposure to Agent Orange

Public Law No. 97–72 (codified in pertinent part at 38 U.S.C. § 610) authorized the VA to provide hospital or nursing home care together with outpatient care designed to prepare a veteran for hospitalization, to provide post-hospitalization follow-up, or to obviate the need for hospitalization to veterans who may have been exposed during service in Vietnam to a toxic substance found in a herbicide or defoliant. This care is authorized "notwithstanding that there is insufficient medical evidence that [the veteran's] disability may be associated with such exposure." 38 U.S.C. § 610(e)(1)(A).

Veterans Administration help may not be provided under this authority for a disability that is found to have resulted from a cause other than exposure to a herbicide or defoliant used in Vietnam. 38 U.S.C. § 610(e)(2). Although Public Law 97–72 conferred eligibility for VA medical assistance on a specific class of veterans, many members of that class were already eligible for such Veterans Administration care under other provisions of the law. *See* 38 U.S.C. § 610.

The Veterans Administration has published guidelines on availability of Agent Orange related treatment. 46 Fed.Reg. 58,636 (1981); Department of Medicine and Surgery Circular 10–82–185. They permit care for any condition that is not clearly and unmistakably associated with another cause (e.g., conditions resulting from trauma).

The statistical information that is available discloses that there were 10,900 inpatient admissions and 434,000 outpatient visits classified as having been provided under Public Law 97–72 during fiscal year 1983. Based upon average utilization rates it is estimated that 6,900 veterans were hospitalized and 72,580 were seen as outpatients under the authority of that law. The total cost of hospitalization during fiscal 1983 was estimated at $34,000,000 and the cost of outpatient services at $35,000,000. At the Fairness Hearings witnesses suggested that these figures do not reflect the value of medical services rendered because of inefficiencies in the VA facilities.

Many of those who testified at the Fairness Hearings said they could not get useful treatment from the VA under Public Law No. 97–72. They went to their own doctors when they needed help and could afford it. Allegedly there is a wide variation in the quality of care provided in the various VA hospitals. Particularly for those living away from large cities, the VA hospitals do not afford reasonable access.

Vietnam veterans are also eligible to receive counseling and related mental health services required because of readjustment difficulties. Family members may also receive counseling to assist in the veteran's treatment and readjustment whether or not the difficulties are related to possible exposure to Agent Orange. Witnesses at the Fairness Hearings indicated that these services were inadequate or below acceptable standards.

C. Aid to Spouses and Children of Veterans

Most veterans' spouses and children with birth defects can obtain no help from government veterans' programs. Protection is much narrower than that given to the veterans themselves. Section 613 of title 38 of the United States Code authorizes the VA to furnish medical care to the spouse or child of a veteran who has a permanent and total service-connected disability and to the surviving spouse or child of a veteran who died as a result of a service-connected disability or who at the time of death had a total disability. 38 U.S.C. § 613(a)(1), (2). Medical care may also be provided to the surviving spouse or child of a person who died while in active service if the death was not due to the person's own conduct. *Id.* § 613(a)(3). Under section 613 care under the CHAMPVA program (Civilian Health and Medical Program of the VA) may be furnished to these

eligible dependents provided they are not eligible for CHAMPUS (Civilian Health and Medical Program of the Uniformed Services) or Medicare benefits.

Dependent children of service personnel killed in action are entitled to CHAMPUS benefits. *See* 10 U.S.C. § 1071, *et seq.* Surviving spouses are also entitled to CHAMPUS benefits except during a remarriage. With limited exceptions the provision of care under the CHAMPVA program is administered by the Department of Defense.

Testimony at the Fairness Hearings indicated that many of those eligible for this personal family help could not receive it. A New York resident, for example, said that he and his family could not afford to go to Washington, D.C., site of the nearest available facility for treatment. A Wyoming resident said he would have to travel 150 miles for this help from the nearest treatment facility. They wanted local private contract medical help paid for by the VA.

### D. Exposure Data

The best indication of areas sprayed from the air is based upon a series of computer tapes. These "Service HERBS" tapes were prepared by the United States Army and Joint Services Environmental Support Group (ESG), formerly the Agent Orange Task Force. This material has been provided to the parties. In addition the United States has arranged for testimony concerning the methods used in preparing the tape and other data such as troop locations. Based on testimony at the Fairness Hearings it seems doubtful that United States records can be relied upon to fix exposure with precision.

There is apparently no complete list of veterans who served in Vietnam and estimates of the number involved vary depending upon the definition of "Vietnam service." The most comprehensive estimate includes persons who flew over the country but never landed there and individuals who spent only a few days in Saigon or who were aboard ships offshore. The more restrictive estimates range from 2.4 to 2.9

million American service personnel during the period when Agent Orange was used. It is impossible, according to the government, to determine how many Americans were exposed, even briefly, to biologically significant amounts of phenoxy herbicides and dioxin (2,3,7,8,–TCDD) contained in Agent Orange. In view of this lack of reliable information the VA "will accept in the absence of positive evidence to the contrary a Vietnam veteran's contention of exposure." DVB Circ. 21–80–1, April 3, 1980. It "is the policy of the VA to concede exposure." Circular May 11, 1980.

### E. Veterans' Dioxin and Radiation Exposure Compensation Standards Act

Congressional findings with respect to the proposed Veterans' Dioxin and Radiation Exposure Compensation Standards Act state the facts as to the government's action and intentions. The Senate has passed the version described below and its bill was sent to a Conference Committee together with the House version. The findings in the Senate version read, insofar as pertinent, as follows:

The Congress makes the following findings:

(1) Veterans who served in Southeast Asia during the Vietnam conflict ... are deeply concerned about possible long-term health effects of exposure to herbicides containing dioxin ....

(2) There is scientific and medical uncertainty regarding such long-term adverse health effects.

(3) In section 102 of Public Law 97–22, the Congress responded to such uncertainty by authorizing priority medical care at Veterans' Administration facilities for any disability of a veteran who may have been so exposed (even though there is insufficient medical evidence linking such disability with such exposure) unless the disability is found to have resulted from a cause other than the exposure.

(4) The Congress has further responded to such medical and scientific uncertainty by mandating, in section 307 of

Public Law 96–151 and section 601 of Public Law 98–160, the conduct of thorough epidemiological studies of the health effects experienced by veterans in connection with exposure ... to herbicides containing dioxin.....

(5) There are a total of sixty-six federally sponsored research projects currently being conducted relating to herbicides containing dioxin, at a cost to the Federal Government in excess of $130,000,-000....

(6) The initial results of one project—an epidemiological study, conducted by the United States Air Force School of Aerospace Medicine of the health status of the "Ranch Hand" veterans who carried out the loading and aerial spraying of herbicides containing dioxin in Vietnam and in the process came into direct skin contact with such herbicides in their most concentrated liquid form—were released on February 24, 1984, and contained the conclusion "that there is insufficient evidence to support a cause and effect relationship between herbicide exposure and adverse health in the Ranch Hand group at this time."

....

(10) The Veterans' Administration has not promulgated permanent regulations setting forth specific guidelines, standards, and criteria for the adjudication of claims for Veterans' Administration disability compensation based on exposure to herbicides containing dioxin....

(11) Such claims present adjudicatory issues which are significantly different from issues generally presented in claims based upon the usual types of injuries incurred in military service, particularly with respect to the difficulty of determining a connection between exposure during service and increased risk of adverse health effects (especially those involving long latency periods and ambiguities of causation) arising thereafter.

(12) It has always been the policy of the Veterans' Administration and is the policy of the United States, with respect to individual claims for service connection, that when, after consideration of all evidence and material of record, there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of a claim, the benefit of the doubt in resolving each such issue will be given to the claimant.

..... The purpose of this Act is to ensure that Veterans' Administration disability compensation is provided to veterans who were exposed during service in the Armed Forces in the Republic of Vietnam to a herbicide containing dioxin ... (and dependency and indemnity compensation is provided to survivors of such veterans) for all disabilities arising subsequent to such service that are connected, based on sound scientific and medical evidence, to such exposure (and for all deaths resulting from such disabilities).

The Administrator of Veterans' Affairs under section 354(a)(2) of title 28, United States Code, if this Senate version is adopted, is ordered to prescribe regulations to establish guidelines, standards and criteria for the resolution of claims for benefits based on a veteran's exposure during service in the Republic of Vietnam prior to May 8, 1975, to a herbicide containing dioxin. The statute provides that "the benefit of the doubt in resolving each ... issue will be given to the claimant."

In providing guidelines based on scientific research and other data the Administrator must "take into account whether the findings are statistically significant, are capable of replication, and withstand peer review." His evaluation must be made "after receiving the advice of the appropriate panel of the Scientific Council of the Advisory Committee on Environmental Hazards."

The diseases referred to in the proposed Act are:

(1) a soft tissue sarcoma, if developed to a degree of disability of 10 per centum or more within thirty years after the date of last departure from the Republic of Vietnam during such service,

(2) porphyria cutanea tarda, if so developed within one year after the date of last departure from the Republic of Vietnam during such service,

(3) chloracne, if so developed within one year after the date of last departure from the Republic of Vietnam during such service, or

(4) any other disease with respect to which the panel of the Scientific Council ... finds that there is sound scientific or medical evidence indicating a connection to exposure to such herbicide and which has so developed within any maximum period of time after departure from the Republic of Vietnam during such service.

Act § 5(a)(1)(B)(i).

The Advisory Committee on Environmental Hazards (the "Committee") is, under the Senate version, to consist of fifteen members appointed by the Administrator of Veterans' Affairs after requesting and considering recommendations from veterans' organizations, including eleven individuals (of whom none may be members of the Armed Forces or be employed by the Veterans Administration or the Department of Defense and not more than three may be Federal employees of other departments or agencies), appointed in consultation with the Director of the National Institutes of Health. Three will be recognized medical or scientific authorities in fields pertinent to understanding the health effects of exposure to dioxin; three will be recognized medical or scientific authorities in fields pertinent to understanding the health effects of exposure to ionizing radiation; five will be recognized medical or scientific authorities in fields such as epidemiology and other disciplines pertinent to determining and assessing the health effects of exposure to dioxin or ionizing radiation in exposed populations; and four will be individuals from the general public, including at least one disabled veteran, having a demonstrated interest in and experience relating to veterans' concerns regarding exposure to dioxin or ionizing radiation.

It is obvious that Congress, in this Senate version of the Act, recognized the government's obligation to compensate all exposed veterans so long as a reasonable basis for finding causality exists. This is confirmed by the discussion in the Congressional Record. Senator Cranston, sponsor of the bill in the Senate, noted:

In addition to the need to proceed with this legislation based on the long-standing concerns of the veterans, their families, and others, two recent events involving these issues in the Federal judiciary have added a further sense of urgency to our efforts. First, on May 7 came the settlement in a New York district court class action lawsuit between Vietnam veterans and the companies that manufacture agent orange. Then on May 10 came the decision in a Federal court in Utah in the radiation exposure class action case ordering damages to be paid to 10 civilians exposed to radiation from test explosions at the Nevada test site. . . .

[T]he basic impact of S. 1651 [H.R. 1961] is to require the VA, through a rulemaking process allowing for public participation, to develop binding regulations for the adjudication of agent orange ... claims in order to bring about consistency in the process and the results. . . .

Of the 20,000 agent orange-related claims filed, only 15 have been granted as follows:

Of 17 P.C.T. [porphyria cutanea tarda, a rare liver condition] cases filed, only 2 have been granted.

Although 13 chloracne cases have been granted service connection, the VA reported in a May 17, 1984, letter ... that it appeared after review that none of the cases, in fact, involve chloracne.

Of the five cases of soft tissue sarcoma filed by Vietnam veterans, none has been granted.

130 Cong.Rec. S6145 (daily ed. May 22, 1984).

Senator Simpson, Chairman of the Veterans' Affairs Committee made a promise for the future when he noted:

This country has never turned its back on its veterans, and never will.... All of us would desperately wish to do "the right thing" for these veterans....

*Id.* at S6157.

The House of Representatives' version of the Act provides a presumption of service connection with respect to chloracne, soft tissue sarcoma and porphyria cutanea tarda. *See* H.R.Rep. No. 592, 98th Cong., 2d Sess. (1984) (Committee report on H.R. 1961, Agent Orange and Atomic Veterans Relief Act).

Both the House and Senate bills reflect the concern of Congress and an agreement to provide full compensation if scientific studies support this result. Currently there also is pressure in Congress to adopt legislation that would provide for indemnification of contractors such as the defendants in this case. H.R. 4199, 98th Cong., 1st Sess. (1984).

## VI. CONCLUSION CONCERNING FAIRNESS OF SETTLEMENT

■ Based on all the information presently available, the procedural posture of the litigation, the difficulty any plaintiff would have in establishing a case against any one or more of the defendants, the uncertainties associated with a trial, and the unacceptable burdens on plaintiffs' and defendants' legal staffs and the courts, the proposed settlement appears to be reasonable. It appears to be in the public's as well as the parties' interest.

Even though the evidence presented to the court to date suggests that the case is without merit, many of those who testified at the Fairness Hearings indicated that they sought its prosecution not for money but for public vindication. It may be, to paraphrase Sir James George Frazer, that the litigation itself has served a useful function: like many trials, the "main object of the ceremony ... is simply to effect a total clearance of all the ills that have been infecting a people." J.G. Frazer, *The Golden Bough* 666 (abridged ed. 1958).

The publicity attendant upon the settlement and subsequent Fairness Hearings, where the court heard almost five hundred witnesses from all parts of the nation, undoubtedly did serve once again to bring to the public's attention how unfairly Vietnam veterans have been treated. They have been abused, rejected and humiliated after serving bravely. Their voices should be heeded by the government and public for whom they fought.

In considering the fairness of the settlement, the court has looked to other sources of aid either presently available to the class or of potential benefit in the future. The government must be considered the source of ultimate protection whether or not there be a satisfactory demonstration of causal relationship to Agent Orange as a result of ongoing or future scientific studies. Government sources of aid exist and should continue to grow. Payment out of public funds is appropriate since many of the problems faced by Agent Orange-exposed veterans are due to Vietnam War-related factors other than the effects of toxic substances. The effects of combat as well as the disappointing reception Vietnam veterans received from the American public and inadequate help from their own government (as compared, for example, to that received by World War II veterans) has caused much emotional stress and physical pain.

Whether or not that pain was caused by Agent Orange, it is shared by a disproportionately large number of Vietnam veterans. They and their families should receive recognition, medical treatment and financial support. Many lives have been broken by the Vietnam experience. The suffering ones deserve succor. Their children are also tormented, perhaps because of Agent Orange, but certainly as a secondary result of the family tensions directly traceable to the Vietnam conflict. The negative ripple effects on other family members, the work place and other arenas of Vietnam veterans' lives have spread to all parts of our society and cannot be ignored. The injustices these brave men and women suffer poison the lives of all Americans, whether or not they served in Vietnam.

The public received the "benefit" of combat service and should help defray the cost.

Obviously all the help necessary cannot come out of the settlement. No amount of money can compensate Vietnam veterans for the suffering they and their families have endured. At the hearings it was emphasized over and over again that money is not the primary issue. But money obviously must be an issue. It is crucial that one veteran, one family, should not be pitted against another on the question of who deserves and who gets help and in what amount.

Our country is rich in public and private resources of every kind. Those resources should be made available to members of the class as often as needed, close to their homes, and with as little bureaucratic red tape as possible.

In addition, there is a large, almost untapped source of voluntary aid from outside the Vietnam War veteran community. One important source is the veterans' peer group that substituted school or other activity for service in the armed forces. Many in this group are now successful lawyers, doctors, business persons and financially successful leaders of the community. Undoubtedly their careers might have been retarded or ended had they served in Vietnam. They could now eradicate some remaining ill will and assist in national reconciliation were they to volunteer some of their talents, resources and influence to aid those who served in Vietnam.

## VII. PLAN FOR DISTRIBUTION OF FUND

One hundred and eighty million dollars plus accrued interest from May 7, 1984 has been or will shortly be paid into the court. The fifty million already in the control of the Clerk of the Court has been invested in United States treasury notes for reasons of safety, liquidity and substantial interest. Various measures for the protection of the funds have been ordered, including bonding of the custodians, advice on investment and control from an unpaid special master and auditing by the Administrative Office of the United States Courts without cost to the class.

For the guidance of the parties the following suggestions made during the Fairness Hearings should be considered in developing a plan for distribution of the settlement funds. These principles do not necessarily reflect the court's views but may serve to focus the parties' attention on some available options.

### A. General Principles

Any committees or governing bodies of organizations set up to distribute settlement funds or otherwise assist Vietnam veterans and their families who may have been affected by Agent Orange should be comprised primarily of veteran representatives. The task of organizing representatives of Vietnam War veterans into an effective group that can make decisions which the veterans will support and that can speak to the veterans with one voice must be given priority. With such an effective organization the $180,000,000 available from the settlement provides a powerful legal, medical, political and social instrument. Without that cooperation the money may become a reason for divisiveness and disunity that may serve to weaken the just claims of the veterans and their ability to vindicate their rights. Veteran representatives should be selected in a manner that will further unite the class rather than promote division and discord. There are many able laypersons, lawyers, doctors and other professionals who served in Vietnam and were exposed to herbicides or who are spouses of those exposed.

Special Master Kenneth Feinberg will assist in such meetings as veterans' representatives may wish. Within a few months decisions will need to be made on a distribution plan; they should be made primarily by veterans, not by nonveteran lawyers. Nevertheless, pursuant to the settlement agreement, the court reserves final authority to approve and supervise any plan for use and distribution of settlement funds.

Similarly, a proportionate share of the funds set aside for Australian and New Zealand members of the class should be controlled by veterans of those countries. The court would consider a single payment made to a person or body of each of these two countries with further distribution being made by those on the scene. Having representatives of these countries and the United States on a distribution agency is another alternative.

The primary responsibility for providing appropriate medical treatment for veterans and assuring adequate research into causation and cure must be assumed by the government.

Transaction costs in distributing the settlement funds must be kept to a minimum. Complex fact-finding should be avoided to reduce the need for attorneys' fees, experts' fees, and time consuming adjudications of individual claims.

It is not possible for all class members to receive significant individual compensation from the settlement funds. To the extent practicable, simple criteria for eligibility should be established to assure acceptable targeting of limited settlement funds and to provide adequate notice of eligibility to class members.

The plan should provide for those class members who, as yet, have not manifested any adverse health effects, but who may do so in the future.

It is better to make some immediate decisions concerning class benefits in order to get prompt aid to some members of the class. To wait for the development of the perfect plan is to lose much of the value of the settlement that makes money available immediately.

### B. National Center for Vietnam Veterans Assistance

One message was heard repeatedly during the Fairness Hearings—that no one in government is listening to, or cares about, the special plight of the Vietnam veteran and his or her family.

Some form of a National Center for Vietnam Veteran assistance should be funded to provide such Vietnam War veterans with a visible, central source of legal and political power. The Center could by appropriate grants provide legal assistance concerning claims against the Veterans Administration; undertake litigation to compel agencies of the government to comply with the law and assist Vietnam veterans; seek further legislation in the Congress and state legislatures to improve the lot of the Vietnam veteran; mobilize lawyers, doctors, and the business and education communities to help Vietnam veterans and their families; encourage research and training for the medical profession in treating Vietnam veterans and their families; and undertake such other activities, including counseling and veteran advisory services, as will assist the Vietnam veterans and their families. Availability of money should not be permitted to sap the vitality of the many volunteers who now work for Vietnam veterans.

### C. Veterans' Benefits

A simple benefits system should be established. The plan should be capable of ready implementation by an administering body such as a health or life insurance company exercising inexpensive ministerial functions.

If some form of proof of exposure to Agent Orange is required, the standard for certification should take account of the fact that many veterans—and particularly their widows and children—may have difficulty in authenticating claims.

Although it would be desirable in an ideal setting to compensate fully every veteran exposed to Agent Orange, there is considerable doubt that this can be accomplished. The limited size of the fund, the near impossibility of proving scientifically which adverse health effects are compensable and which are not, the persuasive evidence of need likely to accompany many individual applications, the danger that large compensation awards will further divide rather than unite the Vietnam veteran community—all of these considerations call into question the idea of providing substantial compensation for individual exposed veterans.

Various options might be considered as alternatives. A limited portion of the fund might be earmarked for all class members filing claims who demonstrate both exposure to Agent Orange and the existence of adverse health effects. An additional lump sum amount might be targeted to those veterans suffering from total physical disability or death from a disease such as cancer. A decreasing term life insurance program for all class members filing valid claims should also be considered. Compassion—not scientific proof—would be the underlying principle of such a program.

Care must be taken not to allow any benefits from the fund to be used to reduce aid to the veteran from other government and private sources. For example, at the hearings there were indications that some local welfare agencies are already seeking waivers from members of the class so that any benefits arising from the fund would be used to reimburse these agencies rather than those who should benefit from the settlement.

### D. Genetic and Family Counseling

It has been recommended that a plan for genetic counseling should be made available to any serviceperson and spouse. It should provide counseling and testing services to any member of the class who believes he or she has been exposed to Agent Orange and fears having children as a result. The purpose of such services would be to advise the veteran and his or her spouse of the possible risks in having children and to reassure them if no such risks appear likely. This service should be made available as soon as possible because many servicepersons are reaching the end of the period when they are likely to have children.

### E. Children With Birth Defects

It is not now possible to attribute any particular birth defect or combination of such defects to Agent Orange exposure of the father. Some veterans and their representatives indicate that a substantial fund should nonetheless be set aside to aid children of members of the class with birth defects. The heavy burden on families of veterans with such children warrants special treatment and compassion. The Fund should have a term of at least twenty-five years and should be able to solicit contributions from both private and public sources. Should proof of Agent Orange causation later become available, the government must assume responsibility for compensating such defects as are shown to have been caused by Agent Orange exposure. *See, e.g.,* statement of Senator Alan Cranston urging the VA " to develop approaches for compensation and health care for those affected children" following release of CDC Birth Defects Study. Houston Chronicle, Aug. 17, 1984, at 22, col. 2.

A Board consisting of representatives of the class, scientists, doctors, social workers, persons skilled in investment and others should be appointed to manage the fund. Veterans themselves with these and other skills should be appointed whenever possible. Among the duties of the Board should be: encouraging research concerning birth defects, monitoring research to determine if causal connections can be scientifically verified, and making single or annual grants to assist families with children with birth defects. Such assistance could include, to the extent that funds are available, payment of medical expenses, vocational training, scholarships, and special costs of care and help to ameliorate the difficulties of this portion of the class. Financial and social needs of the family would be appropriate criteria for eligibility.

Any aid should not reduce assistance or services available from other sources such as food stamps, insurance, Aid to Dependent Children or Social Security Disability payments. Families should be assisted in obtaining maximum help for birth defect children from available and new public and other private services.

The problem of arranging fair and equitable distributions of funds or other aid to those most in need is particularly difficult because of the variations in services presently available for families with children with birth defects. Not only are there

wide disparities in family income, but there are overlapping services and large gaps in available assistance from private insurance, public welfare, private foundations and charities and a host of educational, training and assistance programs mandated by state and federal laws. How aid to this one group of Vietnam veteran families can be arranged without upsetting intricate—but often quite unfair—balances that presently exist presents a challenge worthy of the most dedicated veteran leaders.

### F. Legislation

Testimony at the Fairness Hearings indicated that federal and state legislation will be needed to implement any viable benefits program. For example, the funds paid to, or services rendered to, a veteran or his family should not be deemed taxable as income. Payments should not be used to reimburse public or private agencies or insurance companies, nor should they be used in computation of disability, welfare or other social benefits. The organizations set up to administer the funds should be tax exempt and may need other privileges requiring federal incorporation.

Federal legislation or congressional or executive intervention would also appear necessary as a response to the litany of criticisms levelled at the Veterans Administration during the nationwide Fairness Hearings. These criticisms range from bureaucratic inaction by the Veterans Administration and the failure of the Veterans Administration to assist Vietnam veterans living in rural areas to the absence of federal law permitting Veterans Administration treatment of veterans' spouses and children suffering from birth defects. Whether or not warranted, the perception of poor service to at least some veterans should probably be publicly addressed.

### G. Schedule

October 26, 1984 was fixed as the last date, subject to an extension by the court, for those alleging presently manifested adverse health effects to file claims. Since the hearings revealed that some veterans still were not aware of the need to file a claim form, an extension until January 2, 1985 is granted.

By November 21, 1984, a tentative plan for disposition of the fund must be filed by plaintiffs. Most claims will probably have been filed by early October so that this extension does not require putting off the dates set for consideration of a distribution plan. On or about December 7, 1984, the court intends to discuss the proposed plans with counsel, a small group of veteran representatives and special masters. Public notice of a proposed plan should be given as the court may direct. A final order on settlement fairness and fees should be issued at the end of 1984 to permit appeals. Hearings on the plan are presently scheduled for March 5, 1985 at 10:00 a.m. in the federal courthouse in Brooklyn, New York.

### H. Attorneys' Fees and Disbursements

The court has already provided that applications for attorneys' fees and disbursements must be submitted by August 31, 1984. Hearings on these fees are set for September 26, 1984 in the United States District Courthouse, 225 Cadman Plaza East, Brooklyn, New York. The applications and supporting data must be in the form provided by the Magistrate in her order docketed on July 24, 1984. Any person may examine the applications and be heard in writing or orally as the court may allow at the hearing on attorneys' fees.

### I. Cases Against The Government

Plaintiffs continue to press direct claims against the government for injuries suffered by members of the class. Motions by the government returnable in October to dismiss these claims have not yet been decided. In addition there are third-party claims pending against the government by defendants seeking contribution for their expenditures caused by this litigation on the theory that, if anyone was legally responsible for the alleged injuries to the class, it was the government; the govern-

ment's appeal from an order permitting such claims was dismissed by the Court of Appeals on September 21, 1984. Delays because of appeals and motions coupled with the refusal by the Department of Justice to participate in settlement discussions make it impossible to dispose of these matters at this time.

## VIII. CONCLUSION

In conclusion it is well to remind ourselves of President Lincoln's admonition which is as relevant now, almost fifteen years after the end of the Vietnam war, as it was six score years ago. In his Second Inaugural Address he urged us "to bind up the nation's wounds; to care for him who shall have borne the battle and for his widow, and his orphan—to do all which may achieve and cherish a just and lasting peace among ourselves . . . ." It is time for the government to join with plaintiffs and defendants in even greater efforts toward this noble goal. Whether their hurt can be traced to Agent Orange or whether they are merely "casually unfortunate," C.L. Black, Jr., *The Human Imagination in the Great Society*, 5 (1983), is beside the point in the broader context of the nation's obligations to Vietnam veterans and their families.

## IX. ORDER

The settlement is approved subject to hearings on fees and preliminary consideration of plans for distribution. This order is not final.

SO ORDERED.

## APPENDIX A

### SETTLEMENT AGREEMENT

The parties to the above-entitled action, by and through their attorneys, propose the following Settlement Agreement (the "Agreement") for the Court's approval.

WHEREAS, the above-entitled action has been brought by the plaintiffs as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other persons similarly situated; and

WHEREAS, the Court has, by order dated December 16, 1983, certified this action as a class action, and defined a class (the "Class"), under Rules 23(b)(3) and 23(b)(1)(B) of the Federal Rules of Civil Procedure; and

WHEREAS, the attorneys for the Class represent that notice to the members of the Class has been provided substantially as required by that order; and

WHEREAS, the Seventh Amended Complaint and all predecessor complaints (the "Complaint") assert certain claims against the defendants for injuries allegedly resulting from exposure to phenoxy herbicides composed in whole or in part of 2, 4, 5-trichlorophenoxyacetic acid, *to wit*, Agent Orange, Agent Orange II, Agent Purple, Agent Pink and Agent Green (hereinafter collectively referred to as "Agent Orange"), which were manufactured for or sold to the United States by various defendants for use in Vietnam; and

WHEREAS, all of the defendants have been served or have appeared and have filed answers or are deemed to have answered and denied all of the material allegations of the Complaint, and have asserted affirmative defenses that the claims are without merit and are barred in whole or in part; and

WHEREAS, the attorneys for the Class have conducted a thorough study and investigation of the facts and the law relating to the matters set forth in the Complaint, and have conducted extensive pretrial discovery proceedings, including oral depositions of numerous of the defendants' present and former employees and of present and former government employees, and have examined and analyzed voluminous documentation relating to the subject matter of the Complaint; and

WHEREAS, the defendants deny and disclaim any liability or wrongdoing whatsoever and believe that this action is without merit; and

WHEREAS, the attorneys for the Class have agreed to settle the claims alleged in this action pursuant to the terms and provisions of this Agreement after taking into account the substantial benefits that the members of the Class will receive as a result of the settlement, the expense, burdens and diversion of protracted litigation, including lengthy appeals, the risk of not prevailing at trial, and the conclusion reached by the attorneys for the Class that the settlement is fair, reasonable and adequate and in the best interests of the Class; and

WHEREAS, the defendants desire to avoid the expense, burdens and diversion of protracted litigation, including lengthy appeals, the risk of not prevailing at trial, and desire to put at rest all controversy between the plaintiff Class and defendants, and their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, and desire to settle, compromise and terminate this action, all claims asserted, and all other claims by any member of the Class hereafter arising against the defendants that are, or could in the future be, based on or arise out of any of the matters alleged in the Complaint; and.

WHEREAS, all parties to this Agreement desire and intend that the comprehensive settlement and compromise provided for herein shall extend to and include all claims alleged in the Complaint and all cross-claims alleged in this action (but excluding all claims against the United States), and that this action shall be dismissed with prejudice and without costs to any party;

NOW, THEREFORE, IT IS HEREBY AGREED, by and among the undersigned as of May 7, 1984, that this action shall be compromised and settled, subject to the approval of the Court, upon and subject to the following terms and conditions:

1. Subject to all of the conditions contained in this Agreement, defendants will pay or cause to be paid on their behalf one hundred eighty million dollars ($180,000,-000.00) (the "Settlement Amount") in full and final settlement of all claims for compensatory damages against them, and their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, that arise out of or are based on, or could in the future arise out of or be based on, any of the matters alleged in the Complaint. The unpaid amount of the Settlement Amount shall bear simple interest at the Average Prime Rate (hereinafter defined) from May 7, 1984 through the date of payment. At the time any part of the Settlement Amount is paid, accrued interest shall be payable on that part. "Average Prime Rate" shall mean the sum of the publicly announced prime commercial lending rates of The Bank of New York on the last business day of each month that payments hereunder have been outstanding, divided by the number of months that the payment(s) have been outstanding. All calculations shall be based on a 360-day year. Payment of the Settlement Amount with interest accrued thereon shall be made by defendants within 10 days after an order approving this Agreement has been signed by the Court; *provided, however,* that any defendant may, at its option, pay any or all of its share of the Settlement Amount with interest accrued thereon in advance of the foregoing date. All amounts paid by defendants shall be paid into a fund (the "Fund") to be established, maintained and administered by the Court. No distribution to Class members, or payment of attorneys' fees or out-of-pocket disbursements, is authorized until after an order approving this Agreement has become final and all appeals and requests for review have been decided.

2. The agreement by the defendants to pay the Settlement Amount with interest accrued thereon is not intended to and shall not be deemed to create a joint or joint and several obligation on the part of the defendants. Each defendant shall be obligated solely to pay that portion, with interest, of the Settlement Amount set forth in a

sealed agreement delivered to the Honorable Jack B. Weinstein, Chief Judge, United States District Court for the Eastern District of New York, on May 7, 1984. Failure of any defendant to fulfill its obligations as set forth in said agreement or to abide by any term or condition of this Agreement shall not abrogate this Agreement as to any other defendant or increase any obligation of any other defendant under this Agreement. Each defendant shall provide financial security for its payment in a form acceptable to the Court after consultation with the parties.

3. Defendants will advance sums in amounts to be set from time to time by the Court, in proportion to their contributions to the Settlement Amount, solely for the preparation and dissemination of notice of the settlement and for incidental administration expenses as approved by the Court. The Settlement Amount shall be reduced by the amount of advanced sums. If for any reason this Agreement is not approved or does not become effective, the unused portion of the advanced sums and all interest accrued thereon shall be returned to defendants forthwith in proportion to their contributions to the Settlement Amount, and all expenses paid from sums advanced by defendants shall be divided and assessed as determined by the Court.

4. The Fund shall be maintained and administered by the Court and shall be under the Court's continuous jurisdiction, control and supervision to assure that the Fund shall earn the maximum interest consistent with safety and that all disbursements are properly made. The Court may, with or without consulting the parties, appoint and remove, with or without cause, auditors, special masters, disbursing agents, consultants, counsel or others and enter into appropriate contracts or authorize its agents or special masters to do so. The expenses of persons appointed by the Court shall be payable out of the Fund in accordance with Court order. All expenses of administering the Fund, including the cost of preparing and disseminating notice of settlement to the Class and of validating and determining claims, shall be paid from the Fund. All interest and earnings of the Fund shall accumulate and become part of the Fund. After 25 years from the date of this Agreement, any balance remaining in the Fund shall be disposed of in such manner as the Court may direct. Except as specifically set forth in this Agreement, defendants shall have no responsibility or obligation with respect to the Fund or distributions therefrom.

5. Defendants and their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, are not, and in the future shall not be, subject to liability or expense of any kind to any member of the Class in respect of any claim arising out of the subject matter of the Complaint, except as to their obligations to make payments pursuant to this Agreement. Claims against the Fund shall be the exclusive remedy of all Class members against the defendants or any of their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, and all members of the Class are forever barred from instituting or maintaining any action against any of the defendants, or any of their foreign and domestic predecessors, successors, parents, subsidiaries, affiliates or insurers, as well as any of their stockholders, directors, officers, employees and agents, arising out of or relating to, or in the future arising out of or relating to, the subject matter of the Complaint.

6. The Fund shall indemnify all defendants, and their foreign or domestic predecessors, successors, parents, subsidiaries, affiliates and insurers, as well as any of their stockholders, directors, officers, employees and agents, for all final compensatory judgments (excluding settlements), exclusive of costs and attorneys' fees, rendered against any of them in all state-court actions alleging harm caused by exposure to Agent Orange in or near Vietnam, not to exceed an aggregate amount of $10 million. The Court may, however, allow additional

payments of indemnification after January 1, 1990, if, in the Court's discretion, payments to members of the Class are assured.

7. In the distribution of the Fund arrangements will be made to assist children born on or after January 1, 1984. Such afterborn children by whom or on whose behalf an election is made to receive benefits from the Fund shall be subject to the terms and conditions of paragraph 5 hereof as if members of the Class.

8. The Class specifically includes persons who have not yet manifested injury. All persons who are otherwise qualified but who previously requested exclusion from the Class shall have the opportunity to withdraw their exclusion within a reasonable time as determined by the Court, and shall thereby be included in the Class.

9. Any defendant shall have the right to withdraw from this Agreement if it believes in its discretion that the number of persons who have elected to be excluded from the Class is substantial. Any defendant may exercise that right no later than 20 days before the date for the first public hearing scheduled in accordance with Rule 23(e) of the Federal Rules of Civil Procedure to consider approval of the settlement of this action. If any defendant withdraws from this Agreement pursuant to this paragraph, the Agreement shall remain in full force and effect as to the plaintiff Class and as to the remaining defendants in accordance with their proportionate shares of the Settlement Amount.

10. Neither this Agreement nor any proceeding taken hereunder shall be construed as or deemed to be evidence or an admission or concession by any defendant of any liability or wrongdoing whatsoever, which is expressly denied by each defendant, or on the part of the plaintiffs of any lack of merit in their claims. None of the provisions of this Agreement, nor evidence of any negotiations or proceedings in pursuance of the compromise and settlement herein, shall be offered or received in evidence in this action or any other action or proceeding as an admission or concession of liability or wrongdoing of any nature on the part of any of the defendants, or for any other purpose whatsoever (including, without limitation, to establish jurisdiction, venue or waiver of any affirmative defense), except to enforce the terms and provisions hereof.

11. The plaintiffs and defendants expressly reserve all rights and claims which they now have, or may at any time be entitled to assert against the United States, including its offices, departments, agencies, representatives, agents and employees. Plaintiffs further reserve all such rights and claims against every person (a) not a party to this action, and (b) not a foreign or domestic predecessor, successor, parent, subsidiary, affiliate, insurer, stockholder, director, officer, employee or agent of a defendant. Each defendant further reserves all such rights and claims against every person (a) not presently a party to this action, and (b) not a foreign or domestic predecessor, successor, parent, subsidiary, affiliate, insurer, stockholder, director, officer, employee or agent of another present defendant.

12. The attorneys for the Class shall return to each defendant, respectively, all documents in their possession or control produced by that defendant, including microfilm and all copies, within 30 days after final judgment is entered in this action and is no longer subject to appeal or review, or if plaintiffs pursue claims against the United States within one year after the date of this Agreement, within 30 days after final adjudication of those claims, whichever is later.

13. The settlement of this action shall become effective only when the judgment contemplated by this Agreement dismissing with prejudice and without costs both plaintiffs' claims, including claims for punitive damages, and defendants' cross-claims becomes final and is no longer subject to appeal or review.

14. Any award of plaintiffs' attorneys' fees and necessary out-of-pocket disbursements incurred by them in the prosecution and settlement of this action shall be pay-

able exclusively from the Fund, and defendants shall not be liable for any such payment.

15. All of the undersigned attorneys severally represent that they have been duly authorized to enter into this Agreement.

16. This Agreement will be null and void unless the Court expressly approves it pursuant to Rule 23(e) of the Federal Rules of Civil Procedure as a fair, reasonable and adequate settlement of this action.

17. In the event this Agreement is not approved by the Court, or does not become effective for any reason, then this Agreement shall be null and void for all purposes and of no further force and effect, subject to the provisions of paragraphs 3 and 10 hereof, and all sums remaining in the Fund shall be repaid to the defendants forthwith together with all interest thereon, in accordance with their prior contributions to the Fund.

18. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

19. The Court shall retain jurisdiction over the Fund pending its final disposition.

## APPENDIX B

## ORDER FOR HEARINGS ON FAIRNESS OF SETTLEMENT PLUS ATTACHMENTS

## ORDER CONCERNING NOTICE TO CLASS MEMBERS AND HEARING ON PROPOSED SETTLEMENT

The plaintiffs have submitted to the Court, for approval under Federal Rule of Civil Procedure 23(e), a Settlement Agreement made as of May 7, 1984. The Court has preliminarily determined that the Settlement proposed therein of all claims of the plaintiff class against the defendants is within the range of possible approval.

Accordingly, it is ORDERED:

1. The Court will hold hearings pursuant to Rule 23(e) at the times and places indicated below for the purpose of considering whether the proposed Settlement Agreement is fair, reasonable and adequate and whether the Settlement should therefore be approved.

August 8, 9, 10, 1984, United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y. 11201

August 13, 14, 1984, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604

August 16, 17, 1984 United States District Court, 515 Rusk Avenue, Houston, Texas 77002–2696

August 20, 21, 1984, United States District Court, 75 Spring Street, S.W., Atlanta, Georgia 30303

August 23, 24, 1984 United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102

2. Notice concerning these hearings and the proposed Settlement shall be given to members of the class as follows by the Plaintiffs' Management Committee ("the Committee"), with the expenses attendant thereto to be paid out of funds to be advanced by the defendants under the terms of the Settlement Agreement:

(a) The Notice attached as Exhibit No. 1 shall be mailed by first class United States mail, on or before June 29, 1984, to all members of the class known to the Committee, including but not limited to all those to whom the notice previously given on or about March 9, 1984 was mailed and additionally every other member of the class whose name and address has been received by the Committee thereafter. The Committee shall maintain a record of the name and address of each person to whom the Notice is mailed, and shall file such record with the Court within 30 days thereafter.

(b) The Notice attached as Exhibit No. 2 shall be published no later than June 29, 1984, in the following newspapers and magazines:

The nationwide Sunday edition of the New York Times

U.S.A. Today

Air Force Times

Army Times

Navy Times

The Sunday editions of Newsday, Chicago Tribune, San Francisco Chronicle, Atlanta Constitution and Houston Chronicle.

The ten largest circulation newspapers in Australia, including the Australian

The five largest circulation newspapers in New Zealand, including the Dominion

(c) The Notice attached as Exhibit No. 3 shall be mailed by first class United States mail, on or before June 29, 1984, to each person who requested exclusion from the class pursuant to the prior class notice given on or about March 9, 1984. The Committee shall serve on defendants and file each response to this Notice with the Court within five days after receipt.

3. All applications for attorneys' fees and expenses through the completion of the hearings described in paragraph 1 above which are claimed to be chargeable to the Settlement Fund shall be filed with the Court no later than August 31, 1984. The Court will hold hearings with respect to such applications on September 24 and 25, 1984, at the United States Courthouse, Brooklyn, N.Y.

5. The Court will consider at a later time, following further notice to class members, the manner in which the proceeds of the Settlement, if the Settlement Agreement is approved, are to be allocated and distributed among class members.

DATED: Brooklyn, New York

This 11th day of June, 1984.

---

Jack B. Weinstein, Chief Judge
United States District Court
Eastern District of New York

NOTICE OF PROPOSED SETTLEMENT
OF CLASS ACTION

YOU ARE HEREBY NOTIFIED OF A PROPOSED SETTLEMENT OF THIS CLASS ACTION, OF HEARINGS TO BE HELD BY THE COURT TO DETERMINE WHETHER IT SHOULD BE APPROVED, AND OF WHAT YOU MUST DO NOW IF YOU BELIEVE YOU HAVE A CLAIM FOR ADVERSE HEALTH EFFECTS ALLEGEDLY RELATED TO AGENT ORANGE EXPOSURE IN OR NEAR VIETNAM.

*1. The Class.*

This Court has previously certified a plaintiff class consisting of those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to "Agent Orange" or other phenoxy herbicides, including those composed in whole or in part of 2,4,5-trichlorophenoxyacetic acid or containing some amount of 2,3,7,8-tetrachlorodibenzo-p-dioxin (collectively referred to as "Agent Orange"). The class also includes spouses, parents, and children born before January 1, 1984, directly or derivatively injured as a result of the exposure.

On or about March 9, 1984, notice was given to advise class members of the certification of a class under Rule 23(b)(3) and of their right to request exclusion from the class. All persons who did not request exclusion on or before May 1, 1984, as provided in that notice, are members of the class for the purposes of the proposed Settlement if they fall within the above class definition. Those persons who requested exclusion are being sent a separate notice, pursuant to which they may withdraw such requests and become eligible to participate in the proposed Settlement if it is approved by the Court.

*2. The Litigation And The Proposed Settlement.*

This litigation was brought on behalf of the above defined class against seven chemical company defendants, Dow Chemical Company, Monsanto Company, T H Agriculture & Nutrition Company, Inc., Diamond Shamrock Chemicals Company, Uniroyal, Inc., Hercules Incorporated and Thompson Chemicals Corporation. The

plaintiff class representatives (as appointed by the Court) have sought recovery for various injuries claimed to have resulted from exposure to Agent Orange in or near Vietnam, including among others, various health-related effects upon servicepersons, birth defects to their children and miscarriages by their wives. Defendants denied and continued to deny any liability or wrongdoing.

The attorneys for the class representatives and the attorneys for all of the defendants have entered into a Settlement Agreement, made as of May 7, 1984, which is subject to and conditioned upon the Court's approval of its terms. Under the Settlement, if it is approved, the defendants collectively will pay One Hundred Eighty Million Dollars ($180,000,000), plus interest at the average prime rate from May 7, 1984 to the date of payment, into a Settlement Fund ("the Fund") to be established and supervised by the Court for the payment of class members' claims.

A copy of the Settlement Agreement is attached hereto. Although a summary of its principal terms follows, you should examine the Agreement itself. Nothing in this Notice shall be construed to alter the terms of that Agreement.

If the Settlement is approved by the Court, the defendants' payments into the Fund will dispose of all claims against them asserted in this litigation or arising out of or based upon the matters alleged in this litigation. The defendants will also be entitled to an indemnity out of the Fund up to the total amount of $10 million for judgments that might be rendered against them in certain state-court cases also involving alleged Agent Orange injuries. The Court may allow additional payments of indemnification after January 1, 1990 if, in the Court's discretion, payments to the members of the class are assured.

All payments by the defendants will be made no later than ten days after an order approving the Settlement Agreement has been signed by the Court. The Settlement Agreement allows any defendant to withdraw from the Settlement up to 20 days prior to the Court's first hearing to consider approval of the Settlement in the event it determines that the number of persons who have elected to be excluded from the class is substantial.

The Settlement Agreement confirms that the class includes persons who have not yet manifested injury.

The Settlement Agreement also provides that persons who have previously requested exclusion from the class on or before May 1, 1984 may participate in the Settlement by withdrawing their exclusions.

The Settlement Agreement further provides that arrangements will be made to assist afterborn children from the Fund.

Both the plaintiffs and the defendants reserve all of their rights to make claims against the United States Government and any person or company that is not a defendant or a predecessor, successor, parent, subsidiary, affiliate or insurer of a defendant.

The plaintiff class representatives and their counsel have concluded, after taking into account the many sharply contested issues involved, the risks and costs attending further prosecution of this litigation, and the benefits to be received pursuant to the proposed Settlement, that settlement of this litigation upon the terms provided in the Settlement Agreement will be in the best interests of the class.

3. *Hearings To Consider Approval Of The Settlement Agreement.*

The Settlement Agreement will not become effective unless and until the Court decides that it should be approved as a fair, reasonable and adequate compromise of the aggregate claims of the plaintiff class as a whole. In order to assist the Court in making this decision, the Court will hold hearings ("the fairness hearings") in five cities in various parts of the United States during the month of August, 1984, at the times and places set forth at the end of this Notice. Following those hearings, the Court will determine whether the proposed Settlement, the principal terms of which

are described above, should be approved. THE ONLY QUESTION TO BE DECIDED AT THIS TIME IS WHETHER THIS SETTLEMENT AS A WHOLE IS FAIR, REASONABLE AND ADEQUATE.

All written objections to the Settlement should be submitted to the Clerk in writing by July 30, 1984, at the address given at the end of this Notice. Class members or their representatives may appear at any of the hearings and any objections they have will be heard by the Court. Any person who wishes to be heard should notify the Clerk on or before July 30, 1984, at the address given at the end of this Notice, stating the amount of time he or she requests.

If the Court approves the proposed Settlement, it will subsequently conduct further proceedings with respect to the question of allocation and distribution of the Settlement Fund to qualifying class members in satisfaction of their claims for injuries allegedly related to Agent Orange exposure in or near Vietnam.

The Court recognizes that the question of allocation and distribution of the Settlement Fund to class members involves complex issues that will require extensive further study, as well as input from Vietnam veterans, and therefore will not make any decision on this question at the present stage of the proceedings. The Court does, however, actively solicit and encourage and will consider recommendations and suggestions on this question from any party to the litigation, Vietnam veterans and other interested persons. Any such recommendations and suggestions may be submitted in writing at the address given at the end of this Notice, and will be subject to preliminary oral discussion at the hearings scheduled by this Notice.

The Court is deferring for future consideration the question of fees and expenses to be awarded to plaintiffs' counsel from the Fund. The Court has determined that Rule 5 of the U.S. District Court for the Southern and Eastern Districts of New York should not be applied in this litigation because of the need for continued intensive work by the attorneys until the close of the fairness hearings and because of the complexity of the fee applications. *Cf. In Re "Agent Orange" Product Liability Litigation*, MDL No. 381, P.T.O. 90, 100 F.R.D. 778, 780 (E.D.N.Y.1984) (discretion under local Rules). All applications for such awards of attorneys' fees and expenses through the completion of the fairness hearings will be filed with the Clerk no later than August 31, 1984, and will be available for inspection in the Clerk's Office, United States Courthouse, 225 Cadman Plaza East, Brooklyn, N.Y. 11201 during business hours. The Court will hold a hearing on September 24 and 25, 1984 at the Courthouse in Brooklyn at which class members will be given an opportunity to raise any objections they might have to such applications for fees and expenses.

4. *What You Must Do If You Believe You Have Adverse Health Effects Related To Agent Orange Exposure In Or Near Vietnam And Wish To Make A Claim For Such Effects.*

THE SETTLEMENT FUND WILL BE UTILIZED TO COMPENSATE CLASS MEMBERS FOR CERTAIN ADVERSE HEALTH EFFECTS ALLEGED TO BE RELATED TO AGENT ORANGE EXPOSURE. If the Settlement is approved, a proposed plan for the allocation and distribution of the Settlement Fund to class members will be developed and considered by the Court in subsequent proceedings. The following is a brief outline of the basic elements of the plan that the class representatives have indicated that they expect to propose to the Court:

A. A portion of the Fund—in an amount to be determined after the claims of class members have been formally submitted—will be allocated and distributed to class members who suffer from presently manifested adverse health effects. It is not possible for all class members, regardless of the nature and/or degree of injury, to receive compensation. Accordingly, compensation under the Fund may be limited

APPENDIX B—Continued

to designated kinds of adverse health effects and degrees of disability—as yet to be determined—which will be defined in the plan. In addition, in order to assure that the Fund will not be exhausted before all potential claims for unmanifested adverse health effects are processed, it may prove necessary to adjust the compensation for presently manifested health effects so that funds are available for class members who may manifest compensable effects in the future.

B. A portion of the Fund—in an amount yet to be determined—will be set aside for future payment to those class members who have not, as yet, manifested adverse health effects but who may manifest such effects in the future. This will be done after determining the number and nature of the claims submitted now for presently manifested adverse health effects. Some of the portion of the Fund set aside for such future claims may later become available for additional payments to class members presently suffering from adverse health effects, depending on the number of future claims. The number and nature of such future claims should become clearer with the passage of time.

C. A portion of the Fund—in an amount yet to be determined—will be set aside to assist children, including both those born before 1984 (who are class members) and those born in or after 1984 (who, although not members of the class, may be entitled to assistance from the Fund). Those afterborn children who elect to apply for and receive assistance from the Fund will be subject to the terms and conditions of the Settlement.

D. The designated kinds of adverse health effects entitled to compensation under the Fund may be modified periodically, based upon various scientific studies, some of which are now in progress.

E. In an effort to establish procedures and formulas for the allocation and distribution of the Fund, it is important to determine as soon as possible the current number and nature of the claims made by class members. The prompt filing of claims will allow determinations of both the amount of compensation to be paid each eligible claimant and the administrative mechanism best suited for the processing of such claims. Therefore, all class members who desire compensation for adverse health effects which are already manifested must submit the enclosed Claim Form on or before October 26, 1984 (unless the Court determines that there is good and special reason for failure to meet this deadline). All class members who later learn of adverse health effects allegedly related to Agent Orange exposure that are not now known to them must return the Claim Form within 120 days thereafter.

F. The Claim Form is a preliminary but essential step. If you submit a Claim Form, you will be requested at a later time to submit medical proof and other important information in order to support your claim. The procedure for submitting such proof and other information, as well as other requirements pertaining to the processing and approval of the claim, will be included in the plan referred to above. NOT EVERYONE WHO SUBMITS A CLAIM FORM WILL RECEIVE COMPENSATION UNDER THE PLAN.

G. In developing and administering a plan for the allocation and distribution of the Fund to class members, there will be consultations with medical, scientific, economic, actuarial, insurance, and other experts. In addition, representatives of the class—including Vietnam veterans—will play an important role in providing advice concerning the best methods of achieving maximum benefits for eligible class members and afterborn children.

All class members who submit Claim Forms will be mailed notices describing the proposed plan after it is developed and

other class members will be given notice by publication. All class members will have full opportunity to present to the Court at that time any objections they may have to that proposal, *whether or not they have objected to the Settlement as a whole.*

IF YOU WISH TO APPLY FOR COMPENSATION FOR ADVERSE HEALTH EFFECTS WHICH ARE ALREADY MANIFESTED, YOU MUST COMPLETE AND MAIL THE ENCLOSED CLAIM FORM POSTMARKED ON OR BEFORE OCTOBER 26, 1984. ADDITIONAL COPIES OF THE CLAIM FORM MAY BE OBTAINED BY WRITING TO THE ADDRESS LISTED IN PARAGRAPH 6 BELOW.

IF YOU FAIL TO FILE THIS CLAIM FORM POSTMARKED ON OR BEFORE OCTOBER 26, 1984, YOU WILL BE BARRED FROM MAKING ANY CLAIM FOR ANY ADVERSE HEALTH EFFECT THAT IS ALREADY MANIFESTED (UNLESS THE COURT DETERMINES THAT THERE IS A GOOD AND SPECIAL REASON FOR YOUR FAILURE TO MEET THIS DEADLINE). IF YOU LATER LEARN OF ADVERSE HEALTH EFFECTS ALLEGEDLY RELATED TO AGENT ORANGE EXPOSURE THAT ARE NOT NOW KNOWN TO YOU, YOU MUST RETURN THE CLAIM FORM WITHIN 120 DAYS THEREAFTER.

NOW, THEREFORE, TAKE NOTICE:

1. All potential members of the plaintiff class as defined above and in the Notice given on or about March 9, 1984 who did not request exclusion on or before May 1, 1984 as provided therein are members of the plaintiff class and will be bound by the proposed Settlement, if it is approved, and by the Court's further orders in this litigation.

2. The Court will hold hearings at the times and places indicated below for the purpose of considering whether the proposed Settlement is fair, reasonable and adequate and should be approved. Each hearing will commence at 10:00 a.m.

August 8, 9, 10, 1984, United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y. 11201

August 13, 14, 1984, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604

August 16, 17, 1984, United States District Court, 515 Rusk Avenue, Houston, Texas 77002

August 20, 21, 1984, United States District Court, 75 Spring Street, S.W., Atlanta Georgia 30303

August 23, 24, 1984, United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102

If the Court approves the proposed Settlement following these hearings, it will enter a final judgment dismissing the claims of the class against these defendants, but reserving jurisdiction over the Settlement Fund for the purpose of allocating and distributing its proceeds to members of the Class and otherwise administering the Settlement.

3. Any class member who objects to the proposed Settlement may appear at any one of the hearings to show cause why it should not be approved by the Court or may communicate with the Court in writing prior to the hearing.

4. All class members who desire to claim compensation from the Settlement Fund for adverse health effects which are already manifested must complete and mail the attached Claim Form postmarked on or before October 26, 1984. Failure to do so will bar any such claim (unless the Court determines that there is good and special reason for failure to meet this deadline).

5. The Court will hold a subsequent hearing in United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y., on September 24 and 25, 1984, to consider whether the application for attorneys' fees and expenses to be filed with the Clerk no later than August 31, 1984, should be allowed in whole or in part. Any class member objecting to any such application will be heard at that time.

6. All written communications by class members to the Court other than Claim Forms should be addressed as follows:

Clerk, United States District Court for
the Eastern District of New York
P.O. Box 887
Smithtown, NY 11787
Claim Forms should be sent to the address
shown on the Form.

DATED: Brooklyn, New York
This 11th day of June, 1984

Jack B. Weinstein, Chief Judge
United States District Court
Eastern District of New York

# AGENT ORANGE CLAIM FORM

IMPORTANT: IF YOU BELIEVE YOU CURRENTLY HAVE ADVERSE HEALTH EFFECTS RELATED TO AGENT ORANGE
EXPOSURE, RETURN THIS FORM NO LATER THAN OCTOBER 26, 1984. FAILURE TO RETURN THE FORM BY THAT
DATE WILL PREVENT YOU FROM GETTING MONEY FROM THE SETTLEMENT FUND.
(Please type or print all answers. Additional pages may be attached for extended answers.)

(To Be Filled Out By All Claimants)
Information about Claimant

Claimant's Name (Last, First, Middle): _____

Social Security Number: _____ - _____ - _____
(Or Identification Number for New Zealand and Australian Claimants)

Current Address (Street): _____

(City, State): _____ (Zip): _____

Home Telephone Number (Area Code, Number): (_____)_____

Work Telephone Number (Area Code, Number): (_____)_____

Sex (Circle One): (M)ale (F)emale

Date of Birth: _____ - _____ - _____
 MONTH DAY YEAR

If you have an attorney, please give his or her name, address, and telephone number:

Attorney Name: _____

Firm Name: _____

Address (Street): _____

(City, State): _____ (Zip): _____

Attorney Telephone Number (Area Code, Number): (_____)_____

Information about Veteran

Veteran's Name (Last, First, Middle): _____

Social Security Number: _____ - _____ - _____
(Or Identification Number for New Zealand and Australian Claimants)

Current Address (Street): _____

(City, State): _____ (Zip): _____

Sex (Circle One): (M)ale (F)emale

Date of Birth: _____ - _____ - _____ Date of Death: _____ - _____ - _____
 MONTH DAY YEAR (if deceased) MONTH DAY YEAR

When did Veteran serve in the Armed Services?

FROM: _____ - _____ - _____ TO: _____ - _____ - _____
 MONTH DAY YEAR MONTH DAY YEAR

In what branch of service did Veteran serve? _____

Did Veteran serve in or near Vietnam? (Y)es (N)o

If yes, when? FROM: _____ - _____ - _____ TO: _____ - _____ - _____
 MONTH DAY YEAR MONTH DAY YEAR

What were Veteran's primary duties (e.g., Primary MOS)? _____

Where was Veteran located in or near Vietnam? _____ .

 DATES

To the best of your knowledge, was Veteran sprayed with Agent Orange? (Y)es (N)o _____

Did Veteran see spraying of Agent Orange? (Y)es (N)o _____

Was Veteran in areas that had been previously sprayed with Agent Orange? (Y)es (N)o _____

How often was Veteran in areas sprayed with Agent Orange? (Circle One)

 (C)onstantly (F)requently (S)eldom (N)ever

What is the reason you answered YES to any of the above questions? _____

_____

_____

_____

## PART II

(To Be Filled Out If Claim Is Based On Adverse Health Effects On Veteran Alleged To Be Related To Agent Orange Exposure)

Please describe any medical problems of Veteran that any doctor has advised, or you believe, are related to Agent Orange:

_____

_____

_____

_____

If you have listed any problems above, please list here what effect, if any, such medical problems have had in Veteran's work, daily activities, etc.:

_____

_____

## PART III

(To Be Filled Out If Claim Is Based On Adverse Health Effects On Children Alleged To Be Related To Agent Orange Exposure)

Please list here any birth defects of children which you believe are related to Agent Orange Exposure:

| Name of Child | Birth Date | Mother's Name | Nature of Birth Defect |
|---|---|---|---|
| 1._____ | _____ | _____ | _____ |
| 2._____ | _____ | _____ | _____ |
| 3._____ | _____ | _____ | _____ |

If any child is deceased, state name and date of death:

_____

Name and address of parent or guardian of each child if different from claimant:

_____

_____

## PART IV

(To Be Filled Out If Claim Is Based On Miscarriages Alleged To Be Related To Agent Orange Exposure)

Please list here any pregnancies that did not result in a live birth which you believe are related to Agent Orange exposure:

Name and address of woman: _____

_____

Relationship to Veteran: _____

Date(s) of Miscarriage(s): _____

Has the woman received any professional counseling or advice on the possible effect of Agent Orange on her unborn children? (Y)es (N)o

Describe nature of such counseling or advice: _____

874

NOTE:

IF YOU LATER LEARN OF ADVERSE HEALTH EFFECTS ALLEGEDLY RELATED TO AGENT ORANGE EXPOSURE THAT ARE NOT KNOWN TO YOU, YOU MUST RETURN THIS FORM WITHIN 120 DAYS THEREAFTER.

_____

SIGNATURE OF CLAIMANT

ALL CLAIMS FOR PRESENT ADVERSE HEALTH EFFECTS THAT YOU BELIEVE ARE RELATED TO AGENT ORANGE EXPOSURE MUST BE SUBMITTED BY MAILING THIS FORM TO THE FOLLOWING ADDRESS ON OR BEFORE OCTOBER 26, 1984:

AGENT ORANGE COMPUTER CENTER

P.O. BOX 905

SMITHTOWN, NEW YORK 11787

NOTICE OF PROPOSED SETTLEMENT OF CLASS ACTION

YOU ARE HEREBY NOTIFIED OF A PROPOSED SETTLEMENT OF THIS CLASS ACTION, OF HEARINGS TO BE HELD BY THE COURT TO DETERMINE WHETHER IT SHOULD BE APPROVED, AND OF WHAT YOU MUST DO NOW IF YOU BELIEVE YOU HAVE A CLAIM FOR ADVERSE HEALTH EFFECTS RELATED TO AGENT ORANGE EXPOSURE IN OR NEAR VIETNAM.

This Court has previously certified a plaintiff class consisting of those persons who were in the United States, New Zealand or Australian Armed Forces at any time from 1961 to 1972 who were injured while in or near Vietnam by exposure to "Agent Orange" or other phenoxy herbicides, including those composed in whole or in part of 2,4,5-trichlorophenoxyacetic acid or containing some amount of 2,3,7,8-tetrachlorodibenzo-p-dioxin (collectively referred to as "Agent Orange"). The class also includes spouses, parents, and children born before January 1, 1984, directly or derivatively injured as a result of the exposure.

Defendants have denied any liability or wrongdoing.

The attorneys for the class representatives and the attorneys for all of the defendants have entered into a Settlement Agreement, made as of May 7, 1984, which is subject to and conditioned upon the Court's approval of its terms. Under the Settlement, if it is approved, the defendants collectively will pay One Hundred Eighty Million Dollars ($180,000,000), plus interest at the average prime rate from May 7, 1984 to the date of payment, into a Settlement Fund to be established and supervised by the Court for the payment of class members' claims.

The Settlement Agreement confirms that the class includes persons who have not yet manifested injury, and provides that arrangements will be made to assist afterborn children from the Fund.

The Settlement Agreement will not become effective unless and until the Court decides that it should be approved as a fair, reasonable and adequate compromise of the aggregate claims of the plaintiff class as a whole. In order to assist the Court in making this decision, the Court will hold hearings in the following places on the dates indicated:

August 8, 9, 10, 1984, United States District Court, 225 Cadman Plaza East, Brooklyn, N.Y. 11201

August 13, 14, 1984, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604

August 16, 17, 1984 United States District Court, 515 Rusk Avenue, Houston, Texas 77002-2696

August 20, 21, 1984 United States District Court, 75 Spring Street, S.W., Atlanta, Georgia 30303

August 23, 24, 1984 United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102

Each hearing will begin at 10:00 a.m. Any class member may raise any objection he or she may have to the proposed Settlement at any of the hearings. Written objections to the Settlement may also be submitted to the Clerk on or before July 30, 1984, at the address given at the end of this Notice.

If the Court approves the proposed Settlement, it will subsequently conduct further proceedings with respect to the question of allocation and distribution of the Settlement Fund to qualifying class members in satisfaction of their claims asserting injuries related to Agent Orange exposure in or near Vietnam. The Court solicits and encourages and will consider recommendations and suggestions on this question from any party to the litigation, Vietnam veterans and other interested persons. Class members will be given notice about the proposed plan for allocation and distribution of the Settlement Fund after it is developed, and will have full opportunity to present to the Court at that time any objections they may have to that proposal, *whether or not they have objected to the Settlement as a whole.*

In an effort to establish procedures and formulas for the allocation and distribution of the Fund, it is important to determine as soon as possible the current number and nature of the claims made by class members. If you wish to apply for compensation for adverse health effects which are already manifested, you must complete and mail a claim form (which you may obtain as indicated below) postmarked on or before October 26, 1984. IF YOU FAIL TO FILE SUCH A CLAIM FORM POSTMARKED

ON OR BEFORE OCTOBER 26, 1984, YOU WILL BE BARRED FROM MAKING ANY CLAIM FOR ANY ADVERSE HEALTH EFFECT THAT IS ALREADY MANIFESTED (UNLESS THE COURT DETERMINES THAT THERE IS A GOOD AND SPECIAL REASON FOR YOUR FAILURE TO MEET THIS DEADLINE).

In order to obtain further information about the Settlement, including a copy of the Settlement Agreement, and a Claim Form, call 1-800-645-1355 (from outside New York State) or 1-800-832-1303 (from within New York State), or write to the following address:

Clerk, United States District Court for the Eastern District of New York

P.O. Box 887

Smithtown, NY 11787

DATED: Brooklyn, New York

This 11th day of June, 1984

---

Jack B. Weinstein, Chief Judge
United States District Court
Eastern District of New York

## SPECIAL NOTICE TO PERSONS WHO HAVE FILED EXCLUSION REQUEST FORMS IN THE AGENT ORANGE LITIGATION

Pursuant to a notice of this class action given on or about March 9, 1984, you sent to the Court an "Exclusion Request Form" which requested that you not be included in the class action. The enclosed notice to all class members describes a proposed settlement of the litigation. Pursuant to that settlement, a Fund of $180,000,000, plus interest from May 7, 1984, will be established for the benefit of the members of the plaintiff class. A part of the settlement provides that all persons such as yourself who have filed "Exclusion Request Forms" be permitted to rejoin the class and become eligible to participate in the settlement if it is approved by the Court.

IF YOU WOULD LIKE TO REJOIN THE CLASS, YOU MUST FILL OUT THE ATTACHED FORM AND MAIL IT IN

THE ENCLOSED PREPAID SELF–ADDRESSED ENVELOPE NO LATER THAN JULY 15, 1984. IF YOU DO NOT FILL OUT AND RETURN THE FORM BY THAT DATE, THEN YOU WILL BE BARRED FROM PARTICIPATING IN THE SETTLEMENT. .

**CLERK**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**P.O. Box 887**
**Smithtown, New York 11787**

DATED: Brooklyn, New York
This 11th day of June, 1984

_____

Jack B. Weinstein, Chief Judge
United States District Court
Eastern District of New York

IN RE: "Agent Orange" Product Liability Litigation
MDL #381

I have previously filed an "Exclusion Request Form". I hereby withdraw my exclusion and rejoin the class.

DATED:

SIGNATURE _____

NAME (Print):_____

ADDRESS:_____

_____

CITY:_____

STATE:_____ZIP:_____

SOCIAL SECURITY NO._____

---

## APPENDIX C

## PUBLISHED OPINIONS IN AGENT ORANGE LITIGATION

_In re "Agent Orange" Product Liability Litigation_, 475 F.Supp. 928 (E.D.N.Y.1979) (striking various allegations in the complaint); 475 F.Supp. 928 (E.D.N.Y.1979) (stay of plaintiffs' requests for declaratory and injunctive relief relating to banning of 2, 4, 5–T); 475 F.Supp. 928 (E.D.N.Y.1979) (summary judgment in favor of defendant Northwest Industries, Inc.); 506 F.Supp. 737 (E.D.N.Y.1979) (denial of defendants' motion to dismiss for failure to state a claim under federal common law), _rev'd_, 635 F.2d 987 (2d Cir.1980), _cert. denied_, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116

(1981); 506 F.Supp. 750 (E.D.N.Y.1980) (order requiring government to preserve documents relevant to the litigation); 506 F.Supp. 750 (E.D.N.Y.1980) (continuing stay of all discovery); 506 F.Supp. 750 (E.D.N.Y.1980) (reserving decision on plaintiffs' motion for class certification); 506 F.Supp. 750 (E.D.N.Y.1980) (deeming each defendant to have denied the cross-claims asserted against it by other defendants); 506 F.Supp. 753 (E.D.N.Y.1980) (denying request of plaintiffs' counsel to certify additional documents for review on appeal); 506 F.Supp. 753 (E.D.N.Y.1980) (government's motion to dismiss third party complaints deemed to be directed also against Hooker Chemical and Plastics Company); 506 F.Supp. 753 (E.D.N.Y.1980) (updating earlier order regarding defendants' answers to complaints in MDL 381); 506 F.Supp. 754 (E.D.N.Y.1980) (refusing to strike a plaintiff's notice to take his deposition by videotape); 506 F.Supp. 756 (E.D.N.Y.1980) (scheduling a status conference); 506 F.Supp. 757 (E.D.N.Y.1980) (denial of plaintiffs' motion for relief from individual filing of notice of claim forms required by the Federal Tort Claims Act); 506 F.Supp. 762 (E.D.N.Y.1980) (dismissal of third-party complaints against the government), *modified,* 580 F.Supp. 1242 (E.D.N.Y.1984), (see *infra*); 506 F.Supp. 762 (E.D.N.Y.1980) (certification of class under Rule 23(b)(3)), *modified,* 100 F.R.D. 718 (E.D.N.Y.1983) (see *infra*); 506 F.Supp. 762 (E.D.N.Y.1980) (notice of court's intention to try government contract defense separately); 506 F.Supp. 762 (E.D.N.Y.1980) (denial of plaintiffs' motion for summary judgment on the government contract defense); 506 F.Supp. 762 (E.D.N.Y.1980) (lifting stay of discovery on government contract defense issues); *Ryan v. Cleland,* 531 F.Supp. 724 (E.D.N.Y.1982) (granting the government's motion to dismiss Vietnam veterans' complaint against the Veterans Administration); *In re "Agent Orange" Product Liability Litigation,* 534 F.Supp. 1046 (E.D.N.Y.1982) (denial of defendants' motion for entry of final judgment on earlier dismissal of the government); 534 F.Supp. 1046 (E.D.N.Y.1982) (denial of defendant Dow Chemical Company's motion to amend its previously dismissed complaint against the government); 534 F.Supp. 1046 (E.D.N.Y.1982) (dismissal of defendants Riverdale, Ansul, Hooker and Occidental); 534 F.Supp. 1046 (E.D.N.Y.1982) (denial of motion of certain plaintiffs' counsel to establish a steering committee); 534 F.Supp. 1046 (E.D.N.Y.1982) (denial of Dow Chemical Company's motion to decertify the class); 534 F.Supp. 1046 (E.D.N.Y.1982) (continuation of order tolling statutes of limitations); 534 F.Supp. 1046 (E.D.N.Y.1982) (statement of the elements of the government contract defense); 534 F.Supp. 1046 (E.D.N.Y.1982) (statement of issues to be narrowed); 534 F.Supp. 1046 (E.D.N.Y.1982) (request for discovery timetable on the government contract defense); 537 F.Supp. 977 (E.D.N.Y.1982) (granting summary judgment motion of defendant Uniroyal Merchandising Company); 544 F.Supp. 808 (E.D.N.Y.1982) (denial of motion to disqualify law firm representing five defendants); 544 F.Supp. 808 (E.D.N.Y.1982) (dismissal of defendants Syntex Corporation, Syntex Laboratories, Inc., Syntex Agribusiness, Inc. and Hoffman-Taff, Inc. (Delaware)); 544 F.Supp. 808 (E.D.N.Y.1982) (motion for voluntary dismissal of defendant Hoffman-Taff, Inc. (Missouri) denied); 544 F.Supp. 808 (E.D.N.Y.1982) (denial of motion by defendant Uniroyal, Inc. to implead seven component manufacturers); 565 F.Supp. 1263 (E.D.N.Y.1983) (motions for summary judgment granted in favor of defendants Thompson Chemical Corporation, Hercules, Inc., Riverdale Chemical Company, Hoffman-Taff, Inc. (Missouri); motions for summary judgment of Dow Chemical Company, Uniroyal, Inc. and T.H. Agriculture & Nutrition Company denied); 565 F.Supp. 1263 (E.D.N.Y.1983) (notice of court's intention to combine trial of government contract defense and liability and causation issues); 570 F.Supp. 693 (E.D.N.Y.1983) (approval of Special Master's discovery program); 571 F.Supp. 481 (E.D.N.Y.1983) (creation of a new plaintiffs' management committee); 580 F.Supp. 690 (E.D.N.Y.1984) (preliminary memorandum on conflicts of law);

580 F.Supp. 1242 (E.D.N.Y.1984) (memorandum on government liability), *mandamus denied*, 733 F.2d 10 (2d Cir.), *appeal dismissed*, 745 F.2d 161 (2d Cir.1984); 91 F.R.D. 616 (E.D.N.Y.1981) (plaintiffs' motion for videotaped depositions of *in extremis* plaintiffs); 91 F.R.D. 618 (E.D.N.Y. 1981) (plaintiffs' motions for videotaped depositions); 91 F.R.D. 618 (E.D.N.Y.1981) (granting defendant Thompson-Haywood Chemical Company's motion to amend caption to reflect new corporate name); 91 F.R.D. 618 (E.D.N.Y.1981) (denying plaintiffs' motions to amend complaints); 91 F.R.D. 618 (E.D.N.Y.1981) (denying plaintiffs' motion for summary judgment on government contract defense); 93 F.R.D. 514 (E.D.N.Y.1982) (granting defendant Dow Chemical Company's motion to destroy certain documents); 94 F.R.D. 173 (E.D.N.Y.1982) (appointing Sol Schreiber, Esq., as Special Master); 95 F.R.D. 191 (E.D.N.Y.1982) (denial of rehearing on defendant Uniroyal, Inc.'s motion to implead component manufacturers); 95 F.R.D. 192 (E.D.N.Y.1982) (affirming Special Master's ruling that government employees be deposed in New York); 96 F.R.D. 578 (E.D. N.Y.1983) (adopting Special Master's recommended protective order on production of EPA documents); 96 F.R.D. 582 (E.D.N.Y. 1983) (denial of intervenor CBS's application for access to nonclassified and nonconfidential documents produced during discovery); 96 F.R.D. 587 (E.D.N.Y.1983) (adopting with modifications Special Master's guidelines for taking videotaped depositions of *in extremis* plaintiffs); 97 F.R.D. 424 (E.D.N.Y. 1983) (adopting Special Master's recommendation for an order protecting the confidentiality of documents produced from the government's MAC–V collection); 97 F.R.D. 424 (E.D.N.Y.1983) (adopting Special Master's recommendation for an order protecting the confidentiality of certain USDA documents); 97 F.R.D. 427 (E.D.N.Y.1983) (adopting Special Master's recommended guidelines for assertion of executive privilege); 97 F.R.D. 541 (E.D.N.Y. 1983) (denial of defendants' motion for order certifying interlocutory appeal of order

deferring class certification and notice until after trial of the government contract defense); 97 F.R.D. 542 (E.D.N.Y.1983) (affirming Special Master's ruling on production of certain government documents); 98 F.R.D. 522 (E.D.N.Y.1983) (order on Special Master's recommendation concerning defendants' motions to compel certain discovery from the government); 98 F.R.D. 539 (E.D.N.Y.1983) (unsealing all materials filed in connection with summary judgment motions made by seven of the defendants); 98 F.R.D. 554 (E.D.N.Y.1983) (denying defendant Monsanto's request to maintain seal on one document submitted in connection with other defendants' summary judgment motions); 98 F.R.D. 557 (E.D.N.Y. 1983) (order regarding Special Master's determination of relevancy of documents claimed by the government to be protected from disclosure by state secrets privilege); 98 F.R.D. 558 (E.D.N.Y.1983) (approving Special Master's order for additional discovery regarding defendant Diamond Shamrock Chemicals Company's document retention policy); 99 F.R.D. 338 (E.D.N.Y. 1983) (approving two recommendations of the Special Master, (1) permitting government counsel appearing as counsel for former employees to review personal files of former employees for relevancy as well as privilege, and (2) denying defendants' request to take depositions of custodians of government documents); 99 F.R.D. 645 (E.D.N.Y.1983) (adopting Special Master's recommendation to lift protective order as it related to discovery material produced by the government); 100 F.R.D. 718 (E.D.N.Y. 1983) (reconsideration and modification of class certification and notice), *mandamus denied*, 725 F.2d 858 (2d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984); 100 F.R.D. 735 (E.D.N.Y.1983) (denial of defendants' request for certification for interlocutory appeal of order certifying class); 100 F.R.D. 778 (E.D.N.Y.1984) (denial of defendant Uniroyal, Inc.'s motion to implead herbicide component manufacturers); 101 F.R.D. 97 (E.D.N.Y.1984) (order regarding government's assertion of state secrets privilege).

APPENDIX D

**U.S. Department of Justice**

---

Express Mail April 24, 1984

JA:AMaskin:GLWitt:bf Telephone:
157-0-107 (202) 724-6725

Honorable Judge Jack B. Weinstein
Chief Judge, U.S. District Court for
 the Eastern District of New York
 25 Cadman Plaza East
Brooklyn, New York 11201

 Re: In re "Agent Orange" Product
 Liability Litigation, MDL No. 381

Dear Judge Weinstein:

 I am responding to your specific request for the United
States' position in writing on the Court's appointment of Special
Masters to preside over settlement discussions.

 The United States declines to attend or participate in
settlement negotiations or court settlement conferences because
any settlement of this case that calls for contribution by the
United States is not warranted. This is the United States' firm
position, and we anticipate no change whatever in any aspect of
it.

 In view of our position, we do not object to the Court's
appointment of Special Masters for settlement.

 Respectfully submitted,

 ARVIN MASKIN
 Trial Attorney, Torts Branch
 Civil Division

---

## APPENDIX E

### STATUTES OF LIMITATION IN THE RELEVANT JURISDICTIONS

Below is a table outlining the relevant provisions of the statutes of limitations of the states, territories and foreign countries in which class members are resident. The numbers preceding many of the statutory and case law citations are references to footnotes at the end of the table. If a jurisdiction's rule as to the time of accrual of a particular type of tort action is not indicated, the presumption is that the jurisdiction uses the "time of injury" rule.

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | LIMITATIONS PERIOD BY TYPE OF CASE | | | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | | |
| Alabama | Suits for compensation for latent personal injuries resulting from exposure to toxic substances are to be commenced within 1 year from date such injury is, or in the exercise of reasonable diligence, should have been discovered by the plaintiff Ala.Code § 6-5-502(b). | | 1 year from time the personal injury, death or property damage occurs. Ala.Code § 6-5-502(a). | 1 year. Ala.Code § 6-2-39(5). | | [7] Ala.Code § 6-2-17. | [12] Ala.Code § 6-2-8(c). |
| Alaska | [1] *Sharrow v. Archer*, 658 F.2d 1381 (Alaska 1983). | Tort action accrues when there has been an invasion of a legally protected interest of plaintiff. | | 2 years. Alaska Stat. § 09.10.070 (1962). | | If a cause of action arising in another forum between non-residents of Alaska would be barred in forum, it will be barred in Alaska. Alaska Stat. § 9.10.220 (1962). | [10] Alaska Stat. § 9.10.140 (1962). |
| Arizona | [4] Ariz.Rev.Stat.Ann. § 12-564 (1976). | | 2 years. Ariz.Rev.Stat.Ann. § 12.542 although statute of repose is 12 years after product was first sold for use or consumption, Ariz.Rev.Stat.Ann. § 12-551 (1978), unless cause of action is based upon negligence or breach of warranty. | 2 years. Ariz.Rev. Stat.Ann. § 12-542 (1978). | | No action arising outside Arizona, which is barred because of limitations, may be instituted in Arizona by a person migrating there. Ariz.Rev.Stat.Ann. § 12-506. —Arizona has adopted the "contacts theory for determining choice of law questions in tort cases. *Schwartz v. Schwartz*, 108 Ariz. 562 447 P.2d 254 (1968). | [9] Ariz.Rev.Stat.Ann. § 12-502. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Discovery | Injury | | | | | |
| Arkansas | 4 Ark.Stat.Ann. § 34-2616. | The period begins to run when the death, injury, or damage complained of occurs. | 3 years. Ark.Stat. Ann. § 34-2803(1979). | 3 years. Ark.Stat. Ann. § 37-206 (1947). | None | 12 Ark.Stat.Ann. § 37-226. | |
| California | 1. Brown v. Blieberg, 186 Cal.Rptr. 228, 651 P.2d 815 (1982). Special "discovery" statute for asbestos. Cal.Civ.Proc. Code § 340.2 (1979). —"Discovery" rule applied in Periera v. Dow Chemical Co., Inc., 129 Cal.App.3d 865, 181 Cal.Rptr. 364 (1982) (toxic chemical). | | | 1 year. Cal.Civ.Proc. Code § 340 (1979). | | 8 Cal.Civ.Proc. Code § 361. | 9 Cal.Civ.Proc. Code § 352. |
| Colorado | 1 Short v. Downs, 36 Colo.App. 109, 537 P.2d 754 (1975). | | | 3 years. Colo.Rev. Stats. § 13-80-127.5 (effective to causes of action accruing on or after July 1, 1977). | | 7 Colo.Rev.Stats. § 13-80-118 (1973). | 9 Colo.Rev.Stats. § 13-80-116. |
| Connecticut | 2 years from date injury was or through exercise of reasonable diligence, should have been discovered. Conn. Pub. Act No. 83-15. | | | | 2 years. 1988 Conn. Pub. Act No. 83-15 (eff. April 17, 1983). | None. | None. |

| State | TIME OF ACCRUAL | | LIMITATIONS PERIOD BY TYPE OF CASE | | | | |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
| Delaware | | | | | 2 years from date plaintiff is told by licensed physician that his injuries may be related to exposure. Del.Code Ann. Tit. 10, § 8131(a) (1983). | When confronted with a substantive choice of law situation in a tort action, Delaware will apply the law of the state where the injury occurred. The injury occurs not where the wrong takes place, but rather where the wrong caused the injury. *Hill v. Equitable Trust Co.,* 562 F.Supp. 1324 (1983). [8] Del.Code Ann. Tit. 10, § 8121 (1953). | Infancy does not toll statute of limitations in personal injury actions. Del.Code Ann. 10-8116. |
| District of Columbia | [1] *Barras v. Bell,* 409 A.2d 614 (D.C.1979) (medical malpractice); *see also Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson,* 127 U.S. App.D.C. 93, 381 F.2d 261 (D.C.Cir. 1967) (legal malpractice; time runs from discovery of negligence or when actual damage results). | | | 3 years. D.C.Code Encycl. 512–301 (1966). | | None. | [9] D.C.Code § 12–302. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Florida | 6 Fla.Stat.Ann. § 95-031. | | 12 year repose period after the date of delivery of the completed product to its original purchaser. Fla.Stat.Ann. § 95-031(2) —This statute of repose was declared unconstitutional by the Florida Supreme Court in *Battilla v. Allis Chalmers Manuf, Co.*, 392 So.2d 874 (Fla.1980). | 4 years for actions founded upon negligence. Fla.Stat.Ann. § 95-11(3)(j). | | 7 Fla.Stat.Ann. § 95-10. | None for personal injury suits. |
| Georgia | Georgia has utilized the "continuous tort" concept in lieu of the "discovery" rule except for foreign object cases. *Everhart v. Rich's, Inc.*, 229 Ga. 798, 194 S.E.2d 425 (1972) (fiberglas curtains; continuing duty to warn of potential harm); *Piedmont Pharmacy, Inc. v. Patmore*, 144 Ga. App. 160, 240 S.E.2d 888 (1977) (eye drops used over a three-year span). | | No strict products liability action may be commenced with respect to an injury after 10 years from date of the first sale for use or consumption of the personal property causing the injury. Official Code of Georgia Ann., § 51-1-11 (1978). | 2 years. Official Code of Georgia Ann., § 9-3-33. | | None. Georgia's statute of limitations is normally applied to cases arising in other jurisdiction. *Cleveland Lumber Co. v. Proctor & Schwartz, Inc.*, 397 F.Supp. 1088 (N.D.Ga.1975). | 9 Georgia Ann. § 9-3-90. |
| Hawaii | In *Basque v. Yuk Lin Liau*, 50 Haw. 397, 441 P.2d 636 (1968), the "discovery" rule was applied where damage resulted from a leaking sewer. | | | 2 years. Haw.Rev. Stats. § 657-7 (1972). | | | 9 Haw.Rev.Stats. § 657-13. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Discovery | Injury | | | | | |
| Idaho | | | 2 years. Idaho Code. § 6-1303(3) (1980). But where the product is more than 10 years old a rebuttable presumption arises that the harm occurred after the useful shelf life has expired. Idaho Code § 6-1303(2)(a) (1980). | 2 years. Idaho Code § 5-219 (1971). | | 8 Idaho Code § 5-239. | 9 Provided however, that 6 years is the maximum tolling period for disabilities. Idaho Code § 5-230. |
| Illinois | 6 Ill.Rev.Stats. Ch. 110 § 13-218(d) (1983). | | 2 years. Ill.Rev. Stats. Ch. 110 § 13-213(d) (1983). The statute of repose for strict products liability actions is 12 years from date of first sale, lease, or delivery of possession by seller or 10 years from date of first sale, lease, or delivery of possession to its initial user, consumer, or other non seller, whichever period is earlier. | | | 7 Ill.Rev.Stats. Ch. 110, § 13-210 (1983). | 10 Ill.Rev.Stats. Ch. 110, § 13-112, 211. |

LIMITATIONS PERIOD BY TYPE OF CASE

TIME OF ACCRUAL

| State | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| Indiana | | A cause of action accrues at the time one has suffered (1) a legal injury and (2) resulting damage capable of ascertainment. *Gahimer v. Virginia-Carolina Chemical Corp.*, 241 F.2d 836 (7th Cir. 1957). | 2 years "after accrual or within 10 years after the delivery of the product to the initial user or consumer, except that if cause of action accrues more than eight (8) years but not more than 10 years after the initial delivery, the action may be commenced at any time within 2 years after the cause of action accrues." Ind.Code § 34-4-20A-5. | | | Where an action against a non-resident, which arose outside the state, is barred by the laws of both the place where the action arose and the state where the defendant resides, the action cannot be maintained in Indiana. Ind.Stat. Ann. § 34-1-2-6(b) (1959). When the borrowing statute does not apply, Indiana applies the *lex fori* rule. *Horvath v. Davidson*, 148 Ind. App. 203, 264 N.E. 2d 328 (1970). | Ind.Code § 34-1-2-5; *Lehman v. Scott*, 113 Ind. 76, 14 N.E. 914 (1888). |
| Iowa | [5] *Franzen v. Deere & Co.*, 334 N.W.2d 730 (1983); *Brown v. Ellison*, 364 N.W.2d 197 (1981); *Chrischiller v. Griswold*, 150 N.W.2d 94 (1967). | | | 2 years. Ia. Code Ann. § 614-1. | | If a cause of action which arose outside the state is barred by the laws of any state or country while a defendant resided there, the action may not be maintained in Iowa. Ia. Code Ann. § 614-7. Iowa has adopted the "most significant relationships" rule whereby the local law of the state having the most significant relationship with the occurrence and the parties will be applied. *Fuerste v. Bemis*, 156 N.W.2d 831 (1968). | [1] Ia. Code Ann. § 614-5. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
| | Discovery | Injury | | | | | |
|---|---|---|---|---|---|---|---|
| Kansas | A cause of action does not accrue until the act giving rise to the cause of action first causes substantial injury, or if the fact of injury is not reasonably ascertainable, when it becomes reasonably ascertainable. | | The statute of repose is 10 years after the time of the act giving rise to the cause of action. Kan.Stat.Ann. § 60–513(b). | 2 years. Kan.Stat. Ann. § 60–513 (1976). | | [8] Kan.Stat.Ann. § 60–516 (1976). | [11] No action can be maintained after 8 years from time of act giving rise to cause of action. Kan.Stat.Ann. § 60–515. |
| Kentucky | [3] Ky.Rev.Stat.Ann. § 413.245 (1980). [5] Louisville Trust Co. v. Johns-Manville Products Corp., 580 S.W.2d 497 (1979) (asbestos exposure). | | | 1 year. Ky.Rev.Stat. Ann. § 413.140 (1942). | | [7] Ky.Rev.Stat.Ann. § 413.320. | [9] Ky.Rev.Stat.Ann. § 413.170. |
| Louisiana | [1] Henson v. St. Paul Fire and Marine Insurance Co., 363 So.2d 711 (1978). [5] Yarborough v. Louisiana Cement Co., Inc., 370 So.2d 602 (1979), (exposure to toxic chemicals). | The period of limitations commences when the damage is sustained. La.Civ. Code Ann., Art. 3537. | | 1 year. La.Civ.Code Ann., Art. 3492. | | None. | |
| Maine | [2] Myrick v. James, 444 A.2d 987 (Me. 1982). | Generally, a cause of action in tort accrues at the time when plaintiff sustains a judicially cognizable injury. Bozzuto v. Ouellette, 408 A.2d 697, 699 (Me.1979). | | 6 years for all civil actions except as otherwise provided. Me.Rev.Stat.Ann. Tit. 14, § 752 (1954). | | No action may be brought by any person whose cause of action has been barred by the laws of any foreign state, territory, or country where all parties have resided. Me. Rev.Stat.Ann. Tit. 14, § 866 (1954). | [9] Me.Rev.Stat.Ann. Tit. 14, § 807. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Maryland | In *Poffenberger v. Risser*, 290 Md. 681, 431 A.2d 677 (1981), the Maryland Court of Appeals held that in all civil actions the "discovery" rule is generally applicable in determining when a cause of action accrues. | | | 3 years for civil actions unless otherwise provided. Md. Limitations Code Ann. § 5-101 (1957). | | None. Statutes of limitations are generally considered procedural, unless they bar the right and not merely the remedy, in which case the statute is considered substantive. *President and Directors of Georgetown College v. Madden*, 505 F.Supp. 557, 571 (1980). | 12 Except where statute of limitations has more than 3 years to run at time of removal. Md.Code Ann. § 5-201. |
| Massachusetts | | Cause of action in products liability action accrues at time of injury. *Cannon v. Sears, Roebuck & Co.*, 374 Mass. 739, 374 N.E.2d 582 (1978). | | 3 years. Mass.Gen. Laws Ann. Ch. 260 § 2A (1948). | | No cause of action may be brought by any person which was barred in a foreign jurisdiction while such person resided therein. Mass.Gen.Laws, Ch. 260 § 9 (1958). | 9 Mass.Ann.Laws § 260.7. |
| Michigan | In *Parish v. B. F. Goodrich*, 295 Mich. 271, 235 N.W.2d 570 (1975), the Michigan Supreme Court held that a product liability claim by a consumer against a manufacturer accrues when and where injury and damage are suffered. | | 3 years. Mich.Comp. Laws § 27A-5805. | 3 years. after time of death or injury. Mich.Comp.Laws § 27A-5805. | | 8 Mich.Comp.Laws § 27A-5861 (1978). | 11 Mich.Comp.Laws § 27A-5851. |
| Minnesota | Limitation period runs from time of injury. *Jewson v. Mayo Clinic*, 691 F.2d 405 (8th Cir. 1982). | | 4 years. Minn.Stat. Ann. § 541.05(2). | 2 years. Minn.Stat. Ann. § 541.07(2). | None. | None. | Minn.Stat.Ann. § 541.15(1). |

888

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Mississippi | [3] Miss.Code Ann. § 15-1-36. | Cause of action accrues at time of injury. *Wilson v. Retail Credit Co.*, 325 F.Supp. 460 (S.D. Miss. 1971), *aff'd*, 457 F.2d 1406 (5th Cir. 1972). | Cause of action accrues when damage occurs, *Alabama Great Southern R. Co. v. Allied Chemical Corp.*, 467 F.2d 679 (5th Cir. 1972), unless plaintiff knew or should have known of the defect earlier, *Maly v. Magnavox*, 460 F.Supp. 47 (N.D. Miss.1978). | 6 years. Miss.Code Ann. § 15-1-49. | | [7] Miss.Code Ann. § 15-1-65. | [9] Miss.Code Ann. § 15-1-59. |
| Missouri | [4] Mo.Rev.Stats. § 516-1056 (1976). | "[T]he cause of action shall not be deemed to accrue when the wrong is done . . . but when the damage resulting therefrom is sustained and is capable of ascertainment . . ." Mo.Rev. Stats. § 516.100. | | 5 years. Mo.Rev. Stats. § 516.120 (1989). | | [7] Mo.Rev.Stats. § 516.190 (1989). | [9] Mo.Rev.Stats. § 516.030. |
| Montana | [2] *Johnson v. St. Patrick's Hospital*, 148 Mont. 125, 417 P.2d 469 (1966). | | A district court extended the date of discovery rule used in medical malpractice—foreign object cases to a products liability case involving MER/29. *Hornung v. Richardson-Merrill, Inc.*, 317 F.Supp. 183 (D.Mont.1970). | 3 years. Mont.Code Ann. § 27-2-204. | | An action cannot be started in Montana against a nonresident after the statute of limitations has expired in the non-resident's state, unless the action originally accrues in favor of a Montana resident or plaintiff became a resident of Montana before Statute of Limitations of non-resident's state expired. Mont.Code Ann. § 27-2-104. | [11] Mont.Code Ann. § 27-2-401. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Nebraska | 1 *Taylor v. Karrer*, 198 Neb. 581, 244 N.W.2d 201 (1976). | | 4 years after date on which death, injury, or damage occurs. Neb.Rev.Stat. 25–224(1). The Statute of Repose is 10 years after the date when the product was first sold or leased for use or consumption. Neb. Rev.Stat. 25–224(2). | Notwithstanding the provisions of subsections (1) and (2) of Neb.Rev.Stat. 25–224, any cause of action which a person may have on July 22, 1978 may be brought not later than 2 years following such date. Id. (4). | | All causes of action which are barred by laws of any other state, territory, or country are barred in Nebraska, but no action shall be barred by the laws of any other state, territory, or country unless the same would have been barred by the provisions of this chapter had the defendant been a resident of this state for the period herein described. Neb.Rev. Stat. 25–215. | 9 Neb.Rev.Stat. 25–218. |
| Nevada | 3 Nev.Rev.Stats. § 41A–097(1). | | | 2 years. Nev.Rev. Stats. § 11–190 (1979). | | 8 Nev.Rev.Stats. § 11–020. | 9 Nev.Rev.Stats. § 11–250. |
| New Hampshire | 6 N.H.Rev.Stats.Ann. § 507–D:2. | | 3 years: N.H.Rev. Stats.Ann. § 507–D:2(I). There is a 12 year period of repose after manufacturer sold or parted with possession Id. (II)(A). The statute of repose has been declared unconstitutional by the New Hampshire Supreme Court in *Heath v. Sears, Roebuck & Co*, 123 N.H. 512, 464 A.2d 288 (1983). | | | None. | 10 N.H.Rev.Stats. Ann. § 508–8. |
| New Jersey | | | | 2 years. N.J.Stat. Ann. Tit. 2A:14–2. | | None. | 9 N.J.Stat.Ann. Tit. 2A:14–2. |

## LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
| | Discovery | Injury | | | | | |
|---|---|---|---|---|---|---|---|
| New Mexico | 1 Peralta v. Martinez, 90 N.M. 391, 564 P.2d 194, cert. denied 90 N.M. 636, 567 P.2d 485 (1977). | Limitation period runs from time of injury. New Mexico Electric Service Co. v. Montanez, 80 N.M. 278, 55 P.2d 634 (1976). | | 3 years. N.M.Stat. Ann. § 37-1-8. | | None. Under case law, the statute of limitations is considered procedural and the law of the forum state applies regardless of where the action arose. Sierra Life Insurance Co. v. First National Life Insurance Co., 85 N.M. 409, 512 P.2d 1245 (1973). | 11 N.M.Stat.Ann. § 37-1-10. |
| New York | | Limitation period runs from date of injury. | | 3 years. CPLR § 214. | 2 years from date of discovery of injury or from the date when through exercise of reasonable diligence it should have been discovered. CPLR § 214-b. [See discussion in text.] | A cause of action arising outside of New York cannot be commenced in New York after the expiration of either the period of limitations in New York or the place where the cause of action accrued, except that in a case of a New York resident, the New York Limitations period will apply. CPLR § 202. | If cause of action accrues to an infant, and if period of limitations is less than 3 years, it is extended by period of disability. CPLR § 208. If the time otherwise limited is three years or more and expires no more than 3 years after the disability ceases, the time within which the action must be commenced shall be extended to three years after disability. CPLR § 208. |
| North Carolina | 6 N.C.Gen.Stat. § 1-52(16). | | 3 years. N.C.Gen. Stat. § 1-52(5). The Statute of Repose is 10 years from the last act or omission of the defendant giving rise to the cause of action. N.C.Gen.Stat. § 1-52(16). | | | | 9 N.C.Gen.Stat. § 1-17. |

TIME OF ACCRUAL

LIMITATIONS PERIOD BY TYPE OF CASE

| State | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| North Dakota | | In a product liability action the cause of action accrues at time of injury. *Keller v. Clark Equipment Co.*, 474 F.Supp. 966, 969 (D.N.D.1979). | For injuries occurring after 7/1/81, an action based on breach of implied warranties, design or manufacturing defect, failure to warn or failure to instruct in use of product, there will be no recovery unless injury occurred within 10 years of purchase or 11 years of date of manufacture. However, this does not apply where the manufacturer becomes aware of a defect and fails to warn user who is subsequently injured as a result of the defect. N.D.Cent. Code § 28.01.1-02 (1979). | 6 years. N.D.Cent. Code § 28.01-16 (1977). | | None. | [9] N.D.Cent.Code § 28.01.25. |
| Ohio | | | | | 2 years from date plaintiff is advised by a competent medical authority that he has been injured by exposure to chemical defoliants or herbicides or other causative agents including agent orange. Ohio Rev. Code Ann. § 2305-10. | None. | [9] Ohio Rev.Code Ann. § 2305-16. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|-------|------------|--------|-------------------|-----------------|--------------|-------------------|---------|
| | Discovery | Injury | | | | | |
| Oklahoma | 2 *Seitz v. Jones,* 370 P.2d 300 (Okla.1961); *Lewis v. Owen,* 397 F.2d 587 (10th Cir. 1968). | | In a products liability case, it was held that the limitations period for personal injuries from an occupational disease allegedly produced by the cumulative effect of a dangerous product does not accrue until plaintiff knows, or a reasonably prudent person should know that he has a condition for which his action is brought and that defendant caused it. *Williams v. Borden, Inc.,* 637 F.2d 731 (10th Cir. 1980). | 2 years "for injury to rights of another". Okla.Stat.Ann. Tit. 12 § 95(3) (1970). | | Oklahoma has enacted The Uniform Statute of Limitations on Foreign Claims Act which provides, *inter alia,* that the "period of limitations applicable to a claim accruing outside of the law of this state shall be prescribed by either the law of the place where the claim accrued or by the law of this state, whichever last bars the claim". Okla.Stat. Ann. Tit. 12 § 105. | 11 Okla.Stat.Ann. Tit. 12 § 94-6. |
| Oregon | The "discovery" rule applies in asbestos cases. Ore.Rev.Stat. § 30-905(3). | | 2 years after date of death, injury, or damage. Ore.Rev. Stat. § 30-905(2). The Statute of Repose is 8 years after the date on which the product was first purchased for use or consumption. Ore.Rev.Stat. § 30-905(1). | | | 7 Ore.Rev.Stat. § 12.260. | 9 Ore.Rev.Stat. § 12.160. |

| | TIME OF ACCRUAL | | LIMITATIONS PERIOD BY TYPE OF CASE | | | | |
| State | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| Pennsylvania | 2 Ayers v. Morgan, 397 Pa. 282, 154 A.2d 788 (1959) (medical malpractice-foreign object), Daniels v Beryllium Corp., 227 F.Supp. 591 (E.D.Pa.1964) (industrial pollution exposure); Ciabattori v. Birdsboro Steel Foundary & Machine Co., 386 Pa. 179, 125 A.2d 365 (1956) (silicosis). | | | 2 years. Pa.Const. Stat.Ann. § 5524(2) (1978). | | Pennsylvania has adopted The Uniform Statute of Limitations on Foreign Claims Act, Pa.Const.Stat.Ann. § 5521 (1978). If a claim accrues outside Pennsylvania, the shorter of the statute of limitations of that jurisdiction or Pennsylvania controls. | Time to commence proceedings is not extended by infancy. Pa.Const.Stat.Ann. § 5533. |
| Puerto Rico | | | 1 year. P.R.Laws Ann. Tit. 31 § 5298 | | | 8 P.R. Laws Ann. | |
| Rhode Island | | | | | 3 years from date injury was or through exercise of reasonable diligence should have been discovered. R.I.Gen. Laws § 9-1-14.2 (1982). | 7 R.I.Gen.Laws § 9-1-18. | 9 R.I.Gen.Laws § 9-1-19. |
| South Carolina | The "discovery rule" applies. S.C.Code § 15-3-535. | | 6 years. S.C.Code § 15-3-30 | | | None. | 9 S.C.Code § 15-3-40. |
| South Dakota | | | 3 years. S.D.Comp. Laws Ann. § 15-2-14. The period of repose is 6 years from delivery of product to first purchaser or lessee who was not engaged in business of selling product. S.D.Comp. Laws Ann. § 15-2-12-1. | | | | |

894

## LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Tennessee | [1] *Teeters v. Currey*, 518 S.W.2d 512 (1974). | "Insofar as products liability cases are concerned, the cause of action for injury to the person shall accrue on the date of the personal injury. . . . No person shall be deprived of his right to maintain a cause of action until 1 year from the date of his injury, and under no circumstances shall his cause of action be barred before he sustains an injury." Tenn.Code Ann. § 28-3-104(b). | 6 years. The period of repose is 10 years from date of injury or 1 year after the anticipated life of the product, whichever is shorter, except in case of minors who must sue within one year after attaining majority. The foregoing limitation of actions does not apply to any action resulting from exposure to asbestos. | 1 year. Tenn.Code Ann. § 28-3-104(a). | | "Where a foreign jurisdiction's statute of limitations bars an action accruing therein, while the party to be charged was a resident in such state, the bar is equally effectual in this state". Tenn.Code Ann. § 28-1-112. | [12] Tenn.Code Ann. § 28-1-106. |
| Texas | The "discovery" rule was applied in *Strickland v. Johns-Manville Intern. Corp.*, 461 F.Supp. 215 (S.D.Tex.1978). | | | 2 years. Tex.Rev.Civ. Stat.Ann. Tit. 16A. Art. 5526 (1979). | | None. Texas courts apply the "most significant relationship" test in all conflicts cases sounding in tort. *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979). | [9] Tex.Rev.Civ.Stat. Ann. Tit. 91 Art. 5535. |
| Utah | [3] Utah Code Ann. § 78-14-4. | | 6 years after the date of initial purchase for use or consumption, or 10 years after the date of manufacture of a product. Utah Code Ann. § 78-15-3 (1977). | | | [8] Utah Code Ann. § 78-12-45. | Tolling provisions do not apply to product liability actions. Utah Code Ann. § 78-15-3. |

## LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Vermont | The "discovery" rule applies in personal injury actions. Vt.Stat.Ann., Tit. 12 § 512(4) (Effective July 1, 1976).(16). | | | 3 years. Vt.Stat. Ann., Tit. 12 § 512(4) (1976). | | None. | 9 Vt.Stat.Ann., Tit. 12 § 551. |
| Virginia | "Injury within purview of statute of limitations on action for personal injuries means positive, physical or mental hurt to claimant, not legal wrong in broad sense that his legally protected interest has been invaded". *Locke v. Johns-Manville Corp.*, 221 Va. 951, 275 S.E.2d 900 (1981) (asbestosis). | The cause of action accrues from the date the injury is sustained. Va.Code Ann. § 8.01-230. | | 2 years. Va.Code Ann. § 8.01-243(A). | | None. | 9 Va.Code Ann. § 8.01-229. |
| Washington | 6 Wash.Rev.Code Ann. § 7.2-060(3). | | 3 years. Wash.Rev. Code Ann. § 7.72-060(3). However if the harm occurs more than 12 years after the time of delivery, a rebuttable presumption arises that the harm was caused after the useful safe life of the product had expired. *Id.* at Subsection (2). | | | If an action arising outside of Washington between non-residents is time-barred in that jurisdiction, it cannot be maintained in Washington. Wash.Rev.Code Ann. § 4.16-290 (1962). | 9 Wash.Rev.Code Ann. § 4.16-190. |

LIMITATIONS PERIOD BY TYPE OF CASE

TIME OF ACCRUAL

| State | Discovery | Injury | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| West Virginia | | | | | 2 years after injury was discovered, or, through the exercise of reasonable diligence, should have been discovered, whichever is later. W.Va.Code § 16-28-10 (1982). If such an action is otherwise barred as of the effective date of the law, June 9, 1983, the cause of act is revived and may be filed within 2 years. | If the cause of action accrued outside the state, the shorter of that statute or West Virginia's limitation period will apply. W.Va.Code § 55-2A-2 (1959). | 9 Except that in no case may the action be brought more than 20 years after the time when the cause of action first accrues. W.Va.Code § 55, Art. 2 § 15. |
| Wisconsin | 5 *Hansen v. A. H. Robins, Inc.*, 113 Wis.2d 550, 335 N.W.2d 578 (1983). ("Dalkon Shield") and *Neubauer v. Owens-Corning Fiberglass Corp.*, 686 F.2d 570 (7th Cir. 1982) (asbestosis). | | | 3 years. Wis.Stat. Ann. § 893-54. | | In a non-Wisconsin forum the time for commencement of an action is determined by local law of the forum. If the non-Wisconsin action is based on a Wisconsin cause of action the Wisconsin statute of limitation is tolled from the time of commencement of the action in the non-Wisconsin forum. This tolling provision does not apply to an action commenced on a Wisconsin cause of action in a non-Wisconsin forum if the action is barred by the law of the forum. Wis.Stat.Ann. § 893-15 (Eff. July 1, 1980). | 9 Wis.Stat.Ann. § 893-16. |

LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Wyoming | | | | 4 years. Wyo.Stat. Ann. § 1-3-105(c). | | 7 Wyo.Stat.Ann. § 1-3-117. | 12 Wyo.Stat.Ann. § 1-3-114. |
| AUSTRALIA Australian Capital Territory | | | | 6 years. S. 3. | | | 9 S. 7. |
| New South Wales | Extension of 1 year after material facts of cause of action become known to plaintiff. S. 58(2)(a) & (b). | | | 6 years. S. 14 (1)(b). | | | 9 S. 52(1)(d). |
| Northern Territory | | | | 6 years. S. 36. | | | 9 S. 47. |
| Queensland | | | | 3 years. S. 11. | | | 12 S. 29(2)(c). |
| South Australia | Extension of 1 year after material facts of cause of action become known to plaintiff. S. 48(3)(b)(i) & (ii). | | | 3 years. S. 36(1). | | | 9 S. 45(1); S. 45(3). |
| Tasmania | | | | 3 years. S. 5(1), although judge may extend period by not more than 6 years. S. 5(3). | | | May bring action within 6 years of accrual or within limitations period after disability ceases, whichever is shorter. |

## LIMITATIONS PERIOD BY TYPE OF CASE

| State | TIME OF ACCRUAL | | Product Liability | Personal Injury | Agent Orange | Borrowing Statute | Infancy |
|---|---|---|---|---|---|---|---|
| | Discovery | Injury | | | | | |
| Victoria | Action may be extended for one year after material facts become known to plaintiff. S. 23A(2)(6). | | | 3 years. S. 5(6). | | | [10] S. 23A(2)(a)(i) & (ii). |
| Western Australia | | | | 6 years. S. 38(c)(vi) | | | [9] S. 16 but not more than 30 years. S. 18. |
| NEW ZEALAND | | | | 2 years. S. 2(7) | | | |

[1] Judicially created discovery rule in medical malpractice cases.

[2] Judicially created discovery rule in medical malpractice "foreign object" cases.

[3] Statutorily created discovery rule in professional malpractice cases.

[4] Statutorily created discovery rule in medical malpractice cases.

[5] Judicially created discovery rule for tort actions.

[6] Legislatively created discovery rule for tort actions.

[7] If the action is time-barred in the state where it arose, it is barred in the forum state.

[8] If the action is time-barred in the state where it arose, it is barred in the forum state unless the plaintiff is a citizen of the forum state.

[9] The statute of limitations is tolled during the plaintiff's minority.

[10] The statute of limitations is tolled during the plaintiff's minority except that if the limitations period would have otherwise expired before the end of minority, the suit must be brought no later than two years after the end of minority.

[11] Same as #10, except that the period for filing suit is one year instead of two.

[12] The statute of limitations is tolled during the plaintiff's minority except that all suits must be brought within three years after plaintiff attains majority.